No. 22-2896

# IN THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

## MICHAEL GRASSO,
*individually and trading as General Partner of GF 2014, L.P.,*

*Appellant,*

v.

## TOBY KATZ,

*Appellee.*

---

## APPENDIX VOL. II (PAGES 20-286)

---

On Appeal from the Order of the United States District Court for the Eastern District of Pennsylvania, Dated September 28, 2022, at No. 2-21-cv-05472, Granting Defendant's Motion to Dismiss.

Jordan M. Rand
Teri M. Sherman
KLEHR HARRISON HARVEY
BRANZBURG LLP
1835 Market Street, Suite 1400
Philadelphia, PA 19103
(215) 569-2700

*Attorneys for Appellant*
*Michael Grasso*

*Grasso v. Katz* (No. 22-2896)

**APPENDIX**

**<u>TABLE OF CONTENTS</u>**

| Filed Date | Description | Page No. |
|---|---|---|
| **Volume I** | | |
| 10/10/2022 | Notice of Appeal | Appx0001 |
| 9/28/2022 | Order | Appx0004 |
| 9/28/2022 | Memorandum Opinion | Appx0005 |
| **Volume II** | | |
| *Pulled* 11/28/2022 | E.D.Pa. Case No. 21-05472  Docket Entries | Appx0020 |
| 12/15/2021 | Notice of Removal with Complaint | Appx0023 |
| 1/11/2022 | Amended Complaint with Exhibits A-D and Certificate of Service | Appx0087 |
| 1/25/2022 | Defendant Toby Katz's Motion to Dismiss Amended Complaint Or, In the Alternative, for Summary Judgment, with Proposed Orders, Exhibits 1-23, and Certificate of Service | Appx0123 |
| 2/8/2022 | Plaintiff Grasso's Opposition to Motion to Dismiss – Proposed Order and Exhibit A, Declaration of Jordan M. Rand | Appx0273 |
| 2/22/2022 | Exhibit 24 to Defendant Toby Katz's Reply Brief – Transcript of Videotaped Deposition of Joseph Grasso | Appx0281 |

CLOSED,APPEAL

# United States District Court
## Eastern District of Pennsylvania (Philadelphia)
## CIVIL DOCKET FOR CASE #: 2:21−cv−05472−CMR

| | |
|---|---|
| GRASSO T/A GENERAL PARTNER OF GF 2014, L.P. v. KATZ | Date Filed: 12/15/2021 |
| Assigned to: HONORABLE CYNTHIA M. RUFE | Date Terminated: 09/28/2022 |
| all others Case:  2:22−cv−01012−CMR | Jury Demand: Plaintiff |
| related Case:  2:20−cv−06320−CMR | Nature of Suit: 110 Contract: Insurance |
| Case in other court:  Montgomery County Court of Common Pleas, 21−22879 | Jurisdiction: Diversity |
| USCA, 22−02896 | |
| Cause: 28:1332 Diversity−(Citizenship) | |

**Plaintiff**

**MICHAEL GRASSO**
*TERMINATED: 01/11/2022*
*trading as*
GENERAL PARTNER OF GF 2014, L.P.

represented by **JORDAN M. RAND**
KLEHR HARRISON HARVEY BRANZBURG
1835 Market Street
Suite 1400
PHILADELPHIA, PA 19103
215−569−3024
Email: jrand@klehr.com
*TERMINATED: 01/11/2022*
*LEAD ATTORNEY*

**Plaintiff**

**MICHAEL GRASSO**
*INDIVIDUALLY AND*
*trading as*
GENERAL PARTNER OF GF 2014, L.P.

represented by **JORDAN M. RAND**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**TOBY KATZ**

represented by **DAVID DORMONT**
Montgomery McCracken Walker & Rhoads
1735 Market Street
21st Floor
Philadelphia, PA 19103
215−772−7280
Email: ddormont@mmwr.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 12/15/2021 | 1 | NOTICE OF REMOVAL by TOBY KATZ (Filing fee $ 402 receipt number APAEDC−15611738), filed by TOBY KATZ.(DORMONT, DAVID) (Entered: 12/15/2021) |
| 12/21/2021 | 2 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT* filed by TOBY KATZ.Memorandum of Law, and Certificate of Service. (Attachments: # 1 Memorandum, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Exhibit 11, # 13 Exhibit 12, # 14 Exhibit 13, # 15 Exhibit 14, # 16 Exhibit 15, # 17 Exhibit 16, # 18 Exhibit 17, # 19 Text of Proposed Order #1, # 20 Text of Proposed Order #2, # 21 Certificate of Service)(DORMONT, DAVID) (Entered: 12/21/2021) |

| | | |
|---|---|---|
| 12/30/2021 | 3 | MOTION for Extension of Time to File Response/Reply *to Defendant's Motion to Dismiss* filed by MICHAEL GRASSO.Certificate of Service. (Attachments: # 1 Text of Proposed Order)(RAND, JORDAN) (Entered: 12/30/2021) |
| 12/30/2021 | 4 | RESPONSE in Opposition re 3 MOTION for Extension of Time to File Response/Reply *to Defendant's Motion to Dismiss* filed by TOBY KATZ. (DORMONT, DAVID) (Entered: 12/30/2021) |
| 12/30/2021 | 5 | ORDER GRANTING 3 MOTION FOR EXTENSION OF TIME TO FILE RESPONSE TO 2 MOTION TO DISMISS BY 1/19/2022.. SIGNED BY HONORABLE CYNTHIA M. RUFE ON 12/30/21. 12/30/21 ENTERED AND COPIES E−MAILED. (va, ) (Entered: 12/30/2021) |
| 01/11/2022 | 6 | AMENDED COMPLAINT against All Defendants All Defendants., filed by MICHAEL GRASSO. (Attachments: # 1 Exhibit Assignment, # 2 Exhibit Subpoena, # 3 Exhibit Subpoena Fox Roach, # 4 Exhibit Subpoena Clarke & Cohen, # 5 Certificate of Service)(RAND, JORDAN) (Entered: 01/11/2022) |
| 01/13/2022 | 7 | ORDER THAT THE PROTHONOTARY OF THE COURT OF COMMON PLEAS OF MONTGOMERY COUNTY, PENNSYLVANIA, MAY SUBMIT THE AFORESAID RECORDS TO THE CLERK OF THIS COURT IN ELECTRONIC FORMAT, SO THAT THEY CAN BE FILED IN THE ABOVE−CAPTIONED MATTER. SIGNED BY HONORABLE CYNTHIA M. RUFE ON 1/13/22. 1/13/22 ENTERED AND COPIES E−MAILED. (va) (Entered: 01/13/2022) |
| 01/24/2022 | 8 | ORDER THAT DEFENDANT'S LETTER MOTION TO FILE EXCESS PAGES IS GRANTED. ALONGSIDE DEFENDANT'S RESPONSE TO THE AMENDED COMPLAINT, DEFENDANT IS HEREBY GRANTED LEAVE TO FILE A SUPPORTING MEMORANDUM OF LAW THAT SHALL NOT EXCEED 30 PAGES DOUBLE−SPACED.. SIGNED BY HONORABLE CYNTHIA M. RUFE ON 1/24/2022. 1/24/2022 ENTERED AND COPIES E−MAILED.(kp) (Entered: 01/24/2022) |
| 01/24/2022 | 9 | Original Record together with certified copy of docket entries received from Court of Common Pleas of MONTGOMERY COUNTY. (Attachments: # 1 Complaint, # 2 REMOVAL)(rf, ) (Entered: 01/25/2022) |
| 01/25/2022 | 10 | MOTION to Dismiss *or for Summary Judgment* filed by TOBY KATZ.Brief, Certificate of Service. (Attachments: # 1 Brief, # 2 Text of Proposed Order 1, # 3 Text of Proposed Order 2, # 4 Exhibit 1, # 5 Exhibit 2, # 6 Exhibit 3, # 7 Exhibit 4, # 8 Exhibit 5, # 9 Exhibit 6, # 10 Exhibit 7, # 11 Exhibit 8, # 12 Exhibit 9, # 13 Exhibit 10, # 14 Exhibit 11, # 15 Exhibit 12, # 16 Exhibit 13, # 17 Exhibit 14, # 18 Exhibit 15, # 19 Exhibit 16, # 20 Exhibit 17, # 21 Exhibit 18, # 22 Exhibit 19, # 23 Exhibit 20, # 24 Exhibit 21, # 25 Exhibit 22, # 26 Exhibit 23, # 27 Certificate of Service)(DORMONT, DAVID) (Entered: 01/25/2022) |
| 02/08/2022 | 11 | Memorandum in Opposition re 10 MOTION to Dismiss *or for Summary Judgment filed January 25 2022 by Toby Katz* filed by MICHAEL GRASSO, MICHAEL GRASSO. (Attachments: # 1 Text of Proposed Order, # 2 Exhibit Declaration of Jordan Rand, # 3 Certificate of Service)(RAND, JORDAN) (Entered: 02/08/2022) |
| 02/22/2022 | 12 | REPLY to Response to Motion re 10 MOTION to Dismiss *or for Summary Judgment* filed by TOBY KATZ. (Attachments: # 1 Exhibit 24)(DORMONT, DAVID) (Entered: 02/22/2022) |
| 09/28/2022 | 13 | MEMORANDUM OPINION. SIGNED BY HONORABLE CYNTHIA M. RUFE ON 9/28/22. 9/29/22 ENTERED AND COPIES E−MAILED. (va) (Entered: 09/29/2022) |
| 09/28/2022 | 14 | ORDER GRANTING 10 MOTION TO DISMISS AMENDED COMPLAINT WITH PREJUDICE. SIGNED BY HONORABLE CYNTHIA M. RUFE ON 9/28/22. 9/29/22 ENTERED AND COPIESE−MAILED.(va) (Entered: 09/29/2022) |
| 09/28/2022 | 15 | ORDER THAT THE 2 MOTION TO DISMISS IS DISMISSED AS MOOT. SIGNED BY HONORABLE CYNTHIA M. RUFE ON 9/28/22. 9/29/22 ENTERED AND COPIES E−MAILED. (va) (Entered: 09/29/2022) |
| 10/10/2022 | 16 | NOTICE OF APPEAL by MICHAEL GRASSO. Filing fee $ 505, receipt number APAEDC−16233135. Copies to Judge, Clerk USCA, Appeals Clerk. (RAND, |

| | | |
|---|---|---|
| | | JORDAN) Modified on 10/11/2022 (md). (Entered: 10/10/2022) |
| 10/11/2022 | <u>17</u> | NOTICE of Docketing Record on Appeal from USCA re <u>16</u> Notice of Appeal (Credit Card Payment) filed by MICHAEL GRASSO. USCA Case Number 22−2896 (va) (Entered: 10/11/2022) |

**MONTGOMERY McCRACKEN WALKER & RHOADS LLP**
By:     David Dormont (Bar I.D. 66252)
        Kelly Huff (Bar I.D. 319084)
1735 Market Street, 21st Floor
Philadelphia, PA 19103
(215) 772-1500
*Attorneys for Defendant Toby Katz*


## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Michael Grasso t/a General Partner of GF 2014, L.P., | |
| Plaintiff, | Civil Action No. |
| v. | |
| Toby Katz, | |
| Defendants. | |

## DEFENDANT TOBY KATZ'S NOTICE OF REMOVAL

Pursuant to 28 U.S.C. §§ 1332, 1441, and 1446, Defendant Toby Katz, by and through her counsel and with full reservation of all defenses, objections, and all other rights and remedies, hereby gives notice that the action pending in Court of Common Pleas of Montgomery County captioned *Michael Grasso t/a general Partner of GF 2014, L.P.,* Case No. 2021-22879, has been removed to the United States District Court for the Eastern District of Pennsylvania.  In support of this Notice of Removal, Defendant states as follows:

**Timeliness of Removal**

1.     On November 15, 2021, Plaintiff Michael Grasso trading as General Partner of GF 2014, L.P. ("**GF 2014**") filed a Complaint in the Court of Common Pleas of Montgomery County.  A copy of the Complaint and exhibits attached thereto is attached as Exhibit A.

2.     On November 16, 2021, Plaintiff served a copy of the Complaint on undersigned counsel and requested that he accept service on behalf of Defendant.  This Acceptance of Service was executed and returned on November 24, 2021.  A copy of the Acceptance of Service is attached as Exhibit B.

3.     The filing of this Notice of Removal meets the requirements of 28 U.S.C. § 1446(b), as it is being filed within 30 days of receipt of the Complaint by Defendant.

**Appropriate Venue**

4.     Because the Court of Common Pleas of Montgomery County lies within the Eastern District of Pennsylvania, this Court is the appropriate venue for removal.  28 U.S.C. §§ 110, 1441(a), and 1446(a).

**Diversity of Citizenship Jurisdiction**

5.     The Court has jurisdiction over this matter, and it is therefore properly removable, because there is complete diversity of citizenship between the Plaintiff and Defendant and the alleged amount in controversy exceeds $75,000.  28 U.S.C. § 1332.

6.     Plaintiff GF 2014 is a limited liability company organized under the laws of Pennsylvania. (Compl., ¶ 14).

7.     "[T]he citizenship of an LLC is determined by the citizenship of its members." *Lincoln Benefit Life Co. v. AEI Life*, 800 F.3d 99, 105 (3d Cir. 2015).

8.     All of GF 2014's members are individuals who are residents and citizens of the

-2-

Appx0024

state of Pennsylvania.  (Compl., ¶ 18, 30-31, and Compl. Ex. A)

9.      Therefore, GF 2014 is a citizen of the Commonwealth of Pennsylvania for purposes of the diversity jurisdiction analysis.

10.     Defendant is an individual and a resident of the state of Illinois. (Compl., ¶ 15).

11.     Therefore, Defendant is a citizen of the State of Illinois for purposes of the diversity jurisdiction analysis.

12.     Because none of GF 2014's members are citizens of the state of Illinois, the diversity of citizenship requirement to remove this case to this Court has been satisfied.

13.     While Plaintiff has not alleged a specific quantum of damages in the Complaint, Plaintiff's allegations relevant to the magnitude of those claimed damages establish that they exceed the $75,000 threshold required for diversity jurisdiction.

14.     The Complaint asserts claims for damages based on an alleged interference with a $2 million sale of a property owned by GF 2014.  (Compl. at ¶ 48).

15.     Under Pennsylvania law, a plaintiff who prevails on an abuse of process claim may recover for damages stemming from "harm normally resulting from…any dispossession or interference with the advantageous use of his land, chattels or other things" as well as "specific pecuniary loss that has resulted from the proceedings[.]" *Lerner v. Lerner*, 954 A.2d 1229, 1237–38 (Pa. Super. Ct. 2008) (quoting 42 Pa.C.S.A. § 8353).

16.     For tortious interference with contract claims, "[p]laintiffs are legally permitted to seek damages for the monetary amount they would have received had Defendants not committed the alleged interference[.]"  *Clarity Sports Int'l LLC v. Redland Sports*, 400 F. Supp. 3d 161, 174 (M.D. Pa. 2019).

17.     Additionally, in its prayer for relief, Plaintiff has requested, "monetary damages

-3-

in excess of $50,000.00, together with a preliminary and/or permanent injunction enjoining Katz from interfering with any of GF 2014's business dealings . . . ." (*See* Compl., Counts I and II).

18.    Based on the allegations in the Complaint, the amount in controversy exceeds $75,000, exclusive of interest and costs.  28 U.S.C. § 1332(a).

19.    Therefore, the amount in controversy requirement for diversity of citizenship jurisdiction has been met.

### Notice of Removal Given to the State Court and Plaintiff

27.    Contemporaneously with the filing of this Notice of Removal, Defendants have filed a Notice of Filing of Notice of Removal, along with this Notice and all of the exhibits thereto in *Michael Grasso t/a general Partner of GF 2014, L.P.,* Case No. 2021-22879, pending in the Court of Common Pleas of Montgomery County.  A copy of this Notice is attached as <u>Exhibit C</u>.

28.    Contemporaneously with the filing of this Notice of Removal, Defendant has served a copy of this Notice to Plaintiff's counsel, as required by 28 U.S.C. § 1446(d).

### Reservation of Rights

29.    By filing this Notice of Removal, Defendant does not concede nor waive any defense or motion relating to this action, and further reserve all defenses including those relating to the Court's jurisdiction and the justiciability of this action.

WHEREFORE, for all the foregoing reasons, removal of this action to this Court is proper pursuant to the provisions of 28 U.S.C. §§ 1332, 1441, and 1446.

Dated: December 15, 2021

Respectfully submitted,

*/s/  David Dormont*
David Dormont (Bar I.D. 66252)
Kelly Huff (Bar I.D. 319084)
**MONTGOMERY, MCCRACKEN,**
**WALKER & RHOADS LLP**

-4-

1735 Market Street, 21st Floor
(215) 772-1500

*Attorneys for Defendant Toby Katz*

# Katz Notice of Removal

# <u>EXHIBIT A</u>

Case 2:31-cv-05473-CMR  Document 1  Filed 12/15/21  Page 7 of 64

# IN THE COURT OF COMMON PLEAS OF MONTGOMERY COUNTY, PENNSYLVANIA

Case# 2021-22879-0 Docketed at Montgomery County Prothonotary on 11/15/2021 3:17 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

MICHAEL GRASSO

vs.

TOBY KATZ

NO.  2021-22879

## NOTICE TO DEFEND - CIVIL

You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW. THIS OFFICE CAN PROVIDE YOU WITH INFORMATION ABOUT HIRING A LAWYER.

IF YOU CANNOT AFFORD TO HIRE A LAWYER, THIS OFFICE MAY BE ABLE TO PROVIDE YOU WITH INFORMATION ABOUT AGENCIES THAT MAY OFFER LEGAL SERVICES TO ELIGIBLE PERSONS AT A REDUCED FEE OR NO FEE.

LAWYER REFERENCE SERVICE
MONTGOMERY  BAR ASSOCATION
100 West Airy Street (REAR)
NORRISTOWN, PA 19404-0268

(610) 279-9660, EXTENSION 201

PRIF0034
R 10/11

IN THE COURT OF COMMON PLEAS OF MONTGOMERY COUNTY, PENNSYLVANIA

Case# 2021-22879-0 Docketed at Montgomery County Prothonotary on 11/15/2021 3:17 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

MICHAEL GRASSO

vs.

TOBY KATZ

NO.  2021-22879

## CIVIL COVER SHEET

State Rule 205.5 requires this form be attached to any document commencing an action in the Montgomery County Court of Common Pleas.  The information provided herein is used solely as  an aid in tracking cases in the court system.  This form does not supplement or replace the filing and service of pleadings or other papers as required by law or rules of court.

Name of Plaintiff/Appellant's Attorney:     JORDAN M RAND, Esq., ID: 208671

Self-Represented (Pro Se) Litigant ☐

**Class Action Suit**   ☐ Yes   ☒ No

**MDJ Appeal**   ☐ Yes   ☒ No        **Money Damages Requested** ☒

**Commencement of Action**:          **Amount in Controversy**:

Complaint                               More than $50,000

## Case Type and Code

Contract: _____

Other _____

**Other:**     HARASSMENT, TORTIOUS INTERFERENCE WITH

Case# 2021-22879-0 Docketed at Montgomery County Prothonotary on 11/15/2021 3:17 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

William A. Harvey (Pa. I.D. #25344)
Jordan Rand (Pa. I.D. #208671)
**KLEHR HARRISON HARVEY
BRANZBURG LLP**
1835 Market Street, Suite 1400
Philadelphia, PA 19103
*Attorneys for Michael Grasso*

| | |
|---|---|
| MICHAEL GRASSO t/a General Partner of GF 2014, L.P.<br>120 East Lancaster Ave.<br>Ardmore, Pennsylvania 19003<br><br>Plaintiff,<br><br>vs.<br><br>TOBY KATZ<br>1872 Mission Hills Lane<br>Northbrook, Illinois 60062<br><br>Defendant. | COURT OF COMMON PLEAS OF MONTGOMERY COUNTY, PENNSYLVANIA<br><br>DOCKET NO. |

## NOTICE TO DEFEND

YOU HAVE BEEN SUED IN COURT. IF YOU WISH TO DEFEND AGAINST THE CLAIMS SET FORTH IN THE FOLLOWING PAGES, YOU MUST TAKE ACTION WITHIN TWENTY (20) DAYS AFTER THIS COMPLAINT AND NOTICE ARE SERVED, BY ENTERING A WRITTEN APPEARANCE PERSONALLY OR BY AN ATTORNEY, AND FILING IN WRITING WITH THE COURT YOUR DEFENSES OR OBJECTIONS TO THE CLAIMS SET FORTH AGAINST YOU. YOU ARE WARNED THAT IF YOU FAIL TO DO SO THE CASE MAY PROCEED WITHOUT YOU AND A JUDGMENT MAY BE ENTERED AGAINST YOU BY THE COURT WITHOUT FURTHER NOTICE, FOR ANY MONEY CLAIMED IN THE COMPLAINT OR FOR ANY OTHER CLAIM OR RELIEF REQUESTED BY THE PLAINTIFF. YOU MAY LOSE MONEY OR PROPERTY OR OTHER RIGHTS IMPORTANT TO YOU.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER, GO TO OR TELEPHONE THE OFFICES SET FORTH BELOW. THIS OFFICE CAN PROVIDE YOU WITH INFORMATION ABOUT HIRING A LAWYER.

IF YOU CANNOT AFFORD TO HIRE A LAWYER, THIS OFFICE MAY BE ABLE TO PROVIDE YOU WITH INFORMATION ABOUT AGENCIES THAT MAY OFFER LEGAL SERVICES TO ELIGIBLE PERSONS AT A REDUCED FEE OR NO FEE.

BAR ASSOCIATION OF MONTGOMERY COUNTY
LAWYER REFERRAL SERVICE

9750356.v1

Appx0031

**100 WEST AIRY STREET**
NORRISTOWN, PA  19401
(610) 279 – 9960 (ext. 201)

Case# 2021-22879-0 Docketed at Montgomery County Prothonotary on 11/15/2021 3:17 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

9750356.v1

Appx0032

Case# 2021-22879-0 Docketed at Montgomery County Prothonotary on 11/15/2021 3:17 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the
Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

William A. Harvey (Pa. I.D. #25344)
Jordan Rand (Pa. I.D. #208671)
**KLEHR HARRISON HARVEY
BRANZBURG LLP**
1835 Market Street, Suite 1400
Philadelphia, PA 19103
*Attorneys for Michael Grasso*

| | |
|---|---|
| MICHAEL GRASSO t/a General Partner of GF 2014, L.P.<br>120 East Lancaster Ave.<br>Ardmore, Pennsylvania 19003<br><br>Plaintiff,<br><br>vs.<br><br>TOBY KATZ<br>1872 Mission Hills Lane<br>Northbrook, Illinois 60062<br><br>Defendant. | COURT OF COMMON PLEAS OF MONTGOMERY COUNTY, PENNSYLVANIA<br><br>DOCKET NO. |

## COMPLAINT

Plaintiff Michael Grasso trading as General Partner of GF 2014, L.P. ("**GF 2014**") brings this Complaint against Defendant Toby Katz ("**Katz**"), averring:

## INTRODUCTION

1.    This matter concerns Katz's ongoing harassment of Michael Grasso and GF 2014 under the guise of trying to execute on a default judgment *against neither Michael Grasso nor GF 2014.*

2.    Katz's judgment is *solely against Michael Grasso's son, non-party Joseph Grasso.*

3.    The only connection between GF 2014 and Joseph Grasso, Katz's sole judgment debtor, is that Joseph Grasso and his wife, Donna Grasso, hold a limited partnership interest in GF 2014 *as tenants by the entireties* (the "**Entireties Interest**").

9750356.v1

Appx0033

Case# 2021-22879-0 Docketed at Montgomery County Prothonotary on 11/15/2021 3:17 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

4.      It is well-settled that a judgment creditor cannot execute on entireties property if the judgment is against only one spouse.

5.      That is precisely the case here. Because the Entireties Interest is owned jointly by Joseph and Donna Grasso as tenants by the entireties, it is beyond the reach of Katz's judgment against only Joseph.

6.      Because the Entireties Interest is out of Katz's reach, she has fallen back on a seemingly endless campaign of harassment of virtually every member of Joseph Grasso's family – most notably his father, Michael – and of anyone that has done business with GF 2014.

7.      Katz has deposed Michael Grasso three times for a total of more than 9 hours, and GF 2014 has already produced reams of financial and other documentation even though it is all entirely irrelevant given Katz's inability to execute on the Entireties Interest.

8.      Apparently, that was not enough.

9.      Katz deposed Joseph Grasso's wife, Donna, *twice* bringing her to tears on more than one occasion, she has deposed Michael's granddaughter, Melissa Russo, for no legitimate purpose and he has recently gone so far as to threaten to subpoena Michael Grasso's grandson, Joseph, Jr., for no discernable reason.

10.     And now, Katz is subpoenaing seemingly anyone that has done business with GF 2014, including most recently its realtor and a public adjuster involved in an insurance claim.

11.     In no way, shape or form do these tactics bear any relationship to legitimate discovery in aid of execution.

12.     While Katz's misconduct has ***not*** been tailored to locate assets of Joseph Grasso upon which she might execute, it has been carefully designed to inflict pain, expense, burden and humiliation upon anyone who calls Joseph Grasso family or that has done business with GF 2014.

9750356.v1

Case# 2021-22879-0 Docketed at Montgomery County Prothonotary on 11/15/2021 3:17 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

13.    GF 2014 has therefore filed this Action to put to an end Katz's perversion of the legal process and her interference with GF 2014's business affairs.  Enough is enough.

## PARTIES

14.    GF 2014 is a Pennsylvania limited partnership with an address of 120 East Lancaster Ave., Ardmore, Pennsylvania 19003.

15.    Katz is an adult individual and citizen of Illinois, with an address of 1872 Mission Hills Lane, Northbrook, Illinois 60062.

## JURISDICTION AND VENUE

16.    This Court has jurisdiction pursuant to 42 Pa.C.S.A. § 931.

17.    Venue is proper because the acts and omissions give rise to this Action occurred, and are continuing to occur, in this County.

## FACTUAL BACKGROUND

18.    Michael Grasso created GF 2014 in 2014, with himself as General Partner and with he and his wife owning a 99% limited partnership interest as tenants by the entireties.  This was two years before Katz obtained any judgment against Joseph Grasso.

19.    On November 15, 2016, Katz obtained a default judgment solely against Joseph Grasso (the "**Joe Grasso Judgment**") in a lawsuit captioned *Marshall J. Katz v. Joseph Grasso et al.*, No. 07-CH-24116, in the Circuit Court of Cook County, Illinois, Chancery Division (the "**Illinois Lawsuit**").

20.    Michael Grasso was not a party in the Illinois Lawsuit, and he had no involvement in the facts and circumstances underlying it.

21.    GF 2014 was not a party in the Illinois Lawsuit, and it had no involvement in the facts and circumstances underlying it.

5

9750356.v1

Case# 2021-22879-0 Docketed at Montgomery County Prothonotary on 11/15/2021 3:17 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

22.     On February 1, 2017, Katz transferred the Joe Grasso Judgment to Montgomery County, Docket No. 2017-02140 (the "**Execution Proceedings**").

23.     Neither Michael Grasso nor GF 2014 is a party to the Execution Proceedings.

24.     The only connection between Michael Grasso and the Execution Proceedings is that Michael is Joseph Grasso's 86-year old father.

25.     The only connection between GF 2014 and the Execution Proceedings is that Joseph Grasso and his wife, Donna, hold a 99% limited partnership interest in the company *as tenants by the entireties*.

26.     Because Joseph and Donna Grasso jointly own the Entireties Interest, that property interest is not subject to execution by Katz, as her judgment is solely against Joseph Grasso.

27.     Nevertheless, Katz has made GF 2014 the focus of the Execution Proceedings, and she has therefore been tormenting Michael Grasso in his capacity as its General Partner.

28.     Katz has no facts or explanation as to why she is entitled to information about assets that are beyond the reach of her judgment against only Joseph Grasso.

29.     Katz has made oblique allegations that the Entireties Interest is somehow anything but entireties property, but the facts that have long been known to all parties clearly belie that position.

30.     Michael Grasso long ago admitted that he and his wife originally held a 99% limited partnership interest, as tenants by the entireties, in GF 2014.

31.     Michael Grasso likewise admitted that on January 2, 2017, he and his wife gifted that interest (the Entireties Interest) to their son and daughter-in-law, Joseph and Donna Grasso, *as tenants by the entireties* pursuant to an Assignment of Partnership Interest (the "**Assignment**"). The Assignment is attached as Exhibit "A."

6

9750356.v1

Case# 2021-22879-0 Docketed at Montgomery County Prothonotary on 11/15/2021 3:17 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

32.    Michael Grasso had produced the Assignment to Katz.

33.    Michael also admits that, in connection with the Assignment, gift tax returns were prepared and filed, with a reported value of the Entireties Interest of $3,867,866.00. *See* Exhibit "B." Michael Grasso has given these gift tax returns to Katz.

34.    Michael Grasso admits that, at certain points in the last 5-10 years, he has on occasion given his son a job for which he was paid a salary, and he has produced all of that information to Katz.

35.    And Michael admits that GF 2014 has been issuing monthly distributions to Joseph and Donna Grasso, *as tenants by the entireties*, in the typical amount of $4,000.00.

36.    Michael Grasso has not concealed any of these facts from Katz even though they have nothing to do with Katz's execution on her judgment against only Joseph Grasso.

37.    On November 2, 2020, Katz issued a Subpoena to Attend and Testify to Michael Grasso in his capacity as General Partner of GF 2014 (the "**Subpoena**"). The Subpoena is attached as Exhibit "C."

38.    The Subpoena demanded a multitude of documents about GF 2014 and a deposition of Michael Grasso.

39.    As stated above, GF 2014 undertook the significant burden of locating and producing a multitude of documents, both initially and in response to Katz's repeated follow-up requests.

40.    GF 2014 has now produced all of its tax returns since 2016, all of the documents related to the gifting of the Entireties Interest, reams of documents concerning the Dodds Lane Property, an explosion that occurred there in 2018, the subsequent insurance claim (the "**Insurance**

9750356.v1

Case# 2021-22879-0 Docketed at Montgomery County Prothonotary on 11/15/2021 3:17 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the
Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**Claim**") and a slew of other materials.   Again, none of these materials are relevant to the identification of assets of Joseph Grasso upon which Katz might execute.

41.     In addition, Michael Grasso was forced to sit for three separate deposition sessions totaling more than nine hours.

42.     During these depositions, Katz's attorney questioned Michael Grasso on a wide range of topics, including, for example, every real estate project with which he has been involved (not in his capacity as General Partner of GF 2014) since the early 1980's and, in an effort to simply humiliate him, criminal matters going back almost five decades.

43.     In addition to subjecting Michael Grasso and GF 2014 to abusive, burdensome discovery for no proper purpose, Katz also filed a federal lawsuit against them both in the United States District Court for the Eastern District of Pennsylvania, Docket No. 2:20-CV-06320 (the **"Federal Lawsuit"**).

44.     Since Katz's efforts in the Execution Proceedings have nothing to do with asset discovery, it has long been apparent that Katzs is actually engaged in a totally inappropriate and impermissible effort to conduct discovery for the Federal Lawsuit under the guise of discovery in aid of execution.

45.     Even despite all of this, prior to this Complaint, Michael Grasso and GF 2014 had been content to defend Katz's ill-conceived efforts to monetize the Joe Grasso Judgment by suing and/or harassing anyone and everyone that had ever done business with any member of Joseph Grasso's family and by seeking endless information about one asset that is not and can never be used to satisfy Katz's judgment.

9750356.v1

Case# 2021-22879-0 Docketed at Montgomery County Prothonotary on 11/15/2021 3:17 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

46.     The above-described misconduct of Katz is not, however, what gives rise to this Complaint.  These facts are merely context for Katz's most recent and clearly improper perversion of the legal process, which suggests that, absent judicial intervention, it is never going to stop.

47.     GF 2014 owns a parcel of real property located at 649 Dodds Lane, Gladwyne, PA 19035 (the "**Dodds Lane Property**").

48.     Not content to harass every member of the Grasso family, Katz is now interfering with the sale of the Dodds Lane Property to third parties for $2 million (the "**Dodds Lane Transaction**").

49.     On June 21, 2021, 2021, Katz issued a subpoena in the Execution Proceedings to Clarke and Cohen (the "**Clarke/Cohen Subpoena**") (attached as Exhibit "D"), a public adjuster firm that worked on the Insurance Claim.

50.     Katz deliberately concealed the Clarke/Cohen Subpoena from Michael Grasso, so he did not even know that Katz had issued it until Katz filed a Motion to Compel a deposition of a designee of Clarke and Cohen.  Even then, Katz did not give Michael Grasso notice of the motion; rather, his attorneys saw it in the course of monitoring the docket in the Execution Proceedings.

51.     There is no information that Katz legitimately needs from Clarke and Cohen.

52.     Michael Grasso long ago admitted that GF 2014 received payments from its insurer related to the Insurance Claim, he identified the amounts of the payments and the dates on which they were made and he produced all of the related documents evidencing the payments.

53.     There is no legitimate reason for Katz to seek documents or depositions from Clarke and Cohen, as the intricacies of the Insurance Claim have nothing to do with finding Joseph Grasso's assets.

9

9750356.v1

Appx0039

Case# 2021-22879-0 Docketed at Montgomery County Prothonotary on 11/15/2021 3:17 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the
Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

54.     Rather, the Clarke/Cohen Subpoena is part of Katz's new litigation tactic – punishment for anyone that does business with GF 2014.

55.     Since harassing and humiliating every member of the Grasso family has (unsurprisingly) brought her no closer to locating any assets of Joseph Grasso upon which she might execute, Katz has set her sights on punishing and/or intimidating anyone who would deign to do business with GF 2014 by sucking them into a morass of litigation at great expense and considerable burden.

56.     On September 28, 2021, Katz continued her punishment of those that do business with GF 2014, issuing a subpoena to BHH Affiliates, LLC t/a Fox & Roach, GF 2014's real estate agent in the Dodds Lane Transaction (the "**Fox/Roach Subpoena**"), attached as Exhibit "E."

57.     Once again, Katz concealed the Fox/Roach Subpoena from Michael Grasso for months.

58.     In fact, even though Katz often seeks only documents, in every instance she utilizes subpoenas for depositions and documents so as to avoid having to publicly file a certificate of compliance that would alert Michael Grasso to any of these subpoenas in a timely manner.

59.     On October 29, 2021, suspecting that Katz had issued the Fox/Roach Subpoena, Michael Grasso, through counsel, requested a copy of it from Fox & Roach, but Fox & Roach refused to provide it without a separate subpoena requesting it.

60.     Katz's tactic is working – she is driving wedges between GF 2014 and those with which it does business.

61.     GF 2014's own realtor has been so intimidated by Katz that, out of fear of being dragged more deeply into Katz's sham asset discovery, it determined that the consequences of withholding material information from its own client impacting a still pending $2 million real

9750356.v1

Case# 2021-22879-0 Docketed at Montgomery County Prothonotary on 11/15/2021 3:17 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

estate transaction were *less* severe than doing anything that Katz could try to pervert as part of some imagined, nonsensical conspiracy (the general theme of her pleadings in the Federal Litigation).

62.    It is believed and therefore averred that Katz is deliberately attempting to interfere with the Dodds Lane Transaction so that she can use the threat of the transaction falling apart to extract settlement payments from anyone other than its actual judgment debtor, Joseph Grasso.

63.    It is believed and therefore averred that Katz is signaling to all who would deign to do business with GF 2014 that the consequence of even the most mundane business relationships is endless subpoena practice, fishing expeditions through decades of paper and electronic documents and pointless depositions designed only to waste people's time and money and, wherever possible, to humiliate them.

64.    While Katz has had great success tormenting every member of Joseph Grasso's family and intimidating actual and potential business contacts of GF 2014, she has utterly failed in the singularly most important regard: she has offered no explanation, at any point, what any of her efforts have to do with asset discovery or execution on her judgment against Joseph Grasso.

65.    Katz has never offered any explanation for why she believes that the Entireties Interest can be subject to execution despite having a judgment against only Joseph Grasso.

66.    Katz has never offered any explanation for why she believes that she is entitled to take discovery on every business transaction with which Michael Grasso has been involved over the past 40 years.

67.    And Katz has never offered any explanation for why, after all of this, she remains unsatisfied and instead is only heightening her efforts to embarrass, annoy, harass and humiliate.

68.    This needs to end, and it needs to end now.

11

9750356.v1

Case# 2021-22879-0 Docketed at Montgomery County Prothonotary on 11/15/2021 3:17 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

## COUNT I – ABUSE OF PROCESS

69.     The foregoing paragraphs are incorporated by reference.

70.     The Clark/Cohen Subpoena is a form of legal process.

71.     The Fox/Roach Subpoena is a form of legal process.

72.     Katz utilized subpoenas in the Execution Proceedings for the improper purpose of interfering with GF 2014's business relationships and intimidating those that do or might do business with the company.

73.     As a result, GF 2014 has incurred and, absent judicial intervention, will continue to incur damages.

**WHEREFORE**, GF 2014 respectfully requests that the Court enter judgment against Katz for monetary damages in excess of $50,000.00, together with a preliminary and/or permanent injunction enjoining Katz from interfering with any of GF 2014's business dealings and harassing its business contacts.

## COUNT II – TORTIOUS INTERFERENCE WITH CONTRACT

74.     The foregoing paragraphs are incorporated by reference.

75.     Katz has at all relevant times known of the Dodds Lane Transaction.

76.     Katz has intentionally interfered with the Dodds Lane Transaction by abusing the discovery process in the Execution Proceedings and harassing the parties involved in an effort to either stop the transaction from closing or in order to extract a settlement related to the Joe Grasso Judgment from anyone other than Joseph Grasso.

77.     Katz's misconduct has caused GF 2014 to incur damages.

**WHEREFORE**, GF 2014 respectfully requests that the Court enter judgment against Katz for monetary damages in excess of $50,000.00, together with a preliminary and/or permanent

12

9750356.v1

Appx0042

Case# 2021-22879-0 Docketed at Montgomery County Prothonotary on 11/15/2021 3:17 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

injunction enjoining Katz from interfering with any of GF 2014's business dealings and harassing its business contacts.

Respectfully submitted,

/s/ Jordan Rand
Jordan M. Rand (I.D. No. 208671)
**KLEHR HARRISON HARVEY BRANZBURG LLP**
1835 Market Street, Suite 1400
Philadelphia, PA 19103
*Attorneys for Appellant*

Date: November 15, 2021

13

9750356.v1

Appx0043

Case# 2021-22879-0 Docketed at Montgomery County Prothonotary on 11/15/2021 3:17 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

## VERIFICATION

I, Michael Grasso, verify that the facts contained in the foregoing Complaint are true and correct to the best of my knowledge, information and belief. I understand that false statements herein are made subject to the penalties of 18 Pa. C.S. § 4904 relating to unsworn falsifications to authorities.

Dated: November 15, 2021

9746282.v1

Appx0044

# EXHIBIT A

Case# 2021-22879-0 Docketed at Montgomery County Prothonotary on 11/15/2021 3:17 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2021-22879-0 Docketed at Montgomery County Prothonotary on 11/15/2021 3:17 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

## ASSIGNMENT OF PARTNERSHIP INTEREST

THIS ASSIGNMENT OF PARTNERSHIP INTEREST is made as of the 2nd day of January, 2017, by and between, Michael and Jean Grasso as Tenants by the Entirety, 120 E. Lancaster Avenue, Ardmore, PA 19003 ("Assignor") and Joseph Grasso and Donna Grasso, as Tenants by the Entirety with an address 649 Dodds Lane, Gladwyne, PA 19035 ("Assignee").

WHEREAS, on August 22, 2014 Assignor entered into that certain Limited Partnership Agreement ("Partnership Agreement") of G F 2014, L.P. a Pennsylvania limited partnership ("Partnership"). which Partnership was formed for the purpose of acquiring, owning, managing, and selling or otherwise disposeing of property for investment purposes or any other lawful business that a partnership, with or without limited partners may carry on. ("Partnership Property").

WHEREAS, Assignor has agreed to assign one hundred percent (100.0%) of its Limited Partnership Interest in the Partnership and the Partnership Property to Assignee, and Assignee has agreed to acquire and assume the Limited Partnership Interest of Assignor.

NOW THEREFORE, for and in consideration of the mutual covenants contained herein and other good and lawful consideration, and intending to be legally bound hereby, the parties hereto agree as follows:

1. Assignor does hereby sell, transfer, grant, convey, assign and set over unto Assignee, and Assignee does hereby accept, one hundred percent (100.0%) of Assignor's Limited Partnership Interest, being therefore ninety nine (99.00%) percent of the whole of the Partnership, including without limitation ninety nine (99%) percent of Assignor's right, title and interest in, to and under the Partnership and all Partnership Property, including all rights, benefits, debts,

1

MG0092

Appx0046

Case# 2021-22879-0 Docketed at Montgomery County Prothonotary on 11/15/2021 3:17 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

and liabilities, as well as all duties and obligations accruing under the Partnership Agreement and/or accruing to or from the Partnership.

2. The consideration for this Assignment shall be the sum of TEN DOLLARS ($10.00) ("Purchase Price"), and other good and lawful consideration, the adequacy of which is hereby acknowledged.

3. Assignee by accepting this Assignment does hereby assume and accept all of Assignor's duties and obligations under the Partnership Agreement to the extent of the ninety nine(99%) percent of the Partnership Interest assigned by Assignor to Assignee pursuant hereto whenever arising, from the beginning of existence of the Partnership, and Assignee does hereby agree to release, relieve, indemnify and hold Assignor harmless from any and all costs and expenses, including attorney's fees, arising with regard to the Partnership and/or the Partnership Property, whenever arising to the extent of the ninety nine (99%) percent of the Partnership Interest assigned by Assignor to Assignee pursuant hereto.

4. Assignor hereby covenants, represents and warrants that Assignor has good title to its Partnership Interest and the power and capacity to make this Assignment; and that the Partnership Interest of Assignor assigned hereunder has not been previously assigned by it.

5. This Assignment, and its acceptance by the Assignee, shall inure to the benefit of, and be binding upon, the Assignor and the Assignee and their respective heirs, executors or administrators, successors and assigns.

6. This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania.

2

MG0093

Appx0047

Case# 2021-22879-0 Docketed at Montgomery County Prothonotary on 11/15/2021 3:17 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

IN WITNESS, WHEREOF, the parties hereto, intending to be legally bound hereby, have caused this Assignment of Partnership Interest to be duly executed the day and year first above written.

ASSIGNOR:

MICHAEL GRASSO AND JEAN GRASSO, H/W

AS TENANTS BY THE ENTIRETIES

_____
Michael Grasso

_____
Jean Grasso

Witness: _____


ASSIGNEE:

JOSEPH GRASSO AND DONNA GRASSO, H/W

AS TENANTS BY THE ENTIRETIES

_____
Joseph Grasso

_____
Donna Grasso

Witness: _____

3

MG0094

Appx0048

Case# 2021-22879-0 Docketed at Montgomery County Prothonotary on 11/15/2021 3:17 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

## AGREEMENT OF GIFT

In consideration of our love and affection, we, Michael and Jean Grasso, intending to be legally bound, hereby transfer, effective January 2, 2017 our ninety nine percent (99.0%) Limited Partnership in GF 2014 L.P., owned as tenants by the entirety to Joseph and Donna Grasso, as Tenants by the Entirety.

The parties agree that they will cause GF 2014 L.P. to affect and document this transfer accordingly.

Executed the day and year first written above.

Witness

_____

_____

_____
Michael Grasso

_____
Jean Grasso

Witness

_____

_____

_____
Joseph Grasso

_____
Donna Grasso

MG0095

**Appx0049**

# EXHIBIT B

Case# 2021-22879-0 Docketed at Montgomery County Prothonotary on 11/15/2021 3:17 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2021-22879-0 Docketed at Montgomery County Prothonotary on 11/15/2021 3:17 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**Form 709**

Department of the Treasury
Internal Revenue Service

### United States Gift (and Generation-Skipping Transfer) Tax Return

► Go to www.irs.gov/Form709 for instructions and the latest information.
(For gifts during calendar year 2017)
► See instructions.

OMB No. 1545-0020

**2017**

| | | |
|---|---|---|
| 1  Donor's first name and middle initial  MICHAEL | 2  Donor's last name  GRASSO | 3  Donor's social security number |
| 4  Address (number, street, and apartment number) | | 5  Legal residence (domicile)  PENNSYLVANIA |
| 6  City or town, state or province, country, and ZIP or foreign postal code | | 7  Citizenship (see instructions)  UNITED STATES |

**Part 1 — General Information**

| | | Yes | No |
|---|---|---|---|
| 8   If the donor died during the year, check here ☐ and enter date of death _____ | | | |
| 9   If you extended the time to file this Form 709, check here ☑ | | | |
| 10  Enter the total number of donees listed on Schedule A. Count each person only once ► 2 | | | |
| 11a Have you (the donor) previously filed a Form 709 (or 709-A) for any other year? If "No," skip line 11b | | | X |
| b  Has your address changed since you last filed Form 709 (or 709-A)? | | | X |
| 12  Gifts by husband or wife to third parties. Do you consent to have the gifts (including generation-skipping transfers) made by you and by your spouse to third parties during the calendar year considered as made one-half by each of you? (see instructions.) (If the answer is "Yes," the following information must be furnished and your spouse must sign the consent shown below. If the answer is "No," skip lines 13-18.) | | X | |
| 13  Name of consenting spouse  JEAN DONATO GRASSO | 14  SSN | | |
| 15  Were you married to one another during the entire calendar year? (see instructions) | | X | |
| 16  If 15 is "No," check whether ☐ married ☐ divorced or ☐ widowed/deceased, and give date ► | | | |
| 17  Will a gift tax return for this year be filed by your spouse? (If "Yes," mail both returns in the same envelope.) | | X | |

18  Consent of Spouse. I consent to have the gifts (and generation-skipping transfers) made by me and by my spouse to third parties during the calendar year considered as made one-half by each of us. We are both aware of the joint and several liability for tax created by the execution of this consent.

Consenting spouse's signature ►                           Date ►

| | | | | | |
|---|---|---|---|---|---|
| 19  Have you applied a DSUE amount received from a predeceased spouse to a gift or gifts reported on this or a previous Form 709? If "Yes," complete Schedule C | | | | | X |

**Part 2 — Tax Computation**

| | | | | |
|---|---|---|---|---|
| 1  | Enter the amount from Schedule A, Part 4, line 11 | 1 | 1,905,933. | |
| 2  | Enter the amount from Schedule B, line 3 | 2 | | |
| 3  | Total taxable gifts. Add lines 1 and 2 | 3 | 1,905,933. | |
| 4  | Tax computed on amount on line 3 (see Table for Computing Gift Tax in instructions) | 4 | 708,173. | |
| 5  | Tax computed on amount on line 2 (see Table for Computing Gift Tax in instructions) | 5 | | |
| 6  | Balance. Subtract line 5 from line 4 | 6 | 708,173. | |
| 7  | Applicable credit amount. If donor has DSUE amount from predeceased spouse(s) or Restored Exclusion Amount, enter amount from Schedule C, line 5; otherwise, see instructions | 7 | 2,141,800. | |
| 8  | Enter the applicable credit against tax allowable for all prior periods (from Sch. B, line 1, col. C) | 8 | | |
| 9  | Balance. Subtract line 8 from line 7. Do not enter less than zero | 9 | 2,141,800. | |
| 10 | Enter 20% (.20) of the amount allowed as a specific exemption for gifts made after September 8, 1976, and before January 1, 1977 (see instructions) | 10 | | |
| 11 | Balance. Subtract line 10 from line 9. Do not enter less than zero | 11 | 2,141,800. | |
| 12 | Applicable credit. Enter the smaller of line 6 or line 11 | 12 | 708,173. | |
| 13 | Credit for foreign gift taxes (see instructions) | 13 | | |
| 14 | Total credits. Add lines 12 and 13 | 14 | 708,173. | |
| 15 | Balance. Subtract line 14 from line 6. Do not enter less than zero | 15 | 0. | |
| 16 | Generation-skipping transfer taxes (from Schedule D, Part 3, col. H, Total) | 16 | | |
| 17 | Total tax. Add lines 15 and 16 | 17 | 0. | |
| 18 | Gift and generation-skipping transfer taxes prepaid with extension of time to file | 18 | | |
| 19 | If line 18 is less than line 17, enter balance due (see instructions) | 19 | 0. | |
| 20 | If line 18 is greater than line 17, enter amount to be refunded | 20 | | |

**Sign Here**

Under penalties of perjury, I declare that I have examined this return, including any accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than donor) is based on all information of which preparer has any knowledge.

May the IRS discuss this return with the preparer shown below (see instructions)? ☑ Yes ☐ No

Signature of donor                           Date

**Paid Preparer Use Only**

| | | | | |
|---|---|---|---|---|
| Print/Type preparer's name  HAL J. MICHELS, CPA | Preparer's signature | Date | Check ☐ if self-employed | PTIN  P00445637 |
| Firm's name ► ST. CLAIR CPAS, P.C. | | | Firm's EIN ► 23-2653765 | |
| Firm's address ► 101 W. ELM STREET, STE 500  CONSHOHOCKEN, PA 19428 | | | Phone no. 610-862-1998 | |

LHA   For Disclosure, Privacy Act, and Paperwork Reduction Act Notice, see the instructions for this form.

705501 11-01-17

Form **709** (2017)

1

MG0078

Appx0051

Form 709 (2017)    MICHAEL GRASSO    Page 2

**SCHEDULE A    Computation of Taxable Gifts** (Including transfers in trust) (see instructions)

A  Does the value of any item listed on Schedule A reflect any valuation discount? If "Yes," attach explanation    Yes ☐  No ☒

B  ☐ ▶ Check here if you elect under section 529(c)(2)(B) to treat any transfers made this year to a qualified tuition program as made ratably over a 5-year period beginning this year. See instructions. Attach explanation.

**Part 1 — Gifts Subject Only to Gift Tax. Gifts less political organization, medical, and educational exclusions. (see instructions)**

| A Item number | B • Donee's name and address • Relationship to donor (if any) • Description of gift • If the gift was of securities, give CUSIP no • If closely held entity, give EIN | C 2632(b) election out | D Donor's adjusted basis of gift | E Date of gift | F Value at date of gift | G For split gifts, enter 1/2 of column F | H Net transfer (subtract col. G from col. F) |
|---|---|---|---|---|---|---|---|
| 1 | JOSEPH GRASSO<br>649 DODDS LANE | | | | | | 1,933,933 |

*Gifts made by spouse — complete only if you are splitting gifts with your spouse and he/she also made gifts.*

| | | | | | | | |
|---|---|---|---|---|---|---|---|

**Total of Part 1. Add amounts from Part 1, column H** ▶ 1,933,933.

**Part 2 — Direct Skips. Gifts that are direct skips and are subject to both gift tax and generation-skipping transfer tax. You must list the gifts in chronological order.**

| A Item number | B • Donee's name and address • Relationship to donor (if any) • Description of gift • If the gift was of securities, give CUSIP no • If closely held entity, give EIN | C 2632(b) election out | D Donor's adjusted basis of gift | E Date of gift | F Value at date of gift | G For split gifts, enter 1/2 of column F | H Net transfer (subtract col. G from col. F) |
|---|---|---|---|---|---|---|---|
| 1 | JOSEPH GRASSO<br>649 DODDS LANE | | | | | | |

*Gifts made by spouse — complete only if you are splitting gifts with your spouse and he/she also made gifts.*

| | | | | | | | |
|---|---|---|---|---|---|---|---|

**Total of Part 2. Add amounts from Part 2, column H** ▶

**Part 3 — Indirect Skips. Gifts to trusts that are currently subject to gift tax and may later be subject to generation-skipping transfer tax. You must list these gifts in chronological order.**

| A Item number | B • Donee's name and address • Relationship to donor (if any) • Description of gift • If the gift was of securities, give CUSIP no • If closely held entity, give EIN | C 2632(c) election | D Donor's adjusted basis of gift | E Date of gift | F Value at date of gift | G For split gifts, enter 1/2 of column F | H Net transfer (subtract col. G from col. F) |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

*Gifts made by spouse — complete only if you are splitting gifts with your spouse and he/she also made gifts.*

| | | | | | | | |
|---|---|---|---|---|---|---|---|

**Total of Part 3. Add amounts from Part 3, column H** ▶

*(If more space is needed, attach additional statements.)*

7G5311  11-01-17

2

Form **709** (2017)

MG0079

Case# 2021-22879-0 Docketed at Montgomery County Prothonotary on 11/15/2021 3:17 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Appx0052

Case# 2021-22879-0 Docketed at Montgomery County Prothonotary on 11/15/2021 3:17 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Form 709 (2017)   MICHAEL GRASSO

**SCHEDULE A, PART I CONTINUATION SHEET**

Part 1 - Gifts Subject Only to Gift Tax. Gifts less political organization, medical, and educational exclusions. (see instructors)

| A Item number | B • Donee's name and address • Relationship to donor (if any) • Description of gift • If the gift was of securities, give CUSIP no. • If closely held entity, give EIN | C | D Donor's adjusted basis of gift | E Date of gift | F Value at date of gift | G For split gifts, enter 1/2 of column F | H Net transfer (subtract col. G from col. F) |
|---|---|---|---|---|---|---|---|
| | GLADWYNE, PA 19035 SON GIFT OF 99% INTEREST IN GF 2014 LP (EIN: 47-2929852). SEE ATTACHED SCHEDULE AND APPRAISAL. | | 233,179. | 01/01/17 | 966,967. | 483,484. | 483,483. |
| 2 | DONNA GRASSO 649 DODDS LANE GLADWYNE, PA 19035 DAUGHTER-IN-LAW GIFT OF 99% INTEREST IN GF 2014 LP (EIN: 47-2929852). SEE ATTACHED SCHEDULE AND APPRAISAL. | | 233,179. | 01/01/17 | 966,966. | 483,483. | 483,483. |

**Total of column H** | | | | | | | 966,966. |

705571 04-01-17

3

Form 709 (2017)

MG0080

Case# 2021-22879-O Docketed at Montgomery County Prothonotary on 11/15/2021 3:17 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Form 709 (2017)  MICHAEL GRASSO

**SCHEDULE A, PART 1, GIFTS MADE BY SPOUSE CONTINUATION SHEET**

Part 1 - Gifts Subject Only to Gift Tax. Gifts less political organization, medical, and educational exclusions (see instructions)

| A Item number | B • Donee's name and address • Relationship to donor (if any) • Description of gift • If the gift was of securities, give CUSIP no. • If closely held entity, give EIN | C | D Donor's adjusted basis of gift | E Date of gift | F Value at date of gift | G For split gifts, enter 1/2 of column F | H Net transfer (subtract col. G from col. F) |
|---|---|---|---|---|---|---|---|
| | Gifts made by spouse - complete only if you are splitting gifts with your spouse and he/she also made gifts. | | | | | | |
| 1 | MICHAEL GRASSO GLADWYNE, PA 19035 SON GIFT OF 99% INTEREST IN GF 2014 LP (EIN: 47-2929852). SEE ATTACHED SCHEDULE AND APPRAISAL. | | 233,179. | 01/01/17 | 966,967. | 483,483. | 483,484. |
| 2 | DONNA GRASSO 849 DODDS LANE GLADWYNE, PA 19035 DAUGHTER-IN-LAW GIFT OF 99% INTEREST IN GF 2014 LP (EIN: 47-2929852). SEE ATTACHED SCHEDULE AND APPRAISAL. | | 233,179. | 01/01/17 | 966,966. | 483,483. | 483,483. |

Total of column H: 966,967.

Form 709 (2017)

705572 04-01-17

4

MG0081

Appx0054

Case# 2021-22879-0 Docketed at Montgomery County Prothonotary on 11/15/2021 3:17 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Form 709 (2017)   MICHAEL GRASSO — Page 3

**Part 4 - Taxable Gift Reconciliation**

| | | |
|---|---|---|
| 1 Total value of gifts of donor. Add totals from column H of Parts 1, 2, and 3 | 1 | 1,933,933. |
| 2 Total annual exclusions for gifts listed on line 1 (see instructions) | 2 | 28,000. |
| 3 Total included amount of gifts. Subtract line 2 from line 1 | 3 | 1,905,933. |

Deductions (see instructions)

| | | |
|---|---|---|
| 4 Gifts of interests to spouse for which a marital deduction will be claimed, based on item numbers _____ of Schedule A | 4 | |
| 5 Exclusions attributable to gifts on line 4 | 5 | |
| 6 Marital deduction. Subtract line 5 from line 4 | 6 | |
| 7 Charitable deduction, based on item nos. _____ less exclusions | 7 | |
| 8 Total deductions. Add lines 6 and 7 | 8 | |
| 9 Subtract line 8 from line 3 | 9 | 1,905,933. |
| 10 Generation-skipping transfer taxes payable with this Form 709 (from Schedule D, Part 3, col. H, Total) | 10 | |
| 11 Taxable gifts. Add lines 9 and 10. Enter here and on page 1, Part 2 - Tax Computation, line 1 | 11 | 1,905,933. |

**Terminable Interest (QTIP) Marital Deduction.** (see instructions for Schedule A, Part 4, line 4)

If a trust (or other property) meets the requirements of qualified terminable interest property under section 2523(f), and:

  a. The trust (or other property) is listed on Schedule A, and

  b. The value of the trust (or other property) is entered in whole or in part as a deduction on Schedule A, Part 4, line 4, then the donor shall be deemed to have made an election to have such trust (or other property) treated as qualified terminable interest property under section 2523(f).

If less than the entire value of the trust (or other property) that the donor has included in Parts 1 and 3 of Schedule A is entered as a deduction on line 4, the donor shall be considered to have made an election only as to a fraction of the trust (or other property). The numerator of this fraction is equal to the amount of the trust (or other property) deducted on Schedule A, Part 4, line 6. The denominator is equal to the total value of the trust (or other property) listed in Parts 1 and 3 of Schedule A.

If you make the QTIP election, the terminable interest property involved will be included in your spouse's gross estate upon his or her death (section 2044). See instructions for line 4 of Schedule A. If your spouse disposes (by gift or otherwise) of all or part of the qualifying life income interest, he or she will be considered to have made a transfer of the entire property that is subject to the gift tax. See *Transfer of Certain Life Estates Received From Spouse* in the instructions.

12 **Election Out of QTIP Treatment of Annuities**

☐ ◀ Check here if you elect under section 2523(f)(6) not to treat as qualified terminable interest property any joint and survivor annuities that are reported on Schedule A and would otherwise be treated as qualified terminable interest property under section 2523(f). See instructions. Enter the item numbers from Schedule A for the annuities for which you are making this election ▶

**SCHEDULE B   Gifts From Prior Periods**

If you answered "Yes," on line 11a of page 1, Part 1, see the instructions for completing Schedule B. If you answered "No," skip to the Tax Computation on page 1 (or Schedules C or D, if applicable). Complete Schedule A before beginning Schedule B. See instructions for recalculation of the column C amounts. Attach calculations.

| A Calendar year or calendar quarter (see instructions) | B Internal Revenue office where prior return was filed | C Amount of applicable credit (unified credit) against gift tax for periods after December 31, 1976 | D Amount of specific exemption for prior periods ending before January 1, 1977 | E Amount of taxable gifts |
|---|---|---|---|---|
| | | | | |
| 1 Totals for prior periods | 1 | | | |

| | | |
|---|---|---|
| 2 Amount, if any, by which total specific exemption, line 1, column D is more than $30,000 | 2 | |
| 3 Total amount of taxable gifts for prior periods. Add amount on line 1, column E and amount, if any, on line 2. Enter here and on page 1, Part 2 - Tax Computation, line 2 | 3 | |

*(If more space is needed, attach additional statements.)*

708521  11-01-17

Form 709 (2017)

MG0082

Appx0055

Case# 2021-22879-0 Docketed at Montgomery County Prothonotary on 11/15/2021 3:17 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Form 709 (2017)    MICHAEL GRASSO    Page 4

## SCHEDULE C | Deceased Spousal Unused Exclusion (DSUE) Amount and Restored Exclusion

Provide the following information to determine the DSUE amount and applicable credit received from prior spouses. Complete Schedule A before beginning Schedule C.

| A Name of Deceased Spouse (dates of death after December 31, 2010 only) | B Date of Death | C Portability Election Made? | | D If "Yes," DSUE Amount Received from Spouse | E DSUE Amount Applied by Donor to Lifetime Gifts (list current and prior gifts) | F Date of Gift(s) (enter as mm/dd/yy for Part 1 and as yyyy for Part 2) |
|---|---|---|---|---|---|---|
| | | Yes | No | | | |
| **Part 1 - DSUE RECEIVED FROM LAST DECEASED SPOUSE** | | | | | | |
| | | | | | | |
| **Part 2 - DSUE RECEIVED FROM PREDECEASED SPOUSE(S)** | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| TOTAL (for all DSUE amounts applied from column E for Part 1 and Part 2) | | | | | | |

| | | |
|---|---|---|
| 1 | Donor's basic exclusion amount (see instructions) | 1 |
| 2 | Total from column E, Parts 1 and 2 | 2 |
| 3 | Restored Exclusion Amount (see instructions) | 3 |
| 4 | Add lines 1, 2, and 3 | 4 |
| 5 | Applicable credit on amount in line 4 (See *Table for Computing Gift Tax* in the instructions). Enter here and on line 7, Part 2 - Tax Computation | 5 |

## SCHEDULE D | Computation of Generation-Skipping Transfer Tax

**Note:** Inter vivos direct skips that are completely excluded by the GST exemption must still be fully reported (including value and exemptions claimed) on Schedule D.

Part 1 - Generation-Skipping Transfers

| A Item No. (from Schedule A, Part 2, col. A) | B Value (from Schedule A, Part 2, col. H) | C Nontaxable Portion of Transfer | D Net Transfer (subtract col. C from col. B) |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| Gifts made by spouse (for gift splitting only) | | | |
| | | | |
| | | | |
| | | | |
| | | | |

*(If more space is needed, attach additional statements.)*    Form **709** (2017)

705531 11-01-17

6

MG0083

Appx0056

Case# 2021-22879-0 Docketed at Montgomery County Prothonotary on 11/15/2021 3:17 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Form 709 (2017)   **MICHAEL GRASSO**　　　　　　　　　　　　　　　　　　　　　　　Page 6

**Part 2 - GST Exemption Reconciliation (Section 2631) and Section 2652(a)(3) Election**

Check here ▶ ☐ If you are making a section 2652(a)(3) (special QTIP) election (see instructions)

Enter the item numbers from Schedule A of the gifts for which you are making this election ▶ _____

| | | |
|---|---|---:|
| 1 | Maximum allowable exemption (see instructions) ............................................................ **1** | 5,490,000. |
| 2 | Total exemption used for periods before filing this return ............................................... **2** | |
| 3 | Exemption available for this return. Subtract line 2 from line 1 ..................................... **3** | 5,490,000. |
| 4 | Exemption claimed on this return from Part 3, column C total, below ............................. **4** | |
| 5 | Automatic allocation of exemption to transfers reported on Schedule A, Part 3. To opt out of the automatic allocation rules, you must attach an "Election Out" statement. (see instructions) ...... **5** | |
| 6 | Exemption allocated to transfers not shown on line 4 or 5, above. You must attach a "Notice of Allocation." (see instructions) .................................. **6** | |
| 7 | Add lines 4, 5, and 6 ....................................................................................................... **7** | |
| 8 | Exemption available for future transfers. Subtract line 7 from line 3 ............................. **8** | 5,490,000. |

**Part 3 - Tax Computation**

| A<br>Item No.<br>(from<br>Schedule D,<br>Part 1) | B<br>Net Transfer<br>(from Schedule D,<br>Part 1, col. D) | C<br>GST Exemption<br>Allocated | D<br>Divide col. C<br>by col. B | E<br>Inclusion Ratio<br>(Subtract col. D<br>from 1.000) | F<br>Maximum<br>Estate Tax<br>Rate | G<br>Applicable Rate<br>(multiply col. E<br>by col. F) | H<br>Generation-Skipping<br>Transfer Tax<br>(multiply col. B by col. G) |
|---|---|---|---|---|---|---|---|
| | | | | | 40% (.40) | | |
| | | | | | 40% (.40) | | |
| | | | | | 40% (.40) | | |
| | | | | | 40% (.40) | | |
| | | | | | 40% (.40) | | |
| Gifts made by spouse (for gift splitting only) | | | | | | | |
| | | | | | 40% (.40) | | |
| | | | | | 40% (.40) | | |
| | | | | | 40% (.40) | | |
| | | | | | 40% (.40) | | |
| | | | | | 40% (.40) | | |
| | | | | | 40% (.40) | | |
| **Total exemption claimed. Enter here and on Part 2, line 4, above. May not exceed Part 2, line 3, above** | | | **Total generation-skipping transfer tax. Enter here; on page 3, Schedule A, Part 4, line 10; and on page 1, Part 2 - Tax Computation, line 16** .................................. | | | | |

*(If more space is needed, attach additional statements.)*　　　　　　　　　　　　　　　　　Form **709** (2017)

705532  11-01-17

7

MG0084

Appx0057

Case# 2021-22879-0 Docketed at Montgomery County Prothonotary on 11/15/2021 3:17 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**Form 709**

Department of the Treasury
Internal Revenue Service

## United States Gift (and Generation-Skipping Transfer) Tax Return

▶ Go to www.irs.gov/Form709 for instructions and the latest information.
▶ For gifts made during calendar year 2017)
▶ See instructions.

OMB No. 1545-0020

**2017**

### Part 1 - General Information

| | |
|---|---|
| 1 Donor's first name and middle initial **JEAN DONATO** | 2 Donor's last name **GRASSO** |
| | 3 Donor's social security number |
| 4 Address (number, street, and apartment number) | 5 Legal residence (domicile) **PENNSYLVANIA** |
| 6 City or town, state or province, country, and ZIP or foreign postal code | 7 Citizenship (see instructions) **UNITED STATES** |

| | | Yes | No |
|---|---|---|---|
| 8 If the donor died during the year, check here ▶ ☐ and enter date of death _____ | | | |
| 9 If you extended the time to file this Form 709, check here ▶ ☒ | | | |
| 10 Enter the total number of donees listed on Schedule A. Count each person only once ▶    2 | | | |
| 11a Have you (the donor) previously filed a Form 709 (or 709-A) for any other year? If "No," skip line 11b | | | X |
| b Has your address changed since you last filed Form 709 (or 709-A)? | | | |
| 12 Gifts by husband or wife to third parties. Do you consent to have the gifts (including generation-skipping transfers) made by you and by your spouse to third parties during the calendar year considered as made one-half by each of you? (see instructions.) (If the answer is "Yes," the following information must be furnished and your spouse must sign the consent shown below. If the answer is "No," skip lines 13-18.) | | | X |
| 13 Name of consenting spouse **MICHAEL GRASSO**        14 SSN | | | |
| 15 Were you married to one another during the entire calendar year? (see instructions) | | | X |
| 16 If 15 is "No," check whether ☐ married ☐ divorced or ☐ widowed/deceased, and give date ▶ | | | |
| 17 Will a gift tax return for this year be filed by your spouse? (see instructions) | | | X |
| 18 Consent of Spouse. I consent to have the gifts (and generation-skipping transfers) made by me and by my spouse to third parties during the calendar year considered as made one-half by each of us. We are both aware of the joint and several liability for tax created by the execution of this consent. | | | |

Consenting spouse's signature ▶                                         Date ▶

### Part 2 - Tax Computation

| | | |
|---|---|---|
| 19 Have you applied a DSUE amount received from a predeceased spouse to a gift or gifts reported on this or a previous Form 709? If "Yes," complete Schedule C | | X |
| 1 Enter the amount from Schedule A, Part 4, line 11 | 1 | 1,905,933. |
| 2 Enter the amount from Schedule B, line 3 | 2 | |
| 3 Total taxable gifts. Add lines 1 and 2 | 3 | 1,905,933. |
| 4 Tax computed on amount on line 3 (see Table for Computing Gift Tax in instructions) | 4 | 708,173. |
| 5 Tax computed on amount on line 2 (see Table for Computing Gift Tax in instructions) | 5 | |
| 6 Balance. Subtract line 5 from line 4 | 6 | 708,173. |
| 7 Applicable credit amount. If donor has DSUE amount from predeceased spouse(s) or Restored Exclusion Amount, enter amount from Schedule C, line 5; otherwise, see instructions | 7 | 2,141,800. |
| 8 Enter the applicable credit against tax allowable for all prior periods (from Sch. B, line 1, col. C) | 8 | |
| 9 Balance. Subtract line 8 from line 7. Do not enter less than zero | 9 | 2,141,800. |
| 10 Enter 20% (.20) of the amount allowed as a specific exemption for gifts made after September 8, 1976, and before January 1, 1977 (see instructions) | 10 | |
| 11 Balance. Subtract line 10 from line 9. Do not enter less than zero | 11 | 2,141,800. |
| 12 Applicable credit. Enter the smaller of line 6 or line 11 | 12 | 708,173. |
| 13 Credit for foreign gift taxes (see instructions) | 13 | |
| 14 Total credits. Add lines 12 and 13 | 14 | 708,173. |
| 15 Balance. Subtract line 14 from line 6. Do not enter less than zero | 15 | 0. |
| 16 Generation-skipping transfer taxes (from Schedule D, Part 3, col. H, Total) | 16 | |
| 17 Total tax. Add lines 15 and 16 | 17 | 0. |
| 18 Gift and generation-skipping transfer taxes prepaid with extension of time to file | 18 | |
| 19 If line 18 is less than line 17, enter balance due (see instructions) | 19 | 0. |
| 20 If line 18 is greater than line 17, enter amount to be refunded | 20 | |

Under penalties of perjury, I declare that I have examined this return, including any accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than donor) is based on all information of which preparer has any knowledge.

May the IRS discuss this return with the preparer shown below (see instructions)? ☒ Yes ☐ No

**Sign Here**

Signature of donor _____ Date _____

**Paid Preparer Use Only**

| Print/Type preparer's name | Preparer's signature | Date | Check ☐ if self-employed | PTIN |
|---|---|---|---|---|
| **HAL J. MICHELS, CPA** | | | | P00445637 |

Firm's name ▶ **ST. CLAIR CPAS, P.C.**    Firm's EIN ▶ **23 2653765**

Firm's address ▶ **101 W. ELM STREET, STE 500**    Phone no. **610-862-1998**
**CONSHOHOCKEN, PA 19428**

LHA    For Disclosure, Privacy Act, and Paperwork Reduction Act Notice, see the instructions for this form.    Form **709** (2017)

706501 11-01-17

8

MG0085

Appx0058

Form 709 (2017)    JEAN DONATO GRASSO    Page 2

**SCHEDULE A** Computation of Taxable Gifts (including transfers in trust) (see instructions)

A  Does the value of any item listed on Schedule A reflect any valuation discount? If "Yes," attach explanation.    Yes ☐  No ☒

B ☐ ◄ Check here if you elect under section 529(c)(2)(B) to treat any transfers made this year to a qualified tuition program as made ratably over a 5-year period beginning this year. See instructions. Attach explanation.

Part 1 — Gifts Subject Only to Gift Tax. Gifts less political organization, medical, and educational exclusions. (see instructions)

| A Item number | B • Donee's name and address • Relationship to donor (if any) • Description of gift • If the gift was of securities, give CUSIP no. • If closely held entity, give EIN | C Donor's adjusted basis of gift | D 2632(b) election out | E Date of gift | F Value at date of gift | G For split gifts, enter 1/2 of column F | H Net transfer (subtract col. G from col. F) |
|---|---|---|---|---|---|---|---|
| 1 | JOSEPH GRASSO 649 DODDS LANE | | | | | | |

Gifts made by spouse — complete only if you are splitting gifts with your spouse and he/she also made gifts.

| | | | | | | | |
|---|---|---|---|---|---|---|---|

Total of Part 1. Add amounts from Part 1, column H .................................................► 1,933,933.

Part 2 — Direct Skips. Gifts that are direct skips and are subject to both gift tax and generation-skipping transfer tax. You must list the gifts in chronological order.

| A Item number | B • Donee's name and address • Relationship to donor (if any) • Description of gift • If the gift was of securities, give CUSIP no. • If closely held entity, give EIN | C 2632(b) election out | D Donor's adjusted basis of gift | E Date of gift | F Value at date of gift | G For split gifts, enter 1/2 of column F | H Net transfer (subtract col. G from col. F) |
|---|---|---|---|---|---|---|---|
| 1 | JOSEPH GRASSO 649 DODDS LANE | | | | | | |

Gifts made by spouse — complete only if you are splitting gifts with your spouse and he/she also made gifts.

| | | | | | | | |
|---|---|---|---|---|---|---|---|

Total of Part 2. Add amounts from Part 2, column H ................................................►

Part 3 — Indirect Skips. Gifts to trusts that are currently subject to gift tax and may later be subject to generation-skipping transfer tax. You must list these gifts in chronological order.

| A Item number | B • Donee's name and address • Relationship to donor (if any) • Description of gift • If the gift was of securities, give CUSIP no. • If closely held entity, give EIN | C 2632(c) election | D Donor's adjusted basis of gift | E Date of gift | F Value at date of gift | G For split gifts, enter 1/2 of column F | H Net transfer (subtract col. G from col. F) |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

Gifts made by spouse — complete only if you are splitting gifts with your spouse and he/she also made gifts.

| | | | | | | | |
|---|---|---|---|---|---|---|---|

Total of Part 3. Add amounts from Part 3, column H ................................................►

(If more space is needed, attach additional statements.)    Form **709** (2017)

765511 11-01-17

9

Case# 2021-22879-0 Docketed at Montgomery County Prothonotary on 11/15/2021 3:17 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**Form 709 (2017)** JEAN DONATO GRASSO
**SCHEDULE A, PART 1 CONTINUATION SHEET**

Part 1 - Gifts Subject Only to Gift Tax. Gifts less political organization, medical, and educational exclusions. (see instructions)

| A Item number | B • Donee's name and address • Relationship to donor (if any) • Description of gift • If the gift was of securities, give CUSIP no. • If closely held entity, give EIN | C | D Donor's adjusted basis of gift | E Date of gift | F Value at date of gift | G For split gifts, enter 1/2 of column F | H Net transfer (subtract col. G from col. F) |
|---|---|---|---|---|---|---|---|
| 1 | GLADWYNE, PA 19035 SON GIFT OF 99% INTEREST IN GF 2014 LP (EIN: 47-2929852). SEE ATTACHED SCHEDULE AND APPRAISAL. | | 233,179. | 01/01/17 | 966,967. | 483,484. | 483,483. |
| 2 | DONNA GRASSO 649 DODDS LANE GLADWYNE, PA 19035 DAUGHTER-IN-LAW GIFT OF 99% INTEREST IN GF 2014 LP (EIN: 47-2929852). SEE ATTACHED SCHEDULE AND APPRAISAL. | | 233,179. | 01/01/17 | 966,966. | 483,483. | 483,483. |

Total of column H | 966,966.

705871 04-01-17

10

Form 709 (2017)

MG0087

Case# 2021-22879-0 Docketed at Montgomery County Prothonotary on 11/15/2021 3:17 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Form 709 (2017)  JEAN DONATO GRASSO

**SCHEDULE A, PART 1, GIFTS MADE BY SPOUSE CONTINUATION SHEET**

Part 1 - Gifts Subject Only to Gift Tax. Gifts less political organization, medical, and educational exclusions. (see instructions)

| A Item number | B • Donee's name and address • Relationship to donor (if any) • Description of gift • If the gift was of securities, give CUSIP no. • If closely held entity, give EIN | C | D Donor's adjusted basis of gift | E Date of gift | F Value at date of gift | G For split gifts, enter 1/2 of column F | H Net transfer (subtract col. G from col. F) |
|---|---|---|---|---|---|---|---|
| | GLADWYNE, PA 19035 SON GIFT OF 99% INTEREST IN GF 2014 LP (EIN: 47-2929852). SEE ATTACHED SCHEDULE AND APPRAISAL. | | 233,179. | 01/01/17 | 966,967. | 483,483. | 483,484. |
| 2 | DONNA GRASSO 649 DODDS LANE GLADWYNE, PA 19035 DAUGHTER-IN-LAW GIFT OF 99% INTEREST IN GF 2014 LP (EIN: 47-2929852). SEE ATTACHED SCHEDULE AND APPRAISAL. | | 233,179. | 01/01/17 | 966,966. | 483,483. | 483,483. |

Gifts made by spouse - complete only if you are splitting gifts with your spouse and he/she also made gifts.

Total of column H                                          966,967.

Form 709 (2017)

725572 04-01-17

11

MG0088

Form 709 (2017)    **JEAN DONATO GRASSO**    Page 3

**Part 4 - Taxable Gift Reconciliation**

| | | | |
|---|---|---|---|
| 1 Total value of gifts of donor. Add totals from column H of Parts 1, 2, and 3 | 1 | 1,933,933. |
| 2 Total annual exclusions for gifts listed on line 1 (see instructions) | 2 | 28,000. |
| 3 Total included amount of gifts. Subtract line 2 from line 1 | 3 | 1,905,933. |

Deductions (see instructions)

| | | | | |
|---|---|---|---|---|
| 4 Gifts of interests to spouse for which a marital deduction will be claimed, based on item numbers _____ of Schedule A _____ | 4 | | | |
| 5 Exclusions attributable to gifts on line 4 | 5 | | | |
| 6 Marital deduction. Subtract line 5 from line 4 | 6 | | | |
| 7 Charitable deduction, based on item nos. _____ less exclusions | 7 | | | |
| 8 Total deductions. Add lines 6 and 7 | | 8 | | |
| 9 Subtract line 8 from line 3 | | 9 | 1,905,933. |
| 10 Generation-skipping transfer taxes payable with this Form 709 (from Schedule D, Part 3, col. H, Total) | | 10 | | |
| 11 Taxable gifts. Add lines 9 and 10. Enter here and on page 1, Part 2 - Tax Computation, line 1 | | 11 | 1,905,933. |

**Terminable Interest (QTIP) Marital Deduction.** (see instructions for Schedule A, Part 4, line 4)

If a trust (or other property) meets the requirements of qualified terminable interest property under section 2523(f), and:

   a. The trust (or other property) is listed on Schedule A, and

   b. The value of the trust (or other property) is entered in whole or in part as a deduction on Schedule A, Part 4, line 4, then the donor shall be deemed to have made an election to have such trust (or other property) treated as qualified terminable interest property under section 2523(f).

If less than the entire value of the trust (or other property) that the donor has included in Parts 1 and 3 of Schedule A is entered as a deduction on line 4, the donor shall be considered to have made an election only as to a fraction of the trust (or other property). The numerator of this fraction is equal to the amount of the trust (or other property) deducted on Schedule A, Part 4, line 6. The denominator is equal to the total value of the trust (or other property) listed in Parts 1 and 3 of Schedule A.

If you make the QTIP election, the terminable interest property involved will be included in your spouse's gross estate upon his or her death (section 2044). See instructions for line 4 of Schedule A. If your spouse disposes (by gift or otherwise) of all or part of the qualifying life income interest, he or she will be considered to have made a transfer of the entire property that is subject to the gift tax. See *Transfer of Certain Life Estates Received From Spouse* in the instructions.

**12 Election Out of QTIP Treatment of Annuities**

   [ ] ◀ Check here if you elect under section 2523(f)(6) not to treat as qualified terminable interest property any joint and survivor annuities that are reported on Schedule A and would otherwise be treated as qualified terminable interest property under section 2523(f). See instructions. Enter the item numbers from Schedule A for the annuities for which you are making this election ▶

| **SCHEDULE B** | **Gifts From Prior Periods** |
|---|---|

If you answered "Yes," on line 11a of page 1, Part 1, see the instructions for completing Schedule B. If you answered "No," skip to the Tax Computation on page 1 (or Schedules C or D, if applicable). Complete Schedule A before beginning Schedule B. See instructions for recalculation of the column C amounts. Attach calculations.

| A Calendar year or calendar quarter (see instructions) | B Internal Revenue office where prior return was filed | C Amount of applicable credit (unified credit) against gift tax for periods after December 31, 1976 | D Amount of specific exemption for prior periods ending before January 1, 1977 | E Amount of taxable gifts |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| 1 Totals for prior periods | 1 | | | |

| | | | |
|---|---|---|---|
| 2 Amount, if any, by which total specific exemption, line 1, column D is more than $30,000 | 2 | |
| 3 Total amount of taxable gifts for prior periods. Add amount on line 1, column E and amount, if any, on line 2. Enter here and on page 1, Part 2 - Tax Computation, line 2 | 3 | |

*(If more space is needed, attach additional statements.)*

705521  11-01-17

Form **709** (2017)

12

MG0089

Case# 2021-22879-0 Docketed at Montgomery County Prothonotary on 11/15/2021 3:17 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Appx0062

Case# 2021-22879-0 Docketed at Montgomery County Prothonotary on 11/15/2021 3:17 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Form 709 (2017)   JEAN DONATO GRASSO ▬▬▬▬▬ Page 4

**SCHEDULE C | Deceased Spousal Unused Exclusion (DSUE) Amount and Restored Exclusion**

Provide the following information to determine the DSUE amount and applicable credit received from prior spouses. Complete Schedule A before beginning Schedule C.

| A<br>Name of Deceased Spouse (dates of death after December 31, 2010 only) | B<br>Date of Death | C<br>Portability Election Made?<br>Yes \| No | D<br>If "Yes," DSUE Amount Received from Spouse | E<br>DSUE Amount Applied by Donor to Lifetime Gifts (list current and prior gifts) | F<br>Date of Gift(s) (enter as mm/dd/yy for Part 1 and as yyyy for Part 2) |
|---|---|---|---|---|---|
| **Part 1 - DSUE RECEIVED FROM LAST DECEASED SPOUSE** | | | | | |
| **Part 2 - DSUE RECEIVED FROM PREDECEASED SPOUSE(S)** | | | | | |
| | | | | | |

TOTAL (for all DSUE amounts applied from column E for Part 1 and Part 2)

1  Donor's basic exclusion amount (see instructions) ......... 1
2  Total from column E, Parts 1 and 2 ......... 2
3  Restored Exclusion Amount (see instructions) ......... 3
4  Add lines 1, 2, and 3 ......... 4
5  Applicable credit on amount in line 4 (See *Table for Computing Gift Tax* in the instructions). Enter here and on line 7, Part 2 - Tax Computation ......... 5

**SCHEDULE D | Computation of Generation-Skipping Transfer Tax**

Note: Inter vivos direct skips that are completely excluded by the GST exemption must still be fully reported (including value and exemptions claimed) on Schedule D.

Part 1 - Generation-Skipping Transfers

| A<br>Item No.<br>(from Schedule A, Part 2, col. A) | B<br>Value (from Schedule A, Part 2, col. H) | C<br>Nontaxable Portion of Transfer | D<br>Net Transfer (subtract col. C from col. B) |
|---|---|---|---|
| | | | |
| Gifts made by spouse (for gift splitting only) | | | |
| | | | |

*(If more space is needed, attach additional statements.)*                                  Form 709 (2017)

705531  11-01-17

MG0090

Appx0063

Form 709 (2017)   JEAN DONATO GRASSO                                                                 Page 5

**Part 2 - GST Exemption Reconciliation (Section 2631) and Section 2652(a)(3) Election**

Check here ▶ ☐ if you are making a section 2652(a)(3) (special QTIP) election (see instructions)

Enter the item numbers from Schedule A of the gifts for which you are making this election ▶

| | | |
|---|---|---|
| 1 | Maximum allowable exemption (see instructions) | 1 | 5,490,000. |
| 2 | Total exemption used for periods before filing this return | 2 | |
| 3 | Exemption available for this return. Subtract line 2 from line 1 | 3 | 5,490,000. |
| 4 | Exemption claimed on this return from Part 3, column C total, below | 4 | |
| 5 | Automatic allocation of exemption to transfers reported on Schedule A, Part 3. To opt out of the automatic allocation rules, you must attach an "Election Out" statement. (see instructions) | 5 | |
| 6 | Exemption allocated to transfers not shown on line 4 or 5, above. You must attach a "Notice of Allocation." (see instructions) | 6 | |
| 7 | Add lines 4, 5, and 6 | 7 | |
| 8 | Exemption available for future transfers. Subtract line 7 from line 3 | 8 | 5,490,000. |

**Part 3 - Tax Computation**

| A Item No. (from Schedule D, Part 1) | B Net Transfer (from Schedule D, Part 1, col. D) | C GST Exemption Allocated | D Divide col. C by col. B | E Inclusion Ratio (Subtract col. D from 1.000) | F Maximum Estate Tax Rate | G Applicable Rate (multiply col. E by col. F) | H Generation-Skipping Transfer Tax (multiply col. B by col. G) |
|---|---|---|---|---|---|---|---|
| | | | | | 40% (.40) | | |
| | | | | | 40% (.40) | | |
| | | | | | 40% (.40) | | |
| | | | | | 40% (.40) | | |
| | | | | | 40% (.40) | | |
| | | | | | 40% (.40) | | |
| Gifts made by spouse (for gift splitting only) | | | | | | | |
| | | | | | 40% (.40) | | |
| | | | | | 40% (.40) | | |
| | | | | | 40% (.40) | | |
| | | | | | 40% (.40) | | |
| | | | | | 40% (.40) | | |
| Total exemption claimed. Enter here and on Part 2, line 4, above. May not exceed Part 2, line 3, above | | | Total generation-skipping transfer tax. Enter here; on page 3, Schedule A, Part 4, line 10; and on page 1, Part 2 - Tax Computation, line 16 | | | | |

*(If more space is needed, attach additional statements.)*                                    Form **709** (2017)

703532  11-01-17

14

MG0091

Case# 2021-22879-0 Docketed at Montgomery County Prothonotary on 11/15/2021 3:17 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Appx0064

Case 2:21-cv-05472-CMR   Document 1   Filed 12/15/21   Page 43 of 64

# EXHIBIT C

Case# 2021-22879-0 Docketed at Montgomery County Prothonotary on 11/15/2021 3:17 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2017-02140-0030 Docketed at Montgomery County Prothonotary on 11/16/2020 2:03:45 PM, Fee = $0.00. The file certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

## COMMONWEALTH OF PENNSYLVANIA

## IN THE COURT OF COMMON PLEAS OF MONTGOMERY COUNTY

Marshall J. Katz                     :
                                     :
                                     :
                                     : File No.    2017-02140
                                     :
Joseph Grasso                        :
                                     :
                                     :

## SUBPOENA TO ATTEND AND TESTIFY

TO:  Michael Grasso
     Metro Mortgage Partners
     120 East Lancaster Ave.
     Ardmore, PA  19003

1.  You are ordered by the Court to come to Montgomery McCracken's Offices at 1735 Market St.,

    21st Floor, Philadelphia, PA 19103 or other mutually agreed upon location.
                          (Specify courtroom or other place)

at _____, Philadelphia County, Pennsylvania, on December 1, 2020

at  9:30        o'clock A. M., to testify on behalf of  Plaintiff/Judgment Marshall Katz

in the above case, and to remain until excused.

2.  And bring with you the following:  the Documents identified in Exhibit A.


        **If you fail to attend or to produce the documents or things required by this subpoena, you may be subject to the sanctions authorized by Rule 234.5 of the Pennsylvania Rules of Civil Procedure, including but not limited to costs, attorney fees and imprisonment.**

**ISSUED BY A PARTY/ATTORNEY IN COMPLIANCE WITH Pa.R.C.P.No.234.2 (a)**

NAME: David Dormont

ADDRESS: Montgomery McCracken Walker & Rhoads LLP

 1735 Market Street, Philadelphia, PA  19103

TELEPHONE:  215-772-7280

SUPREME COURT ID #:   66252

                                    BY THE COURT:
                                            _____ Prothonotary

DATE: 11/12/2020  _____         _____
           /Seal of the Court                    Agent/Deputy

**OFFICIAL NOTE:** This form of subpoena shall be used whenever a subpoena is issuable including hearings in connection with depositions and before arbitrators, masters, commissioners, etc. in compliance with Pa.R.C.P.No.234.1. If a subpoena for production of documents, records or things is desired, complete paragraph 2.

## Notice of Language Rights



**FREE INTERPRETER**
PO Box 311 Norristown, PA 19404
languageaccesscoordinator@montcopa.org
610-278-3231
www.pacourts.us/language-rights

**Spanish/Español:** Usted tiene derecho a un intérprete libre de costo. Para solicitar un intérprete favor de informárselo al personal judicial utilizando la información provista en la parte superior de este aviso.

**Russian/Русский:** У вас есть право на бесплатные услуги переводчика. Заявка на переводчика подается в суд по адресу, телефону или эл. почте, указанным выше в заголовке этого уведомления.

**Mandarin/Cantonese Simplified Chinese/普通话/粤语简体中文:** 您有权获得得免费的口译员服务。若需要口译员，请使用本通知上方提供的联系信息通知法院工作人员。

**Korean/한국어:** 귀하는 비용에 대한 부담 없이 통역 서비스를 받을 권리가 있습니다. 통역 서비스를 요청하려면 본 통지서의 상단에

**Arabic/العربية:** يحق لك الحصول على خدمات مترجم فوري مجاناً. لطلب مترجم فوري، يرجى إخطار موظفي المحكمة باستخدام المعلومات الواردة في الجزء العلوي من هذا الإشعار.

---

**RETURN OF SERVICE:**

On the _____ day of _____, 20___,

I, _____

served _____
(NAME OF PLACE SERVED)

the foregoing subpoena by: _____
method of service)

I verify that the statements in this return of service are true and correct. I understand that false statements herein are made subject to the penalties of 18 Pa.C.S.A. § 4904 relating to unsworn falsification to authorities.

DATE: _____

_____
(SIGNATURE)

Appx0067

# EXHIBIT A

The deponent **Michael Grasso** is hereby directed to bring to the deposition the following **documents:**[1]

1.     All documents related to the formation of GF 2014 L.P., including any partnership agreements and documents related to the funding of GF 2014 L.P.

2.     All documents modifying and/or amending GF 2014 L.P.'s formation documents, including any change to the partnership agreements.

3.     All annual financial statements prepared (internally and/or externally) for GF 2014 L.P. from 2016 to date.

4.     GF 2014 L.P.'s financial records (including, but not limited to, balance sheets, income statements, and check registers) from January 1, 2017 to date.

5.     All bank, credit union, or other financial institution statements from January 1, 2017 to date for all checking accounts of every kind in which GF 2014 L.P. has a direct or indirect interest of any kind, individually or jointly with someone else, or through a business entity in which it has an interest.

6.     All bank, credit union, or other financial institution statements from January 1, 2017 to date for all savings accounts of every kind in which GF 2014 L.P. has a direct or indirect interest of any kind, individually or jointly with someone else, or through a business entity in which it has an interest.

7.     All bank, credit union, or other financial institution statements from January 1, 2017 to date for all certificates of deposit of every kind in which GF 2014 L.P. a direct or indirect interest

---

[1]    The terms "document" and "documents" shall have the broadest meaning permitted under the applicable court rules and shall include any and all written, typed, printed, recorded or graphic material, however produced, reproduced or stored, whether an original or a copy, and whether prepared, published or released by any person or entity, including but not limited to, memoranda, letters, reports, agreements, contracts, correspondence, electronic mail, text messages, instant messages, voicemail, audio files, spreadsheets, databases, social media **postings, telegrams, minutes or records of meetings, reports, summaries, lists, drafts, re**visions, **invoices, receipts, original and preliminary notes, sketches, records, ledgers, contracts, b**ills, inventories, financial data, accounting and fin**ancial records, diaries, journals, calendars,** statements, work papers, videotapes, cassette tapes, photographs, pamphlets, brochures, advertisements, trade letters, press releases, tables, articles, conversation summaries, and printouts. It also includes information stored electronically, whether in a computer database, the cloud, the Internet, or otherwise, and includes information stored in electronic form on magnetic, optical, or other forms of media such as disks, CD-ROM, optical disks, ROM, and tape, regardless of whether such documents are presently also in non-electronic form.

of any kind, individually or jointly with someone else, or through a business entity in which it has an interest.

8.      All statements, paper or electronic mailings, from January 1, 2017 to date from any brokerage or investment firm at which GF 2014 L.P. maintains an account in which it has a direct or indirect interest of any kind, individually or jointly with someone else, or through a business entity in which it has an interest.

9.      GF 2014 L.P.'s last four filed tax returns filed with or prepared for any federal, state, or local taxing authority.

10.     Any and all agreements between GF 2014 L.P. and Defendant Joseph Grasso and/or Donna Ohara Grasso.

11.     Any and all agreements between GF 2014 L.P. and any entity Defendant Joseph Grasso and/or Donna Ohara Grasso control, operate, oversee or have an ownership interest of at least 10%.

12.     Any and all communications between Defendant Joseph Grasso and any entity the Deponent controls, operates, oversees or has an ownership interest of at least 10%, from January 1, 2017 to date.

13.     Any and all checks that the Deponent wrote and/or signed payable to Defendant Joseph Grasso and/or Donna Ohara Grasso from January 1, 2017 to date.

14.     Any and all documents evidencing any payments and/or transfers that the Deponent made on behalf of Defendant Joseph Grasso and/or Donna Ohara Grasso from January 1, 2017 to date.

15.     Any and all documents evidencing any payment and/or transfers that any entity the Deponent controls, operates, oversees or has an ownership interest of at least 10%, on behalf of Defendant Joseph Grasso and/or Donna Ohara Grasso from January 1, 2017 to date.

16.     Any and all documents evidencing any payments and/or transfers that the Deponent made to an entity that Defendant Joseph Grasso and/or Donna Ohara Grasso own or control from January 1, 2017 to date.

17.     Any and all documents evidencing any payments and/or transfers that any entity that the Deponent controls, operates, oversees or has an ownership interest of at least 10%, on behalf an entity that Defendant Joseph Grasso and/or Donna Ohara Grasso own or control from January 1, 2017 to date.

18.     Any and all documents (including any statements) submitted by GF 2014 L.P. to any insurance company that insured the property at 649 Dodds Lane, Gladwyne, PA 19035 at the time of the November 2018 explosion at the property.

19.    Copies of all utility bills for 649 Dodds Lane, Gladwyne, PA 19035 from January 1, 2020 to date.

20.    Any and all documents evidencing any payments and/or transfers that Defendant Joseph Grasso and/or Donna Ohara Grasso made to the Deponent from January 1, 2017 to date.

21.    Any and all documents evidencing any payments and/or transfers that Defendant Joseph Grasso and/or Donna Ohara Grasso made to any entity that the Deponent controls, operates, oversees or has an ownership interest of at least 10%, from January 1, 2017 to date.

Appx0070

# EXHIBIT D

Case# 2021-22879-0 Docketed at Montgomery County Prothonotary on 11/15/2021 3:17 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2021-22879-0 Docketed at Montgomery County Prothonotary on 11/15/2021 3:17 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**David Dormont, Esquire**
**PA I.D. No. 66252**
**MONTGOMERY MCCRACKEN WALKER**          **Attorneys for Plaintiff**
  **& RHOADS LLP**
**1735 Market Street, 21st Floor**
**Philadelphia, PA  19103**
**Tel: (215) 772-1500**
**Email: ddormont@mmwr.com**

| | |
|---|---|
| **MARSHALL KATZ,**<br>    **Plaintiff,**<br><br>      **v.**<br><br>**JOSEPH GRASSO,**<br>    **Defendant** | **COURT OF COMMON PLEAS**<br>**MONTGOMERY COUNTY**<br><br>**Case No. 2017-02140** |

## NOTICE OF DEPOSITION

**TO:**    Maurice Mitts, Esq.
        Mitts Law LLC
        1822 Spruce Street
        Philadelphia, PA 19103
        mmitts@mittslaw.com

Please take notice that, pursuant to the Pennsylvania Rules of Civil Procedure 3117(a) and 4007.1(a), Plaintiff/Judgment Creditor Marshall Katz, by and through his attorneys, will take the deposition of **Clarke & Cohen** before an officer duly authorized to administer oaths at the law offices of **Montgomery McCracken Walker & Rhoads LLP, 1735 Market Street, Philadelphia, Pennsylvania, 19103,** or other mutually agreed to location, beginning on **Monday, July 12, 2021** at **9:30 a.m.**

Pursuant to Pa. R. Civ. P. 4007.1(e), Clarke & Cohen has been directed to designate one or more officers, directors, managing agents or other persons who consent to testify on its behalf concerning the following topics:

Case# 2021-22879-0 Docketed at Montgomery County Prothonotary on 11/15/2021 3:17 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

a. The preparation and support for the Sworn Statement in Proof of Loss under the American Home Assurance Company, Company Claim No. 9549224463US, Policy No. 026032320 (a copy of which Proof of Loss is attached hereto as Exhibit 1);

b. The preparation and support for the Sworn Statement in Proof of Loss under the American Home Assurance Company, Company Claim No. 8346143042US, Policy No. 026032320 (a copy of which Proof of Loss is attached hereto as Exhibit 2);

c. The preparation and support for any other Sworn Statement in Proof of Loss filed regarding the November 4, 2018 explosion at 649 Dodds Lane, Gladwyne, PA 19035;

d. Any communication between Clarke & Cohen and Joseph Grasso related to the property located at 649 Dodds Lane, Gladwyne, PA 19035; and

e. The value of any improvements made to the buildings located at 649 Dodds Lane, Gladwyne, PA 19035 prior to the November 4, 2018 explosion.

Clarke and Cohen is further directed to bring to the deposition all documents[1] related to or concerning:

a. The Sworn Statement in Proof of Loss under the American Home Assurance Company, Company Claim No. 9549224463US, Policy No. 026032320 (a copy of which Proof of Loss is attached hereto as Exhibit 1), including, but not limited, to all documents supporting, considered and/or relied upon in calculating the amount of the Full Cost of Repaid or Replacement of ">3,000,000";

---

[1] The terms "document" and "documents" shall have the broadest meaning permitted under the applicable court rules and shall include any and all written, typed, printed, recorded or graphic material, however produced, reproduced or stored, whether an original or a copy, and whether prepared, published or released by any person or entity, including but not limited to, memoranda, letters, reports, agreements, contracts, correspondence, electronic mail, text messages, instant messages, voicemail, audio files, spreadsheets, databases, social media postings, telegrams, minutes or records of meetings, reports, summaries, lists, drafts, revisions, invoices, receipts, original and preliminary notes, sketches, records, ledgers, contracts, bills, inventories, financial data, accounting and financial records, diaries, journals, calendars, statements, work papers, videotapes, cassette tapes, photographs, pamphlets, brochures, advertisements, trade letters, press releases, tables, articles, conversation summaries, and printouts. It also includes information stored electronically, whether in a computer database, the cloud, the Internet, or otherwise, and includes information stored in electronic form on magnetic, optical, or other forms of media such as disks, CD-ROM, optical disks, ROM, and tape, regardless of whether such documents are presently also in non-electronic form.

Case# 2021-22879-0 Docketed at Montgomery County Prothonotary on 11/15/2021 3:17 PM. Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

    b.  The Sworn Statement in Proof of Loss under the American Home Assurance Company, Company Claim No. 8346143042US, Policy No. 026032320 (a copy of which Proof of Loss is attached hereto as Exhibit 2), including, but not limited, to all documents supporting, considered and/or relied upon in calculating the amount of the Full Cost of Repaid or Replacement of $3,339,818.59;

    c.  Any other Sworn Statement in Proof of Loss filed related to the November 4, 2018 explosion at 649 Dodds Lance, Gladwyne, PA 19035; and.

    d.  The property located at 649 Dodds Lane, Gladwyne, PA 19035, including, but not limited to, any documents related to the improvements made to the buildings located at 649 Dodds Lane, Gladwyne, PA 19035 prior to the November 4, 2018 explosion.

The deposition will continue from day to day until completed or adjourned. You are invited to attend and participate.

**Date**: June 21, 2021

                            **MONTGOMERY MCCRACKEN WALKER & RHOADS LLP**

                            By: */s/ David Dormont*
                                   **David Dormont**
                                   **PA ID No. 66252**
                                   **1735 Market Street**
                                   **Philadelphia, PA 19103-7505**
                                   **(215) 772-7280**
                                   **ddormont@mmwr.com**
                                   **Attorney for the Plaintiff/ Judgment Creditor Marshall Katz**

Case# 2021-22879-0 Docketed at Montgomery County Prothonotary on 11/15/2021 3:17 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

## SWORN STATEMENT IN PROOF OF LOSS

| | |
|---|---|
| 026032320 | 9549224463US |
| POLICY NUMBER | COMPANY CLAIM NO |
| $   126,407,884 | 026032320 |
| AMOUNT OF POLICY AT | POLICY NO. |
| TIME OF LOSS | |
| 8-17-2017 | The Graham Company |
| DATE ISSUED | AGENCY AT |
| 8-17-2019 | Lisa Talley |
| DATE EXPIRES | AGENT |

To the   American Home Assurance Company
of   175 Water Street, New York, New York 10038
At time of loss, by the above indicated policy of insurance you insured   U.S. Realty Associates, Inc.

against loss by   All Risks of Physical Loss or Damage   to the property described according to
the terms and conditions of the said policy and all forms, endorsements, transfers and assignments attached thereto.

1. Time and Origin: An   explosion   loss occurred about the hour of   8   o'clock   P   M.,

On the   4th   day of   November   20  18  , The cause and origin of the said loss were;
An explosion resulting from a gas leak. The cause of the gas leak is undetermined following the ATF's investigation.

2. Occupancy: The building described, or containing the property described, was occupied at the time of the loss, as follows, and
for no other purpose whatever:   Residence - Mansion occupied by entrusted party

3. Title and Interest: At the time of the loss the interest of your insured in the property described therein was
U.S. Realty Associates, Inc.   No other person or persons had any interest therein
or encumbrance thereon, except:   None known

4. Changes: Since the said policy was issued there has been no assignment thereof, or change of interest, use, occupancy,
possession, location or exposure of the property described, except:   None Known

5. Total Insurance: The total amount of insurance upon the property described by this policy was, at the time of the loss,
$   126,407,884   .

| | | | | |
|---|---|---|---|---|
| 6. | Full Cost of said property at time of loss . . . . . . . . . . . . . | $ | Undetermined |
| 7. | Full Cost of Repair or Replacement . . . . . . . . . . . . . . . . | $ | >3,000,000 |
| 8. | Applicable Depreciation, Betterment and/or Reduction . . . . . . . . | $ | N/A |
| 9. | Undisputed amount agreed for first partial payment . . . . . . . . | $ | 3,000,000 |

The said loss did not originate by any act, design or procurement on the part of your insured, or this affiant; nothing has been done by or
with the privity or consent of your insured or this affiant, to violate the conditions of the policy, or render it void; no articles are mentioned
herein or in annexed schedules but such as were destroyed or damaged at the time of said loss; no property saved has in any manner
been concealed, and no attempt to deceive the said company, as to the extent of said loss, has in any manner been made. Any other
information that may be required will be furnished and considered a part of this proof.

The furnishing of this blank or the preparation of proofs by a representative of the above Insurance company is not a waiver of any of
its rights.

State of   Pennsylvania
County of   Montgomery

US Realty Associates, Inc.
By
X _____   Insured
Michael Grasso, President   20 20

Subscribed and sworn to before me this   30th   day of   January   20

_____ Notary Public

Commonwealth of Pennsylvania - Notary Seal
Robert A. Greenberg, Notary Public
Montgomery County
My commission expires December 1, 2021
Commission number 1062272
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

## EXHIBIT
## 1

MG00240

Case# 2021-22879-0 Docketed at Montgomery County Prothonotary on 11/15/2021 3:17 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

## SWORN STATEMENT IN PROOF OF LOSS

| | |
|---|---|
| 025032320 **POLICY NUMBER** | 8346143042US **COMPANY CLAIM NO** |
| $ 125,407,884 **AMOUNT OF POLICY AT TIME OF LOSS** | 025032320 **POLICY NO.** |
| 8-17-2017 **DATE ISSUED** | The Graham Company **AGENCY AT** |
| 8-17-2019 **DATE EXPIRES** | Lisa Talley **AGENT** |

To the   American Home Assurance Company

of   175 Water Street, New York, New York 10038

At time of loss, by the above indicated policy of insurance you insured   U.S. Realty Associates, Inc.

against loss by   All Risks of Physical Loss or Damage   to the property described according to the terms and conditions of the said policy and all forms, endorsements, transfers and assignments attached thereto.

1. Time and Origin: An   explosion   loss occurred about the hour of   8   o'clock   P   M.,

On the   4th   day of   November   20 18 .   The cause and origin of the said loss were: An explosion resulting from a gas leak. The cause of the gas leak is undetermined following the ATF's investigation.

2. Occupancy: The building described, or containing the property described, was occupied at the time of the loss as follows, and for no other purpose whatever:   Residence - Mansion occupied by entrusted party

3. Title and Interest: At the time of the loss the interest of your insured in the property described therein was U.S. Realty Associates, Inc.   No other person or persons had any interest therein or encumbrance thereon, except:   None known

4. Changes: Since the said policy was issued there has been no assignment thereof, or change of interest, use, occupancy, possession, location or exposure of the property described, except:   None Known

5. Total Insurance: The total amount of insurance upon the property described by this policy was, at the time of the loss, $ 125,407,884 .

| | | |
|---|---|---|
| 6. Full Cost of said property at time of loss. . . . . . . . . . . . . . . . . . . | $ | Undetermined |
| 7. Undisputed Amount of Repair or Replacement . . . . . . . . . . . . . . . | $ | 3,339,818.59 |
| 8. Applicable Depreciation, Betterment and/or Reduction . . . . . . . . . . | $ | (209,442.67) |
| 9. Minus Previous Payment . . . . . . . . . . . . . . . . . . . | $ | (3,000,000) |
| 10. Minus Deductible . . . . . . . . . . . . . . . . . . . . . | $ | (10,000) |
| 11. Undisputed amount of second partial payment . . . . . . . . . . . . . | $ | 120,375.92 |

The said loss did not originate by any act, design or procurement on the part of your insured, or this affiant; nothing has been done by or with the privity or consent of your insured or this affiant, to violate the conditions of the policy, or render it void; no articles are mentioned herein or in annexed schedules but such as were destroyed or damaged at the time of said loss; no property saved has in any manner been concealed, and no attempt to deceive the said company, as to the extent of said loss, has in any manner been made.  Any other information that may be required will be furnished and considered a part of this proof.

The furnishing of this blank or the preparation of proofs by a representative of the above insurance company is not a waiver of any of its rights.
US Realty Associates, Inc.

State of   Pennsylvania

County of   Montgomery   By   Michael Grasso President   Insured

Subscribed and sworn to before me this   28th   day of   February   20 20

_____ Notary Public

Commonwealth of Pennsylvania - Notary Seal
Robert A. Greenberg, Notary Public
Montgomery County
My commission expires December 1, 2021
Commission number 1062272
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

## EXHIBIT 2

MG00242

Appx0076

# EXHIBIT E

Case# 2021-22879-0 Docketed at Montgomery County Prothonotary on 11/15/2021 3:17 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2021-22879-0 Docketed at Montgomery County Prothonotary on 11/15/2021 3:17 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**David Dormont, Esquire**
**PA I.D. No. 66252**
**MONTGOMERY MCCRACKEN WALKER**                    **Attorneys for Plaintiff**
  **& RHOADS LLP**
**1735 Market Street, 21st Floor**
**Philadelphia, PA  19103**
**Tel: (215) 772-1500**
**Email: ddormont@mmwr.com**

| | |
|---|---|
| **MARSHALL J. KATZ,**<br>          **Plaintiff,**<br>     **v.**<br><br>**JOSEPH GRASSO,**<br>          **Defendant.** | **PHILADELPHIA COUNTY**<br>**COURT OF COMMON PLEAS**<br>**TRIAL DIVISION**<br><br>**January TERM, 2021**<br>**Case No.  00616** |

## <u>NOTICE OF DEPOSITION</u>

**TO:**   Maurice Mitts, Esq.
          Michael Duffy, Esq.
          Mitts Law LLC
          1822 Spruce Street
          Philadelphia, PA 19103
          mmitts@mittslaw.com
          mduffy@mittslaw.com

Please take notice that, pursuant to the Pennsylvania Rules of Civil Procedure 3117(a) and

4007.1(a), Plaintiff/Judgment Creditor Marshall Katz, by and through his attorneys, will take the

deposition of the **Custodian of Records of BHH Affiliates, LLC t/a Fox & Roach** before an

officer duly authorized to administer oaths at the law offices of **Montgomery McCracken Walker**

**& Rhoads LLP, 1735 Market Street, 21st Floor, Philadelphia, Pennsylvania, 19103,** or other

mutually agreed upon location, beginning on **October 8, 2021** at **10:00 a.m.**

Case# 2021-22879-0 Docketed at Montgomery County Prothonotary on 11/15/2021 3:17 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

The deponent has been directed to bring to the deposition all documents[1] related to or concerning Joseph Grasso, Donna Grasso, and/or GF 2014, including but not limited to:

1. All documents related to or concerning any agreement between Joseph Grasso, Donna Grasso, and/or GF 2014 L.P., as the buyers and Joseph Soffer and/or Cheryl Soffer, as the sellers, for the real estate located at 817 Muirfield Rd., Bryn Mawr, Lower Merion Township, PA 19010 from October 1, 2019 to date;

2. All documents related to and/or concerning the Iron Hill Company check numbered 6448 and dated January 2, 2020 made payable to Fox Roach, LP in the amount of $100,000;

3. Any brokerage agreement between Joseph Grasso, Donna Grasso, and/or GF 2014 L.P., on one hand, and Berkshire Hathaway Home Services Fox and Roach, and/or Lynn and/or Harris Berger, on the other, from January 1, 2016 to date;

4. All documents related to or concerning the sale or offer to sell the property located at 649 Dodds Lane, Gladwyne, Pennsylvania 19035, including, not limited to, Seller's Property Disclosure Statements and Agreement for the sale of the property, from January 1, 2017 to date;

---

[1] The terms "document" and "documents" shall have the broadest meaning permitted under the applicable court rules and shall include any and all written, typed, printed, recorded or graphic material, however produced, reproduced or stored, whether an original or a copy, and whether prepared, published or released by any person or entity, including but not limited to, memoranda, letters, reports, agreements, contracts, correspondence, electronic mail, text messages, instant messages, voicemail, audio files, spreadsheets, databases, social media postings, telegrams, minutes or records of meetings, reports, summaries, lists, drafts, revisions, invoices, receipts, original and preliminary notes, sketches, records, ledgers, contracts, bills, inventories, financial data, accounting and financial records, diaries, journals, calendars, statements, work papers, videotapes, cassette tapes, photographs, pamphlets, brochures, advertisements, trade letters, press releases, tables, articles, conversation summaries, and printouts. It also includes information stored electronically, whether in a computer database, the cloud, the Internet, or otherwise, and includes information stored in electronic form on magnetic, optical, or other forms of media such as disks, CD-ROM, optical disks, ROM, and tape, regardless of whether such documents are presently also in non-electronic form.

5.  All documents related to or concerning the renting or leasing of the property located at 373
    Righters Mill Road, Gladwyne, Pennsylvania 19035 from July 1, 2018 to date;

6.  All communications between Joseph Grasso, Donna Grasso, and/or GF 2014 L.P., on one
    hand, and Berkshire Hathaway Home Services Fox and Roach, and/or Lynn and/or Harris
    Berger, on the other, from January 1, 2016 to date.

Date: **September 28, 2021**

                                           **MONTGOMERY MCCRACKEN WALKER &**
                                           **RHOADS LLP**

                                           **By: _/s/ David Dormont_**
                                                  **David Dormont**
                                                    **PA ID No. 66252**
                                                    **1735 Market Street**
                                                    **Philadelphia, PA 19103-7505**
                                                    **(215) 772-7280**
                                                    **ddormont@mmwr.com**
                                                    **Attorney for the Plaintiff/ Judgment**
                                                    **Creditor Marshall Katz**

Case# 2021-22879-0 Docketed at Montgomery County Prothonotary on 11/15/2021 3:17 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Appx0080

# Katz Notice of Removal

# <u>EXHIBIT B</u>

William A. Harvey (Pa. I.D. #25344)
Jordan Rand (Pa. I.D. #208671)
**KLEHR HARRISON HARVEY
BRANZBURG LLP**
1835 Market Street, Suite 1400
Philadelphia, PA 19103
*Attorneys for Michael Grasso*

| | |
|---|---|
| MICHAEL GRASSO t/a General Partner of GF 2014, L.P.<br><br>Plaintiff,<br><br>vs.<br><br>TOBY KATZ<br><br>Defendant. | COURT OF COMMON PLEAS OF MONTGOMERY COUNTY, PENNSYLVANIA<br><br>DOCKET NO. 2021-22879 |

### ACCEPTANCE OF SERVICE

I, David Dormont, am authorized to and do accept service of the Complaint in this matter on behalf of the defendant, Toby Katz, effective November 24, 2021.

David Dormont
**MONTGOMERY MCCRACKEN
WALKER & RHOADS LLP**
1735 Market Street, 21st Floor
Philadelphia, PA 19103
Ph: 215-772-7280
ddormont@mmwr.com
*Attorneys for Defendant Toby Katz*

Date: November 24, 2021

Appx0082

# Katz Notice of Removal

# <u>EXHIBIT C</u>

**Montgomery McCracken Walker & Rhoads LLP**
**By:    David Dormont**
**ddormont@mmwr.com**
**PA Attorney Identification No.: 66252**
**1735 Market Street**
**Philadelphia, PA 19103-7505**
**Telephone No.: (215) 772-7280**
***Attorneys for Defendant Toby Katz***

| | |
|---|---|
| **MICHAEL GRASSO, a/t General Partner of GF 2014, L.P.**<br>    **Plaintiff,**<br><br>    **v.**<br>**TOBY KATZ,**<br>    **Defendant.** | **COURT OF COMMON PLEAS**<br>**MONTGOMERY COUNTY**<br><br>**Case No. 2021-22879** |

<u>**NOTICE OF FILING OF NOTICE OF REMOVAL**</u>

PLEASE TAKE NOTICE THAT on December 15, 2021, Defendant Toby Katz in the above-captioned action removed this action to the United States District Court for the Eastern District of Pennsylvania by filing a Notice of Removal in that Court. A copy of the Notice of Removal is attached hereto as <u>Exhibit 1</u>. Accordingly, and pursuant to 28 U.S.C. § 1446(d), this Court may proceed no further unless and until the case is remanded.

Dated: December 15, 2021                     Respectfully submitted,


                                             /s/  David Dormont
                                             David Dormont (Bar I.D. 66252)
                                             **MONTGOMERY, MCCRACKEN,**
                                             **WALKER & RHOADS LLP**
                                             1735 Market Street, 21st Floor
                                             Philadelphia, PA 19103
                                             (215) 772-1500

                                             *Attorneys for Defendant Toby Katz*

Appx0084

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on December 15, 2021, a true and correct copy of the foregoing Notice

of Filing Notice of Removal was served by e-mail to the party listed below:

William A. Harvey, Esq.
Jordan Rand, Esq.
Klehr Harrison Harvey Branzburg LLP
1835 Market Street, Suite 1400
Philadelphia, PA 19103

*Attorneys for Plaintiff Michael Grasso trading*
*as General Partner of GF 2014, L.P.*

/s/  David Dormont
David Dormont (Bar I.D. 66252)
**MONTGOMERY, MCCRACKEN,**
**WALKER & RHOADS LLP**
1735 Market Street, 21st Floor
Philadelphia, PA 19103
(215) 772-1500

*Attorneys for Defendant Toby Katz*

**Appx0085**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 15, 2021, a true and correct copy of the foregoing Notice

of Removal was served by e-mail to the party listed below:

William A. Harvey, Esq.
Jordan Rand, Esq.
Klehr Harrison Harvey Branzburg LLP
1835 Market Street, Suite 1400
Philadelphia, PA 19103

*Attorneys for Plaintiff Michael Grasso trading
as General Partner of GF 2014, L.P.*

/s/  David Dormont
David Dormont (Bar I.D. 66252)
Kelly Huff (Bar I.D. 319084)
**MONTGOMERY, MCCRACKEN,
WALKER & RHOADS LLP**
1735 Market Street, 21st Floor
Philadelphia, PA 19103
(215) 772-1500

*Attorneys for Defendant Toby Katz*

5689213v1

**Appx0086**

JS 44  (Rev. 10/20)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Michael Grasso, individually and as General Partner of GF 2014 LP

**(b)** County of Residence of First Listed Plaintiff    Montgomery
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Jordan Rand, 1835 Market St., Phila. PA: 215-569-3024

## DEFENDANTS

Toby Katz

County of Residence of First Listed Defendant    **Illinois**
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

David Dormont, 1735 Market St., Phila, PA: 215-772-7280

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | | | |
|---|---|---|---|
| ☐ 1 | U.S. Government Plaintiff | ☐ 3 | Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 | U.S. Government Defendant | ☒ 4 | Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☒ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Pharmaceutical Personal Injury | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 190 Other Contract | ☒ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | **SOCIAL SECURITY** | ☐ 485 Telephone Consumer Protection Act |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/Exchange |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | |
|---|---|---|---|---|---|
| ☐ 1 Original Proceeding | ☒ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer | ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:

Brief description of cause:
Claims for abuse of process, tortious interference and declaratory judgment stemming from bad faith litigation tactics

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

**DEMAND $**
None at this time

CHECK YES only if demanded in complaint:
**JURY DEMAND:**  ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*    JUDGE    RUFE    DOCKET NUMBER    20-cv-06320

DATE
January 11, 2022

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE          MAG. JUDGE

Appx0087

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

**DESIGNATION FORM**
*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: _____ 120 E Lancaster Ave., Ardmore, PA 19003 _____

Address of Defendant: _____ 1872 Mission Hills Lane, Northbrook, IL 60062 _____

Place of Accident, Incident or Transaction: _____ Montgomery County, PA _____

---

*RELATED CASE, IF ANY:*

Case Number: __20-cv-06320__     Judge: __RUFE__     Date Terminated: _____

Civil cases are deemed related when *Yes* is answered to any of the following questions:

1.  Is this case related to property included in an earlier numbered suit pending or within one year       Yes [✓]   No [ ]
    previously terminated action in this court?

2.  Does this case involve the same issue of fact or grow out of the same transaction as a prior suit      Yes [ ]   No [✓]
    pending or within one year previously terminated action in this court?

3.  Does this case involve the validity or infringement of a patent already in suit or any earlier         Yes [ ]   No [✓]
    numbered case pending or within one year previously terminated action of this court?

4.  Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights       Yes [ ]   No [✓]
    case filed by the same individual?

I certify that, to my knowledge, the within case [ ] is / [▪] is not related to any case now pending or within one year previously terminated action in
this court except as noted above.

DATE: __01/11/2022__     _____     __208671__
                         *Must sign here*
                         *Attorney-at-Law / Pro Se Plaintiff*     *Attorney I.D. # (if applicable)*

---

**CIVIL: (Place a √ in one category only)**

| *A.* | *Federal Question Cases:* | | *B.* | *Diversity Jurisdiction Cases:* |
|---|---|---|---|---|
| [ ] 1. | Indemnity Contract, Marine Contract, and All Other Contracts | | [ ] 1. | Insurance Contract and Other Contracts |
| [ ] 2. | FELA | | [ ] 2. | Airplane Personal Injury |
| [ ] 3. | Jones Act-Personal Injury | | [ ] 3. | Assault, Defamation |
| [ ] 4. | Antitrust | | [ ] 4. | Marine Personal Injury |
| [ ] 5. | Patent | | [ ] 5. | Motor Vehicle Personal Injury |
| [ ] 6. | Labor-Management Relations | | [ ] 6. | Other Personal Injury *(Please specify):* _____ |
| [ ] 7. | Civil Rights | | [ ] 7. | Products Liability |
| [ ] 8. | Habeas Corpus | | [ ] 8. | Products Liability – Asbestos |
| [ ] 9. | Securities Act(s) Cases | | [✓] 9. | All other Diversity Cases |
| [ ] 10. | Social Security Review Cases | | | *(Please specify):* _____ Business Torts |
| [ ] 11. | All other Federal Question Cases | | | |
| | *(Please specify):* _____ | | | |

---

**ARBITRATION CERTIFICATION**
*(The effect of this certification is to remove the case from eligibility for arbitration.)*

I, __Jordan Rand__, counsel of record *or* pro se plaintiff, do hereby certify:

[ ]   Pursuant to Local Civil Rule 53.2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case
      exceed the sum of $150,000.00 exclusive of interest and costs:

[✓]   Relief other than monetary damages is sought.

DATE: __01/11/2022__     _____     __208671__
                         *Sign here if applicable*
                         *Attorney-at-Law / Pro Se Plaintiff*     *Attorney I.D. # (if applicable)*

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

*Civ. 609 (5/2018)*

Appx0088

William A. Harvey (Pa. I.D. #25344)
Jordan Rand (Pa. I.D. #208671)
**KLEHR HARRISON HARVEY**
**BRANZBURG LLP**
1835 Market Street, Suite 1400
Philadelphia, PA 19103
*Attorneys for Michael Grasso*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| MICHAEL GRASSO, individually and t/a General Partner of GF 2014, L.P. | DOCKET NO. 21-cv-05472 |
| Plaintiff, |  |
| vs. |  |
| TOBY KATZ |  |
| Defendant. |  |

## AMENDED COMPLAINT

Plaintiffs Michael Grasso ("**Michael**") trading as General Partner of GF 2014, L.P. ("**GF 2014**") and Michael, in his individual capacity, bring this Amended Complaint against Defendant Toby Katz ("**Katz**"), averring:

## INTRODUCTION

1.      This matter concerns Katz's ongoing harassment of Michael and GF 2014 and her interference with both of their business relationships, as well as with Michael's relationships with his children and grandchildren, under the guise of trying to execute on a default judgment *against only Michael's son, Joseph* (the "**Joe Grasso Judgment**").

2.      There is no connection between Michael or GF 2014 and the Jose Grasso Judgment.

3.      Apparently unable to locate sufficient assets belonging to Joseph, Katz has defaulted to tormenting Michael and his entire family in an effort to squeeze payment out of someone other than Joseph.

4.      The primary focus of Katz's fury is a limited partnership interest in GF 2014 that is owned by Joseph and his wife, Donna Grasso, *as tenants by the entireties* (the "**Entireties Interest**").

5.      It is well-settled that a judgment creditor cannot execute on entireties property if the judgment is against only one spouse, as is the case with respect to the Entireties Interest.

6.      That fact, however, has not stopped Katz from prosecuting a seemingly endless campaign against Michael, his business partners and his entire family under the guise of seeking discovery about the Entireties Interest.

7.      GF 2014 has filed this Action to put to an end Katz's perversion of the legal process and to stop her interference with Michael's and GF 2014's business and personal relationships.

## **PARTIES**

8.      GF 2014 is a Pennsylvania limited partnership with an address of 120 East Lancaster Ave., Ardmore, Pennsylvania 19003.

9.      Michael is an adult individual and resident of Pennsylvania with a usual place of business at 120 East Lancaster Ave., Ardmore, Pennsylvania 19003.

10.     Katz is an adult individual and citizen of Illinois, with an address of 1872 Mission Hills Lane, Northbrook, Illinois 60062.

## **JURISDICTION AND VENUE**

11.     This Court has jurisdiction pursuant to 42 Pa.C.S.A. § 931.

9836388.v1

**Appx0090**

12.    Venue is proper because the acts and omissions give rise to this Action occurred, and are continuing to occur, in this County.

## FACTUAL BACKGROUND

13.    Michael created GF 2014 in 2014, with himself as General Partner and with he and his wife owning a 99% limited partnership interest as tenants by the entireties.

14.    Two years later, on November 15, 2016, Katz obtained the Joe Grasso Judgment in a lawsuit captioned *Marshall J. Katz v. Joseph Grasso et al*., No. 07-CH-24116, in the Circuit Court of Cook County, Illinois, Chancery Division (the "**Illinois Lawsuit**").

15.    Michael was not a party in the Illinois Lawsuit, and he had no involvement in the facts and circumstances underlying it.

16.    GF 2014 was not a party in the Illinois Lawsuit, and it had no involvement in the facts and circumstances underlying it.

17.    On February 1, 2017, Katz transferred the Joe Grasso Judgment to Montgomery County, Docket No. 2017-02140 (the "**Execution Proceedings**").

18.    Neither Michael Grasso nor GF 2014 is a party to the Execution Proceedings.

19.    The only connection between Michael and the Execution Proceedings is that Michael is Joseph's 86-year old father.

20.    The only connection between GF 2014 and the Execution Proceedings is that Joseph and his wife, Donna, hold a 99% limited partnership interest in the company ***as tenants by the entireties*** (the "**Entireties Interest**").

21.    Because Joseph and Donna Grasso jointly own the Entireties Interest, that property is not subject to execution by Katz, as her judgment is solely against Joseph.

9836388.v1

**Appx0091**

22.    Nevertheless, Katz has made Michael and GF 2014 the focus of the Execution Proceedings, and she has been tormenting Michael, his children and even his grandchildren under the guise of asset discovery.

23.    Katz has no facts or explanation as to why she is entitled to information about assets that are beyond the reach of her judgment against only Joseph.

24.    There can be no legitimate dispute about the nature of the Entireties Interest.

25.    Michael long ago admitted that he and his wife originally held a 99% limited partnership interest, as tenants by the entireties, in GF 2014.

26.    Michael likewise admitted that on January 2, 2017, he and his wife gifted that interest (the Entireties Interest) to their son and daughter-in-law, Joseph and Donna Grasso, *as tenants by the entireties,* pursuant to an Assignment of Partnership Interest (the "**Assignment**"). The Assignment is attached as Exhibit "A."

27.    Michael had produced the Assignment to Katz.

28.    Michael also admits that, in connection with the Assignment, gift tax returns were prepared and filed, with a reported value of the Entireties Interest of $3,867,866.00.

29.    Michael also admits that, at certain points in the last 5-10 years, he has on occasion given his Joseph son a job for which he was paid a salary, and he has produced all of that information to Katz.

30.    And Michael admits that GF 2014 has been issuing monthly distributions to Joseph and Donna Grasso, *as tenants by the entireties*, in the usual amount of $4,000.00.

31.    Michael has not concealed any of these facts from Katz even though they have nothing to do with Katz's execution on the Joe Grasso Judgment against only Joseph.

Appx0092

32.    Katz has nevertheless used legal process to perpetuate seemingly endless paper discovery and depositions involving Michael, GF 2014, Michael's entire family (other than Joseph) and a host of Michael's and GF 2014's business contacts.

33.    On November 2, 2020, Katz issued a Subpoena to Attend and Testify to Michael Grasso in his capacity as General Partner of GF 2014 (the "**Subpoena**").  The Subpoena is attached as Exhibit "B."

34.    The Subpoena demanded a multitude of documents about GF 2014 and a deposition of Michael.

35.    As stated above, GF 2014 undertook the significant burden of locating and producing a multitude of documents, both initially and in response to Katz's endless follow-up requests.

36.    GF 2014 has now produced all of its tax returns since 2016, all of the documents related to the gifting of the Entireties Interest, reams of documents concerning its property at 649 Dodds Lane, Gladwyne, PA (the "**Dodds Lane Property**"), an explosion that occurred there in 2018, the subsequent insurance claim (the "**Insurance Claim**") and a slew of other materials that have nothing to do with the location of Joseph's assets upon which Katz might execute.

37.    In addition, Katz forced Michael to sit for three separate deposition sessions totaling more than nine hours.

38.    During these depositions, Katz's attorney questioned Michael on a wide range of topics, including, for example, every real estate project with which he has been involved (not in his capacity as General Partner of GF 2014) since the early 1980's and, in an effort to simply humiliate him, criminal matters going back almost five decades.

39.     It then became clear that harassment was not Katz's sole objective; rather, she was also searching for evidence in order to institute another lawsuit, this time against Michael, GF 2014 and Joseph's wife, Donna Grasso.

40.     On December 16, 2020, Katz commenced that litigation (Docket No. 2:20-CV-06320, the "**Katz Litigation**").  Katz asserts claims of fraudulent transfer, civil conspiracy and unjust enrichment relying on the theory that the Dodds Lane Property was fraudulently transferred into GF 2014, which Katz alleges is Joseph's alter-ego.

41.     It is clear that Katz is using the Execution Proceedings for at least four improper purposes: (1) to harass Michael and his entire family; (2) to interfere with Michael's and GF 2014's business relationships; (3) to damage Michael's relationships with his children and grandchildren; and (4) to prematurely conduct discovery for the Katz Litigation in violation of the Federal Rules of Civil Procedure.

42.     With respect to Katz's harassment of Michael's entire family, Katz has subpoenaed Michael's daughter-in-law, Donna Grasso, his granddaughter and his grandson despite having no legitimate reason to do so.

43.     Donna Grasso has been deposed by Katz's lawyer; he made her cry repeatedly during it.

44.     It appears that Katz is simply trying to pressure Michael to pay Joseph's judgment by tormenting Michael's whole family.

45.     Katz has likewise abused the discovery process in the Execution Proceedings for the purpose of damaging Michael's and GF's current and prospective business relationships.

46.     On September 28, 2021, Katz issued a subpoena to BHH Affiliates, LLC t/a Fox & Roach, GF 2014's real estate agent for the Dodds Lane Property that is currently under agreement

9836388.v1

Appx0094

to be sold, as Katz knows (the "**Fox/Roach Subpoena**").  A true and correct copy of the Fox/Roach Subpoena is attached hereto as Exhibit "C."

47.     Katz concealed the Fox/Roach Subpoena from Michael for months.

48.     On October 29, 2021, suspecting that Katz had issued the Fox/Roach Subpoena, Michael, through counsel, requested a copy of it from Fox & Roach, but Fox & Roach refused to provide it without a separate subpoena requesting it.

49.     Fox & Roach is a firm with which GF 2014 currently has a listing agreement with respect to the Dodds Lane Property, and it is a firm with which Michael and GF 2014 have a reasonable expectation of doing future business.  Indeed, Michael has done business with two realtors for over 20 years who are currently at Fox & Roach, and he had, prior to the events giving rise to this Action, every expectation of continuing to do so.

50.     As a result of Katz's harassment of Fox & Roach, the firm now refuses to engage in basic communication directly with Michael and GF 2014, and the prospects of future business dealings has been diminished.

51.     GF 2014's realtor has been so intimidated by Katz that, out of fear of being dragged more deeply into Katz's sham asset discovery, it determined that the consequences of withholding material information from its own client impacting a still pending $2 million real estate transaction were *less* severe than doing anything that Katz could try to pervert as part of some imagined, nonsensical conspiracy (the general theme of her pleadings in the Katz Litigation).

52.     It is believed and therefore averred that Katz is deliberately attempting to interfere with the Dodds Lane Transaction so that she can use the threat of the transaction falling apart to extract settlement payments from anyone other than its actual judgment debtor, Joseph.

9836388.v1

Appx0095

53.     GF 2014 is essentially a real estate holding company. Harassing real estate agents and other industry players poisons the well for GF 2014 to conduct its regular operations of buying and selling real estate.  Word spreads quickly among the real estate agent community, which is by nature are tightly networked. Even one withdrawn bid or missed deal can be very costly.

54.     There is no information that can be obtained from Fox & Roach that could in any way impact execution on the Joe Grasso Judgment.

55.     Katz has similarly interfered with Michael's and GF 2014's relationship with their insurance adjusters.

56.     On November 4, 2021, Katz served a subpoena on Clarke & Cohen, GF 2014's insurance adjuster engaged for a claim related to an explosion at the Dodds Lane Property (the "**Clarke/Cohen Subpoena**").  A true and correct copy of the Clarke & Cohen Subpoena is attached hereto as Exhibit "D."

57.     Katz deliberately concealed the Clarke/Cohen Subpoena from Michael, so he did not even know that Katz had issued it until Katz filed a Motion to Compel a deposition of a designee of Clarke and Cohen.  Even then, Katz did not give Michael notice of the motion; rather, his attorneys saw it in the course of monitoring the docket in the Execution Proceedings.

58.     There is no legitimate reason for Katz to seek documents or depositions from Clarke and Cohen, as the intricacies of the Insurance Claim have nothing to do with finding Joseph's assets.

59.     The reason for Katz involving Clarke and Cohen is to damage that firm's relationship with Michael and GF 2014.

60.     In addition to directly damaging Michael's and GF 2014's relationships with Fox & Roach and Clarke and Cohen, Katz intends for those firms to damage Michael's and/or GF

9836388.v1

**Appx0096**

2014's reputation more generally in the business community by sharing with others the severe consequences that they have endured as apparent punishment for doing business with them.

61.     It is believed and therefore averred that Katz is signaling to all who would deign to do business with GF 2014 that the consequence of even the most mundane business relationships is endless subpoena practice, fishing expeditions through decades of paper and electronic documents and pointless depositions designed only to waste people's time and money and, wherever possible, to humiliate them.

62.     In addition to harming Michael's business relationships, Katz has set out to damage his relationships with his family members, particularly his grandchildren, by harassing them under the guise of discovery and by trying to convince them in the course of that effort that Michael has somehow been involved in wrongdoing.

63.     Finally, Katz's purported 'asset discovery' is a transparent attempt to end-run around the Federal Rules of Civil Procedure by prematurely conducting discovery for the Katz Litigation using the Execution Proceedings (and then by further harassing Michael by forcing him to undergo another round of identical torment once discovery is permitted in the Katz Litigation).

64.     There has not yet been any Rule 26(f) or Rule 16 conference in the Katz Litigation, so discovery is not yet permitted in that case.

65.     None of Katz's 'discovery' in the Execution Proceedings has anything to do with locating assets to monetize the judgment against Joseph.

66.     It is therefore clear that Katz is actually engaged in a totally inappropriate and impermissible effort to conduct discovery for the Katz Litigation under the guise of discovery in aid of execution.

9836388.v1

67.     In no way, shape or form do any of these tactics bear any relationship to legitimate discovery in aid of execution.

68.     While Katz's misconduct has ***not*** been tailored to locate assets of Joseph upon which she might execute, it has been carefully designed to inflict pain, expense, burden, harm and humiliation upon anyone who calls Joseph family or that has done business with Michael or GF 2014.

## COUNT I – ABUSE OF PROCESS

69.     The foregoing paragraphs are incorporated by reference.

70.     The subpoenas issued to Michael's and GF 2014's business contacts and to Michael's family members constitute legal process.

71.     Katz utilized legal process in the Execution Proceedings for the improper purposes described above.

72.     As a result, GF 2014 and Michael have incurred damages including but not limited to emotional distress, strain on business and/or personal relationships and inordinate expenses associated with responding to Katz's abusive process.

**WHEREFORE**, GF 2014 and Michael respectfully request that the Court enter judgment against Katz for monetary damages in excess of $75,000.00, together with a preliminary and/or permanent injunction enjoining Katz from interfering with any of plaintiffs' business relationships and/or Michael's personal, familial relationships.

## COUNT II – TORTIOUS INTERFERENCE WITH CONTRACT AND PROSPECTIVE BUSINESS RELATIONSHIPS

73.     The foregoing paragraphs are incorporated by reference.

74.     Katz has at all relevant times known of the Dodds Lane Transaction.

9836388.v1

Appx0098

75.     Katz has intentionally interfered with the Dodds Lane Transaction by abusing the discovery process in the Execution Proceedings and harassing the parties involved in an effort to either stop the transaction from closing, to extract a settlement related to the Joe Grasso Judgment from anyone other than Joseph and/or to make it painful and difficult for the transaction to close.

76.     Katz has also interfered with Michael's and GF 2014's relationships with firms with which it does business and with which it reasonably expected to continue to do business, such as, for example, its realtors and insurance adjusters.

77.     As result, Katz has caused actual legal damage in the form of emotional distress (Michael) and actual harm to reputation (Michael and GF 2014) that Katz should have reasonably expected to flow from her misconduct.

**WHEREFORE**, GF 2014 and Michael respectfully request that the Court enter judgment against Katz for monetary damages in excess of $75,000.00, together with a preliminary and/or permanent injunction enjoining Katz from interfering with any of plaintiffs' business relationships and/or Michael's personal, familial relationships.

## COUNT III – DECLARATORY JUDGMENT

78.     The foregoing paragraphs are incorporated by reference.

79.     There is a ripe case or controversy between the parties as to whether the Entireties Interest is subject to execution with respect to a judgment against only Joseph.

80.     This case or controversy has immediate implications, as Katz continues to harass plaintiffs and Michael's entire family under the guise of trying to execute on the Entireties Interest.

81.     The Entireties Interest was assigned by Michael and Jean Grasso to their son and daughter-in-law, Joseph and Donna Grasso, as tenants by the entireties.

9836388.v1

**Appx0099**

82.    The Entireties Interest is therefore not subject to execution with respect to a judgment against only Joseph.

83.    If the Entireties Interest is not subject to execution, then there is no legitimate reason to continue to harass Michael, GF 2014, any person or company that does business with either and/or every member of Michael's family.

**WHEREFORE**, GF 2014 respectfully requests judgment declaring that the Entireties Interest in not subject to execution with respect to Katz's judgment against only Joseph, together with a preliminary and/or permanent injunction (1) enjoining Katz from interfering with any of GF 2014's or Michael's business relationships and (2) prohibiting Katz from harassing members of Michael's family.

Respectfully submitted,

/s/ Jordan Rand
Jordan M. Rand (I.D. No. 208671)
**KLEHR HARRISON HARVEY
BRANZBURG LLP**
1835 Market Street, Suite 1400
Philadelphia, PA 19103
*Attorneys for Appellant*

Date: January 11, 2022

Appx0100

# EXHIBIT A

Case# 2021-22879-0 Docketed at Montgomery County Prothonotary on 11/15/2021 3:17 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2021-22879-0 Docketed at Montgomery County Prothonotary on 11/15/2021 3:17 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

## ASSIGNMENT OF PARTNERSHIP INTEREST

THIS ASSIGNMENT OF PARTNERSHIP INTEREST is made as of the 2nd day of January, 2017, by and between, Michael and Jean Grasso as Tenants by the Entirety, 120 E. Lancaster Avenue, Ardmore, PA 19003 ("Assignor") and Joseph Grasso and Donna Grasso, as Tenants by the Entirety with an address 649 Dodds Lane, Gladwyne, PA 19035 ("Assignee").

WHEREAS, on August 22, 2014 Assignor entered into that certain Limited Partnership Agreement ("Partnership Agreement") of G F 2014, L.P. a Pennsylvania limited partnership ("Partnership"). which Partnership was formed for the purpose of acquiring, owning, managing, and selling or otherwise disposeing of property for investment purposes or any other lawful business that a partnership, with or without limited partners may carry on. ("Partnership Property").

WHEREAS, Assignor has agreed to assign one hundred percent (100.0%) of its Limited Partnership Interest in the Partnership and the Partnership Property to Assignee, and Assignee has agreed to acquire and assume the Limited Partnership Interest of Assignor.

NOW THEREFORE, for and in consideration of the mutual covenants contained herein and other good and lawful consideration, and intending to be legally bound hereby, the parties hereto agree as follows:

1. Assignor does hereby sell, transfer, grant, convey, assign and set over unto Assignee, and Assignee does hereby accept, one hundred percent (100.0%) of Assignor's Limited Partnership Interest, being therefore ninety nine (99.00%) percent of the whole of the Partnership, including without limitation ninety nine (99%) percent of Assignor's right, title and interest in, to and under the Partnership and all Partnership Property, including all rights, benefits, debts,

1

MG0092

Appx0102

Case# 2021-22879-0 Docketed at Montgomery County Prothonotary on 11/15/2021 3:17 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

and liabilities, as well as all duties and obligations accruing under the Partnership Agreement and/or accruing to or from the Partnership.

2. The consideration for this Assignment shall be the sum of TEN DOLLARS ($10.00) ("Purchase Price"), and other good and lawful consideration, the adequacy of which is hereby acknowledged.

3. Assignee by accepting this Assignment does hereby assume and accept all of Assignor's duties and obligations under the Partnership Agreement to the extent of the ninety nine(99%) percent of the Partnership Interest assigned by Assignor to Assignee pursuant hereto whenever arising, from the beginning of existence of the Partnership, and Assignee does hereby agree to release, relieve, indemnify and hold Assignor harmless from any and all costs and expenses, including attorney's fees, arising with regard to the Partnership and/or the Partnership Property, whenever arising to the extent of the ninety nine (99%) percent of the  Partnership Interest assigned by Assignor to Assignee pursuant hereto.

4.  Assignor hereby covenants, represents and warrants that Assignor has good title to its Partnership Interest and the power and capacity to make this Assignment; and that the Partnership Interest of Assignor assigned hereunder has not been previously assigned by it.

5. This Assignment, and its acceptance by the Assignee, shall inure to the benefit of, and be binding upon, the Assignor and the Assignee and their respective heirs, executors or administrators, successors and assigns.

6. This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania.

MG0093

Appx0103

Case# 2021-22879-0 Docketed at Montgomery County Prothonotary on 11/15/2021 3:17 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

IN WITNESS, WHEREOF, the parties hereto, intending to be legally bound hereby, have caused this Assignment of Partnership Interest to be duly executed the day and year first above written.

ASSIGNOR:

MICHAEL GRASSO AND JEAN GRASSO, H/W
AS TENANTS BY THE ENTIRETIES

_____
Michael Grasso

_____
Jean Grasso

Witness: _____

ASSIGNEE:

JOSEPH GRASSO AND DONNA GRASSO, H/W
AS TENANTS BY THE ENTIRETIES

_____
Joseph Grasso

_____
Donna Grasso

Witness: _____

3

MG0094

Appx0104

Case# 2021-22879-0 Docketed at Montgomery County Prothonotary on 11/15/2021 3:17 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

## AGREEMENT OF GIFT

In consideration of our love and affection, we, Michael and Jean Grasso, intending to be legally bound, hereby transfer, effective January 2, 2017 our ninety nine percent (99.0%) Limited Partnership in GF 2014 L.P., owned as tenants by the entirety to Joseph and Donna Grasso, as Tenants by the Entirety.

The parties agree that they will cause GF 2014 L.P. to affect and document this transfer accordingly.

Executed the day and year first written above.

Witness

_____

Michael Grasso

_____

Jean Grasso

Witness

_____

Joseph Grasso

_____

Donna Grasso

MG0095

**Appx0105**

# EXHIBIT B

Case# 2021-22879-0 Docketed at Montgomery County Prothonotary on 11/15/2021 3:17 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2021-02140-0330 dated at Montgomery County Prothonotary on 12/08/2020 2:03:45 PM / Fee = $800.00 The file certifies this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania. Cases Records access Policy that limits the public availability of the content of the files reproduced of the certain identified information in certain identified documents.

# COMMONWEALTH OF PENNSYLVANIA

## IN THE COURT OF COMMON PLEAS OF MONTGOMERY COUNTY

Marshall J. Katz                    :
                                    :
                                    :
                                    : File No.   2017-02140
                                    :
Joseph Grasso                       :
                                    :
                                    :

## SUBPOENA TO ATTEND AND TESTIFY

TO: Michael Grasso
    Metro Mortgage Partners
    120 East Lancaster Ave.
    Ardmore, PA 19003

1.  You are ordered by the Court to come to Montgomery McCracken's Offices at 1735 Market St.,
    21st Floor, Philadelphia, PA 19103 or other mutually agreed upon location.
                        (Specify courtroom or other place)

at _____, Philadelphia County, Pennsylvania, on December 1, 2020

at  9:30 _____ o'clock A. M., to testify on behalf of  Plaintiff/Judgment Marshall Katz

in the above case, and to remain until excused.

2.  And bring with you the following:  the Documents identified in Exhibit A.

        If you fail to attend or to produce the documents or things required by this subpoena, you may be subject to the sanctions authorized by Rule 234.5 of the Pennsylvania Rules of Civil Procedure, including but not limited to costs, attorney fees and imprisonment.

ISSUED BY A PARTY/ATTORNEY IN COMPLIANCE WITH Pa.R.C.P.No.234.2 (a)

NAME: David Dormont

ADDRESS: Montgomery McCracken Walker & Rhoads LLP

1735 Market Street, Philadelphia, PA 19103

TELEPHONE: 215-772-7280

SUPREME COURT ID #:  66252

                                    BY THE COURT:

                                    _____ Prothonotary

DATE: 11/12/2020 _____           _____ Agent/Deputy
        Seal of the Court

OFFICIAL NOTE: This form of subpoena shall be used whenever a subpoena is issuable including hearings in connection with depositions and before arbitrators, masters, commissioners, etc. in compliance with Pa.R.C.P.No.234.1. If a subpoena for production of documents, records or things is desired, complete paragraph 2.

## Notice of Language Rights

**FREE INTERPRETER**
PO Box 311 Norristown, PA 19404
languageaccesscoordinator@montcopa.org
610-278-3231
www.pacourts.us/language-rights

**Spanish/Español:** Usted tiene derecho a un intérprete libre de costo. Para solicitar un intérprete favor de informárselo al personal judicial utilizando la información provista en la parte superior de este aviso.

**Russian/Русский:** У вас есть право на бесплатные услуги переводчика. Заявка на переводчика подается в суд по адресу, телефону или эл. почте, указанным выше в заголовке этого уведомления.

**Mandarin/Cantonese Simplified Chinese/普通话/粤语/简体中文:** 您有权获得得免费的口译及笔译服务。若需要口译员, 请使用本通知上方提供的联系信息通知法院工作人员。

**Korean/한국어:** 귀하는 비용에 대한 부담 없이 통역 서비스를 받을 권리가 있습니다. 통역 서비스를 요청하려면 본 통지서의 상단에

**Arabic/العربية**

---

RETURN OF SERVICE:

On the _____ day of _____, 20___

I, _____
(NAME OF PLACE SERVED)

served _____

with the foregoing subpoena by: _____
(the method of service)

I verify that the statements in this return of service are true and correct. I understand that false statements herein are made subject to the penalties of 18 Pa.C.S.A. § 4904 relating to unsworn falsification to authorities.

DATE: _____

_____
(SIGNATURE)

Appx0108

# EXHIBIT A

The deponent **Michael Grasso** is hereby directed to bring to the deposition the following **documents:**[1]

1.    All documents related to the formation of GF 2014 L.P., including any partnership agreements and documents related to the funding of GF 2014 L.P.

2.    All documents modifying and/or amending GF 2014 L.P.'s formation documents, including any change to the partnership agreements.

3.    All annual financial statements prepared (internally and/or externally) for GF 2014 L.P. from 2016 to date.

4.    GF 2014 L.P.'s financial records (including, but not limited to, balance sheets, income statements, and check registers) from January 1, 2017 to date.

5.    All bank, credit union, or other financial institution statements from January 1, 2017 to date for all checking accounts of every kind in which GF 2014 L.P. has a direct or indirect interest of any kind, individually or jointly with someone else, or through a business entity in which it has an interest.

6.    All bank, credit union, or other financial institution statements from January 1, 2017 to date for all savings accounts of every kind in which GF 2014 L.P. has a direct or indirect interest of any kind, individually or jointly with someone else, or through a business entity in which it has an interest.

7.    All bank, credit union, or other financial institution statements from January 1, 2017 to date for all certificates of deposit of every kind in which GF 2014 L.P. a direct or indirect interest

---

[1]    The terms "document" and "documents" shall have the broadest meaning permitted under the applicable court rules and shall include any and all written, typed, printed, recorded or graphic material, however produced, reproduced or stored, whether an original or a copy, and whether prepared, published or released by any person or entity, including but not limited to, memoranda, letters, reports, agreements, contracts, correspondence, electronic mail, text messages, instant messages, voicemail, audio files, spreadsheets, databases, social media **postings, telegrams, minutes or records of meetings, reports, summaries, lists, drafts, revisions, invoices, receipts, original and preliminary notes, sketches, records, ledgers, contracts, bills,** inventories, financial data, accounting and fin**ancial records, diaries, journals, calendars,** statements, work papers, videotapes, cassette tapes, photographs, pamphlets, brochures, advertisements, trade letters, press releases, tables, articles, conversation summaries, and printouts. It also includes information stored electronically, whether in a computer database, the cloud, the Internet, or otherwise, and includes information stored in electronic form on magnetic, optical, or other forms of media such as disks, CD-ROM, optical disks, ROM, and tape, regardless of whether such documents are presently also in non-electronic form.

Case# 2021-02840-0330 Docketed on Montgomery County Prothonotary on 12/03/2020 2:03:45 PM (Fee=$900.00 The e-file Page swith the approximus of the filing company. This is filing comply sub-file PBublic Access PBolicy of the Unified Unified Judicial System of Permsylvania and Patred Payer-file of Court of first directed filing use filing staff federal information and document saffected by the matter of the matter file federal information documents.

of any kind, individually or jointly with someone else, or through a business entity in which it has an interest.

8.    All statements, paper or electronic mailings, from January 1, 2017 to date from any brokerage or investment firm at which GF 2014 L.P. maintains an account in which it has a direct or indirect interest of any kind, individually or jointly with someone else, or through a business entity in which it has an interest.

9.    GF 2014 L.P.'s last four filed tax returns filed with or prepared for any federal, state, or local taxing authority.

10.    Any and all agreements between GF 2014 L.P. and Defendant Joseph Grasso and/or Donna Ohara Grasso.

11.    Any and all agreements between GF 2014 L.P. and any entity Defendant Joseph Grasso and/or Donna Ohara Grasso control, operate, oversee or have an ownership interest of at least 10%.

12.    Any and all communications between Defendant Joseph Grasso and any entity the Deponent controls, operates, oversees or has an ownership interest of at least 10%, from January 1, 2017 to date.

13.    Any and all checks that the Deponent wrote and/or signed payable to Defendant Joseph Grasso and/or Donna Ohara Grasso from January 1, 2017 to date.

14.    Any and all documents evidencing any payments and/or transfers that the Deponent made on behalf of Defendant Joseph Grasso and/or Donna Ohara Grasso from January 1, 2017 to date.

15.    Any and all documents evidencing any payment and/or transfers that any entity the Deponent controls, operates, oversees or has an ownership interest of at least 10%, on behalf of Defendant Joseph Grasso and/or Donna Ohara Grasso from January 1, 2017 to date.

16.    Any and all documents evidencing any payments and/or transfers that the Deponent made to an entity that Defendant Joseph Grasso and/or Donna Ohara Grasso own or control from January 1, 2017 to date.

17.    Any and all documents evidencing any payments and/or transfers that any entity that the Deponent controls, operates, oversees or has an ownership interest of at least 10%, on behalf an entity that Defendant Joseph Grasso and/or Donna Ohara Grasso own or control from January 1, 2017 to date.

18.    Any and all documents (including any statements) submitted by GF 2014 L.P. to any insurance company that insured the property at 649 Dodds Lane, Gladwyne, PA 19035 at the time of the November 2018 explosion at the property.

Appx0110

19.    Copies of all utility bills for 649 Dodds Lane, Gladwyne, PA 19035 from January 1, 2020 to date.

20.    Any and all documents evidencing any payments and/or transfers that Defendant Joseph Grasso and/or Donna Ohara Grasso made to the Deponent from January 1, 2017 to date.

21.    Any and all documents evidencing any payments and/or transfers that Defendant Joseph Grasso and/or Donna Ohara Grasso made to any entity that the Deponent controls, operates, oversees or has an ownership interest of at least 10%, from January 1, 2017 to date.

Appx0111

# EXHIBIT C

Case# 2021-22879-0 Docketed at Montgomery County Prothonotary on 11/15/2021 3:17 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2021-22879-0 Docketed at Montgomery County Prothonotary on 11/15/2021 3:17 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**David Dormont, Esquire**
**PA I.D. No. 66252**
**MONTGOMERY MCCRACKEN WALKER**        **Attorneys for Plaintiff**
  **& RHOADS LLP**
**1735 Market Street, 21st Floor**
**Philadelphia, PA  19103**
**Tel: (215) 772-1500**
**Email: ddormont@mmwr.com**

| | |
|---|---|
| **MARSHALL KATZ,**<br>    **Plaintiff,**<br><br>    **v.**<br><br>**JOSEPH GRASSO,**<br>    **Defendant** | **COURT OF COMMON PLEAS**<br>**MONTGOMERY COUNTY**<br><br>**Case No. 2017-02140** |

## NOTICE OF DEPOSITION

**TO:**    Maurice Mitts, Esq.
        Mitts Law LLC
        1822 Spruce Street
        Philadelphia, PA 19103
        mmitts@mittslaw.com

      Please take notice that, pursuant to the Pennsylvania Rules of Civil Procedure 3117(a) and

4007.1(a), Plaintiff/Judgment Creditor Marshall Katz, by and through his attorneys, will take the

deposition of **Clarke & Cohen** before an officer duly authorized to administer oaths at the law

offices of **Montgomery McCracken Walker & Rhoads LLP, 1735 Market Street,**

**Philadelphia, Pennsylvania, 19103,** or other mutually agreed to location, beginning on **Monday,**

**July 12, 2021** at **9:30 a.m.**

      Pursuant to Pa. R. Civ. P. 4007.1(e), Clarke & Cohen has been directed to designate one

or more officers, directors, managing agents or other persons who consent to testify on its behalf

concerning the following topics:

Case# 2021-22879-0 Docketed at Montgomery County Prothonotary on 11/15/2021 3:17 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

a.  The preparation and support for the Sworn Statement in Proof of Loss under the American Home Assurance Company, Company Claim No. 9549224463US, Policy No. 026032320 (a copy of which Proof of Loss is attached hereto as Exhibit 1);

b.  The preparation and support for the Sworn Statement in Proof of Loss under the American Home Assurance Company, Company Claim No. 8346143042US, Policy No. 026032320 (a copy of which Proof of Loss is attached hereto as Exhibit 2);

c.  The preparation and support for any other Sworn Statement in Proof of Loss filed regarding the November 4, 2018 explosion at 649 Dodds Lane, Gladwyne, PA 19035;

d.  Any communication between Clarke & Cohen and Joseph Grasso related to the property located at 649 Dodds Lane, Gladwyne, PA 19035; and

e.  The value of any improvements made to the buildings located at 649 Dodds Lane, Gladwyne, PA 19035 prior to the November 4, 2018 explosion.

Clarke and Cohen is further directed to bring to the deposition all documents[1] related to or concerning:

a.  The Sworn Statement in Proof of Loss under the American Home Assurance Company, Company Claim No. 9549224463US, Policy No. 026032320 (a copy of which Proof of Loss is attached hereto as Exhibit 1), including, but not limited, to all documents supporting, considered and/or relied upon in calculating the amount of the Full Cost of Repaid or Replacement of ">3,000,000";

---

[1]    The terms "document" and "documents" shall have the broadest meaning permitted under the applicable court rules and shall include any and all written, typed, printed, recorded or graphic material, however produced, reproduced or stored, whether an original or a copy, and whether prepared, published or released by any person or entity, including but not limited to, memoranda, letters, reports, agreements, contracts, correspondence, electronic mail, text messages, instant messages, voicemail, audio files, spreadsheets, databases, social media postings, telegrams, minutes or records of meetings, reports, summaries, lists, drafts, revisions, invoices, receipts, original and preliminary notes, sketches, records, ledgers, contracts, bills, inventories, financial data, accounting and financial records, diaries, journals, calendars, statements, work papers, videotapes, cassette tapes, photographs, pamphlets, brochures, advertisements, trade letters, press releases, tables, articles, conversation summaries, and printouts. It also includes information stored electronically, whether in a computer database, the cloud, the Internet, or otherwise, and includes information stored in electronic form on magnetic, optical, or other forms of media such as disks, CD-ROM, optical disks, ROM, and tape, regardless of whether such documents are presently also in non-electronic form.

Case# 2021-22879-0 Docketed at Montgomery County Prothonotary on 11/15/2021 3:17 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

   b.   The Sworn Statement in Proof of Loss under the American Home Assurance Company, Company Claim No. 8346143042US, Policy No. 026032320 (a copy of which Proof of Loss is attached hereto as Exhibit 2), including, but not limited, to all documents supporting, considered and/or relied upon in calculating the amount of the Full Cost of Repaid or Replacement of $3,339,818.59;

   c.   Any other Sworn Statement in Proof of Loss filed related to the November 4, 2018 explosion at 649 Dodds Lance, Gladwyne, PA 19035; and.

   d.   The property located at 649 Dodds Lane, Gladwyne, PA 19035, including, but not limited to, any documents related to the improvements made to the buildings located at 649 Dodds Lane, Gladwyne, PA 19035 prior to the November 4, 2018 explosion.

The deposition will continue from day to day until completed or adjourned.  You are invited to attend and participate.

**Date**: June 21, 2021

                 **MONTGOMERY MCCRACKEN WALKER & RHOADS LLP**

                 By: */s/ David Dormont*
                      **David Dormont**
                      **PA ID No. 66252**
                      **1735 Market Street**
                      **Philadelphia, PA 19103-7505**
                      **(215) 772-7280**
                      **ddormont@mmwr.com**
                      **Attorney for the Plaintiff/ Judgment Creditor Marshall Katz**

Case# 2021-22879-0 Docketed at Montgomery County Prothonotary on 11/15/2021 3:17 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

## SWORN STATEMENT IN PROOF OF LOSS

| | |
|---|---|
| 026032320 | 9549224463US |
| **POLICY NUMBER** | **COMPANY CLAIM NO** |
| $   126,407,884 | 026032320 |
| **AMOUNT OF POLICY AT TIME OF LOSS** | **POLICY NO.** |
| 8-17-2017 | The Graham Company |
| **DATE ISSUED** | **AGENCY AT** |
| 8-17-2019 | Lisa Talley |
| **DATE EXPIRES** | **AGENT** |

To the   American Home Assurance Company
of   175 Water Street, New York, New York 10038
At time of loss, by the above indicated policy of insurance you insured   U.S. Realty Associates, Inc.

against loss by   All Risks of Physical Loss or Damage   to the property described according to the terms and conditions of the said policy and all forms, endorsements, transfers and assignments attached thereto.

1. Time and Origin: An   explosion   loss occurred about the hour of   8   o'clock   P   M.,

On the   4th   day of   November   20   18   . The cause and origin of the said loss were;
An explosion resulting from a gas leak. The cause of the gas leak is undetermined following the ATF's investigation.

2. Occupancy: The building described, or containing the property described, was occupied at the time of the loss as follows, and for no other purpose whatever:   Residence - Mansion occupied by entrusted party

3. Title and Interest: At the time of the loss the interest of your insured in the property described therein was
U.S. Realty Associates, Inc.   No other person or persons had any interest therein
or encumbrance thereon, except:   None known

4. Changes: Since the said policy was issued there has been no assignment thereof, or change of interest, use, occupancy, possession, location or exposure of the property described, except:   None Known

5. Total Insurance: The total amount of insurance upon the property described by this policy was, at the time of the loss,
$   126,407,884   .

| | | |
|---|---|---|
| 6. Full Cost of said property at time of loss | $ | Undetermined |
| 7. Full Cost of Repair or Replacement | $ | >3,000,000 |
| 8. Applicable Depreciation, Betterment and/or Reduction | $ | N/A |
| 9. Undisputed amount agreed for first partial payment | $ | 3,000,000 |

The said loss did not originate by any act, design or procurement on the part of your insured, or this affiant; nothing has been done by or with the privity or consent of your insured or this affiant, to violate the conditions of the policy, or render it void; no articles are mentioned herein or in annexed schedules but such as were destroyed or damaged at the time of said loss; no property saved has in any manner been concealed, and no attempt to deceive the said company, as to the extent of said loss, has in any manner been made. Any other information that may be required will be furnished and considered a part of this proof.

The furnishing of this blank or the preparation of proofs by a representative of the above insurance company is not a waiver of any of its rights.

State of   Pennsylvania
County of   Montgomery
Subscribed and sworn to before me this   30th   day of   JANUARY   20   20

US Realty Associates, Inc.
By Michael Grasso, President   Insured

_____ Notary Public

Commonwealth of Pennsylvania - Notary Seal
Robert A. Greenberg, Notary Public
Montgomery County
My commission expires December 1, 2021
Commission number 1062272
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

**EXHIBIT 1**

MG00240

Appx0116

Case# 2021-22879-0 Docketed at Montgomery County Prothonotary on 11/15/2021 3:17 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**SWORN STATEMENT IN PROOF OF LOSS**

025032320
POLICY NUMBER
$ 125,407,884
AMOUNT OF POLICY AT TIME OF LOSS
8-17-2017
DATE ISSUED
8-17-2019
DATE EXPIRES

8346143042US
COMPANY CLAIM NO
025032320
POLICY NO.
The Graham Company
AGENCY AT
Lisa Talley
AGENT

To the   American Home Assurance Company
of   175 Water Street, New York, New York 10038
At time of loss, by the above indicated policy of insurance you insured   U.S. Realty Associates, Inc.

against loss by   All Risks of Physical Loss or Damage   to the property described according to the terms and conditions of the said policy and all forms, endorsements, transfers and assignments attached thereto.

1. Time and Origin: An   explosion   loss occurred about the hour of   8   o'clock   P   M.,
On the   4th   day of   November   20 18 .   The cause and origin of the said loss were: An explosion resulting from a gas leak. The cause of the gas leak is undetermined following the ATF's investigation.

2. Occupancy: The building described, or containing the property described, was occupied at the time of the loss as follows, and for no other purpose whatever:   Residence - Mansion occupied by entrusted party

3. Title and Interest: At the time of the loss the interest of your insured in the property described therein was U.S. Realty Associates, Inc.   No other person or persons had any interest therein or encumbrance thereon, except:   None known

4. Changes: Since the said policy was issued there has been no assignment thereof, or change of interest, use, occupancy, possession, location or exposure of the property described, except:   None Known

5. Total Insurance: The total amount of insurance upon the property described by this policy was, at the time of the loss, $ 125,407,884

6. Full Cost of said property at time of loss. . . . . . . . . . . . . . . $   Undetermined
7. Undisputed Amount of Repair or Replacement . . . . . . . . . . $   3,339,818.59
8. Applicable Depreciation, Betterment and/or Reduction . . . . . . . . . $   (209,442.67)
9. Minus Previous Payment . . . . . . . . . . . $   (3,000,000)
10. Minus Deductible . . . . . . . . . . . $   (10,000)
11. Undisputed amount of second partial payment . . . . . . . . . $   120,375.92

The said loss did not originate by any act, design or procurement on the part of your insured, or this affiant; nothing has been done by or with the privity or consent of your insured or this affiant, to violate the conditions of the policy, or render it void; no articles are mentioned herein or in annexed schedules but such as were destroyed or damaged at the time of said loss; no property saved has in any manner been concealed, and no attempt to deceive the said company, as to the extent of said loss, has in any manner been made. Any other information that may be required will be furnished and considered a part of this proof.

The furnishing of this blank or the preparation of proofs by a representative of the above insurance company is not a waiver of any of its rights.

State of   Pennsylvania
County of   Montgomery
Subscribed and sworn to before me this   28th   day of   February   20 20

US Realty Associates, Inc.
By   Michael Grasso   President   Insured

Notary Public

Commonwealth of Pennsylvania - Notary Seal
Robert A. Greenberg, Notary Public
Montgomery County
My commission expires December 1, 2021
Commission number 1062272
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

EXHIBIT 2

MG00242

Appx0117

# EXHIBIT D

Case# 2021-22879-0 Docketed at Montgomery County Prothonotary on 11/15/2021 3:17 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2021-22879-0 Docketed at Montgomery County Prothonotary on 11/15/2021 3:17 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**David Dormont, Esquire**
**PA I.D. No. 66252**
**MONTGOMERY MCCRACKEN WALKER**      **Attorneys for Plaintiff**
  **& RHOADS LLP**
**1735 Market Street, 21st Floor**
**Philadelphia, PA  19103**
**Tel: (215) 772-1500**
**Email: ddormont@mmwr.com**

| | |
|---|---|
| **MARSHALL J. KATZ,**<br>**Plaintiff,**<br>**v.**<br><br>**JOSEPH GRASSO,**<br>**Defendant.** | **PHILADELPHIA COUNTY**<br>**COURT OF COMMON PLEAS**<br>**TRIAL DIVISION**<br><br>**January TERM, 2021**<br>**Case No.  00616** |

<u>**NOTICE OF DEPOSITION**</u>

**TO:**    Maurice Mitts, Esq.
         Michael Duffy, Esq.
         Mitts Law LLC
         1822 Spruce Street
         Philadelphia, PA 19103
         mmitts@mittslaw.com
         mduffy@mittslaw.com

Please take notice that, pursuant to the Pennsylvania Rules of Civil Procedure 3117(a) and

4007.1(a), Plaintiff/Judgment Creditor Marshall Katz, by and through his attorneys, will take the

deposition of the **Custodian of Records of BHH Affiliates, LLC t/a Fox & Roach** before an

officer duly authorized to administer oaths at the law offices of **Montgomery McCracken Walker**

**& Rhoads LLP, 1735 Market Street, 21st Floor, Philadelphia, Pennsylvania, 19103,** or other

mutually agreed upon location, beginning on **October 8, 2021** at **10:00 a.m.**

Case# 2021-22879-0 Docketed at Montgomery County Prothonotary on 11/15/2021 3:17 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

The deponent has been directed to bring to the deposition all documents[1] related to or concerning Joseph Grasso, Donna Grasso, and/or GF 2014, including but not limited to:

1. All documents related to or concerning any agreement between Joseph Grasso, Donna Grasso, and/or GF 2014 L.P., as the buyers and Joseph Soffer and/or Cheryl Soffer, as the sellers, for the real estate located at 817 Muirfield Rd., Bryn Mawr, Lower Merion Township, PA 19010 from October 1, 2019 to date;

2. All documents related to and/or concerning the Iron Hill Company check numbered 6448 and dated January 2, 2020 made payable to Fox Roach, LP in the amount of $100,000;

3. Any brokerage agreement between Joseph Grasso, Donna Grasso, and/or GF 2014 L.P., on one hand, and Berkshire Hathaway Home Services Fox and Roach, and/or Lynn and/or Harris Berger, on the other, from January 1, 2016 to date;

4. All documents related to or concerning the sale or offer to sell the property located at 649 Dodds Lane, Gladwyne, Pennsylvania 19035, including, not limited to, Seller's Property Disclosure Statements and Agreement for the sale of the property, from January 1, 2017 to date;

---

[1] The terms "document" and "documents" shall have the broadest meaning permitted under the applicable court rules and shall include any and all written, typed, printed, recorded or graphic material, however produced, reproduced or stored, whether an original or a copy, and whether prepared, published or released by any person or entity, including but not limited to, memoranda, letters, reports, agreements, contracts, correspondence, electronic mail, text messages, instant messages, voicemail, audio files, spreadsheets, databases, social media postings, telegrams, minutes or records of meetings, reports, summaries, lists, drafts, revisions, invoices, receipts, original and preliminary notes, sketches, records, ledgers, contracts, bills, inventories, financial data, accounting and financial records, diaries, journals, calendars, statements, work papers, videotapes, cassette tapes, photographs, pamphlets, brochures, advertisements, trade letters, press releases, tables, articles, conversation summaries, and printouts. It also includes information stored electronically, whether in a computer database, the cloud, the Internet, or otherwise, and includes information stored in electronic form on magnetic, optical, or other forms of media such as disks, CD-ROM, optical disks, ROM, and tape, regardless of whether such documents are presently also in non-electronic form.

Case# 2021-22879-0 Docketed at Montgomery County Prothonotary on 11/15/2021 3:17 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

5. All documents related to or concerning the renting or leasing of the property located at 373 Righters Mill Road, Gladwyne, Pennsylvania 19035 from July 1, 2018 to date;

6. All communications between Joseph Grasso, Donna Grasso, and/or GF 2014 L.P., on one hand, and Berkshire Hathaway Home Services Fox and Roach, and/or Lynn and/or Harris Berger, on the other, from January 1, 2016 to date.

Date: **September 28, 2021**

**MONTGOMERY MCCRACKEN WALKER & RHOADS LLP**

By: */s/ David Dormont*
      **David Dormont**
      **PA ID No. 66252**
      **1735 Market Street**
      **Philadelphia, PA 19103-7505**
      **(215) 772-7280**
      **ddormont@mmwr.com**
      **Attorney for the Plaintiff/ Judgment Creditor Marshall Katz**

## CERTIFICATE OF SERVICE

I, Jordan M. Rand, hereby certify that on the January 11, 2022, I caused a true and correct copy of the foregoing Amended Complaint related to be served by email and the Court's ECF notification system upon the following:

David Dormont
Montgomery McCracken
1735 Market Street, 21st Floor
Philadelphia, PA 19103

By:    /s/ Jordan Rand
       Jordan M. Rand, Esquire

9836388.v1

Appx0122

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

---

| | |
|---|---|
| **MICHAEL GRASSO, individually and t/a General Partner of GF 2014, L.P.,**<br>        **Plaintiff,**<br><br>      **v.**<br><br>**TOBY KATZ,**<br>        **Defendant.** | **Civil Action No. 21-cv-05472** |

---

**DEFENDANT TOBY KATZ'S
MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT OR,
IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

---

Pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(6) and 56, Defendant Toby Katz moves to dismiss Plaintiff Michael Grasso, individually and trading as General Partner of GF 2014, L.P.'s Amended Complaint, or in the alternative, for summary judgment in her favor and against Plaintiff for the reasons set forth in the accompanying Memorandum of Law.

Accordingly, Defendant respectfully requests that her Motion to Dismiss be granted and Plaintiff's Amended Complaint be dismissed, with prejudice, or in the alternative, summary judgment should be entered in favor or Defendant and against Plaintiff.

Respectfully Submitted,

Dated:  January 25, 2022

**MONTGOMERY, MCCRACKEN,
WALKER & RHOADS, LLP**

*/s/ David Dormont* _____
David Dormont
Kelly Huff
1735 Market Street, 21st Floor
Philadelphia, PA 19103
Phone:  215-772-1500
Email: ddormont@mmwr.com; khuff@mmwr.com
***Attorneys for Defendant***

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **MICHAEL GRASSO, individually and t/a General Partner of GF 2014, L.P.,**<br>          **Plaintiff,**<br><br>          **v.**<br><br>**TOBY KATZ,**<br>          **Defendant.** | **Civil Action No. 21-cv-05472** |

**PROPOSED ORDER #1**

AND NOW, this _____ day of _____, 2022, upon consideration of Defendant Toby Katz's Motion to Dismiss Plaintiff's Amended Complaint and any response thereto, it is hereby **ORDERED** that Defendant's Motion is **GRANTED** and the Amended Complaint of Plaintiff Michael Grasso, individually and trading as the General Partner of GF 2014, L.P. is **DISMISSED** with prejudice.

**BY THE COURT:**


_____
**CYNTHIA M. RUFE, J.**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **MICHAEL GRASSO, individually and t/a General Partner of GF 2014, L.P.,** <br> **Plaintiff,** <br><br> **v.** <br><br> **TOBY KATZ,** <br> **Defendant.** | **Civil Action No. 21-cv-05472** |

## PROPOSED ORDER #2

AND NOW, this _____ day of _____, 2022, upon consideration of

Defendant Toby Katz's Motion for Summary Judgment and any response thereto, it is hereby

**ORDERED** that Defendant's Motion is **GRANTED**.  Judgment is entered in favor of Defendant

Toby Katz and against Plaintiff Michael Grasso, individually and trading as General Partner of

GF 2014, L.P.

**BY THE COURT:**

_____

**CYNTHIA M. RUFE, J.**

Common Pleas - Montgomery Co.            Katz v. Grasso                                Friday
No. 2017-02140                Videotape Deposition of Michael Grasso              May 14, 2021

Page 1

1              IN THE COURT OF COMMON PLEAS
                      MONTGOMERY COUNTY
2

3                         - - -

4

5      MARSHALL KATZ,

6           Plaintiff,

7           V.                        Case No. 2017-02140

8      JOSEPH GRASSO,

9           Defendant.

10

                          VOLUME I
11

12

               Videotaped deposition of MICHAEL
13
       GRASSO, taken at the offices of U.S. Realty, Inc.,
14
       120 East Lancaster Avenue, Ardmore, Pennsylvania,
15
       on Friday, May 14, 2021, commencing at
16
       approximately 9:04 a.m., before Joanne Rose, a
17
       Registered Merit Reporter, Certified Realtime
18
       Reporter and Notary Public, pursuant to notice.
19

20

21                    - - - - - -
                      TATE & TATE
22              Certified Court Reporters
               520 Stokes Road - Suite C-1
23              Medford, New Jersey 08055
              (856) 983-8484 - (800) 636-8283
24                  www.tate-tate.com

**EXHIBIT**

**1**

(856) 983-8484              Tate & Tate, Inc.              (800) 636-8283
              520 Stokes Road, Suite C-1 Medford, NJ 08055

Appx0126

Common Pleas - Montgomery Co.                    Katz v. Grasso                                    Friday
No. 2017-02140                        Videotape Deposition of Michael Grasso              May 14, 2021

---

Page 2

```
 1   APPEARANCES:
 2      MONTGOMERY McCRACKEN
        WALKER & RHOADS LLP
 3      BY: DAVID DORMONT, ESQUIRE
        ddormont@mmwr.com
 4      BY: RACHEL GOODMAN, ESQUIRE
        rgoodman@mmwr.com
 5      BY: KACIE KERGIDES, ESQUIRE
        kkergides@mmwr.com
 6      1735 Market Street
        Philadelphia, PA 19103-7505
 7      215-772-7280
        Attorneys for Plaintiff/
 8      Judgment Creditor Marshall Katz
 9      KLEHR, HARRISON, HARVEY,
        BRANZBURG LLP
10      BY: JORDAN M. RAND, ESQUIRE
        jrand@klehr.com
11      1835 Market Street
        Suite 1400
12      Philadelphia, PA 19103
        215-569-3024
13          Attorney for Witness,
            Michael Grasso
14
15   PRESENT VIA ZOOM:
16      MITTS LAW, LLC
        BY: MAURICE R. MITTS, ESQUIRE
17      mmitts@mittslaw.com
        1822 Spruce Street
18      Philadelphia, PA  19103
        215-866-0112
19          Attorney for Defendant
            Joseph Grasso
20
21   ALSO PRESENT:
        Max Stein, Videographer
22
23
24
```

Page 4

```
 1   EXHIBITS (Continued...)
 2        EXHIBIT INDEX
 3
     EXHIBIT                          PAGE
 4
 5   Katz 46  U.S. Return of Partnership Income  115
          for 2019
 6   Katz 48  Photocopy of check dated 11/9/2018  122
          from GF 2014 L.P. made payable to
 7        Joseph and Donna Grasso
 8   Katz 49  Check Register for GF 2014 L.P.   29
          01/17 through 02/21
 9
10   Katz 50  Two-page document entitled   129
          E-Statements
11   Katz 51  Photocopy of check dated 1/6/14 made  80
          payable to Donna Grasso in the
12        amount of $4,000
13   Katz 62  PA Dept. of State Corporation   135
          Bureau Certificate of Limited
14        Partnership
15   Katz 64  Email dated 12/11/20 from Joe   155
          Grasso to Michael Grasso with
16        attachments
17   Katz 65  Email dated 3/12/21 from Joe   156
          Grasso to Michael Grasso
18
     Katz 89  Obituary of Richard A. Koory   60
19
     Katz 91  M. Burr Keim Company Articles of   137
20        Incorporation for Iron Hill Company
21   Katz 93  Document entitled Previous Clients  142
          Success Stories
22   Katz 94  Multi-page Louderback document   142
          entitled Projects, Examples of Our
23        Work
24
```

---

Page 3

```
 1        EXAMINATION INDEX
 2
     MICHAEL GRASSO
 3
        BY MR. DORMONT . . . . . . . . . . . . . 6
 4
                    - - -
 5
          EXHIBIT INDEX
 6
 7   EXHIBIT                          PAGE
 8   Katz 1   Subpoena To Attend and Testify   15
 9   Katz 2   Order dated 2/8/21            17
10   Katz 21  Multi-page document listing various  53
          projects from Metro Development's
11        website
12   Katz 24  Multi-page document containing   81
          photocopies of checks from USRA
13        Construction Management made payable
          to Joseph Grasso
14
     Katz 31  Certificate of Limited Partnership  86
15        of GF 2014 L.P.
16   Katz 32  Limited Partnership Agreement of GF  90
          2014 L.P.
17
     Katz 33  Assignment of Partnership Interest  101
18
     Katz 35  United States Gift (and   97
19        Generation-Skipping Transfer) Tax
          Return for 2017
20
     Katz 36  Multi-page document with first page 102
21        entitled GF 2014 LP Valuation For
          Gift Tax Purposes January 1, 2017
22
     Katz 45  U.S. Return of Partnership Income  105
23        for 2018
24
```

Page 5

```
 1   EXHIBITS (Continued...)
 2
          EXHIBIT INDEX
 3
 4   EXHIBIT                          PAGE
 5   Katz 96  Multi-page document containing bank 138
          statement produced by WSFS Bank
 6
 7   Katz 98  Photocopy of checks from HTP   148
          Associates made payable to Iron Hill
 8   Katz 121  M. Burr Keim Company Articles of   163
          Incorporation for ABW-PA, Inc.
 9
10   Katz 122  Two-page document entitled Order   163
          Business Documents
11   Katz 157  Email dated 10/23/20 from Jean   124
          Grasso to Joseph Grasso and Michael
12        Grasso with attached letter dated
          10/21/20
13
     Katz 158  Email dated 3/16/21 from Jean   126
14        Grasso to Joseph Grasso and Michael
          Grasso with attached letter dated
15        3/12/21
16   Katz 176  Email dated 8/5/19 from Richard   62
          Koory to J. Grasso, et al.
17
     Katz 251  Email series with top email dated   67
18        6/11/19 from Krista Grasso to Paul
          Taraschi, et al.
19
20
21        (EXHIBITS RETAINED BY ATTORNEY)
22
23
24
```

---

2 (Pages 2 to 5)

Common Pleas - Montgomery Co.                    Katz v. Grasso                              Friday
No. 2017-02140                          Videotape Deposition of Michael Grasso              May 14, 2021

---

Page 6

1       VIDEOGRAPHER:  We are here today,
2   Friday, May 14, 2021, for the video-recorded
3   deposition of Michael Grasso taken by the plaintiff
4   in the matter of Marshall Katz vs. Joseph Grasso in
5   the Court of Common Pleas, Montgomery County, Case
6   Number 2017-02140.
7       I am Max Stein, the videographer.  The
8   court reporter is Joanne Rose and we represent Tate
9   & Tate Court Reporting.
10      Counsel will please introduce
11  themselves and whom you represent.
12      MR. DORMONT:  David Dormont.  I
13  represent the Judgment Creditor, Marshall J. Katz.
14  And with me are two of my associates, Rachel
15  Goodman and Kacie Kergides.
16      MR. RAND:  Jordan Rand for the
17  deponent, Michael Grasso.
18      VIDEOGRAPHER:  The time is now
19  9:04 a.m. and the court reporter will now swear in
20  the witness.
21      MICHAEL GRASSO, having been duly
22  sworn, was examined and testified as follows:
23              EXAMINATION
24  BY MR. DORMONT:

---

Page 7

1   Q.   Good morning, Mr. Grasso.
2        Could you please state your full name
3   for the record?
4   A.   Michael Grasso, G-r-a-s-s-o.
5   Q.   And where do you currently reside?
6   A.   10 Cherry Lane, Wynnewood, PA.
7   Q.   And is Joseph Grasso your son?
8   A.   One of them.
9   Q.   What do you call him?
10  A.   What do I call him?
11  Q.   Yeah.
12  A.   Joseph.
13  Q.   And you also have a grandson who...
14  A.   I have 13 grandchildren.
15  Q.   You have one named Joseph?
16  A.   I have two named Joseph.
17  Q.   Okay, you have two named Joseph.
18       Your son Joseph has a son whose name
19  is also Joseph?
20  A.   Yes.
21  Q.   What do you call him?
22  A.   Joseph.
23  Q.   Okay.  That's fine.
24  A.   Unless I go by the dirty names, but that's

---

Page 8

1   something else.
2   Q.   That's fine.
3   A.   If I'm mad at him.
4   Q.   Have you ever testified before?
5   A.   Yes.
6   Q.   On how many occasions?
7   A.   Oh, I don't remember, more than one.
8   Q.   More than ten?
9   A.   Probably.
10  Q.   Have you ever testified in court before?
11  A.   Yes.
12  Q.   On how many occasions?
13  A.   Two or three.
14  Q.   What type of cases were those?
15  A.   All kinds.
16  Q.   Well...
17  A.   Civil, criminal, all kind of cases.
18  Q.   What type of civil cases have you testified
19  in?
20  A.   Well, I testified in bankruptcy court a
21  couple times when I was trying to -- when I was
22  trying to foreclose on properties that were in
23  bankruptcy.
24       And I testified in criminal cases

---

Page 9

1   where I was involved.
2   Q.   How were you involved in the criminal cases?
3   A.   I was a defendant.
4   Q.   What...
5        MR. RAND:  I'm going to object to any
6   further line of questioning.
7        MR. DORMONT:  No, excuse me.  If the
8   witness says he was involved in a criminal case,
9   I'm allowed to find out what the criminal case was
10  about.
11       MR. RAND:  This is a deposition in aid
12  of execution.
13       MR. DORMONT:  Understood.  And the
14  witness's credibility matters.
15       MR. RAND:  All right.  I'm going to
16  instruct you not to answer.
17       MR. DORMONT:  Okay.  Let me put on the
18  record now.  This deposition is a deposition in aid
19  of execution.
20       Mr. Rand, you told me -- you asked me
21  earlier in the week on Wednesday how long the
22  deposition would take.
23       MR. RAND:  You're wasting your time.
24  The objection is on the record.  Continue.

---

3 (Pages 6 to 9)

Common Pleas - Montgomery Co.              Katz v. Grasso                    Friday
No. 2017-02140              Videotape Deposition of Michael Grasso          May 14, 2021

---

Page 10

1          MR. DORMONT: Excuse me. I'm allowed
2    to make a statement.
3          MR. RAND: It's your time.
4          MR. DORMONT: I asked how long the
5    deposition -- you asked me how long the deposition
6    would be. I said it would take all day.
7          I found out earlier today from the
8    witness that he says he has to leave at 12:00 or
9    12:30 due to his stamina. I respect that. We will
10   come back.
11         But I just want to make it clear
12   that's the case. I have an absolute right. I will
13   ask my questions and I will get a Court Order if I
14   need to.
15   BY MR. DORMONT:
16   Q.   Sir, you were a defendant in a criminal
17   case. Where was that criminal case?
18         MR. RAND: Michael, I'm going to
19   instruct you not to answer.
20   BY MR. DORMONT:
21   Q.   It's a matter of public record, sir, isn't
22   it, your case?
23         MR. RAND: Michael, I'm going to
24   instruct you not to answer.

---

Page 11

1    BY MR. DORMONT:
2    Q.   Were you found guilty?
3          MR. RAND: Michael, I'm going to
4    instruct you not to answer.
5    BY MR. DORMONT:
6    Q.   What were you charged with, sir?
7          MR. RAND: Instruction not to answer.
8          MR. DORMONT: Rachel, could you call
9    the court --
10         THE WITNESS: I don't want to answer
11   this bullshit but I will --
12         MR. RAND: It's such a waste of time.
13         MR. DORMONT: -- and see if we can get
14   a judge on the line. We're going to continue. I'm
15   not going to waste time. Please call Montgomery
16   County Court and find out what happens.
17         I've never had a witness who has been
18   in a criminal case who I can't find out even if he
19   was found guilty or not.
20         MR. RAND: Okay.
21   BY MR. DORMONT:
22   Q.   Sir, do any of your cases involve Joseph
23   Grasso?
24   A.   No.

---

Page 12

1    Q.   And, as I said, my name is David Dormont. I
2    represent the successor in interest to Marshall
3    Katz in connection with execution proceedings
4    against Joseph Grasso as a result of a judgment
5    entered against Joseph Grasso in the Court of
6    Common Pleas of Montgomery County, Pennsylvania.
7          I'm going to be asking you a series of
8    questions today in connection with these execution
9    proceedings. Do you understand that?
10   A.   Yes.
11   Q.   If you don't understand the question during
12   the deposition, will you say so?
13   A.   Sure.
14   Q.   And if you don't understand the question, I
15   will rephrase it so you can understand it.
16         Do you understand that?
17   A.   Yes.
18   Q.   If you don't hear a question, will you tell
19   me?
20   A.   Yes.
21   Q.   Then I will repeat it so you can hear it.
22   Do you understand?
23   A.   What did you say?
24   Q.   If you do not hear a question, I will repeat

---

Page 13

1    it --
2    A.   Okay.
3    Q.   -- if you tell me. Do you understand that?
4    A.   Thank you. Yes.
5    Q.   Do you understand that the court reporter
6    only writes down what you say here today?
7    A.   Yes.
8    Q.   And do you understand that when you're
9    answering a question verbally, the court reporter
10   only writes down what you say, not when you nod or
11   shake your head?
12   A.   Okay.
13   Q.   And so there's no confusion, when you answer
14   a question, will you please use "yes" or "no"
15   rather than something like "okay" because that
16   might be unclear?
17   A.   Yes.
18   Q.   Thank you. If you don't know the answer to
19   a question, will you say so?
20   A.   Sure.
21   Q.   Now, if you need a break at any point for
22   any reason, to get a cup of coffee, just because
23   you're tired, because you need to go to the
24   bathroom, will you tell me?

---

(856) 983-8484                          Tate & Tate, Inc.                  (800) 636-8283
                              520 Stokes Road, Suite C-1 Medford, NJ 08055

Appx0129

Common Pleas - Montgomery Co.          Katz v. Grasso                          Friday
No. 2017-02140              Videotape Deposition of Michael Grasso        May 14, 2021

---

Page 14

1    A.   Sure.  Yes.
2    Q.   And as long as there's not a question
3    pending, we'll take a break.  All right?
4    A.   Okay.  Yes.
5    Q.   And if there is a question, I would just ask
6    that you answer the question and then we'll take a
7    break.
8    A.   Yes.
9    Q.   Now, you've taken an oath to tell the truth
10   here today.  Correct?
11   A.   Yes.
12   Q.   Do you know of any reason why you could not
13   testify here truthfully?
14   A.   No.
15   Q.   What did you do to prepare for today's
16   deposition?
17   A.   Nothing.
18   Q.   Did you discuss this deposition with anyone?
19   A.   Yes, with my counsel.  Sure, I did.
20   Q.   When did you discuss the deposition with
21   your counsel?
22   A.   Yesterday.
23   Q.   And how long did you spend speaking to your
24   counsel?

---

Page 15

1    A.   15 minutes maybe?
2         MR. RAND:  A little longer, about a
3    half hour.
4    BY MR. DORMONT:
5    Q.   Have you discussed your deposition with your
6    son?
7    A.   No.
8    Q.   Your son Joseph.
9    A.   Yes.
10   Q.   And if I do ever use the term your son, I'm
11   going to mean Joseph unless I say otherwise.
12        Is that agreeable?
13   A.   Yes.
14        (Exhibit Katz 1 was pre-marked for
15   identification.)
16   BY MR. DORMONT:
17   Q.   Let me show you what I've marked as Katz
18   Exhibit 1.
19        Have you seen this subpoena before?
20   A.   I'm not sure.
21   Q.   Are you aware that you were subpoenaed in
22   this case?
23   A.   Yes.
24   Q.   And, in fact, was that subpoena served at

---

Page 16

1    your home?
2    A.   I think so.
3    Q.   Now, the subpoena required you to produce
4    certain documents.
5         Are you aware of that?
6    A.   Yes.
7    Q.   Have you produced all the documents in your
8    custody, possession or control that are responsive
9    to this subpoena?
10   A.   I think so, all I could find.
11   Q.   Now, did you personally search for
12   responsive documents?
13   A.   No.
14   Q.   Who did?
15   A.   Members of my staff.  I'm completely
16   computer illiterate.  I do not even get an email or
17   send an email.
18        So I've asked people in our -- to
19   search our email, their email and they found
20   whatever information my lawyer thought was
21   appropriate to send to you and that's what they
22   sent you.
23   Q.   Who did the searching specifically by name?
24   A.   Rob Greenberg, my daughter Krista, our IT

---

Page 17

1    guy.  I don't even remember his name, the IT guy.
2    I don't remember his name, but that's the people I
3    think they used.
4    Q.   Do you know what files or computers were
5    searched?
6    A.   No.  I know nothing about computers at all,
7    so you can skip those questions.
8         (Exhibit Katz 2 was pre-marked for
9    identification.)
10   BY MR. DORMONT:
11   Q.   I want to show you what I've marked as
12   Exhibit 2.
13        This is an Order signed by Judge
14   Garrett Page on February 8, 2021 compelling a
15   document production and your deposition.
16        Were you aware that there was a Court
17   Order compelling both?
18   A.   No.
19   Q.   Now, the Order required all documents to be
20   produced within 21 days of this Order.
21        Are you aware that that deadline was
22   extended to March 19, 2021?
23   A.   No.
24   Q.   Were you aware that you did not comply with

---

5 (Pages 14 to 17)

Common Pleas - Montgomery Co.      Katz v. Grasso      Friday
No. 2017-02140      Videotape Deposition of Michael Grasso      May 14, 2021

**Page 18**

1  the Court's Order by producing all relevant
2  documents by the extended date of March 19?
3        **MR. RAND:** Objection to form. You can
4  answer.
5        THE WITNESS: I have no idea.
6  BY MR. DORMONT:
7  Q.  Do you know why the Court Order was not
8  obeyed?
9  **A.  I have no idea.**
10  Q.  Who would know?
11  **A.  I don't know.**
12  Q.  Did you feel compelled to comply with the
13  Court Order?
14        **MR. RAND:** Objection to form. You can
15  answer.
16        THE WITNESS: I didn't even see the
17  Court Order and I don't understand the Court Order.
18  I'm not a lawyer and this is all mumbo-jumbo to me.
19        And I have no inhouse -- I used to
20  have an inhouse attorney, but he's dead. So I
21  don't know how to answer these questions.
22  BY MR. DORMONT:
23  Q.  Well, it says, "Movant Michael Grasso shall
24  produce all relevant" --

**Page 19**

1  **A.  I'm sorry. I can't hear a word you're**
2  **saying.**
3  Q.  I'm looking at the Order --
4  **A.  Yes.**
5  Q.  -- which is Exhibit 2. I'm looking at the
6  fifth line.
7        It says, "Movant Michael Grasso shall
8  produce all relevant and responsive documents to
9  Plaintiff's Subpoena within twenty one days of the
10  date of this Order."
11        Do you see that?
12  **A.  Yes.**
13  Q.  What about that is mumbo-jumbo to you that
14  you didn't understand?
15        **MR. RAND:** Objection to form. You can
16  answer.
17        THE WITNESS: It's still mumbo-jumbo.
18  Okay? I didn't see this before, so I don't know
19  what you're talking about.
20  BY MR. DORMONT:
21  Q.  So no one gave you a copy of the Court
22  Order?
23  **A.  They might have but I don't -- I don't know**
24  **what it means.**

**Page 20**

1  Q.  Did you ask?
2        **MR. RAND:** Objection.
3        THE WITNESS: Probably.
4        **MR. RAND:** Objection. You're asking
5  for attorney/client privileged communications.
6        **MR. DORMONT:** No, I'm not. You're
7  assuming who gave it to him. I don't know.
8  BY MR. DORMONT:
9  Q.  Sir, who gave you the Order?
10  **A.  Who gave me the Order?**
11  Q.  Correct.
12  **A.  You did. It's the first time I saw it.**
13  Q.  So no one ever showed you the Court Order
14  before?
15  **A.  They may have. I don't remember.**
16  Q.  Sir, you originally produced 135 pages of
17  documents on March 23, 2021.
18        Did you take a look at those
19  documents?
20  **A.  No.**
21  Q.  And an additional 111 documents were
22  produced on April 27, '21.
23        Did you look at those?
24  **A.  No.**

**Page 21**

1  Q.  Now, to date only 246 documents have been
2  produced in response to the subpoena.
3        Are those all the documents that you
4  have within your possession, custody or control
5  that are responsive to the subpoena?
6  **A.  I think so. I'm not sure, I guess. I have**
7  **no idea.**
8  Q.  Well, who was responsible for making sure
9  that all responsive documents were produced?
10  **A.  Counsel. They were sent to him.**
11  Q.  How many documents were sent to your
12  counsel?
13  **A.  I would suspect all of them.**
14  Q.  Who sent documents to your counsel?
15  **A.  Somebody in our office. I'm not sure who**
16  **put it together and sent it, but I don't know.**
17  Q.  Well, who did you charge with doing that?
18  **A.  I told you, Rob Greenberg; my daughter**
19  **Krista; the IT guy, who I don't remember his**
20  **name -- I can try to find out -- what we had in our**
21  **system that is to satisfy the attorney's request**
22  **for documents, my attorney's request for documents.**
23  Q.  Did you withhold any documents?
24  **A.  Not that I know of.**

6 (Pages 18 to 21)

Common Pleas - Montgomery Co.              Katz v. Grasso                          Friday
No. 2017-02140                   Videotape Deposition of Michael Grasso          May 14, 2021

---

Page 22

1  Q.  Now, what electronic devices do you use?
2  **A.  None, none.**
3  Q.  Is there a computer at your house?
4  **A.  Yes.**
5  Q.  Do you ever use that computer?
6  **A.  To the extent I receive emails on it, yes, I**
7  **do receive emails on it.  That's all.**
8  **I can't send an email.  I can't**
9  **forward an email.  I can't respond to an email**
10 **because I don't know how to do it.  But I do**
11 **have -- I am able to read emails when they come in.**
12 Q.  Did someone check your home computer for
13 responsive documents?
14 **A.  No.**
15 Q.  Why not?
16 **A.  Because whatever is on the home document is**
17 **in my documents here in the office, same thing,**
18 **same computer, just another, another station.**
19 Q.  Do you have a work computer?
20 **A.  What's that?**
21 Q.  Do you have a work computer?
22 **A.  A work?  What's that mean?**
23 Q.  Work.
24 **A.  My work?**

Page 23

1  Q.  Yes.
2  **A.  I have a computer on my desk that receives**
3  **emails.  That's all it does.**
4  Q.  Do you have a phone?
5  **A.  Yes.**
6  Q.  What type of phone do you have?
7  **A.  Excuse me?**
8  Q.  What type of phone do you have?
9  **A.  Hello, goodbye phone, a typical phone.  The**
10 **same phone that's sitting on the desk there.**
11 Q.  Do you have a cell phone?
12 **A.  Oh, yes.**
13 Q.  What type of cell phone do you have?
14 **A.  Flip phone.  Here it is (indicating).**
15 Q.  Does it receive emails?
16 **A.  No.**
17 Q.  Do you ever send any texts?
18 **A.  I don't know how to send texts.  I don't**
19 **know how to send emails.**
20 Q.  I want to -- you have Exhibit 1 still in
21 front of you?
22 **A.  Excuse me?  Yes.**
23 Q.  Now, I want to look at request number 3.
24 **A.  Geez, it's fighting me.**

Page 24

1  **MR. DORMONT:  It looks like that one**
2  is backwards.
3  THE WITNESS:  I got it.
4  BY MR. DORMONT:
5  Q.  Now, request number 3 required the
6  production of "all annual financial statements
7  prepared (internally and/or externally) for GF 2014
8  from 2016 to date."
9  **A.  Yes, that's what it says.**
10 Q.  Now, nothing has been produced for GF
11 2016 -- for 2016, 2017 or 2020.
12 Are you aware of that?
13 **A.  No.**
14 **MR. RAND:  Objection to form.  You can**
15 answer.
16 THE WITNESS:  No.
17 BY MR. DORMONT:
18 Q.  Well, do you have GF 2014 financial
19 statements for 2016?
20 **A.  I guess so.  They may be on my -- on the**
21 **office computer, but I don't have them.**
22 Q.  But you could ask someone to get those
23 documents.  Correct?
24 **A.  I could have if I'm -- I thought they were**

Page 25

1  submitted.  I thought they submitted them.  I'm not
2  sure because I didn't see the documents that went
3  over.
4  And if they weren't submitted and we
5  have them, we'd be happy to show them to you.
6  Q.  And the same thing for 2017 and 2020.
7  A.  If my lawyer says it's appropriate to give
8  them to you and we have them, we'd be happy to turn
9  them over to you.
10 If we haven't and they were not -- and
11 they were appropriate to send to you and we have
12 them and we haven't done it, it's an oversight.
13 Sorry.
14 Q.  You have multiple entities that you --
15 A.  50.
16 Q.  Okay.  50 different entities?
17 A.  For a high school drop-out, pretty good for
18 a high school drop-out.
19 Q.  You've done very well for yourself.
20 A.  Not as good as Donald Trump.  I did all
21 right though.  I've been working since I was 12
22 years old, so I've been working hard for a long
23 time.
24 Q.  I have no doubt.

---

7 (Pages 22 to 25)

Common Pleas - Montgomery Co.          Katz v. Grasso                      Friday
No. 2017-02140           Videotape Deposition of Michael Grasso        May 14, 2021

Page 26

1      Do you have internal financial
2   statements that get prepared?
3   **A.   Excuse me?**
4   Q.   Internal financial statements.
5   **A.   On who?**
6   Q.   On your 50 different entities.
7   **A.   No.  Unless I ask for them, I don't have**
8   **them available.**
9   Q.   But if you asked for an internal financial
10  report for any of your entities, you could get one.
11  Correct?
12  **A.   Sure.**
13  Q.   Now, for example, you could have a balance
14  sheet for each --
15  **A.   Excuse me?**
16  Q.   You could have a balance sheet for any of
17  the entities.  Correct?
18  **A.   If I asked for them, I'm sure I can get**
19  **them.**
20  Q.   And you could have a profit and loss
21  statement for any of the entities?
22  **A.   Absolutely.**
23  Q.   Why have no profit and loss statements been
24  turned over?

Page 27

1   **A.   For what?**
2   Q.   For GF 2014 L.P.?
3   **A.   I don't know if we have any.  I sent tax**
4   **returns.  I think -- I know that.  That's all.**
5        MR. RAND:  Can I clarify what I think
6   is the gap in understanding?
7        MR. DORMONT:  Sure.
8        MR. RAND:  David is asking whether
9   something like a profit and loss statement could be
10  created versus whether it exists right now.
11       So are you saying these documents
12  could all be created if you went to the -- if you
13  were asked to do so?
14       THE WITNESS:  I guess they could
15  create them.  I'm not sure, but I think they can.
16  BY MR. DORMONT:
17  Q.   All the data for these entities is in the
18  computer system.  Correct?
19  **A.   Yes.**
20  Q.   So every time you write a check, it's in the
21  computer system?
22  **A.   Yes.**
23  Q.   And the computer system has all of the
24  records necessary for the generation of a profit

Page 28

1   and loss statement?
2   **A.   I suspect so.**
3   Q.   And, in fact, profit and loss statements are
4   needed in preparing tax returns, for example?
5   **A.   Yes.  And I don't see them usually.  It's**
6   **sent to the outside accountants by my chief**
7   **financial officer.**
8   Q.   But these are all documents that you
9   regularly create to give to your accountant?
10  **A.   I don't.  Somebody in the office does.**
11  Q.   But someone who is under your custody and
12  control.  Correct?
13  **A.   Well, I guess the word -- somebody who is in**
14  **the office that handles that matter will be doing**
15  **it.**
16  Q.   Someone who you employ?
17  **A.   Yes, not me, the company employs.**
18  Q.   Well, which company employs them?
19  **A.   They work for USRA Construction Management**
20  **Company.**
21  Q.   Do all of your employees work for USRA
22  Construction Management?
23  **A.   Yes.**
24  Q.   Now, I'm going to ask the same question.

Page 29

1        Are you familiar with a check
2   register?
3   **A.   No.  I mean, I'm not familiar with it.  I**
4   **know it exists, but I don't know what it is.**
5   Q.   Some check registers have been produced in
6   this case, in fact, produced by you.  Let me get...
7        MR. DORMONT:  Could you grab me
8   Exhibit 49 for a second.  I'll show you an example.
9        THE WITNESS:  Okay.
10       (Exhibit Katz 49 was pre-marked for
11  identification.)
12       THE WITNESS:  I've seen -- excuse me.
13  Go ahead.
14  BY MR. DORMONT:
15  Q.   Did you want to say something?
16  **A.   No.  It's okay.**
17  Q.   Okay.  This is a document, Exhibit 49, that
18  you produced.  It has a Bates label MG0102 through
19  107.  Do you see that?
20  **A.   No.  What are you talking about?**
21  Q.   There's a... if you hold the document and
22  you look at the top right and you turn it, there's
23  a letter and number sequence.
24  **A.   I don't know.**

8 (Pages 26 to 29)

Common Pleas - Montgomery Co.   Katz v. Grasso   Friday
No. 2017-02140   Videotape Deposition of Michael Grasso   May 14, 2021

---

Page 30

1    **MR. RAND:**  We'll stipulate it's
2    document MG0102.
3    BY MR. DORMONT:
4    Q.    And this is a document that you produced.
5    I'm not sure whether you're aware of that or if
6    this was done by counsel.
7    **A.    I didn't physically produce it, but it was**
8    **produced out of our office.**
9    Q.    So this is a -- it says on the top "Check
10   Register."
11   **A.    Correct.**
12   Q.    Have you seen reports like this before?
13   **A.    Yes, not for this specific company but for**
14   **another company I might have asked for it.  In**
15   **other words, how much did I pay Klehr Harrison so**
16   **far?  So they'll give me the register.**
17   Q.    The document request sought all check
18   registers from January 1, 2017 to date for GF 2014
19   L.P.  That's request number 4.
20       Do you see that?
21   **A.    Uh-huh.**
22   Q.    Is that a yes?
23   **A.    Yes.  I'm sorry.**
24   Q.    Okay.  Is there a reason that the complete

---

Page 31

1    check register for GF 2014 L.P. from January 1,
2    2017 to date was not produced?
3        **MR. RAND:**  I'm going to object because
4    you and I discussed producing the relevant
5    information related to Joe and you did not object
6    to this production.
7        If you now have an objection, assert
8    it and I'll deal with it after the deposition.
9        **MR. DORMONT:**  Excuse me.  This -- all
10   documents.  If you selectively did it, you violated
11   the Court Order.  It's very clear.
12       You made an objection.  The Court
13   overruled the objection.  All documents were
14   supposed to be produced.  You're telling me now
15   that you deliberately did not produce documents
16   according to the Court Order?
17       **MR. RAND:**  We specifically discussed
18   this.
19       **MR. DORMONT:**  We did not.
20       **MR. RAND:**  We did.
21       **MR. DORMONT:**  Counsel, you know, the
22   statement is on the record.  I don't like these
23   false statements.
24   BY MR. DORMONT:

---

Page 32

1    Q.    Sir, you can produce the check register for
2    every check for GF 2014 from 2017 to date.
3    Correct?
4    **A.    Yes.**
5    Q.    Okay.  And that hasn't been done yet to your
6    knowledge.  Correct?
7    **A.    I don't know.**
8    Q.    Now, request number 5 required the
9    production of all bank statements from January 1,
10   2017 to date for all checking accounts of every
11   kind in which GF 2014 LP has a direct or indirect
12   interest of any kind.
13       Are you aware of that?
14   **A.    Yes, I'm aware of that.  I see it.**
15   Q.    Well, are you aware that those documents
16   were not produced?
17       **MR. RAND:**  Objection to form.  You can
18   answer.
19       THE WITNESS:  We have no bank
20   statement for GF 2014.  How could I produce
21   something that I don't have?
22   BY MR. DORMONT:
23   Q.    So where does GF 2014 do its banking?
24   **A.    We keep a co-mingled account that covers 50**

---

Page 33

1    **different partnerships, and this -- checks all come**
2    **out of the same account.**
3        **And if I were to turn over those**
4    **documents to you, it would be something I would**
5    **not -- I would go to the Supreme Court to stop you**
6    **from asking me because it's other people's business**
7    **and you're not entitled to it.**
8    Q.    So you defied the Court Order?
9    **A.    I didn't defy a Court Order, counselor.  You**
10   **defied my personal -- my personal stuff.**
11       THE WITNESS:  All right.  I'll be
12   there shortly.
13   BY MR. DORMONT:
14   Q.    Do you need to take a break, sir?
15   **A.    Excuse me?**
16   Q.    Do you need to take a break?
17   **A.    Not right now.  Go ahead.**
18   Q.    Sir, this co-mingled account --
19   **A.    Yes.**
20   Q.    -- whose name is that in?
21   **A.    Metro Development Company.**
22   Q.    And GF 2014 L.P. has an interest in that
23   account.  Correct?
24   **A.    Correct.  And there's 10,000 checks a month**

---

9 (Pages 30 to 33)

Common Pleas - Montgomery Co.            Katz v. Grasso                        Friday
No. 2017-02140                  Videotape Deposition of Michael Grasso         May 14, 2021

---

Page 34

1  written out of that account for all various
2  partnerships and people that you have no business
3  asking information for.
4        So I can't give it to you. I haven't
5  got an account for GF 2014. I can give you the
6  check register, whatever checks they've written out
7  of that account but that's all I could give you.
8        I thought this was enough. But if you
9  want more, we'll give it to you.
10  Q. Other than this co-mingled account in Metro
11  Development's name, does GF 2014 have any savings
12  accounts?
13  A. No.
14  Q. Does it have any brokerage accounts?
15  A. No.
16  Q. Now, request number 9 sought GF 2014's last
17  four filed tax returns.
18       I will tell you that the 2018 and the
19  2019 reports were produced but not 2016 or 2017.
20  Are you aware of that?
21  A. No. But if they're available, we'd be happy
22  to give them to you. Maybe they weren't available.
23  So if they're available, we're happy to give them
24  to you.

---

Page 35

1  Q. Can you think of any reason why your 2016
2  and 2017 --
3  A. I have no --
4  Q. -- taxes were not produced?
5  A. Who knows? I have no idea.
6        MR. RAND: I thought they were
7  produced. I'll look back but...
8        THE WITNESS: If we didn't produce
9  them, I'd be happy to give them to you.
10        MR. DORMONT: I have all the documents
11  here that were produced. They were not produced.
12  BY MR. DORMONT:
13  Q. Now, did GF 2014 file a tax return in 2015?
14  A. I suspect. If they were in business then,
15  yes.
16  Q. Did GF 2014 file a tax return in every year
17  in which it was in business?
18  A. Yes.
19  Q. Now, are there any agreements between GF
20  L.P. -- strike that.
21       Are there any agreements between GF
22  2014, L.P. and either defendant Joseph Grasso or
23  Donna Grasso?
24  A. What do you mean by agreements?

---

Page 36

1  Q. Any type of agreement.
2  A. Well, there's a partnership agreement.
3  Q. What partnership agreement?
4  A. GF 2014's partnership agreement.
5  Q. Any other agreements --
6  A. No.
7  Q. -- other than that?
8        Are there any lease agreements between
9  GF 14, L.P. and either Joseph or Donna Grasso?
10  A. No.
11  Q. Now, request 12 sought any and all
12  communications between Joseph Grasso and any entity
13  that you control, operate, oversee or have an
14  interest of at least 10 percent in from January 1,
15  2017 to date.
16       Have all those documents been
17  produced?
18  A. I suspect. Other documents -- I have no
19  idea of any documents but if there were any, we
20  produced them.
21  Q. I'll represent to you that some documents
22  have been produced but the overwhelming majority
23  have not.
24       Do you know why that's the case?

---

Page 37

1  A. I don't know what you're talking about,
2  overwhelming, which ones you're talking about. But
3  all I know is that we, I thought, produced whatever
4  we had.
5  Q. Well, I know that, because Joseph produced
6  documents, there are numerous documents he produced
7  that you did not produce.
8  A. Maybe. I have no idea what you're talking
9  about.
10  Q. Well, how often do you communicate with
11  Joseph?
12  A. As little as possible.
13  Q. Okay.
14  A. As little as possible.
15  Q. Why is that?
16  A. He's a thorn in my side. He's a nut
17  besides. Okay? I don't even talk to him anymore.
18  Q. When did you last talk to him?
19  A. I don't remember.
20  Q. Have you talked to him this year?
21  A. I don't remember, maybe.
22  Q. Well, what's the last thing you remember
23  discussing with him?
24  A. He told me to go F myself in an email he

---

10 (Pages 34 to 37)

Common Pleas - Montgomery Co.　　Katz v. Grasso　　Friday
No. 2017-02140　　Videotape Deposition of Michael Grasso　　May 14, 2021

---

Page 38

1　sent me.  Okay?
2　Q.  When did he do that?
3　**A.  Two days ago.  I didn't respond, but I don't**
4　**know how to respond.  But I'm not, I'm not**
5　**responding.**
6　Q.  What was the topic?
7　**A.  I have no idea.  He's a crazy man.**
8　Q.  How long has he been a crazy man?
9　**A.  As long as I can remember.**
10　Q.  And how is he crazy?
11　**A.  Calling his father "Go F yourself" after his**
12　**father was trying -- as good as I've been to him?**
13　**Forget about it.**
14　Q.  Well, what spurred him to say, "Go F
15　yourself"?
16　**A.  I... his insanity.**
17　Q.  Has he been diagnosed as insane?
18　**A.  Yes.**
19　Q.  By who?
20　**A.  I don't know.  His wife tells me he's going**
21　**to a psychiatrist.  That's all I can tell you.**
22　Q.  Well, has he been insane for the last --
23　　MR. RAND:  I'm going to object to any
24　further --

---

Page 39

1　　THE WITNESS:  I don't know.  I'm not a
2　doctor.
3　　MR. RAND: -- questioning along these
4　lines.
5　　MR. DORMONT:  Excuse me.
6　　MR. RAND:  No.  This is a deposition
7　in aid of execution.  His mental diagnoses have
8　nothing to do with that.
9　　MR. DORMONT:  This is not the --
10　counsel, you're really interfering in an
11　inappropriate way.
12　　MR. RAND:  If you want to go get a
13　Motion To Compel to find out about Joe's mental
14　health, go for it.
15　　MR. DORMONT:  I'm asking because -- as
16　we're dealing with discovery in aid of execution,
17　this matters.
18　　MR. RAND:  No.  I'm going to instruct
19　you not to answer another question along these
20　lines.  David, you're wasting your time.
21　　MR. DORMONT:  Jordan, please don't
22　yell at me.  You're really being inappropriate.
23　　MR. RAND:  Keep violating HIPAA.
24　　MR. DORMONT:  This does not violate

---

Page 40

1　HIPAA.
2　　THE WITNESS:  Next question,
3　counselor.  Stop it.  You're wasting your time.
4　BY MR. DORMONT:
5　Q.  The reason I'm -- let me explain.
6　　So he's crazy.  Do you do business
7　with a crazy person?
8　**A.  Excuse me.  I say he's crazy.  I'm not a**
9　**doctor.  I don't -- I'm not saying he's crazy but**
10　**he does -- he's been acting strangely and I know**
11　**he's been seeing a psychiatrist.**
12　　**So that's why -- all I could tell you**
13　**about his physical -- his mental, his mental**
14　**position right now.**
15　Q.  Okay.  I'm trying to find out for how long
16　this has been the case.
17　**A.  I have no idea.**
18　Q.  More than a year?
19　**A.  It comes and goes.  No, I don't know.**
20　Q.  Sir, would you do business with a crazy
21　person?
22　**A.  No.  But I... I happen to have -- he happens**
23　**to be my son, so maybe I would be a little more**
24　**sympathetic.  Even I have a breaking point there,**

---

Page 41

1　too.
2　　**MR. DORMONT:**  I understand the Court
3　is going to be calling my cell phone.  So I'm
4　putting my...
5　　THE WITNESS:  While you do that, I'm
6　going to go see the little boy's room.
7　　**MR. DORMONT:**  We'll take a break.
8　　VIDEOGRAPHER:  We're now going off the
9　video record.  The time is 9:36.
10　　(Recess taken.)
11　　VIDEOGRAPHER:  We're now back on the
12　video record.  The time is 9:42.
13　　**MR. DORMONT:**  During the break we did
14　confirm that the 2016 and 2017 tax returns for GF
15　2014 were not produced and counsel has advised us
16　that those will be produced after this deposition
17　or after today so we can obviously continue asking
18　questions as is appropriate without those
19　documents.
20　　THE WITNESS:  Counsel, please talk up.
21　I'm having a tough time hearing you.  Face me.  If
22　you're like this (indicating), I can't hear a word
23　you say, even with my hearing aids on.
24　BY MR. DORMONT:

---

11 (Pages 38 to 41)

Common Pleas - Montgomery Co.          Katz v. Grasso                    Friday
No. 2017-02140              Videotape Deposition of Michael Grasso      May 14, 2021

Page 42

1  Q.  So if at any point you can't hear me, let me
2  know.  I will repeat it.  I'm sorry.
3  A.  Okay.  Go ahead.
4  Q.  And if I'm talking loudly on the video, it's
5  because -- I just want to make it clear, because
6  I'm not yelling at you.  I'm just trying to make
7  sure you can hear me.
8  A.  That's okay.  I've been yelled at before.
9  Q.  If you've been married a long time, I'm sure
10 you have, as have I.
11         Sir, have you produced any and all
12 documents evidencing any payment or transfer that
13 you made on behalf of Joseph Grasso or Donna Grasso
14 from 2017 to date?
15 A.  I think so.
16 Q.  Now, there was, of course, an explosion at
17 649 Dodds Lane in Gladwyne at the house in 2018.
18         Do you recall that?
19 A.  Yes.
20 Q.  All documents that were submitted by GF 2014
21 L.P. to any insurance company were supposed to be
22 produced.
23         Were you aware of that?  That's
24 request 18.

Page 43

1  A.  I'm not aware of it, but if it was part of
2  the -- part of the subpoena, I thought we tried
3  to -- whatever we had we sent you.
4  Q.  Well, very few documents have been produced
5  from that.
6  A.  That's all there is, probably, that we have.
7  Q.  Well, who would have the documents?
8  A.  The insurance company.  And this was
9  handled -- this was handled by an attorney in our
10 office.
11         He's not an inhouse attorney but he
12 was in our office taking space.  And he's passed
13 away.  And I don't know.  He was handling that
14 claim for me.
15 Q.  And what happened to those records?
16 A.  I have no idea.  I don't have them.
17 Q.  Well, who would know what happened to those
18 records?
19 A.  The boogeyman.  I have no idea.
20 Q.  Did anyone search for those records?
21 A.  I don't have -- I have no place to search.
22 Where am I going to search?
23 Q.  Well...
24 A.  I searched our computers and what we found

Page 44

1  in our computers we sent you.
2  Q.  You hired an adjustment company, correct --
3  A.  Yes.
4  Q.  -- to do work?
5         Did you ask them to provide you with
6  those records?
7  A.  Recently you mean?
8  Q.  Yes.
9  A.  No.
10 Q.  I assume there was a detailed proof of loss
11 in connection with that explosion?
12 A.  Yes, there was.
13 Q.  And that was prepared on behalf of GF 2014,
14 L.P.  Correct?
15 A.  No.  I think it was U.S. Realty.  That was
16 the name of the policy it was in.
17 Q.  But U.S. Realty insured GF 2014's property.
18 Correct?
19 A.  No, it didn't.  U.S. Realty is just a
20 brokerage firm.  And the insurance agent, for some
21 reason, put the policy in that name.
22         But all the -- all the partnerships
23 that are covered by this policy are named in the
24 policy as additional insured.

Page 45

1  Q.  So whatever was done by U.S. Realty was done
2  on behalf of GF 2014 relating to this explosion?
3  A.  I suspect.
4  Q.  And you control U.S. Realty.  Correct?
5  A.  Yes.
6  Q.  And you can get U.S. Realty's records
7  relating to the explosion.  Correct?
8  A.  They have none.  They do not have any.  They
9  were all handled by Richard Koory verbally and I
10 have no -- I have no, no way to get his records.
11 Q.  Did you ask the company that U.S. Realty
12 hired as the insurance adjuster, which I believe is
13 Clarke & Cohen?
14 A.  No, no.
15 Q.  Why didn't you ask them?
16 A.  Nobody asked me to ask them.
17 Q.  Now, GF -- excuse me.  Request number 19
18 requested copies of all utility bills for 649 Dodds
19 Lane.
20 A.  We have none.
21 Q.  Who pays for the utilities?
22 A.  I have no idea.
23 Q.  Well --
24 A.  There's no utilities in our name or GF

12 (Pages 42 to 45)

Page 46

1   **2014's name that I'm aware of.  I never saw a bill.**
2   Q.   Is there water at the property?
3   **A.   Yes.**
4   Q.   Who pays the water bill?
5   **A.   I think GF 2014 pays it.  If it comes here,**
6   **we pay it.**
7   Q.   Well, if the water bill came here, you would
8   have utility records.  Correct?
9   **A.   For that water bill, that's all I would**
10  **have, if it came.  I don't know if it came or not.**
11  Q.   Do you think Aqua provides water for free?
12  **A.   Not to me they don't.**
13  Q.   They don't provide water free to me either.
14        So my question is why aren't there
15  utility bills that have been produced?
16  **A.   That's not a utility bill.  A water bill is**
17  **something that's billed to the property.  Utilities**
18  **are billed to whoever used the utilities.**
19        **So the water bill probably came here.**
20  **I'm not sure.  But if it did and it came here and**
21  **we paid it, we'd be happy to give you copies of**
22  **them.**
23  Q.   What about the electric bill?
24  **A.   I have no electric in our name at that**

Page 47

1   **property nor GF 14's name either.**
2   Q.   Who has electric --
3   **A.   I have no idea.**
4   Q.   Is there electricity at the property?
5   **A.   I don't know.**
6   Q.   Well, you're the general partner of GF 2014.
7   Correct?
8   **A.   Yes, yes.**
9   Q.   And what are your responsibilities as the
10  general partner of GF 2014?
11  **A.   To manage the financing and the real estate.**
12  Q.   And --
13  **A.   And the entities that it owns.**
14  Q.   And the Dodds Lane property is one of those
15  assets.  Correct?
16  **A.   Amongst others, yes.**
17  Q.   So...
18  **A.   I don't check the other ones' electric bills**
19  **either.  So I don't know who pays them.**
20  Q.   Well...
21  **A.   The other entities.**
22  Q.   Who would know the answer to that?
23  **A.   Nobody.**
24  Q.   Nobody?

Page 48

1   **A.   If the bill is here, if the bill is here, we**
2   **will produce it.  If it's not here, I can't produce**
3   **it.  I know one thing.  I don't -- I never got an**
4   **electric bill for that property.**
5   Q.   So --
6   **A.   I might have gotten water bills but I didn't**
7   **get electric bills.  I do get tax bills.  We pay**
8   **the taxes.**
9   Q.   Who is responsible for paying for the
10  electric at the Dodds Lane property?
11  **A.   I have no idea.  I answered that question**
12  **twice now.  You said it a third time.  I have no**
13  **idea whether there was any electric even on there.**
14  Q.   Well, when is the last time you were there?
15  **A.   I don't remember, not often.**
16  Q.   Have you been there since the explosion?
17  **A.   No.  I was there a couple days after the**
18  **explosion but not since.**
19  Q.   Has Joseph Grasso or Donna Grasso made any
20  payments to you --
21  **A.   No.**
22  Q.   -- since 2017?
23        Now, has Joseph paid any expense for
24  any entity that you control, operate, oversee or

Page 49

1   have an ownership interest in?
2   **A.   Not that I know of.**
3   Q.   Well, if Mr. Grasso said that he did make
4   payments on behalf -- excuse me.  I shouldn't say
5   Mr. Grasso.  I apologize.
6        If Joseph says he did make payments on
7   behalf of GF 2014 --
8   **A.   Payments to who?**
9   Q.   Let me try to rephrase it so we're all on
10  the same page.
11        If Joseph said that he paid expenses
12  for the real estate located at Dodds Lane, would
13  that be correct?
14  **A.   No.  He might have paid the electric -- if**
15  **he was living there, and it was before the**
16  **explosion, he might have paid the electric bill.**
17  **Maybe that's what he calls expenses.**
18        **But I'm not aware of any other thing**
19  **he paid.  He might have cut the grass, too.  I**
20  **don't know.**
21  Q.   Well, has he been improving the property?
22  **A.   Has he been improving the property?**
23  Q.   Correct.
24  **A.   What do you mean by improving the property?**

13 (Pages 46 to 49)

Appx0138

Common Pleas - Montgomery Co.
No. 2017-02140

Katz v. Grasso
Videotape Deposition of Michael Grasso

Friday
May 14, 2021

---

Page 50

1  Q.   Well, do you -- you're a real estate
2  developer.  What's your understanding of improving
3  the property?
4  A.   I don't know what improvements he might have
5  made.  I was not privy to them.
6  Q.   Well, were you --
7  A.   It all depends when.  Before the explosion
8  or after the explosion, during the explosion?
9  Q.   Well, let's start before the explosion.
10  A.   Go ahead.
11  Q.   Was he fixing up the property?
12  A.   I think he was.
13  Q.   Okay.  And did he take his money and fix the
14  property?
15  A.   He wasn't taking my money so he must have
16  used his own money.
17  Q.   Do you know how much money he --
18  A.   I have no idea.
19  Q.   Please let me finish.
20  A.   All right.
21  Q.   For the court reporter please let me finish
22  my question.
23  A.   All right.  Go ahead.
24  Q.   Before the explosion do you know how much

---

Page 51

1  money Mr. Grasso spent to improve the Dodds Lane
2  property?
3  A.   I have no idea.
4  Q.   Who would know?
5  A.   Joe.
6  Q.   Now, the property exploded.  Correct?
7  A.   Yes.
8  Q.   And, as a result of that explosion, GF 2014
9  got over $3 million.  Correct?
10  A.   That may be the right number.  I'm not sure
11  of the exact number, but that may be close.
12  Q.   And part of the thing that GF 2014 was paid
13  for were the improvements to the property that were
14  made by Joe.  Correct?
15  A.   No, not that I know of.  It was based on
16  rebuilding the property.
17  Q.   And it was rebuilding the property to the
18  state it had been in prior to the explosion.
19  Correct?
20  A.   No.  I don't know.  I'm not, I'm not an
21  insurance adjuster so I have no idea what the claim
22  was.  Ask the adjuster that question.  I have no
23  idea.
24  Q.   So you signed the proof of loss.  Correct?

---

Page 52

1  A.   I was -- yes, it was stuck in front of me
2  and I signed it, yes.
3  Q.   And you swore in that proof of loss that the
4  proof of loss was accurate.  Correct?
5  A.   Yes.  To my knowledge, it was accurate.
6  Q.   And whatever improvements were made to the
7  property would have been included in that proof of
8  loss.  Correct?
9  A.   Maybe.  I have no idea.
10  Q.   So what do you consider your primary
11  business is?  You have a number of entities.
12  A.   My primary business for many years, I would
13  describe myself as being a real estate developer.
14  Because of the pandemic and because of the clock,
15  my age, I am not considering myself anymore a real
16  estate developer.
17       What I've been doing in the last
18  couple years is just managing my portfolio.
19  Q.   And one of your companies is Metro
20  Development.  Correct?
21  A.   Yes.
22  Q.   And is it correct that they have developed,
23  leased and managed over 15 million square feet of
24  commercial and residential real estate?

---

Page 53

1  A.   Pretty close, yes.
2       (Exhibit Katz 21 was pre-marked for
3  identification.)
4  BY MR. DORMONT:
5  Q.   I'll show you what I've marked as Exhibit
6  Katz 21.  This is a composite exhibit that we took
7  from the various projects on the Metro Development
8  website.
9       Are you familiar with the website?
10  A.   No, but I'm familiar with this.
11  Q.   And is this a list of the projects that
12  you --
13  A.   Some of them.  It doesn't have everything in
14  here.
15  Q.   And what relationship does or did Joseph
16  have with Metro Development?
17  A.   Very little, if any.
18  Q.   Well, did he have any?
19  A.   No ownership.  Now, for instance, let's take
20  the properties.  This is from my recollection.
21  This is going back to 1986.
22       I think that Joe had an interest in
23  Spring-Del, one of the properties we own.  And
24  Joe was a tenant of Spring-Del for many years.

---

14 (Pages 50 to 53)

Common Pleas - Montgomery Co.                Katz v. Grasso                          Friday
No. 2017-02140                    Videotape Deposition of Michael Grasso            May 14, 2021

---

Page 54

1        He was, he was an investor in Spring-
2    Del and I think he got his investment from sweat
3    equity he put -- he worked at it and we gave him a
4    piece of the deal.
5        That's way back, probably in 1980...
6    1990 maybe.  I don't know what year that was.  Here
7    it is, '92.
8    Q.   Okay.  Well, things like the Packard
9    Building, that's one of your things that's under
10   the 2001 date.
11   A.   I think he had some equity in that project,
12   too.
13   Q.   Other than equity, did he have any other
14   involvements?
15   A.   He might have worked on the construction job
16   at that time.
17   Q.   And who was he -- who was he working for
18   when he did the construction?
19   A.   He might have been on USRA's payroll at that
20   time.  He might have been.  I don't remember.
21       If he worked on the project and USRA
22   was doing the work, I would suspect he was on that
23   payroll.
24   Q.   What about Ashbridge Manor and Ashbridge

---

Page 55

1    Commons?
2    A.   Yeah, Joe worked on that project as a
3    construction superintendent, correct.
4    Q.   And he did that on behalf of USRA
5    Construction Management?
6    A.   Probably.
7    Q.   And the Valley Square Shopping Center?
8    A.   I don't think he had anything to do with
9    that.  I personally -- my recollection is I don't
10   think he had anything to do with that.
11   Q.   Now, does U.S. Realty Associates own
12   anything?
13   A.   No.  It owns, it owns nothing really.  It's
14   got a bank account but that's it.
15       It's a licensed real estate brokerage
16   firm and why the parking lot is vacant today is
17   because all of the brokerage guys are working out
18   of their house right now.
19   Q.   Did Joseph have a relationship with U.S.
20   Realty Associates?
21   A.   Not that I know of.
22   Q.   Now, USRA Construction Management, is that a
23   company that you own?
24   A.   Yes.

---

Page 56

1    Q.   And who runs that company?
2    A.   Me.
3    Q.   And when was it formed?
4    A.   Whew, I don't remember.
5    Q.   A long time ago?
6    A.   I don't remember.  I don't remember.  I'm
7    sorry.
8    Q.   Is it still operating?
9    A.   It was, it was, it was established to do
10   construction work for projects we owned or were
11   involved with.
12       Latter years we changed the formula.
13   We decided to subcontract out and work -- it was a
14   union, a licensed union carpentry contracting
15   company.
16       We gave up our union, our union
17   membership, and decided to not do direct
18   construction ourselves and hire outside
19   contractors.
20       At one point that had been changed.
21   We had the company and we use it now for payroll
22   for all our employees, period.  It does no
23   construction work at all.
24   Q.   Did you subcontract some of USRA's

---

Page 57

1    construction management work to a company that
2    Joseph ran?
3    A.   Not to my recollection, no.
4    Q.   Now, we're currently at 120 East Lancaster
5    Avenue in Ardmore.
6        Is this your primary business
7    location?
8    A.   Yes.
9    Q.   Do you have any other business locations?
10   A.   No.
11   Q.   And are all your entities based here?
12   A.   Yes.
13   Q.   And to the -- I'm going to try to group
14   this.
15       To the extent of these various limited
16   partnerships among the 50 organizations that you
17   own, are you the managing partner of each of
18   those?
19   A.   I'm the general partner, yes.  At one point
20   I was either the corporate general partner of the
21   LLC, whatever the accountants set up at the time.
22   Q.   And how many employees work out of this
23   office here at 120 Lancaster Avenue?
24   A.   Well, the brokerage group of real estate

---

15 (Pages 54 to 57)

Common Pleas - Montgomery Co.          Katz v. Grasso                           Friday
No. 2017-02140               Videotape Deposition of Michael Grasso         May 14, 2021

---

Page 58

1  salespeople and brokers that work here are not on
2  USRA's payroll. They're all self-employed
3  individuals.
4         They are licensed through USRA, U.S.
5  Realty, excuse me, and they're not on my payroll.
6  We do collect their commissions and we disburse
7  based on our contractual obligations to them.
8         So that's a group of four or five
9  people, maybe six people. The licenses are hanging
10 here on the wall.
11        USRA here has six, seven people and
12 then it employs people at various locations,
13 concierge, cleaning service people that clean the
14 buildings, take the trash out. They're all on USRA
15 payroll also.
16 Q.   And I assume there are management people at
17 each of the locations?
18 A.   Some of them, not all of them; when
19 necessary, yes.
20        We have a couple of men that just
21 travel around into the shopping centers and stuff
22 to check that the lights are working and the trash
23 is being picked up and whoever we use to sweep the
24 lot is doing the job.

---

Page 59

1         We have at least two people doing that
2  that are driving around and go from site to site.
3  Q.   Now, who is responsible for the bookkeeping
4  for the 50 entities?
5  A.   We are here in our office. Our chief
6  financial officer is Rob Greenberg at this point.
7  Over the last 25 years we've changed a couple, more
8  than once.
9  Q.   How long has Rob Greenberg been
10 responsible --
11 A.   Ten years at least, maybe more.
12 Q.   Okay. And how many people work under
13 Mr. Greenberg?
14 A.   Four, three, four. It changed. It's been
15 changed because of the pandemic. Nobody is showing
16 up.
17 Q.   I certainly understand that.
18        Now, Mr. Koory had been the general
19 counsel for you for about 24 years. Correct?
20 A.   25 years I think. He wasn't general
21 counsel. He was a person that had space in our
22 office. He had his own legal business because he
23 handled other clients, too, out of our office,
24 which was part of the deal.

---

Page 60

1         And he would do from time to time --
2  day by day, if I had any legal... if a
3  slip-and-fall came into the office -- we'd get them
4  all the time -- I would give it to Rich and say,
5  Rich, I don't know what this is all about, and he
6  would forward it to the insurance company. Okay?
7         Stuff like that he would handle for us
8  on a daily basis, like the claim we have over at
9  Dodds Lane.
10        I don't think Richard was even
11 licensed in Pennsylvania. He was not a
12 Pennsylvania lawyer. So he did not handle any
13 legal court matters.
14        (Exhibit Katz 89 was pre-marked for
15 identification.)
16 BY MR. DORMONT:
17 Q.   But let me show you what I've marked as
18 Exhibit 89.
19 A.   There's my buddy, Richard.
20 Q.   This is a copy of...
21 A.   His website, is that what you're trying to
22 say?
23 Q.   This is a copy of an obituary that I found
24 for him.

---

Page 61

1  A.   Oh.
2  Q.   And in this document describing his work, in
3  the second page, second paragraph, "Richard served
4  as general counsel to U.S. Realty Associates, Inc.
5  for the past 24 years."
6         Do you see that?
7  A.   Yeah.
8  Q.   Was that -- are you telling me that's an
9  inaccurate statement?
10 A.   Yes.
11 Q.   Okay.
12 A.   Who wrote it, his daughter? Maybe
13 she thought -- maybe that's what she thought.
14 Q.   Well, was he --
15 A.   He was here and she might have thought he
16 was our inhouse -- he was our general counsel.
17        He might have even advertised himself
18 as being that from time to time, but he was an
19 attorney that had space in our office and we used
20 him whenever we needed him.
21 Q.   So if Mr. Koory represented himself as --
22 A.   He didn't. His daughter did. He was dead
23 already when that obit was written.
24 Q.   If Mr. Koory represented himself as the

---

16 (Pages 58 to 61)

Common Pleas - Montgomery Co.    Katz v. Grasso    Friday
No. 2017-02140    Videotape Deposition of Michael Grasso    May 14, 2021

---

Page 62

1  general counsel for U.S. Realty at any point, that
2  would be false. Correct?
3  A.  It would be incorrect.
4      (Exhibit Katz 176 was pre-marked for
5  identification.)
6  BY MR. DORMONT:
7  Q.  I'm going to hand you an exhibit which we've
8  marked as Exhibit Katz 176. This is an email from
9  Mr. Koory dated August 5, 2019.
10 A.  Uh-huh.
11 Q.  Do you see that?
12 A.  Uh-huh.
13 Q.  Is that a yes?
14 A.  Yes.
15 Q.  And you were copied on this email. Correct?
16 A.  I don't know.
17 Q.  Well, do you see under the Cc's it says,
18 "Michael Grasso"?
19 A.  Okay. What year is this? If I was copied,
20 I did not -- would be able to even read emails in
21 '19. So I don't know if it came or not.
22 Q.  Well, when did you get to learn to reading
23 emails?
24 A.  It's... sometime during the pandemic I was

---

Page 63

1  able to get on it. They taught me how to at least
2  receive emails. Before that I didn't even get
3  emails. I didn't have a computer on my desk.
4  Q.  Sir, do you see in this email Mr. Koory
5  identifies himself as the general counsel, U.S.
6  Realty, Inc.?
7  A.  Yeah. That was also incorrect, even there.
8  Q.  So Mr. Koory, who is or Mr. Koory, who was a
9  lawyer, was incorrectly representing himself as
10 U.S. Realty's general counsel?
11 A.  Correct. We had no general counsel. We
12 used outside counsel all the time, and he would
13 handle the day-by-day stuff for us.
14 Q.  Would it also have been wrong for him to
15 represent himself as the general counsel of GF
16 2014?
17 A.  Yes. Unless I told him to do something for
18 GF 2014 he didn't, whatever he did...
19 Q.  Did you have an engagement letter with
20 Mr. Koory?
21 A.  No.
22 Q.  Did you pay Mr. Koory?
23 A.  He would bill each partnership each month
24 for what services he did for that partnership.

---

Page 64

1  Q.  Now, since Mr. Koory's untimely passing last
2  year due to COVID, has he been replaced?
3  A.  We just recently took another lawyer in here
4  to take his space on a trial basis, not more
5  than -- the beginning of this month to do some of
6  the stuff that Richard would help for us.
7      And he's only working two days a week
8  and we'll see if it works. It might not. We'll
9  see. But our volume of work is much less now than
10 it has been over the years.
11 Q.  Now, I want to ask you some questions
12 relating to your son Joseph.
13     Do you consider him to be an honest
14 and truthful person?
15 A.  Yes.
16 Q.  What business relationships do you have with
17 Joseph currently?
18 A.  Business relationships --
19 Q.  Yes.
20 A.  -- I have with Joseph? Right to this
21 moment?
22 Q.  Yes.
23 A.  Well, the only -- GF 2014, I'm managing that
24 partnership with him and his wife, yes.

---

Page 65

1  Q.  Any other relationships?
2  A.  Not that I can -- not that I can recall
3  right now.
4  Q.  Have you had any business dealings with him
5  within the past six years?
6  A.  Probably.
7  Q.  Could you tell me what those relationships
8  are?
9  A.  I can't tell you exactly what they are.
10 Just from memory, I don't have any recollection of
11 any specific case.
12 Q.  Can you tell me generally?
13 A.  Generally he might have called me on
14 something or something I asked him to do for me. I
15 don't remember exactly, but from time to time I
16 would have a conversation with him.
17     We don't speak very often, but when we
18 do...
19 Q.  Well, how -- "very often" means different
20 things to different people. How --
21 A.  Sometimes I go three months without talking
22 to him. Sometimes I might talk twice in one week.
23 I don't know.
24 Q.  What involvement did Joseph have in

---

17 (Pages 62 to 65)

Common Pleas - Montgomery Co.           Katz v. Grasso                           Friday
No. 2017-02140              Videotape Deposition of Michael Grasso           May 14, 2021

---

Page 66

1  developing any projects that were being developed
2  by your company?
3      MR. RAND:  Objection to form.  You can
4  answer but if you say when, I think that would be
5  helpful.
6  BY MR. DORMONT:
7  Q.   Well, let's take the last ten years.
8  A.   I... who knows?  I don't remember exactly.
9  There's -- like, you just reminded me that he did
10  work as a construction manager for Ashbridge Manor.
11  I forgot, but you reminded me.  That's what it is.
12      So I think Ashbridge Manor was
13  probably more than ten years ago, probably 20 years
14  ago or 15 years ago, at least.
15      So I don't know exactly what he has --
16  what we've asked him to do for us over the last ten
17  years, but there has been times I've said, do this
18  for me, Joe, or do that for me, Joe, and he did.
19  Q.   And do you compensate him?
20  A.   If what I asked him for was something he had
21  to get paid for, sure.
22  Q.   And are there contracts?
23  A.   No.
24  Q.   Is the agreement oral?

---

Page 67

1  A.   No.
2  Q.   How do you decide what to pay him?
3  A.   What I thought it was worth, if it was worth
4  anything or he might have done it for nothing.
5  Q.   So he'll sometimes --
6  A.   Nothing serious.  I mean, I had nothing that
7  I said -- well, he worked for Spring-Del.  He
8  got -- he got paid a salary for working for USRA at
9  the time, I think.  And then he also got a piece of
10  the action for sweat equity.
11      That was one of the assets I bought
12  back from the bankruptcy court.
13  Q.   Other than Ashbridge, has he provided sweat
14  equity for any other projects?
15  A.   I'm not sure -- Spring-Del I think I,
16  think.  I'm not even sure of Ashbridge, but I know
17  Spring-Del he did.
18      Ashbridge he might have put a check
19  up.  I don't know.  I can't remember.  He's got a
20  very small percentage, by the way, or he had until
21  the bankruptcy court divested him of it.
22      (Exhibit Katz 251 was pre-marked for
23  identification.)
24  BY MR. DORMONT:

---

Page 68

1  Q.   Let me show you what I've marked as Exhibit
2  251.  251 is an email from Krista Grasso to a Paul
3  Taraschi?  I'm not sure how you pronounce it.
4      Do you know who that is?
5  A.   No.
6  Q.   Now, Krista Grasso is one of your daughters.
7  Is that correct?
8  A.   One of my daughters, yes.
9  Q.   And who does she work for?
10  A.   She works for USRA Construction Management.
11  Q.   And the email says in the third paragraph,
12  "We have asked that Joe Grasso work with you to
13  develop a plan for the expansion."
14      Do you see that?
15  A.   Yeah.
16  Q.   And do you see your son Joseph was copied?
17  A.   Apparently.
18  Q.   Now, first of all, what project does this
19  concern?
20  A.   I have no idea.
21  Q.   Why was your company asking Joseph to work
22  with Mr. Taraschi to develop a plan for expansion?
23  A.   I have no idea.
24  Q.   Well, who would know?

---

Page 69

1  A.   Maybe Krista would know.
2  Q.   Did Mr. Grasso or did Joseph perform these
3  services?
4  A.   I have no idea.
5  Q.   Was he compensated for these services?
6  A.   I didn't, as I remember anyhow.
7  Q.   Well, who would know the answer?
8  A.   I don't even know what project you're
9  talking about.  I have no idea what you're talking
10  about.  All right?  I don't even know this fellow.
11  His name is what, Joe or Paul?
12  Q.   Paul.
13  A.   I have no idea who Paul is.
14  Q.   Have you ever known Joseph to lie in his
15  business dealings?
16      MR. RAND:  Objection to form.  You can
17  answer, if you know.
18      THE WITNESS:  No.  I'll answer it that
19  way.
20  BY MR. DORMONT:
21  Q.   If it's truthful, you can answer certainly
22  that way.
23      Now, you said that Joseph had been an
24  employee of yours at a certain point in time.

---

18 (Pages 66 to 69)

Common Pleas - Montgomery Co.                    Katz v. Grasso                              Friday
No. 2017-02140                        Videotape Deposition of Michael Grasso            May 14, 2021

---

Page 70

1  A.   He was probably employed by us way back when
2  he was doing construction -- we were doing our own
3  construction, yes.
4  Q.   And have any of your entities paid him money
5  for any reason in the last ten years other than for
6  payroll?
7  A.   Oh, I think that GF 2014 paid him money and
8  the various entities that he had interest in, which
9  we bought -- which I bought back at the bankruptcy
10 court.
11      But before I bought it back and before
12 he was in bankruptcy, he was getting checks from
13 the entities, like everybody else was getting
14 checks.
15 Q.   Since the bankruptcy -- well, let me... you
16 bought these -- let me bring it back a little bit.
17      You bought these entities in 2015.  Is
18 that correct?
19 A.   No.  I think it was 2014.
20 Q.   Okay.  Since you bought those entities back
21 in 2014, have any of your entities paid Joseph any
22 money for any reason?
23      MR. RAND:  Objection, asked and
24 answered.  You can answer again.

---

Page 71

1      THE WITNESS:  No.  The answer is no.
2  The only one that paid him anything was GF 2014.
3  Any income that came from those other entities went
4  into GF 2014.
5  BY MR. DORMONT:
6  Q.   Well, what's GF 2014 paying him for?
7  A.   Well, I'll tell you why it was paying him.
8  Grasso Family Partnership is a partnership that I
9  set up that gave 20 percent interest to each of my
10 five kids and I was the one percent general
11 partner.
12      In 1996 I gifted my house to Grasso
13 Family Partnership, amongst other things.  So
14 Grasso Family Partnership had some assets.
15      When the bankruptcy court put the
16 stuff up for auction, I was a bidder because I did
17 not want a stranger being my limited partner,
18 whoever it may be, especially, in fact, my own
19 house I was living in and I was paying rent to the
20 partnership was part of the deal.
21      So I went to the sale and bid in and I
22 was the high bidder and wind up owning all those
23 entities that were in the bankruptcy court. And I
24 established GF 2014 to put those entities, all of

---

Page 72

1  them, into that partnership.
2      And that partnership was owned at that
3  time by my wife and I as limiteds and general.  So
4  GF -- the Grasso Family Partnership paid the
5  limited partners each month $4000.  And sometimes,
6  once in a while, a big bonus check goes out to them
7  when we have extra cash.
8      The same $4000 a month that's going to
9  all the other siblings went to GF 2014.  So GF 2014
10 I thought it would be fair to give Donna and Joe
11 that same $4000 check.
12      That's why you see in the register all
13 those $4000 checks.  They went to all five kids.
14 And whatever Joe got all five kids got directly.
15 Q.   And why did you --
16 A.   And I think he needed it more than they did
17 because he was at that point in bankruptcy and
18 needed money to buy bread.
19 Q.   Why did you make it payable to Joseph and
20 Donna rather than just Joseph?
21 A.   Because I... you've got to understand.  When
22 Joseph married Donna, she was 16 years old or maybe
23 17.  He was 19.  She came into our house as a
24 young, little girl.  She's as close to me as any of

---

Page 73

1  my own children.
2      And I wanted to make sure that Donna
3  and Joe were one and they stayed together all these
4  years.  And I made sure she would get covered in
5  the checks.  That's my own personal gut feeling and
6  what I wanted to do.
7  Q.   Now, has --
8  A.   That's one of the reasons why when I gifted
9  them the limited partnership to GF 2014, it
10 didn't go to Joe.  It went to Donna and Joe because
11 Donna was entitled to it.
12      And I didn't do it for any of my other
13 kids because of my five kids, three of them are not
14 married.  Only two are married, Joe and Donna and
15 my son Michael, the doctor.
16      And I spoke to him about that issue
17 and he says it was not necessary because he had
18 taken care of his own estate planning.  And that
19 was the end of it.
20 Q.   Has Donna Grasso ever been an employee of
21 yours?
22 A.   No.
23 Q.   Now, you obviously knew about Joseph's
24 bankruptcy when he filed it in 2012.  Correct?

---

19 (Pages 70 to 73)

Common Pleas - Montgomery Co.          Katz v. Grasso                    Friday
No. 2017-02140            Videotape Deposition of Michael Grasso      May 14, 2021

---

Page 74

1   A.   I knew about it in 2014.  I didn't know
2   about it -- maybe I didn't know about it in 2012
3   exactly, but I knew he was having financial
4   problems.
5   Q.   Did he consult with you before he filed for
6   bankruptcy?
7   A.   Yeah.  He spoke to me and I said to him -- I
8   made some calls to other bankruptcy lawyers and I
9   told him don't dare file for bankruptcy.  It's a
10  mistake.  Don't do it.  Okay?
11          He didn't listen to me.  He usually
12  doesn't listen to me.  And he filed for bankruptcy
13  and it just destroyed him.
14  Q.   Why did you tell him not to file for
15  bankruptcy?
16  A.   Huh?
17  Q.   Why did you tell him not to file for
18  bankruptcy?
19  A.   Because the lawyers I spoke to said it was a
20  bad move.  They're going to appoint a trustee.
21  They're going to wipe him out.  Don't let him do
22  it.  Settle each claim individually.
23          And I said to him, do that.  And he
24  spoke to his lawyer, who I guess wanted the fee,

---

Page 75

1   and he went into bankruptcy.  And see what
2   happened?
3   Q.   Now, did you understand that before he filed
4   for bankruptcy he had a large number of creditors
5   and owed tens of millions of dollars?
6   A.   No, I didn't know that.  I mean, I'm aware
7   of it afterwards after he filed for bankruptcy.
8   Q.   Were you aware that he was denied a
9   discharge of bankruptcy?
10  A.   No.  I don't even know what that means.
11  Q.   That means -- I'll try to explain and see if
12  you understand the concept in maybe not those
13  technical, legal words, because lawyers love our
14  technical, legal words.
15          It means normally when you go into
16  bankruptcy, assuming everything goes well, at the
17  end of your bankruptcy you get discharged and all
18  of your old debts go away.
19          But if you're denied a discharge at
20  the end of the bankruptcy, you don't get that.  All
21  your creditors still have their claims.
22          Were you aware of that?
23  A.   I'm not, I'm not that sophisticated in
24  bankruptcy proceedings.  I don't know what that

---

Page 76

1   means and I didn't know whether he got that or not.
2   Q.   At some point did you learn that Joseph's
3   creditors could still go after him?
4   A.   No.
5   Q.   Where does your son live?
6   A.   Right now he rents a house in Gladwyne
7   someplace.
8   Q.   Have you been to that house?
9   A.   Yes.
10  Q.   When was the last time you were there?
11  A.   Oh, two years ago, maybe.
12  Q.   Does your house -- does your son have more
13  than one house?
14  A.   Not that I know of.  He's renting this
15  house.  I know that.
16  Q.   What does your son do for a living?
17  A.   Now?
18  Q.   Yeah.
19  A.   I have no idea.
20  Q.   Do you know where he works?
21  A.   Excuse me?
22  Q.   Do you know where he works?
23  A.   No.
24  Q.   Do you know how he makes ends meet?

---

Page 77

1   A.   I do the best I can.  I send him 4,000 a
2   month, more or less, and that's what ends meet.  I
3   don't know.  After that, he's a grown man.  He's
4   got to take care of himself.
5   Q.   Do you know how he --
6   A.   I do help his kids though.  What's that?
7   Q.   Do you know how he does that, how he makes
8   ends meet?
9   A.   I don't know.
10  Q.   Does he ask you for money?
11  A.   No.
12  Q.   Does he own any businesses?
13  A.   What's that?
14  Q.   Does he own any businesses?
15  A.   Not that I know of.
16  Q.   Does he operate any businesses?
17  A.   Not that I know of.
18  Q.   Is all the money that you've given your son
19  reflected in Exhibit Katz 49, which is the GF 2014
20  check register?
21  A.   The only money he got was through this
22  payment.  I even noticed that one of the payments
23  were paid directly to Donna, not to Donna and Joe,
24  for some reason.

---

20 (Pages 74 to 77)

Common Pleas - Montgomery Co.          Katz v. Grasso                          Friday
No. 2017-02140              Videotape Deposition of Michael Grasso          May 14, 2021

---

Page 78

1        Maybe, maybe he wasn't around to cash
2    the check at that time.
3    Q.   Which one, which one are you talking about?
4    A.   I just noticed there's one check here not
5    made to Donna and Joe.  It's made to Donna alone.
6    She must have been the only one around at the time.
7        Maybe I misread it.  Maybe I didn't
8    catch it.  Well, I might have misread it.
9    Q.   I don't see that but...
10   A.   Maybe I misread it.  It could be.  I thought
11   maybe there was one.  I thought I saw one that was
12   made to her alone.  Okay, I'm sorry.  I won't
13   interrupt you.
14   Q.   Have you ever given money to her alone?
15   A.   No.  If it's not on here, I didn't give it
16   to her.
17        MR. RAND:  You all right?
18        THE WITNESS:  Yeah, so far so good.
19   BY MR. DORMONT:
20   Q.   Now, did all of these checks come out of
21   that collective account --
22   A.   Yes.
23   Q.   -- that's... and that's the Metro
24   Development account?

---

Page 79

1    A.   Yes.
2    Q.   Has Joseph asked you to pay any bills of his
3    since 2014?
4    A.   Just -- we advanced $4000, more or less, for
5    him to pay for -- after the explosion he had to
6    have a place to live and he needed money for the
7    rent.
8        So we advanced him that $4000 out of
9    GF 2014 to pay the rent.
10   Q.   Did he pay it back?
11   A.   No.  And I haven't asked for it and I didn't
12   expect to get it back.
13   Q.   Other than GF 2014, have any of your
14   entities given any money to Joe?
15   A.   I don't -- no.  Maybe but I don't have any
16   recollection...
17   Q.   And I think -- I think you said it but I
18   apologize, that you haven't paid any of your son's
19   bills?
20   A.   Not that I know of, no.
21   Q.   Does he owe you any money?
22   A.   No.
23   Q.   Do any of the entities that he controls or
24   manages owe you any money?

---

Page 80

1    A.   The answer to that question is I don't know
2    which ones he controls or manages.
3    Q.   What is U.S. Realty Insurance Exchange?
4    A.   When we get this master policy that covers
5    all the entities, we then produce bills for each
6    entity, for their portion of that policy.
7        And that, that -- we bill each entity.
8    Because some of the entities the banks collect
9    escrow for insurance, so they pay directly.  We
10   have to have someplace to put the money when it
11   comes in so we can pay the premium.
12        And as each partnership pays its
13   premium, it goes into that account and that account
14   pays the insurance company primarily.  There may be
15   other reasons once in a while it's used but
16   primarily that's what it's used for.
17   Q.   Would U.S. Realty Insurance Exchange make
18   any payments to Donna?
19   A.   I don't know, not that I know of.
20        (Exhibit Katz 51 was pre-marked for
21   identification.)
22   BY MR. DORMONT:
23   Q.   Let me show you what I've marked as Exhibit
24   51.  Exhibit 51 is a check from U.S. Realty

---

Page 81

1    Insurance Exchange payable to Donna Grasso dated
2    January 6, 2014.
3        Do you see that?
4    A.   I have no recollection what it's for, why it
5    was done.  It may be -- that may be the
6    distribution from Grasso Family we put into that
7    account to pay her.
8        I don't know the answer to that
9    question but it's not -- no big deal.
10   Q.   You signed that check.  Correct?
11   A.   Yeah.  It looks like my signature.
12   Q.   Now, do you have records relating to Joseph
13   being an employee of USRA Construction Management
14   Company?
15   A.   No.  We have no records that go back 20
16   years, ten years.  He hasn't been an employee of
17   ours at least for the last 15 years, maybe more.
18        (Exhibit Katz 24 was pre-marked for
19   identification.)
20   BY MR. DORMONT:
21   Q.   Sir, I'm showing you what we've marked as
22   Exhibit 24.  This is a number of checks all from
23   2015 from USRA Construction Management payable to
24   Joseph Grasso.

---

21 (Pages 78 to 81)

Common Pleas - Montgomery Co.            Katz v. Grasso                              Friday
No. 2017-02140                  Videotape Deposition of Michael Grasso          May 14, 2021

Page 82

1      Do you see that?
2 A. Yep. That's six years ago. Am I correct?
3 Q. Yes.
4 A. I don't remember what they're for. He may
5 have been put back on our payroll for some reason,
6 and that's probably what it was. I have no idea.
7 Q. Do you have payroll records from within the
8 last six years?
9 A. I don't have payroll -- I'm sure we don't
10 have payroll records that go back six, seven years
11 ago.
12      We just had a shredder company come in
13 and take four truckloads of stuff that was shred,
14 not because of this case, because we had no room
15 for it.
16 Q. Well, when did that shredder company come?
17 A. Last week, two weeks ago. And I don't even
18 know what was in there. It was all kind of old
19 documents that were laying around for years.
20 Q. And who made the decision that documents
21 should be shredded a week or two ago?
22 A. We went over -- my CFO and I went down in
23 the basement and any box that was written seven
24 years or older we marked with a red tape and that

Page 83

1 stuff went out the door.
2 Q. So you --
3 A. It was a truckload.
4 Q. So you destroyed documents that were seven
5 years or older?
6 A. Yes, correct.
7 Q. We can agree that records from 2016 are
8 not -- excuse me. We can agree that records from
9 2015 are not more than seven years old. Correct?
10 A. You say payroll records. I don't know if we
11 kept payroll records or whether they were in them
12 boxes or not. It's possible.
13 Q. Do you have computer records relating to
14 your employees?
15 A. I don't. We may have. Is this the -- when
16 did Joe file for bankruptcy?
17      MR. RAND: '12 I think.
18 BY MR. DORMONT:
19 Q. He filed for bankruptcy in 2012.
20 A. This is '15. He might have needed a job at
21 that period. We might have put him on the payroll.
22 Q. How long was he on --
23 A. It's not my signature on these checks, by
24 the way.

Page 84

1 Q. Well, these are payroll checks. Do you see
2 that?
3 A. Yeah. They're machined. I don't even make
4 them.
5 Q. They're issued by ADP?
6 A. Yeah. That's why my signature is not on it.
7 Q. For how long was Joseph on the payroll?
8 A. I have no idea.
9 Q. Who would know?
10 A. We may have some records. I have to go
11 check it out. But it just might have been a
12 plug-in to give him some cash to operate and live
13 with while he was in real serious financial
14 straits.
15      I don't think he was working full time
16 for the company. He was doing -- he might have
17 done some work for us to pay him.
18 Q. Who made the decision to pay him?
19 A. Me, I guess, because I don't remember any of
20 it. But if he was there, I made the decision.
21 Q. And did you continue this for a long period
22 of time?
23 A. I don't know.
24 Q. Well, who would I -- who would know the

Page 85

1 answer to that question?
2 A. I would go -- I could have my chief
3 financial officer go back and give you when this
4 started, when this ended. I can't.
5 Q. Did USRA have a retirement plan?
6 A. No. I don't -- I don't think so.
7 Q. So people who were employees neither could
8 make a contribution to an employment plan or --
9 A. I think we -- I think there's some, some
10 IRA? Is that what it's called? Something like
11 that. I think we had something like that. I'm
12 not, I'm not an employee so I don't know.
13 Q. Does Joseph have an account?
14 A. I don't think so. I don't know.
15 Q. Who would know?
16 A. I'll check with my financial officer.
17 I could find out for you when this started and when
18 this ended and I could find out for you if he has
19 any IRA account.
20 Q. I would appreciate that and any records
21 relating to the same.
22 A. No problem.
23 Q. Now, what is GF 2014 L.P.'s business?
24 A. The business is to -- is a partnership that

22 (Pages 82 to 85)

Common Pleas - Montgomery Co.          Katz v. Grasso                          Friday
No. 2017-02140          Videotape Deposition of Michael Grasso          May 14, 2021

---

Page 86

1   earns money.
2   Q.   Okay.  And you formed the partnership?
3   A.   Excuse me?
4   Q.   Did you form the partnership?
5   A.   Yes.  Not physically but I had it formed.
6        (Exhibit Katz 31 was pre-marked for
7   identification.)
8   BY MR. DORMONT:
9   Q.   I'll show you what was marked as Exhibit
10  Katz 31.
11       Do you recognize this as the
12  Certificate of Limited Partnership that you signed
13  on August 21, 2014?
14  A.   It's not my signature, by the way, and I
15  have no recollection of it.
16  Q.   So it says, "Michael Grasso" but that's not
17  your signature?
18  A.   I told them to sign it for me.  It's not my
19  signature.
20  Q.   Do you know whose signature it was?
21  A.   I have no idea.  It might have been Richard
22  Koory's, who set it up.
23  Q.   Is the rest of the information on this
24  document correct?

---

Page 87

1   A.   I don't know.
2   Q.   Well, are you the general partner of the
3   partnership?
4   A.   Yes.
5   Q.   And is the address of the partnership 120
6   East --
7   A.   Yes.
8   Q.   -- Lancaster Avenue?
9   A.   That's correct.
10  Q.   Now, who decided who GF 2014's partners
11  were?
12  A.   Excuse me?
13  Q.   Who made the decision about who the partners
14  should be of GF 2014?
15  A.   My wife and I.
16  Q.   Okay.  And why did you make that decision?
17  That's a bad question.
18       You said that -- you decided you were
19  going to be partners with yourself.  Is that your
20  testimony?
21  A.   In many cases, in many cases, not only here,
22  many other cases.
23       MR. RAND:  Objection to form.  Jean
24  was also a partner.  Correct?

---

Page 88

1        THE WITNESS:  Yeah.
2   BY MR. DORMONT:
3   Q.   So can we agree that everyone who was a
4   limited partner when the partnership was formed was
5   also a general partner?
6   A.   I don't understand the question, but I'll
7   try to answer the question for you.  Okay?
8   Q.   Sure.
9   A.   There are many partnerships that I am a
10  general partner and my wife and I are limiteds
11  also, many partnerships.
12       I would say 90 percent of the
13  partnerships that are drawn I'm a general partner
14  and my wife and I are limited partners or it's a
15  corporate general partner, LLC general partner, and
16  my wife and I are the limited partners.
17       And there are other limited partners
18  in the, in the -- there may be other limited
19  partners also, but that's in general the way we do
20  business and still do business.
21  Q.   But in this case you were the general
22  partner and your wife and you were the limited
23  partners --
24  A.   Correct.

---

Page 89

1   Q.   -- is that correct?
2   A.   Same thing with Grasso Family.  I'm the
3   general partner and the kids are limited
4   partners.
5   Q.   And when you formed this, did you intend
6   that after Joseph's bankruptcy was over that he
7   would then become the 99 percent limited partner?
8   A.   It entered my mind, but I wasn't sure what I
9   was going to do.
10  Q.   At some point did you make that decision?
11  A.   Yes.
12  Q.   And when did you make that decision?
13  A.   When the GF 14 had received enough income
14  from the various partnerships that I bought at the
15  bankruptcy, had accumulated enough funds to pay my
16  wife and I back the amount of money we spent to buy
17  the interests, we then decided to give that limited
18  partnership to Joe and Donna.
19  Q.   Now, does GF 2014 have any officers?
20  A.   Here.  I mean...
21  Q.   Officers, not offices.
22  A.   Officers?  Only me, general partner.
23  Q.   Does GF 2014 have any employees?
24  A.   No.

---

23 (Pages 86 to 89)

Common Pleas - Montgomery Co.             Katz v. Grasso                          Friday
No. 2017-02140                 Videotape Deposition of Michael Grasso        May 14, 2021

---

Page 90

1      (Exhibit Katz 32 was pre-marked for
2   identification.)
3   BY MR. DORMONT:
4   Q.   I'm going to show you what I've marked as
5   Katz Exhibit 32.  It's entitled Limited Partnership
6   Agreement of GF 2014, L.P.
7      Do you see that?
8   A.   Yes.
9   Q.   Is this the Limited Partnership Agreement of
10  GF 2014, L.P.?
11  A.   It certainly looks like it.  It looks like
12  my signature on it, too.
13  Q.   And who prepared this document?
14  A.   Richard Koory.
15  Q.   And when was it executed?
16  A.   Well, there's a date on it.  Let me look at
17  the date.  There's no date on it.
18  Q.   I mean, there's a date on the first page.
19  It says, "...this 22nd day of August, 2014," front
20  page.
21  A.   Well, that's probably around this time.
22  Q.   And what assets did GF 2014...
23  A.   Acquire --
24  Q.   Acquire, yeah.

---

Page 91

1   A.   -- from the bankruptcy court?
2      Well, I know it had Grasso Family's
3   partnership interest, Spring-Del's partnership
4   interest.  There was five or six partnerships that
5   Joe had some interest in and those were all in the
6   bankruptcy package.  I don't remember all of them.
7      I know Spring-Del was one of them.
8   Spring Ridge may be one, which is Ashbridge Manor.
9   I know the most important one for me was Grasso
10  Family.  I think the Packard Building was --
11  there's a couple other ones in there.
12  Q.   So you took all of Joe's assets that you
13  bought out of bankruptcy and put them into GF 2014.
14  Correct?
15  A.   Yes.  And I paid for them.  And it was
16  bidding.  And if your client wanted to come and
17  bid, he should have come and bid, because I bid.
18  Q.   Okay.  So did --
19  A.   It was a public auction.
20  Q.   Have you placed any other assets?
21  A.   Excuse me?
22  Q.   Have you placed any other assets into GF
23  2014 L.P.?
24  A.   Yes, the deed to Dodds Lane.  I purchased a

---

Page 92

1   mortgage, a first mortgage, and began to foreclose
2   on that mortgage to clean the title up.
3      One of the other creditors objected.
4   After two years of litigation, we settled with them
5   and we then foreclosed on the mortgage.
6      At that -- it took us two years to get
7   that -- to do that.  Once it was foreclosed upon
8   and I had about a million one of costs to buy the
9   mortgages and pay the back taxes, which were around
10  $400,000 that had accumulated on the property, we
11  took title at sheriff's sale.
12     And I put the deed into GF 2014's
13  name, and I put a mortgage on the property for a
14  million one or a million dollars, something like
15  that.
16  Q.   You put a mortgage on it?
17  A.   That's correct, the same time.  When the
18  deed came from the sheriff, we put a mortgage on it
19  for the million one that it still owed me.
20  Q.   And whose name --
21  A.   Because at that point Joe and Donna were
22  limited partners, not me and my wife.  And I still
23  got a million one still open due me.
24  Q.   Due to who?

---

Page 93

1   A.   Me and my wife.
2   Q.   Is there a reason that mortgage -- that
3   document was not produced?
4   A.   Not produced?
5   Q.   Yeah.
6   A.   It wasn't asked for.  I'd be happy to
7   produce it for you.
8   Q.   Okay.  I'd appreciate it if you would.
9   A.   They did a title search.  You could find the
10  mortgage is on there.
11  Q.   Do you know when exactly that mortgage was
12  added?
13  A.   I don't know the exact date.  The same date
14  the sheriff was able to give us the deed, we
15  recorded the mortgage.  And we have a title
16  insurance policy, too, insuring it.
17     Because Richard asked me, do you want
18  this title insured?  I said, yes.
19  Q.   And who was the counter-party to the
20  mortgage?
21  A.   Excuse me?
22  Q.   Someone has to give you a mortgage.
23  A.   Yes.  I signed the mortgage as general
24  partner for GF 2014 and the mortgage is in the

---

24 (Pages 90 to 93)

Common Pleas - Montgomery Co.             Katz v. Grasso                          Friday
No. 2017-02140                  Videotape Deposition of Michael Grasso        May 14, 2021

---

Page 94

1   company called Metro Mortgage Partners.  It's a
2   partnership that's owned by my wife and I.
3           And we put mortgages not only on this
4   property that Joe owned, we've got mortgages all
5   over the place.  We've got about $10 million of
6   mortgages due us from various people, not Joe,
7   other people, other entities.
8   Q.   Well, why did you decide to wait until after
9   the sheriff's sale to transfer the limited
10  partnership interest -- let me try that again.  I
11  apologize.
12          Why did you decide to wait until
13  January of 2017 to transfer the limited partnership
14  interest in GF 2014 to Joseph and Donna?
15  A.   I thought I explained that earlier.
16          My wife and I had received enough --
17  well, GF 14 had received enough cash from the
18  various partnerships that it bought at sheriff's
19  sale to repay the million three or million two that
20  I had put up at the bankruptcy sale.
21          So I thought it was appropriate at
22  that point that we turn it over to Joe and Donna.
23  Q.   So you're saying that in basically three
24  years, from 2014 to 2017 --

---

Page 95

1   A.   Or '18, whatever it was.
2   Q.   -- GF 2014 had collected in excess of a
3   million dollars?
4   A.   Correct.  And it's still collecting money.
5   But, you see, I'm the general partner and I can
6   disburse the money to GF 2014 or not and all these
7   partnerships.
8           So if I don't want to disburse it, GF
9   14 will never get it.
10  Q.   Now, when you foreclosed upon the Dodds Lane
11  property, you intended for Joseph and Donna to
12  remain at the property.  Correct?
13  A.   No.  I had no, no recollection of that being
14  the purpose.  The purpose was to clear up the
15  title.
16  Q.   Well, my question is did you plan to evict
17  them once you foreclosed upon the property?
18  A.   No.
19  Q.   In fact, you knew and you intended for them
20  to remain at the property even after the
21  foreclosure?
22          MR. RAND:  Objection, asked and
23  answered.  You can answer again.
24          THE WITNESS:  The answer to that

---

Page 96

1   question is I... I had no reason to throw them out.
2   They were cutting the grass.  So there was some,
3   some good things for them to be there, good reasons
4   for them to be there.
5   BY MR. DORMONT:
6   Q.   And did Joseph and Donna agree to assume the
7   duties and responsibilities of a partner of GF
8   2014?
9           MR. RAND:  Objection to form.  You can
10  answer, if you understand.
11          THE WITNESS:  I think we told them --
12  I let them know that we're doing it.  They had no
13  objection.
14  BY MR. DORMONT:
15  Q.   By the way, would the bankruptcy trustee
16  have had any way to find out about the transfer of
17  the limited partnership interest to Joseph and
18  Donna in 2017?
19          MR. RAND:  Objection to form.  If you
20  have any idea...
21          THE WITNESS:  I have no idea.
22  BY MR. DORMONT:
23  Q.   Did you tell the bankruptcy trustee?
24  A.   No.

---

Page 97

1           MR. RAND:  Objection to form.
2           (Exhibit Katz 35 was pre-marked for
3   identification.)
4   BY MR. DORMONT:
5   Q.   Let me show you what we've marked as Exhibit
6   Katz 35.
7           Do you recognize this Form 709 Gift
8   Tax Return for 2017?
9   A.   Yes.
10  Q.   And did you sign this return?
11  A.   Yes.
12  Q.   And did you review it for accuracy before
13  you signed it?
14  A.   As far as -- as much as I could, yes.
15  Q.   And there are two Form 709s here.
16          One is for you and one is for your
17  wife, Jean.  Correct?
18  A.   Uh-huh, yes.
19  Q.   And the total value of this gift was more
20  than $3.8 million.  Correct?
21  A.   Excuse me?
22  Q.   The total value of the gift was more than
23  $3.8 million.  Correct?
24          MR. RAND:  Objection to form.  You can

---

25 (Pages 94 to 97)

Appx0150

Common Pleas - Montgomery Co.                Katz v. Grasso                        Friday
No. 2017-02140              Videotape Deposition of Michael Grasso          May 14, 2021

---

Page 98

1    answer.
2         THE WITNESS:  I don't know.
3    BY MR. DORMONT:
4    Q.   Well --
5    A.   These numbers were put on by the
6    accountants.  I have no idea where they got them
7    from.
8    Q.   But you signed the tax return?
9    A.   After they said it was the right thing to
10   do.  So I signed it, yes, like I do 50 other
11   partnerships.
12        Do you think I read them all?  They're
13   this thick.  They said this from the accountant.
14   If he prepares it, I sign it.
15   Q.   Let me then walk you through it.
16        Do you see --
17   A.   You don't have to.  I don't want to hear it.
18   Whatever is on the form is on the form.  It speaks
19   for itself.
20   Q.   But --
21   A.   I don't want to talk about it.  It speaks
22   for itself.
23   Q.   Sir --
24   A.   Next.  Next question.  Counselor, I'm not

---

Page 99

1    answering any more of these stupid questions.  All
2    right?  I told you.  I do not understand this.  I'm
3    a high school drop-out.
4         This was done by my accountant.  I
5    have no idea what's on the form.  I signed it
6    because my accountant said it was appropriate.
7    Q.   Sir, you're a sophisticated,
8    multi-millionaire developer.
9    A.   Absolutely, because I got an accountant.  I
10   don't know how to read those, especially tax forms.
11   Q.   So --
12   A.   Sophisticated ball link (phonetic).  You
13   break your back working day and night and somebody
14   comes out of the blue and wants to bother me.
15   Go ahead.  Next question, counselor.
16   Q.   Can we agree that this gift --
17   A.   Come on, counselor.  Next question.
18   Q.   -- is over $3.8 million?
19        MR. RAND:  Objection, asked and
20   answered.
21        MR. DORMONT:  It's asked.  It's
22   absolutely not answered.
23        THE WITNESS:  It speaks for itself.
24   These numbers were put together by the accountant,

---

Page 100

1    not me, based on their information they had.
2    BY MR. DORMONT:
3    Q.   Did you know the value of the gift you were
4    providing?
5    A.   I know that we've been gifting a long time
6    and I know that the gift tax limits were up to
7    about $11 million right now.
8         And when I saw this number, I know it
9    was way below the $11 million yet and I had room to
10   go, so I wasn't worried about it.
11        And these numbers, what I said, were
12   put together by the accountant.  I have -- I don't
13   know where he got them, but that's where he got
14   them.
15   Q.   We'll go through some of that.
16        MR. RAND:  Do you want to take a break
17   or are you good?
18        THE WITNESS:  It's all right.
19        MR. RAND:  We've been going about an
20   hour.
21        THE WITNESS:  What did you do, hide
22   the water?
23        MR. RAND:  I've got you.
24        (Brief pause.)

---

Page 101

1         (Exhibit Katz 33 was pre-marked for
2    identification.)
3    BY MR. DORMONT:
4    Q.   I'm showing you what we've marked as Exhibit
5    Katz 33.
6         Do you recognize this document which
7    is entitled Assignment of Partnership Interest?
8    A.   Yes.
9    Q.   And did Mr. Koory prepare this?
10   A.   Yes.
11   Q.   And who witnessed your signature?
12   A.   Excuse me?
13   Q.   The last page has some signatures.
14   A.   Uh-huh.
15   Q.   And I'm wondering who witnessed your
16   signature.
17   A.   What's that?
18   Q.   Who witnessed your signature?  Do you know?
19   A.   No.
20   Q.   Were you --
21   A.   That's strange.  I don't know who that is.
22   Q.   Were you and Joseph and Donna in the same
23   room when this document was executed?
24   A.   I don't think so.

---

26 (Pages 98 to 101)

Common Pleas - Montgomery Co.                     Katz v. Grasso                              Friday
No. 2017-02140                        Videotape Deposition of Michael Grasso            May 14, 2021

---

Page 102

1          (Exhibit Katz 36 was pre-marked for
2     identification.)
3     BY MR. DORMONT:
4     Q.   I'm showing you what we've marked as Exhibit
5     36.  Exhibit 36, which was produced by you, is
6     entitled GF 2014 LP Valuation For Gift Tax
7     Purposes.
8          Have you seen this before?
9     A.   No.
10    Q.   Now, this document identifies various assets
11    of GF 2014 as of January 1, 2017.
12         Do you see that?
13    A.   Uh-huh.
14    Q.   Is that a yes?  Is that a yes?
15    A.   Yes, that's what it says.
16    Q.   Does this identify all of GF 2014's assets
17    as of January 1, 2017?
18    A.   I recognize most of them.  The only one I
19    don't recognize is Souderton.  I don't think he had
20    any interest in that at all.
21         Now, that may have been -- that may be
22    one of the... one of the entities that was
23    purchased in bankruptcy court but it had nothing.
24    So that's just -- that's just a line item.

---

Page 103

1     Q.   It lists no market value there?
2     A.   What's that?
3     Q.   On the right-hand column there's a fair
4     market value.  Do you see?
5     A.   Yeah.
6     Q.   And it lists no value at all for Souderton.
7     A.   That's probably why.
8     Q.   Now, am I correct that the first two
9     entities, 111 S. 15th Street Associates and Chest-
10    Pac Associates, both are different parts of the
11    Packard Building?
12    A.   Yes.
13    Q.   Spring-Del Associates, is that the property
14    at 520...
15    A.   (Indicating) North Delaware Avenue, yes.
16    Q.   And you pointed to Riverview Place.
17         Are you converting that to condos now?
18    A.   No.  It's an office building.
19    Q.   Office building.
20         And when was that -- has it always
21    been office buildings?
22    A.   Yes.
23    Q.   What is Spring Ridge Associates?
24    A.   That's the Ashbridge Manor.

---

Page 104

1     Q.   And I think you've already discussed the GF
2     Family Limited Partnership.  Is that correct?
3     A.   Grasso Family?
4     Q.   Yes.  Excuse me.
5     A.   Yes.
6     Q.   The Grasso Family Limited Partnership.
7          And then there's a liability listed,
8     Grasso Family LP.  Do you see that?
9     A.   Book value?  Market value?  What are you
10    talking about?
11    Q.   Under Liabilities, if you go down under
12    Liabilities --
13    A.   Okay.
14    Q.   -- you'll see a liability.
15    A.   900,000?
16    Q.   Correct.
17    A.   I have no idea what that is.
18    Q.   And do you see the total value of the gift
19    is listed at over $3.8 million?
20    A.   This apparently was prepared by the
21    accountant.  So I don't -- I never -- I'm not even
22    sure I ever saw it before.
23    Q.   Do you believe it's inaccurate?
24    A.   No.

---

Page 105

1     Q.   Do you know who -- you say the accountants.
2     Who exactly prepared this?
3     A.   I think it was Hal Michels with our
4     accounting firm.  And I'm trying to remember the
5     name of the accounting firm, only because they just
6     sold out to another guy -- another large firm.
7          It's a new name, so I don't remember
8     the name off the top of my head.
9     Q.   Was it St. Clair CPAs?
10    A.   St. Clair, that's correct.  But it's not
11    St. Clair anymore.  They just sold out to another
12    company or they were purchased by another company.
13         (Exhibit Katz 45 was pre-marked for
14    identification.)
15    BY MR. DORMONT:
16    Q.   I'm showing you what we've marked as Exhibit
17    45.  Exhibit 45 purports to be GF 2014's tax return
18    for 2018.
19         Are you familiar with this document?
20    A.   No.
21    Q.   Would you have signed this document?
22    A.   Yes, along with 50 other ones.  But what it
23    has, the numbers, I have no idea where they got
24    them from or where they come from.

---

27 (Pages 102 to 105)

Common Pleas - Montgomery Co.          Katz v. Grasso                        Friday
No. 2017-02140                 Videotape Deposition of Michael Grasso        May 14, 2021

---

Page 106

1   Q.   Well, did you believe they were accurate --
2   A.   Yes.
3   Q.   -- when you signed the return?
4   A.   I believe the accountants are always
5   accurate until the IRS says they're not.
6   Q.   So is it correct that the total assets of GF
7   2014 as of the end of 2018 were over $3.5 million?
8   A.   Could be.
9   Q.   Do you have any reason to question that?
10  A.   Excuse me?
11  Q.   Do you have any reason to doubt that number?
12  A.   No.  And I don't even know where that number
13  comes from.  Maybe it's the proceeds of the fire
14  claim is in that money or the explosion.  '18?  It
15  probably was.
16  Q.   So you think the proceeds of the explosion
17  are in here?
18  A.   That and the cash, the cash -- what are they
19  showing as cash in the bank?
20  Q.   Well, we can take a look.
21       If you turn to the document, the fifth
22  page, which is the fifth page of -- it's the third
23  page.  It's page 5 of the tax return.  So you
24  probably have to go back a couple of pages.  It's

---

Page 107

1   Bates labeled MG0046 on the bottom.
2   A.   No, it does not include -- it does not
3   include the banking.  It had $145 in the bank.
4   Q.   I think what it shows is -- yeah.  In the
5   bank at the beginning of the year $145,000 and
6   change and at the end of the year 11,000 and
7   change.
8   A.   So we disbursed the money one way or
9   another, paid bills or something, insurance.
10  Q.   Well, what insurance did GF 2014 have?
11  A.   It had fire insurance, liability insurance.
12  Q.   Was that 100 and...
13  A.   No.  I'm sorry.
14  Q.   Do you have records of how much that was?
15  A.   I'm sure I do, but not off the top of my
16  head.
17  Q.   If you look at the end of the year, the
18  total assets went up to 3.5 million from around
19  3,082,000.  Do you see that?
20       MR. RAND:  Where are you looking?
21       MR. DORMONT:  The same page 5, line
22  14.
23       THE WITNESS:  So what's your
24  question?

---

Page 108

1   BY MR. DORMONT:
2   Q.   My question is will you agree that the
3   assets went up by over $400,000 in 2018?
4   A.   If that's what it says, that's what it is, I
5   suspect.  It's from the books and records of the
6   company.
7   Q.   Now, on line 19b it has the mortgages or
8   notes or bonds payable in more than a year
9   increasing from 1 million to 1.4 million.
10       Do you see that?
11  A.   Uh-huh.
12  Q.   Is that a yes?
13  A.   That's probably what the books show, but the
14  balance now is about a million one, plus accrued
15  interest.
16  Q.   Well, did you loan $400,000 to someone?
17  A.   I told you, I purchased the mortgages.  And
18  I don't know what this reflects, whether it was
19  after the foreclosure, before the foreclosure.  I
20  don't know.  And I don't know what these numbers
21  are from.
22  Q.   Does Mr. Greenberg know?
23  A.   He might or the accountant certainly should
24  know from the books and records of the company.

---

Page 109

1   Q.   Now, just turning back to page 4 of this
2   document, is it correct that the net rental income
3   for the year was 161,000?
4   A.   If that's what it says, that's what it was.
5   Q.   Line 2.
6   A.   If that's what it says, that's what it is.
7   Q.   So I need you -- I can't testify.  I need
8   you to confirm these things.
9   A.   What's the question again?
10  Q.   On page --
11       MR. RAND:  I'm going to object, asked
12  and answered.  He's already said he has no reason
13  to doubt the accuracy of this entire return.
14       THE WITNESS:  If that's what it says,
15  that's what it is.  You've asked me each item.  I
16  don't remember any of them.
17  BY MR. DORMONT:
18  Q.   So if you turn to page 12, which is Bates
19  labeled MG0054...
20  A.   Yep.
21  Q.   At the bottom do you see "The entity owns
22  20% or more directly or 50% or more overall of
23  partnerships or trusts."  That's Statement 2 and
24  then it lists various entities.

---

28 (Pages 106 to 109)

Common Pleas - Montgomery Co.            Katz v. Grasso                                    Friday
No. 2017-02140            Videotape Deposition of Michael Grasso                    May 14, 2021

---

**Page 110**

1      Do you see that?
2   A.   So what's the question?
3   Q.   First of all, I just want to direct you to
4   that. Are we looking at the same thing?
5   A.   I'm looking at it, yes.
6   Q.   Now, there's 126 Lancaster Associates. Do
7   you see that?
8   A.   Yes.
9   Q.   Now, 126 Lancaster Associates owns this
10  building. Correct?
11  A.   Yes.
12  Q.   And, according to this, that is 100 percent
13  owned by GF 2014. Correct?
14  A.   126 East Lancaster?
15  Q.   Yes.
16  A.   It's owned -- GF 2014 owns none of it.
17  Q.   So you're saying that the tax return then
18  is --
19  A.   Incorrect.
20  Q.   Incorrect.
21  A.   And they...
22  Q.   What about QPSR Partners?
23  A.   I don't think they own any of that either.
24  Maybe, maybe, maybe not.

---

**Page 111**

1   Q.   What is QPRS --
2   A.   I have no idea.
3   Q.   Let me say it. What is QPSR Partners?
4   A.   I have no idea.
5   Q.   What is Route 113 Associates?
6   A.   They -- I know what that is. It's an
7   existing partnership and GF 2014 absolutely owns
8   none of it. Never did, never has.
9   Q.   Next page, this is Statement 3. It lists
10  commercial realty and there's a negative number, do
11  you see that, negative 54,000?
12  A.   Yeah, yep.
13  Q.   What is that, "Commercial Realty"?
14  A.   I have no idea. I've never heard of such a
15  company called Commercial Realty. It's not my
16  company. It says commercial -- all of them say
17  commercial. They're all commercial properties.
18       Chest-Pac, you know what that is. 111
19  South 15th, you know what that is. Spring-Del,
20  Spring Ridge, you know what that is and Grasso
21  Family Partnership.
22       These are commercial properties
23  apparently, how they categorized them.
24  Q.   Right. But do you know what the negative is

---

**Page 112**

1   on the top?
2   A.   No.
3   Q.   Now, on Statement 9, which is on page 14...
4   A.   14 you want to talk about?
5   Q.   Yes, page 14, Statement 9, which is at the
6   bottom. It says, "Other Investments"?
7   A.   L you're talking about? Schedule L?
8   Q.   Schedule L, yes.
9   A.   There's Schedule Ls.
10  Q.   Well, that's why I was referring you to
11  Statement Number 9, the one at the bottom.
12  A.   I don't know what he's talking about.
13  Number 9? Did you say Number 9?
14  Q.   You're right. There are two things that say
15  Schedule L. The second one, if you go over, it
16  says, "Other Investments" and then it says,
17  "Statement 9."
18       Do you see that?
19  A.   Go ahead.
20  Q.   Okay. Now, it lists the Dodds Lane
21  property. Correct?
22  A.   It does.
23  Q.   And it says the beginning of the year value
24  was a million and the end of the year value was 1.4

---

**Page 113**

1   million.
2       Do you see that?
3   A.   That's correct. That's what it shows. I'm
4   not sure where that came from, but it's what it
5   shows.
6   Q.   Well, do you know why the value increased by
7   $400,000 in a year?
8   A.   Inflation maybe.
9   Q.   You think inflation was --
10  A.   Could be.
11  Q.   -- 40 percent?
12  A.   Could be. We might have been asked that
13  question one year and then the next year realized
14  that we made a mistake the first year. So I don't
15  know.
16  Q.   So were you aware that in 2018 Joseph was
17  busy improving the Dodds Lane property?
18  A.   He was doing some improvements, yes.
19  Q.   And you knew about those improvements.
20  Correct?
21  A.   I knew he was doing some improvements. I
22  had no idea what they were. I haven't been in the
23  property so I don't know.
24  Q.   Well, you know, for example, that the

---

29 (Pages 110 to 113)

Appx0154

Common Pleas - Montgomery Co.          Katz v. Grasso                    Friday
No. 2017-02140                Videotape Deposition of Michael Grasso      May 14, 2021

---

**Page 114**

1  explosion was supposedly caused by workmen who were
2  finishing up work on the heating system?
3  **A.   That's what I heard.**
4  Q.   Okay.  And did you pay for those
5  improvements to the heating system?
6  **A.   No.**
7  Q.   Who paid for the improvements to the heating
8  system?
9  **A.   I don't know, probably Joe, but I don't know**
10 **for sure.  If he said he did, he did.**
11 Q.   And why was Joe spending his money to
12 improve the Dodds Lane property?
13 **A.   Well, I think in 2018 he was already a**
14 **limited partner.  Correct?  And he knew him and his**
15 **wife would eventually gain by any improvements he**
16 **did, him and his wife.**
17 Q.   And did you allow him to make whatever
18 improvements --
19 **A.   Yes.**
20 Q.   -- he wanted to the property?
21 **A.   Yes.**
22 Q.   And did you keep a record of the value of
23 those improvements?
24 **A.   No.  I have no idea what they were.  You**

---

**Page 115**

1  **reminded me the air conditioning was changed, but**
2  **that's all I know because you reminded me.**
3  Q.   And if you'd turn to the 18th page of the
4  document, there is a schedule K-1.  Is -- I'll wait
5  until you get there.
6         Is that schedule K-1 accurate?
7  **A.   K-1 you say?**
8  Q.   Yes.
9  **A.   Okay.**
10 Q.   My question is --
11 **A.   What's your question?**
12 Q.   -- is it accurate?
13 **A.   I guess.**
14 Q.   Do you have any reason to doubt it?
15 **A.   Excuse me?**
16 Q.   Do you have any reason to doubt its
17 accuracy?
18         **MR. RAND:**  Objection, asked and
19 answered.
20         THE WITNESS:  No.
21         (Exhibit Katz 46 was marked for
22 identification.)
23 BY MR. DORMONT:
24 Q.   I'll show you what we've marked as Exhibit

---

**Page 116**

1  46.  This appears to be the Income Tax Return for
2  2019 related to GF 2014.
3  **A.   Uh-huh.**
4  Q.   Did Mr. Michels prepare this return as well?
5  **A.   Excuse me?  Yes.**
6  Q.   And would you review this return before it
7  was filed?
8  **A.   I'm sorry.  You're talking to the paper.**
9  Q.   Would you review this return before it was
10 filed?
11 **A.   No.  Quite frankly, I don't understand it.**
12 Q.   Did someone in your office review it before
13 you signed it?
14 **A.   I don't think so.  I think somebody gave**
15 **them the information and they made the return.**
16 Q.   Did you sign this return?
17 **A.   Yes, along with 50 other ones.  They came in**
18 **in a box this big (indicating).**
19 Q.   Does Mr. Greenberg review these tax returns
20 before you sign them?
21 **A.   No, I don't think so.**
22 Q.   Now, could we turn to Exhibit 13, please.
23 Not 13, excuse me.
24        Taking a look at Exhibit 46, could you

---

**Page 117**

1  turn to page 13?
2  **A.   What page are you talking about?**
3  Q.   Page 13.  There's a 13 at the bottom of the
4  page.  It's Bates labeled MG0014.
5  **A.   Go ahead.**
6  Q.   This, again, is Statement 2 and it lists
7  various entities that --
8  **A.   They're wrong.**
9  Q.   Okay.
10 **A.   Route 113 was never part of GF 2014, nor was**
11 **MG Palace.  Those are entities -- Route 113 is**
12 **three or four partners, my wife and I and other**
13 **people.  And GF Palace (sic) is just me and my**
14 **wife.**
15        **Why they're on here, I don't know.  I**
16 **think the accountant or somebody screwed up.**
17 Q.   Okay.
18 **A.   They were never part of GF 2014.**
19 Q.   What does MG Palace own?
20 **A.   It owns a building in Downingtown, which is**
21 **leased and we are the landlords.**
22 Q.   Okay.  Who do you lease it to?
23 **A.   It's a bowling alley right now, I think.**
24 Q.   And who owns the bowling alley?

---

Common Pleas - Montgomery Co.                Katz v. Grasso                              Friday
No. 2017-02140                   Videotape Deposition of Michael Grasso         May 14, 2021

---

Page 118

1  A.  Who owns the bowling alley?
2  Q.  Yeah.
3  A.  I have no idea. I know the guy we deal
4  with. I can't remember his name but... it escapes
5  me for the moment.
6       It's amazing how this shit gets on and
7  the mistakes they make, the accountants.
8  Q.  When did you acquire this bowling alley?
9  A.  Oh, five, six years ago.
10  Q.  Why did you buy a bowling alley?
11  A.  I own everything else in that shopping
12  center. It was the only other piece that was
13  missing. And I think Joe owned it at one time, Joe
14  and Donna owned it.
15       And it was going to sheriff's sale and
16  I bought it -- I think I bought it at sheriff's
17  sale or -- either that or I bought the mortgage and
18  foreclosed, one or the other. I'm not sure.
19       But now I own it. Nothing to do with
20  Joe or Donna. I own it, period. And the tenant
21  was in there when I foreclosed on it.
22  Q.  You have Exhibit Katz 49 in front of you.
23  A.  I'm sorry? Again, counselor, I can't hear
24  you.

---

Page 119

1  Q.  You have Exhibit Katz 49 in front of you.
2  That's the check register that we looked at
3  before --
4  A.  Yeah.
5  Q.  -- for GF 2014.
6       (Cell phone ringing.)
7       THE WITNESS: My car, my car, my
8  car...
9       MR. DORMONT: If you need to take it,
10  you can take it.
11       THE WITNESS: No. It's somebody
12  calling. My car warranty is over, you know.
13       MR. DORMONT: Oh, yeah, one of those.
14  No one seems to have good warranties these days.
15       THE WITNESS: Go ahead. I'm sorry.
16  BY MR. DORMONT:
17  Q.  So the question is, if you look at this,
18  this is supposed to be every check that was issued
19  to Joe or Donna from January of 2017 through
20  February of this year.
21       Do you see that?
22  A.  Uh-huh.
23  Q.  But there are no checks prior to 2018.
24  A.  I don't know. I think this is the only --

---

Page 120

1  we were under the impression this is all you asked
2  for. And that's what we gave, what you asked for.
3  Q.  Well, my question is were there checks
4  issued in 2017 --
5  A.  I don't know.
6  Q.  Okay. Let me just finish the question so we
7  have a clear record.
8       Were there checks issued by GF 2014 to
9  Joseph or Donna Grasso in 2017?
10  A.  I don't know.
11  Q.  Now, one of these checks is for $5,000 when
12  everything else was 4,000. If you look at the
13  fifth page of the document, there's a Check 245.
14  A.  That may be the amount that Grasso Family
15  paid the other partners that month. It could be.
16  Q.  Do you know why that --
17  A.  No.
18  Q.  -- amount was different?
19  A.  No.
20  Q.  Now, there's a check here for $40,000.
21  A.  I think I explained that already, counselor.
22  I'll do it again, if you want.
23  Q.  The $40,000 check?
24  A.  Yeah, I explained what it was.

---

Page 121

1  Q.  I don't remember you explaining that.
2  A.  40,000? 4,000, not 40,000.
3  Q.  No. There's a check -- well, let me get the
4  check and show it to you.
5       MR. RAND: I think you did this one,
6  too.
7       THE WITNESS: Huh?
8       MR. RAND: You explained this one as
9  well.
10       THE WITNESS: 4,000.
11       MR. RAND: No, no. There's another
12  one for 40 that you also spoke about literally.
13       THE WITNESS: What was it?
14       MR. RAND: The 40?
15       THE WITNESS: Yeah.
16       MR. RAND: You said, like, when Joe
17  needed rent or something, you supposedly --
18       THE WITNESS: Oh, that was for 4,000.
19       MR. RAND: No, it was 40.
20       THE WITNESS: I have no recollection
21  of the 40,000. I don't even know what it's for.
22  I'm not even sure it's correct. Is this 40,000?
23       MR. RAND: Yeah.
24       THE WITNESS: I have no idea what it's

---

31 (Pages 118 to 121)

Common Pleas - Montgomery Co.                Katz v. Grasso                              Friday
No. 2017-02140                   Videotape Deposition of Michael Grasso            May 14, 2021

---

Page 122

1   for. But it may have been distributed. So this
2   was -- I see it has a $10,000 check that was voided
3   out.
4              (Exhibit Katz 48 was pre-marked for
5   identification.)
6   BY MR. DORMONT:
7   Q.   I'm showing you what we've marked as Katz
8   Exhibit 48.
9   A.   **Okay. I don't know what it was for,**
10  **counselor.**
11  Q.   Did you sign the check?
12  A.   **It may have been the same purpose. We might**
13  **have distributed 40,000 to all the limited partners**
14  **in Grasso Family and we decided to give Joe his end**
15  **and Donna.**
16  Q.   Well, who would know why you issued a
17  $40,000 check?
18  A.   **Me. But I don't have a recollection at this**
19  **moment of why, but I could -- if I go back, I could**
20  **tell you.**
21  Q.   Well, if you look at Exhibit 49 and you turn
22  to the second page...
23  A.   **Yeah.**
24  Q.   ...it says, "leasing," I assume "expense"?

---

Page 123

1   A.   **Yes.**
2   Q.   Do you see that?
3   A.   **You know, I think that -- I think that check**
4   **is... apparently I... I don't know what it's for,**
5   **to be honest with you. I don't remember.**
6   Q.   Would you have records supporting why that
7   check was made?
8   A.   **I just gave you the records. The check**
9   **itself is the record that I have. Above that, no.**
10  Q.   I meant back-up or emails relating to that
11  check.
12  A.   **I have no emails at all that I can give**
13  **you.**
14  Q.   But you do occasionally send emails?
15  A.   **I do not send emails. I don't know how to**
16  **send emails, so I can't send email. I don't know**
17  **how to do it.**
18         **When I had a secretary, yeah, I had**
19  **her send it out for me once in a while. But the**
20  **last couple of years I haven't had a secretary.**
21         (Brief pause.)
22         THE WITNESS: Do you remember the date
23  of the explosion?
24         MR. RAND: It was around November 18.

---

Page 124

1              THE WITNESS: It could be -- it could
2   be that was the reason for the check.
3              MR. RAND: I think so but... if you
4   don't remember, you don't remember. Don't guess.
5              THE WITNESS: Okay. I don't know.
6              (Exhibit Katz 157 was pre-marked for
7   identification.)
8   BY MR. DORMONT:
9   Q.   Let me show you what we've marked as Exhibit
10  157. Exhibit 157 is an email -- first of all, this
11  was produced by Joseph and not by you.
12         And you obviously have an email
13  address that's M --
14  A.   **You'll notice I didn't send this email. You**
15  **noticed that, didn't you?**
16  Q.   Well, it says it's from Jean.
17  A.   **My wife sent this email, not me.**
18  Q.   But the text of the email --
19  A.   **It says dad told her to send it. Joe is --**
20  **it's a Violation Notice and I asked him whether he**
21  **knew anything about it. And I said to my wife,**
22  **send it to Joe, see what he knows about it.**
23  Q.   So your wife would write an email and sign
24  it, "Love, dad"?

---

Page 125

1   A.   **Yeah, why not? Because I told her to send**
2   **it.**
3   Q.   This is an October 23, 2020 email.
4         Why were you sending a Violation
5   Notice relating to Dodds Lane to Joseph?
6   A.   **Because I wanted him to check it out and see**
7   **what -- what it was all about and get it fixed, if**
8   **it's -- to take care of it and let me know what it**
9   **was.**
10        **Did he ever let me know? Probably**
11  **not.**
12  Q.   Was he responsible for fixing it?
13  A.   **No. He was -- he would at least give me**
14  **why, why we had the violation and whether it was,**
15  **whether it was corrected or not. And I was going**
16  **to correct it.**
17        **Apparently I had somebody go out and**
18  **correct it. I don't know who did it.**
19  Q.   Well, what was the violation?
20  A.   **I have no -- I don't remember.**
21  Q.   Who paid to fix the violation?
22  A.   **GF 2014, if he had to pay for it, yeah.**
23  Q.   So somewhere there's a record of this
24  improvement in your GF 2014 --

---

32 (Pages 122 to 125)

Common Pleas - Montgomery Co.           Katz v. Grasso                    Friday
No. 2017-02140           Videotape Deposition of Michael Grasso           May 14, 2021

---

Page 126

1    A.  No, this wasn't an improvement.  It's just a
2  question of what the violation was.
3          Let me see what the violation is.  It
4  could be trash.  It could be something else.
5  Q.  The road had potholes.
6    A.  Oh, potholes.  I don't think we ever fixed
7  it.  I just told them I wasn't going to do it.  So
8  I didn't do it.
9          It was on the street, the potholes,
10  and it was a community -- it's not a public street.
11  I think that's -- Dodds Lane is a -- owned by the
12  property owners.  So they had to all pool money
13  together to fix any potholes.
14          We never put any money towards it.
15  Nobody ever asked me for it.  But I think this
16  violation went out to every property owner on the
17  street.  That's my recollection.  I'm not sure.
18  Q.  Is there a homeowners association of some
19  sort?
20    A.  Not that I know of.  It's a private street.
21  Q.  Well, then who is it who organizes the
22  repairs of the street?
23    A.  I don't know.
24          (Exhibit Katz 158 was pre-marked for

---

Page 127

1  identification.)
2  BY MR. DORMONT:
3  Q.  Let me show you this notice.  We've marked
4  this Exhibit as 158.
5          Now, this is from March of this year.
6    A.  This is current.
7  Q.  Right.
8    A.  This is current.
9  Q.  And, once again, this email says, "Joe,
10  attached please find Violation Notice for Dodds
11  Lane.  Let me know how you are going to address
12  this.  Dad."  Correct?
13    A.  Yeah, or are you going to address it.  He
14  never addressed it at all.  It's still out there
15  being a violation.  Nobody addressed it.
16  Q.  Why did you expect Joe to address this?
17    A.  Because he's a limited partner and he has
18  some interest in the property, him and his wife,
19  and he should look at it.
20  Q.  Should he pay for the improvements?
21    A.  It was never done.  I didn't ask him to pay
22  for anything.
23  Q.  If the improvements are made, do you expect
24  Joe to bill you and you pay him?

---

Page 128

1    A.  No.  I expected Joe to tell me what the
2  problem was and if I had to hire a third party to
3  fix it, I would hire a third party to fix it.
4          I haven't hired anybody and, as far as
5  I know, this violation is still out there.
6  Q.  Have you hired people to fix up the Dodds
7  Lane property?
8    A.  No.  Oh, we did hire somebody after the
9  explosion, after the explosion, for two years while
10  the Firearms -- what's it called?
11  Q.  The ATF?
12    A.  Huh?
13  Q.  Alcohol, Tobacco and Firearms?
14    A.  ...were reviewing the explosion, we were not
15  allowed on the property.  The township kept asking
16  us to clean it up and we couldn't do it because
17  they wouldn't allow us on the property.
18          But once we got the release from the
19  Firearms department, from the investigators, and we
20  then were able to go onto the property, I think we
21  did hire somebody to clean it up.  I think we spent
22  a couple hundred thousand to clean it up.
23  Q.  Who did you pay?
24    A.  Huh?

---

Page 129

1  Q.  Who did you pay?
2    A.  Whoever billed me.  I don't remember off the
3  top of my head.
4  Q.  And who arranged for that clean-up?  Did you
5  do that?
6    A.  I had Joe help me with it, yeah, find
7  somebody to do it.
8  Q.  Did you pay Joe for that?
9    A.  No.
10          (Exhibit Katz 50 was pre-marked for
11  identification.)
12  BY MR. DORMONT:
13  Q.  I'll show you what we've marked as Exhibit
14  50.  Now, I don't know what these were.  They were
15  produced by you as responsive.
16          Can you tell me what these documents
17  are?
18    A.  I have no idea.
19  Q.  Can you tell me who would know?
20    A.  I don't even know what they are, so I can't
21  tell you who would know.
22  Q.  Well --
23    A.  What is it?
24  Q.  Well, it looks to me to be some type of

---

33 (Pages 126 to 129)

Common Pleas - Montgomery Co.                    Katz v. Grasso                                    Friday
No. 2017-02140                      Videotape Deposition of Michael Grasso                    May 14, 2021

---

Page 130

1  check register probably located --
2  **A.   It doesn't look like that to me, because**
3  **basically it's not my -- these checks -- this**
4  **register you showed me is a register that I've seen**
5  **before.**
6         **I've never seen anything like this**
7  **before and I don't know where this came from.**
8  Q.   Do you know who would know?
9  **A.   Huh?**
10  Q.   Do you know who would know?
11  **A.   I don't even know what they are.  How would**
12  **I know who would know?**
13  Q.   Now, this communal bank account that you
14  have, the money gets swept out every night.
15  Correct?
16  **A.   We do have an arrangement with the bank to**
17  **earn interest, that's correct.**
18  Q.   Okay.  And do you see on the second page it
19  noticed -- it references the sweep?
20  **A.   What's that?**
21  Q.   On the second page at the top it references
22  the sweep.
23  **A.   Could be.**
24  Q.   A sweep back?  Do you see that?

---

Page 131

1  **A.   What's that?**
2  Q.   Yes.  Do you see there's a sweep back and
3  then you have a transfer and, you know, then you
4  get some interest.
5  **A.   This might be a bunch of checks that was**
6  **written, but I don't know where this came from.**
7         **I do know we do sweep each night to**
8  **earn some interest.  We used to earn a lot of**
9  **interest, but today, with the interest rates being**
10  **so low, we're lucky we earn a couple thousand**
11  **dollars a month.**
12  Q.   And if a company, let's say GF 2014, wants
13  to write a check, it would come out of that central
14  account.  Correct?
15  **A.   That's correct.**
16  Q.   Is there any limit on the size check that GF
17  2014 can write?
18  **A.   Well, I get a cash report each day with all**
19  **the balances of all the partnerships, and we will**
20  **not draw a check more than what their balance is in**
21  **their checking account, on their particular line**
22  **item.**
23  Q.   So every day you get a balance for GF 2014?
24  **A.   I get a check report on all my partnerships,**

---

Page 132

1  **50 partnerships, including U.S. Realty's corporate**
2  **account, USRA's corporate account, USRA's payroll**
3  **account, all the accounts.  And it gives me a**
4  **balance on each one of them.**
5  Q.   Okay.
6  **A.   Because I don't write checks.  The checks**
7  **are done by machine today.  And I keep balances --**
8  **I keep records of -- I keep account of what the**
9  **balances are.**
10  Q.   Did you review that today?
11  **A.   Yes.**
12  Q.   And how much money does GF 2014 have?
13  **A.   I don't know, a couple million dollars, the**
14  **proceeds from the fire, of course, claim.**
15  Q.   And what have you been doing with the
16  proceeds of the fire?
17  **A.   We paid some bills.  And we're hoping -- we**
18  **paid the architect, the engineers that are doing**
19  **design work for the new building.  We're going to**
20  **build there some day.  And that's what we've been**
21  **paying.**
22         **We do have another claim, I think,**
23  **from the insurance company for the architectural**
24  **fees and stuff that we are paying now that we'll**

---

Page 133

1  eventually get back from the insurance company.
2         We hired an engineer, an architect, a
3  landscape architect, everything the township wanted
4  in order to get a new permit to build a new
5  building.  And that's in the process right now of
6  being done.
7  Q.   And who hired these people?
8  **A.   Me, not me directly but GF 2014.**
9  Q.   Well, who exactly hired them?
10  **A.   Excuse me?**
11  Q.   Who hired them?
12  **A.   Who hired them?  Individually spoke to them?**
13  Q.   Yeah.
14  **A.   I think Joe spoke to them and referred them**
15  **to us.  He'd like to meet them.**
16  Q.   So you're having Joe decide who the
17  contractors are going to be?
18  **A.   I had Joe help, yes.  Not the contractor,**
19  **these engineers that designed the building.**
20  Q.   And is Joe being compensated for his --
21  **A.   Who?  Not Joe, not at all.**
22         **We are getting billed by the architect**
23  **and engineers.  And we pay those directly.  It's**
24  **not a big deal, I don't know, a couple hundred**

---

(856) 983-8484                            Tate & Tate, Inc.                            (800) 636-8283
520 Stokes Road, Suite C-1 Medford, NJ  08055

**Appx0159**

Common Pleas - Montgomery Co.                Katz v. Grasso                                Friday
No. 2017-02140                    Videotape Deposition of Michael Grasso            May 14, 2021

---

Page 134

1  thousand, maybe 60, 70,000 bucks, something like
2  that.
3  Q.   On page -- the first page of Exhibit 50
4  there's something listed "MGJAD."
5  A.   AD.
6  Q.   What is that?
7  A.   That's a partnership that we own.
8  Q.   And who are the partners?
9  A.   My wife and I, Jeff D'Ambrosio and a bunch
10 of other people. I don't know who -- it owns a
11 shopping center in Downingtown.
12 Q.   Now, do you own a property at 579 East
13 Lafayette Street?
14 A.   Yes.
15 Q.   And what entity owns that?
16 A.   579 Associates.
17 Q.   And who owns that partnership?
18 A.   My wife and I.
19 Q.   And are you familiar with an entity called
20 579, LLC?
21 A.   That may be my general partners in that
22 partnership. It may be. I'm not sure. I'm not
23 sure of that or I may be personally a general
24 partner. I don't know.

---

Page 135

1          (Exhibit Katz 62 was pre-marked for
2  identification.)
3  BY MR. DORMONT:
4  Q.   I'm showing you an exhibit which we've
5  marked as Exhibit Katz 62. It's a Certificate of
6  Limited Partnership for 579 E. Lafayette, LLP.
7  A.   L.P., Limited Partner.
8  Q.   So this is the entity that owns 579 East
9  Lafayette Street. Correct?
10 A.   Correct.
11 Q.   And it lists the general partner as 579 --
12 A.   LLP. It's me.
13 Q.   Now, has that property been leased?
14 A.   Yes, it's been leased since we've owned it.
15 Q.   And who is in charge of leasing it?
16 A.   Our staff, our sales staff that leases all
17 the properties for us and keeps them leased.
18 Q.   And who is currently leasing the property?
19 A.   What's that?
20 Q.   Who is leasing the property?
21 A.   Who is the tenant? Is that the question
22 you're asking?
23 Q.   Yes.
24 A.   I don't remember off the top -- I think it's

---

Page 136

1  Iron Hill Company at this point. There were
2  other -- there were other entities before that but
3  I think this is the latest one.
4  Q.   And what is Iron Hill Company?
5  A.   I don't know much about them. I know it's
6  -- I think it's a construction company.
7  Q.   Who owns Iron Hill?
8  A.   I have no idea.
9  Q.   Who operates Iron Hill?
10 A.   I have no idea.
11 Q.   What involvement did you have with the
12 creation or formation of Iron Hill?
13 A.   None.
14 Q.   What relationship do you have with Iron
15 Hill?
16 A.   None, except the lease.
17 Q.   Is the lease in writing?
18 A.   Excuse me? Yes.
19 Q.   Who signed the lease?
20 A.   I don't know. I don't have it in front of
21 me. I know I signed it from my end, I guess.
22 Q.   Who negotiated the lease?
23 A.   Probably me. And who with? I don't
24 remember. It was probably one of us, one of the

---

Page 137

1  real estate guys, according to me. They made a
2  deal.
3          I think we had this leased to another
4  entity even before I bought the property. That's
5  why I bought it. But then that entity went out of
6  business and a new tenant moved in. So it's been
7  changing.
8  Q.   Well, when did you buy the property?
9  A.   Apparently, from what this says, it was
10 purchased in -- what year? 2021. That's the
11 address. I'm sorry. There's no date on this?
12 2013.
13          (Exhibit Katz 91 was pre-marked for
14 identification.)
15 BY MR. DORMONT:
16 Q.   I want to show you what I've marked as
17 Exhibit 91. Exhibit 91 is the Articles of
18 Incorporation for Iron Hill Company.
19          Do you see that?
20 A.   Iron Hill Company? Yes, I see it.
21 Q.   And it lists the corporations's initial
22 registered office as this building. Correct?
23 A.   That's what it says here, but I don't know
24 who -- who incorporated them?

---

35 (Pages 134 to 137)

Appx0160

Common Pleas - Montgomery Co.  Katz v. Grasso  Friday
No. 2017-02140  Videotape Deposition of Michael Grasso  May 14, 2021

---

Page 138

1 Q. Well, it says, W.R. Worthington, Jr.
2 **A. I don't know who he is.**
3 Q. So, as far as you're concerned, Iron Hill
4 Company never used this address --
5 **A. They shouldn't have.**
6 Q. -- in this building?
7 **A. They shouldn't have.**
8 Q. Did Iron Hill ever operate out of these
9 offices?
10 **A. Not that I know of, unless they were a**
11 **tenant -- a subtenant of one of the tenants in the**
12 **building.  But I don't think so.**
13 Q. Well, it says Suite 101.  Isn't that --
14 **A. That's this one.  It never was in our suite.**
15   THE WITNESS:  Any emails?  That's my
16 wife.
17   (Exhibit Katz 96 was pre-marked for
18 identification.)
19 BY MR. DORMONT:
20 Q. I'm showing you what we've marked as Exhibit
21 96.  This is a bank statement produced by WSFS
22 Bank.
23 **A. Who?**
24 Q. WSFS Bank.

---

Page 139

1 **A. WSFS.**
2 Q. Are you familiar with WSFS?
3 **A. I know who WSFS is, yes.**
4 Q. And this is a bank statement dated August
5 31, 2017 --
6 **A. Uh-huh.**
7 Q. -- for Iron Hill Company.  Do you see that?
8 **A. Yeah, I see it.**
9 Q. And do you see the address that Iron Hill
10 Company --
11 **A. Used?**
12 Q. -- used?
13 **A. That's where they prepared their rent, but**
14 **they weren't occupied.**
15 Q. Well, the address is this office.
16 **A. I understand.  I see it, but it's not**
17 **correct.**
18 Q. Well, were Iron Hill Company's bank
19 statements coming to your offices by mistake?
20 **A. I've never seen one.**
21 Q. Did anyone ever advise you that Iron Hill
22 was using --
23 **A. No.**
24 Q. -- your offices --

---

Page 140

1 **A. No.**
2 Q. Let me finish.
3   Did anyone ever advise you that Iron
4 Hill was using your offices to direct its bank
5 statements?
6 **A. No.**
7 Q. And is it correct you don't know who runs
8 Iron Hill?
9 **A. Nope.**
10 Q. You said, no.  I just want to -- is it
11 correct that you don't know who owns Iron Hill?
12 **A. No, I don't know who owns it.**
13 Q. And you don't know -- and is it correct you
14 don't know who operates Iron Hill?
15 **A. I think my grandson works for Iron Hill,**
16 **Joe, Jr.  That's all I know.**
17   **The reason why I know that, I recently**
18 **got an email from him and he's on the email saying**
19 **he's an officer or an employee of the company.**
20 Q. How long has he worked for Iron Hill?
21 **A. I have no idea.  I just found out that he**
22 **did by this email a week ago, ten days ago.**
23 Q. Now, are you familiar with a company called
24 The Louderback Group, LLC?

---

Page 141

1 **A. That's who I got the email from, from my**
2 **grandson, Joe.  I have no idea other than that.  I**
3 **think he works for that company.**
4 Q. Do you know the relationship between The
5 Louderback Group and Iron Hill?
6 **A. I don't have any idea.**
7 Q. Do you know where The Louderback Group
8 operates out of?
9 **A. Not that -- I'm not sure.  I'm not sure.**
10 Q. Well, are you aware --
11 **A. Not out of this building.  I can tell you**
12 **that much.**
13 Q. Are you aware that it operates out of 579
14 East Lafayette Street in Norristown?
15 **A. Do they?**
16 Q. I'm asking you.  Are you aware of that?
17 **A. No.**
18 Q. So is it correct you don't know whether
19 there's any lease with Louderback Group?
20 **A. I have no lease with Louderback.**
21 Q. Have you ever done any business with
22 Louderback?
23 **A. No, not that I could remember.**
24 Q. Have you ever done any work with Iron Hill?

---

36 (Pages 138 to 141)

Common Pleas - Montgomery Co.          Katz v. Grasso                    Friday
No. 2017-02140          Videotape Deposition of Michael Grasso          May 14, 2021

---

Page 142

1   A.   I think Iron Hill hired the demolition
2   people that cleaned the lot up at Dodds Lane.
3   Q.   Other than --
4   A.   Other than that, nothing.
5        (Exhibit Katz 93 was pre-marked for
6   identification.)
7   BY MR. DORMONT:
8   Q.   I'm showing you what I've marked as Exhibit
9   Katz 93.  This is a page from the Louderback
10  website.  Do you see that?
11  A.   Yep.
12  Q.   And this lists "Previous Clients Success
13  Stories."
14  A.   They never did any work for me.
15  Q.   Okay.
16  A.   Typically they lie like a rug on these, on
17  these advertisements.
18  Q.   So let's just get it clear.
19       Is it correct that when Louderback
20  says it worked for U.S. Realty Associates, Inc.,
21  that's a false statement?
22  A.   Absolutely.
23       (Exhibit Katz 94 was pre-marked for
24  identification.)

---

Page 143

1   BY MR. DORMONT:
2   Q.   I want to show you what we've marked as
3   Exhibit Katz 92.  These are pages again from --
4   excuse me.  We've marked this as Katz 94.
5        These are a series of pages from the
6   Louderback website.  Do you see that?
7   A.   I see it.
8   Q.   Okay.
9   A.   It don't mean it's true, but I see it.
10  Q.   Well, the first project it lists, that's a
11  picture of the Curtis Building.  Correct?
12  A.   The Curtis Building?
13  Q.   Or excuse me.  The Public Ledger Building.
14  A.   Could be.  I don't know.
15  Q.   Actually, I think it's -- actually, you can
16  see Walnut.  I think it is the Curtis Building.
17       Was that a project that U.S. Realty
18  helped develop?
19  A.   No.
20  Q.   Who developed that?
21  A.   Joe.  Anything with the Curtis Center.
22  Q.   What about 990 Spring Garden?  That was a
23  property that you developed.  Correct?
24  A.   Correct.

---

Page 144

1   Q.   And, in fact, that's one of the properties
2   listed in Katz 21?
3   A.   Correct.
4   Q.   Did you hire Louderback to do that work?
5   A.   Never even heard of them then.  I didn't
6   hear of -- even the -- this is Ashbridge Manor over
7   here.
8   Q.   Ashbridge Manor is on the third page?
9   A.   Third page, yeah.
10  Q.   Okay.  Did Louderback have anything to do
11  with that?
12  A.   No, not that I -- none.
13  Q.   Who built that?
14  A.   US -- that was USRA Construction Management.
15  Q.   What about The Grande?
16  A.   That's the same thing.
17  Q.   Same...
18  A.   USRA Construction.  Yeah, Joe might have
19  been working for us at the time but it was USRA
20  Construction, not Louderback.
21  Q.   Okay.  Then you look at the bottom of that
22  fourth page, "579 East Lafayette Street, Coming
23  Soon."  Do you see?
24  A.   Where do you see that?

---

Page 145

1   Q.   Back -- the fourth page, yeah.  You've got
2   it right there.  Do you see 579 East...
3   A.   Yeah.
4   Q.   Is Louderback working on 5 --
5   A.   Could be, not by my permission but they will
6   do what they want to do.  They're not working on
7   any property -- they're not doing anything for me
8   on it.
9   Q.   Well, are they doing anything?
10  A.   For me?
11  Q.   As far as you know.  I mean, you own 579.
12  Correct?
13  A.   They do nothing for me at 579 and they've
14  done nothing for me at any of these properties, any
15  of them, any of them.
16       These properties, now, some of these
17  properties I don't know.  See, I can't tell all of
18  them.  Some of these properties, like, these Urban
19  Air properties I don't own.  Could be, could be.
20       I don't -- see, these properties at
21  the end, they're probably -- could be, not mine.
22  Q.   What about the retail space?  You know,
23  Shops at Valley Square.
24  A.   They had nothing to do with it, nothing.

---

37 (Pages 142 to 145)

Common Pleas - Montgomery Co.              Katz v. Grasso                          Friday
No. 2017-02140                 Videotape Deposition of Michael Grasso             May 14, 2021

---

### Page 146

1    Same thing with this Ashbridge Square, nothing to
2    do with it. Bakers Centre, nothing to do with it.
3    Q.  Swedesford Plaza?
4    A.  What's that? Nothing to do with it.
5    Q.  These are all your properties. Correct?
6    A.  Yes.
7    Q.  So is this the first time you're learning
8    that Louderback's website uses all of your
9    properties?
10   A.  Yes.
11   Q.  Okay. The Pavilion at Lansdale?
12   A.  That's not mine.
13   Q.  What about this Michael's in Warrington?
14   A.  What's that?
15   Q.  The Warrington properties, you have a
16   Michael's and you have a Staples.
17   A.  Pets Plus is not my property. Dollar Tree
18   is not my property. This Michael's is not my
19   property. The Shops at Warrington are my property.
20   He had nothing to do with it.
21   Q.  And the Swedesford Square Shopping Center?
22   A.  I don't know anything about that property at
23   all. Panera Bread, Harrisburg, I know nothing
24   about that property at all.

---

### Page 147

1       Anything that had to do with any of
2    those properties that are on that, on that -- on my
3    brochure, he didn't have nothing to do with them.
4    Louderback had nothing to do with them. I don't
5    know who they are.
6    Q.  Well, was Joe involved with each of those
7    properties?
8    A.  No. Some of them he is. Like, Spring-Del
9    he was a partner; Spring Ridge he was a partner.
10   Q.  Are you familiar with Bucks County Coffee?
11   A.  No.
12   Q.  Are you aware that it has rented space at
13   579 East Lafayette Street?
14   A.  No, not from me. Not from me it's not. It
15   may be a subtenant.
16   Q.  Do you give your tenants the right to
17   sublease --
18   A.  Most times, sometimes, yeah.
19   Q.  What is HTP Associates?
20   A.  HTP Associates, it sounds familiar. I think
21   it's a partnership that owns a shopping center in
22   Hilltown.
23   Q.  And that's a property that you own?
24   A.  I'm a general partner and a limited partner

---

### Page 148

1    in. I think that's the one.
2    Q.  And did you ever hire Iron Hill to work for
3    you?
4    A.  Not up there. That, we've owned that for 25
5    years. Iron Hill wasn't even around. I didn't
6    even know -- they're not a 25 year-old company, are
7    they?
8    Q.  To the best of my knowledge, no, but I am
9    not the fact witness.
10   A.  Okay. To the best of my knowledge, too.
11       (Exhibit Katz 98 was pre-marked for
12   identification.)
13   BY MR. DORMONT:
14   Q.  I'll show you what we've marked as Exhibit
15   98. Exhibit 98 comes from WSFS and has Bates
16   number WSFS 000855.
17   A.  Finish what you're saying.
18   Q.  Do you see that there is a check there from
19   HTP Associates?
20   A.  Yes, to Iron Hill Company. Apparently Iron
21   Hill Company at that time -- what year is this?
22   Q.  This is...
23   A.  '17?
24   Q.  2017.

---

### Page 149

1    A.  Did some work for us, not for me, TI work
2    for a tenant up there, you know, some small job.
3       This shopping center is 30 acres. It
4    has a Home Depot and it's got 40 shops. This may
5    be just some work for one of the tenants up there.
6    Q.  Well, this check isn't from the tenant.
7    It's from your --
8    A.  From us to do work for the tenant
9    improvements, yes.
10   Q.  So you were paying Iron Hill Company?
11   A.  Apparently.
12   Q.  Okay. And why did you contract with Iron
13   Hill Company?
14   A.  Why did I hire them?
15   Q.  Yeah.
16   A.  Because they were available and the price
17   was right.
18   Q.  Well, who negotiated this?
19   A.  I don't remember. That was what year, 2013?
20   Q.  No, 2017.
21   A.  '17. I don't remember who we negotiated
22   with and who else we put it out to bid for, but
23   this was probably a tenant improvement.
24       I could find out what this is for, but

---

38 (Pages 146 to 149)

Appx0163

Common Pleas - Montgomery Co.  Katz v. Grasso  Friday
No. 2017-02140  Videotape Deposition of Michael Grasso  May 14, 2021

---

Page 150

1  I don't know off the top of my head.
2  Q.  Well, did you have a contract with Iron
3  Hill?
4  A.  Probably.
5  Q.  Are there other cases where you've hired
6  Iron Hill?
7  A.  To clean up Dodds Lane, but I can't remember
8  any other off the top of my head.  There might have
9  been.  We're always doing TI work and work
10  here and there and we put out -- I look for small
11  contractors to do it.
12  Q.  Well, this contract was for over $80,000.
13  Do you --
14  A.  That's a small contract for me.  It may not
15  be for you, but it is for me.
16  Q.  So how many -- you know, what's the dollar
17  value of business that you've done with Iron Hill
18  over the last few years?
19  A.  This looks like -- this one and 150 or
20  something to clean up the lot.  That's all I can
21  remember.  There may be other small ones around.
22       If you hadn't brought this to my
23  attention, otherwise, I would have forgot this one,
24  too, otherwise.  And I'm not even sure what it's

---

Page 151

1  for.  It's probably, probably TI work or tenant
2  improvement, putting a tenant in place.
3  Q.  By the way, is Donna the person who you
4  leased 579 East Lafayette Street to?
5  A.  I don't think so.
6  Q.  Have you ever entered into a contract with
7  Donna?
8  A.  No, not that I remember.
9  Q.  Do you have all your contracts somewhere?
10  A.  No.
11  Q.  For any given property you don't have the
12  contracts?
13  A.  Excuse me?
14  Q.  For any given property you don't have --
15  well, let's take the leases.
16       Do you have leases for each of your
17  properties?
18  A.  Absolutely, we've got leases.
19  Q.  So somewhere you have a lease with Iron Hill
20  you believe?
21  A.  It's probably scanned in in our computer,
22  yes.
23  Q.  Now, is anyone living in the Dodds Lane
24  property currently?

---

Page 152

1  A.  Now, no.
2  Q.  Were people living at the Dodds Lane
3  property before the explosion?
4  A.  Joe and Donna in a small little house that
5  was part of the property.
6  Q.  And were they paying rent?
7  A.  No.
8  Q.  And why were they -- why were they living at
9  a small property rather than the main property?
10  A.  The last time I saw, the main property was
11  not livable.  It was all gutted out inside.  There
12  was no -- nothing there but a gutted out property.
13  Q.  And were you aware of Joe's plans to improve
14  the property?
15  A.  Yes.  I thought he was going to improve it.
16  He wanted to.  Then the explosion happened and that
17  all changed.
18  Q.  Now, are you aware of any plans to develop
19  the land at 579 East Lafayette Street?
20  A.  I spoke to my grandson about it.  He wanted
21  to do an apartment house and I said, good luck.
22  Let me know.
23       For apartments, I'll sell it to him if
24  he wants to buy it.  If Louderback, whatever their

---

Page 153

1  name is, wanted to buy it, I'll sell it to them.
2  Q.  How much are you going to sell it to him
3  for?
4  A.  I have no idea.
5  Q.  Is the conversation you had with your
6  grandson two weeks ago?
7  A.  Two, three weeks ago, yeah.
8  Q.  Is that --
9  A.  In fact, I referred him to a couple of
10  people that may be able to help him with financing
11  and stuff.
12  Q.  Who did you refer him to?
13  A.  I don't remember the name, some -- a couple
14  of mortgage brokers that we have done over the
15  years -- business with over the years.
16  Q.  Have you discussed it with anyone else?
17  A.  No.
18  Q.  Have you had any communications with anyone
19  other than this phone call two or three weeks ago?
20  A.  No.  He sent me a set of plans which I
21  looked at.  I said, great, looks nice, Joe.  Good
22  luck.
23  Q.  And --
24  A.  If you need help, here's somebody I think

---

Appx0164

Common Pleas - Montgomery Co.                Katz v. Grasso                                 Friday
No. 2017-02140                Videotape Deposition of Michael Grasso                    May 14, 2021

---

Page 154

1  that can help you with financing.
2  Q.   Is your grandson doing this by himself?
3  **A.   Excuse me?**
4  Q.   Is your grandson developing this property by
5  himself?
6  **A.   As far as I know, yeah.**
7  Q.   And what's your involvement in this project?
8  **A.   My involvement.**
9  Q.   Yes.
10 **A.   None, except I own the property.**
11         THE WITNESS:  Goodbye.
12 BY MR. DORMONT:
13 Q.   Now, let me ask.  When someone sends you an
14 email, what happens to that email?
15 **A.   When?**
16 Q.   Within the last year.
17 **A.   I would, I would see it.**
18 Q.   How would you see it?
19 **A.   On the screen.  Now, I have a screen.**
20 **Before that I didn't have a screen.  Now I have a**
21 **screen.  I can see it.**
22 Q.   And how long have you had a screen?
23 **A.   The beginning of last year, when the**
24 **pandemic hit, I figured I have to learn how to see**

---

Page 155

1  something on the screen because I had no staff.
2  Q.   So at some point in early 2020.  Is that
3  correct?
4  **A.   Yeah.  I think it was before -- that's**
5  **before Richard passed away.  I think it was March**
6  **or April of last year.**
7  Q.   And do you read your emails?
8  **A.   Yes.**
9  Q.   Okay.
10 **A.   As far as I can tell, I read them.  Some of**
11 **them I miss.  Some get -- is this the plan for**
12 **Lafayette?  That was sent in by Joe.**
13         (Exhibit Katz 64 was pre-marked for
14 identification.)
15 BY MR. DORMONT:
16 Q.   I'll show you what I've marked as Exhibit
17 64.  And this is a document that came from Joseph
18 Grasso, not one that you produced.
19 **A.   No.  This is young Joe who sent me this.**
20 **I got this plan that I saw from young Joe, not from**
21 **my son.**
22 Q.   Well, you recognize this as an email which
23 is dated December 11, 2020 as coming from your son.
24 Correct?

---

Page 156

1  **A.   I don't remember getting this email.**
2  Q.   Okay.
3  **A.   I did get one from my grandson, not from**
4  **Joe.**
5  Q.   Is this your correct email?
6  **A.   That's correct.  It don't mean that I got**
7  **it, because I don't read all of them.**
8  Q.   Do you not read emails that come from your
9  son?
10 **A.   If I, if I pick it up, yes.  I don't pick**
11 **every one up.  Some go in the junk pile.  Some go**
12 **in the -- I lose them.  Some go in deleted items.**
13 **I can't -- I'm not an expert at it.**
14         **But I don't remember getting this one.**
15 **I remember getting this plan from my grandson.**
16 Q.   So you don't remember getting, knowing --
17 you don't remember getting a December 11, 2020
18 email from Joe Grasso regarding developing a
19 property at 579 East Lafayette --
20 **A.   No.**
21 Q.   -- is that correct?
22 **A.   I did get one from my grandson later on.**
23         (Exhibit Katz 65 was pre-marked for
24 identification.)

---

Page 157

1  BY MR. DORMONT:
2  Q.   I'll show you what we've marked as Exhibit
3  Katz 65.  This is a March 12, 2021 email from your
4  grandson.  Correct?
5  **A.   Yeah.  I remember getting this.**
6  Q.   And you saw that your son Joe was copied on
7  this.  Correct?
8  **A.   Was he?  Yeah, I see he was copied on it.**
9  **Very good.**
10 Q.   And your grandson said this project would
11 cost around $18.5 million.  Correct?
12 **A.   That's what he says.**
13 Q.   And it says, "We've met with city council as
14 well as the Redevelopment Authority."
15         Do you see that?
16 **A.   Yes.**
17 Q.   Okay.  Now, who did you understand the "we"
18 was?
19 **A.   I have no idea.**
20 Q.   Well, did you know that Joe was involved
21 with Iron Hill?
22 **A.   Did I know Joe was involved in Iron Hill?**
23 Q.   Your son.
24 **A.   I wasn't sure.  I had a suspicion he was**

---

40 (Pages 154 to 157)

Common Pleas - Montgomery Co.                Katz v. Grasso                                    Friday
No. 2017-02140                    Videotape Deposition of Michael Grasso                    May 14, 2021

Page 158

1  working for them, but I'm unsure.
2  Q.  Why did you have suspicions?
3  A.  Because he favored them somewhat for some of
4  the contracts.
5  Q.  What do you mean he favored them?
6  A.  Well, he did the work at Dodds Lane.  I
7  asked him to get somebody to do work at Dodds Lane
8  and he got Iron Hill.
9         So I figured he had some interest in
10  it, but I wasn't sure and I'm still not sure.
11  Q.  Well, when you hire a contractor, you don't
12  try to know who owns the company?
13  A.  No.  I hired contractors for $50 million
14  contracts and didn't know who owned the company.
15  Q.  What is your assessment of the likelihood of
16  this project going forward?
17  A.  Excuse me?
18  Q.  What is your assessment of the likelihood of
19  this project going forward?
20  A.  I don't know.  It would be nice.
21  Q.  And what type of profits would a project
22  like this develop?
23  A.  What's that?
24  Q.  What type of profits?

Page 159

1  A.  What do you mean by what type of profits?
2  Q.  Well, if it cost $18.5 million --
3  A.  I didn't go into the details.  When I saw
4  this mumbo-jumbo, I sent -- I told him to call a
5  mortgage broker.  I don't -- I didn't go over the
6  numbers.
7  Q.  Well, you've developed apartments before.
8  Correct?
9  A.  Yes.
10  Q.  So in your experience what are the typical
11  profits?
12  A.  What have I thought of the profits?
13  Q.  Yeah, for apartments.
14  A.  I didn't take much concern over them.  All
15  right?  I own the property.  If they want to
16  develop it, very good.
17        I own property all over the city and
18  if people want to develop it, I say, come on, bring
19  me a check that I'm happy with and you can develop
20  all you want.
21  Q.  But you haven't discussed how much you want
22  with your grandson?
23  A.  No, I have no clue.  But, you know, I told
24  Joe that I thought it was worth between 30 and $40

Page 160

1  per apartment.  That's the worth -- that's the
2  value of units.
3        And because it's in the Opportunity
4  Zone, like he tells me in his email, it should be
5  worth what it's worth.  I haven't heard a thing
6  back.  And I also told him -- I gave him some
7  referrals for mortgage information.
8  Q.  Now, did you consider Mr. Koory to be an
9  honest man?
10  A.  I'm sorry.  You're talking to the paper
11  again.
12  Q.  Did you consider Mr. Koory to be an honest
13  man?
14  A.  Who, Koory?
15  Q.  Koory.
16  A.  Richard Koory?
17  Q.  Richard Koory.
18  A.  Absolutely.  A little bit of a numbskull but
19  an honest one.
20  Q.  And how often would you interact with him
21  personally?
22  A.  Every day.
23  Q.  And was his office near yours?
24  A.  Up around the corner.

Page 161

1  Q.  And was he an employee of U.S. Realty
2  Associates?
3  A.  Again, I told you.  Again, I'm going to
4  repeat it.  Maybe you'll write it down this time.
5        He was not an employee of mine.  He
6  was inhouse because I gave him an office.  And he
7  billed me monthly whenever I gave him work to do on
8  every partnership separately.  And each partnership
9  would pay him directly as an outside attorney each
10  month.
11  Q.  Did Mr. Koory have authority to make
12  decisions on behalf of your companies without
13  consulting with you?
14  A.  Not without consulting me.  And I don't
15  think he did.
16  Q.  And from time to time did you authorize
17  Mr. Koory to act on your behalf regarding various
18  entities?
19  A.  I'm sure I did.
20  Q.  Did Mr. Koory have a secretary or a legal
21  assistant?
22  A.  We would provide him help.  One of the gals
23  would help him out once in a while.  He didn't have
24  a full-time girl though.

41 (Pages 158 to 161)

Common Pleas - Montgomery Co.                    Katz v. Grasso                          Friday
No. 2017-02140                        Videotape Deposition of Michael Grasso        May 14, 2021

---

**Page 162**

1   Q.   Who was his secretary or legal assistant?
2   **A.   Oh, whoever was available.**
3   Q.   Now, are you familiar with a company called
4   APW-PA, Inc.?  APW -- ABW.
5   **A.   No, I'm not.**
6   Q.   Do you know who owns ABW?
7   **A.   I told you, I'm not familiar with the**
8   **company.**
9   Q.   Can you tell me anything about ABW?
10          MR. RAND:  Objection, asked and
11  answered.  He's already said it twice.
12          THE WITNESS:  For the third time you
13  asked me the same question.  I don't know who ABW
14  is.  I never heard of them.  My recollection is I
15  have no recollection of it at all.
16          Once in a while we set up a company
17  that lasted a week and then it would die.  We'd
18  close it down because we didn't use it.  That
19  happens all the time.
20  BY MR. DORMONT:
21  Q.   Well, is ABW one of those companies?
22  **A.   Could be.  We just, we just set up a company**
23  **called 10 Monument Road.  We were trying to buy the**
24  **10 Monument building from Channel 10.**

---

**Page 163**

1          **We set the company up.  We negotiated**
2   **and we never got the contract.  And the company is**
3   **sitting there.  We're going to close it down.  We**
4   **even got a tax ID number for it.**
5          (Exhibit Katz 121 was pre-marked for
6   identification.)
7   BY MR. DORMONT:
8   Q.   Here is a document we've marked as Exhibit
9   121.
10         This is Articles of Incorporation for
11  ABW-PA, Inc.  Do you see that?
12  **A.   Uh-huh.**
13  Q.   Is that a yes?
14  **A.   Yeah, I see it.**
15  Q.   And do you see the corporation's address --
16  **A.   Yes, I see it.**
17  Q.   -- is this office?
18  **A.   It's this address, yes.  That don't mean it**
19  **wasn't a company that was started and never used.**
20  **It could be.  But I have no recollection of what**
21  **that company was all about.**
22         (Exhibit Katz 122 was pre-marked for
23  identification.)
24  BY MR. DORMONT:

---

**Page 164**

1   Q.   I show you a document which we've marked as
2   Exhibit Katz 122.
3          This comes from the Pennsylvania
4   Secretary of State's website and this is for
5   ABW-PA, Inc.  Do you see that?
6   **A.   Uh-huh.**
7   Q.   And do you see that it lists this office as
8   its address?
9   **A.   Uh-huh.**
10  Q.   Is that a yes?
11  **A.   And my name, too.**
12  Q.   And your name as the president?
13  **A.   Yeah.  It don't mean I remember this**
14  **company.  Probably it was set up and I don't know**
15  **if it was ever used.  It might have been, but I**
16  **don't remember it.**
17  Q.   Do you know why it was called ABW?
18  **A.   I have no idea.**
19         MR. RAND:  You can answer again.
20         THE WITNESS:  Huh?
21         MR. RAND:  Just say it again.
22         THE WITNESS:  No.
23  BY MR. DORMONT:
24  Q.   Now, were you aware that Joseph had

---

**Page 165**

1   purchased the Dodds Lane property in 2007?
2   **A.   No.**
3   Q.   Are you aware that he took out a loan to buy
4   the property?
5   **A.   No.**
6   Q.   Are you aware that there was a loan on the
7   property?
8   **A.   I eventually bought a mortgage on that**
9   **property, yeah, but I wasn't aware that Joe bought**
10  **it, when he bought it, what loan he had in 2007.**
11         **All I know when I bought the mortgage,**
12  **whatever year it was, 2014, '13, '12, I bought the**
13  **mortgage then.  And it's not unusual.  We've been**
14  **buying mortgages for 30 years.**
15         **I bought mortgages from RTC, PIDC,**
16  **every bank in the city.  I'm the only guy that ever**
17  **foreclosed on Dan Tabas.  I bought a mortgage on**
18  **his property and I foreclosed on him.**
19         **So that's what I do for a living.**
20  **Okay?**
21  Q.   And when you foreclose on a property, you --
22  **A.   Usually develop it.**
23  Q.   You create an entity and you buy it
24  directly.  Correct?

---

(856) 983-8484                          Tate & Tate, Inc.                      (800) 636-8283
                              520 Stokes Road, Suite C-1 Medford, NJ  08055

Appx0167

Common Pleas - Montgomery Co.          Katz v. Grasso                              Friday
No. 2017-02140          Videotape Deposition of Michael Grasso          May 14, 2021

---

Page 166

1  A.  Excuse me?
2  Q.  When you foreclose on an entity, you create
3  a new entity and you buy it directly from the
4  company.  Correct?
5       MR. RAND:  Objection to form.  You can
6  answer if there's...
7       THE WITNESS:  I don't know what he's
8  talking about, to be perfectly honest with you.
9  Say it again.
10 BY MR. DORMONT:
11 Q.  When you buy a property, do you buy it
12 yourself or do you use straw people to purchase it?
13      MR. RAND:  Objection to form.  You can
14 answer if you understand it.
15      THE WITNESS:  It all depends.  We've
16 done both.
17 BY MR. DORMONT:
18 Q.  Why do you use straw people?
19 A.  We don't want the buyer -- the seller to
20 know we're buying it.  That's normally what is the
21 reason for it.
22 Q.  And why don't you want the seller to know --
23 A.  I have -- every property has got a different
24 reason for it.  I mean, I own the property next

---

Page 167

1  door.  We don't want them to know we're buying
2  because we own next door.  There's 50 reasons for
3  it.
4  Q.  Well, are you aware that VIST Bank had a
5  mortgage on the Dodds Lane property?
6  A.  I think we bought that mortgage from VIST.
7       MR. RAND:  Oh, VIST.
8       THE WITNESS:  And I think we bought
9  another mortgage from VIST all at one time.  There
10 was two mortgages we bought at a discount from
11 VIST.
12 BY MR. DORMONT:
13 Q.  What was the second mortgage you bought?
14 A.  A property in Doylestown.  We foreclosed on
15 it and cleaned the title up.
16 Q.  And who owned -- who owned the property?
17 A.  Who owns it today?  Me, my wife and I.
18 Q.  No, beforehand.
19 A.  Joe owned it before then.  Like he owned
20 Dodds Lane, he owned that one.  There was two
21 mortgages I bought.
22 Q.  Now, who approached VIST Mortgage about
23 buying the mortgage?
24 A.  Excuse me?

---

Page 168

1  Q.  Who approached VIST Bank about buying the
2  mortgage?
3  A.  I had been talking to VIST some time off and
4  on, but I don't know whether I approached them or
5  somebody else approached them.  I don't remember.
6  Q.  Well, if you didn't approach them, who else
7  would approach them?
8  A.  I have no idea.
9  Q.  Are you familiar with an entity called BAE
10 Investments, LLC?
11 A.  I do remember BAE.  I think he was involved
12 with the negotiations.
13 Q.  Well, who --
14 A.  I think we paid him a fee for doing it, too.
15 Q.  Well, is the who Mel Shaw?
16 A.  I don't know.
17 Q.  Well, why did you pay BAE Investments for
18 this transaction?
19 A.  Because they negotiated the purchase price
20 of their mortgages.  We paid them a fee.
21 Q.  Well, did BAE Investments come to you with
22 this deal?
23 A.  Probably.
24 Q.  Well, I thought you said you bought the two

---

Page 169

1  together?
2  A.  I bought two mortgages together from VIST
3  Bank and BAE may have been the negotiator in that
4  deal.  I'm not sure.
5  Q.  Well, what's your relationship with
6  Mr. Shaw?
7  A.  I don't even know him, except that he might
8  have worked -- handled this for me.  I don't think
9  I ever met him.
10 Q.  Are you familiar with an Allan Weissman
11 A.  Excuse me?
12 Q.  Allan Weissman.
13 A.  Allan Weissman has been my partner for 35
14 years and before him his father.  He's a very
15 wealthy person in New York.  He now lives in
16 Connecticut.  Nothing to do with Shaw or anything
17 else.
18      He may have been one of the people
19 that were -- we were going to use as an additional
20 investor in the purchase, if we needed more
21 capital.  But I don't think we ever used him.
22 Q.  Does your son Joe have a relationship with
23 Mr. Shaw?
24 A.  I don't know.

---

43 (Pages 166 to 169)

Appx0168

Common Pleas - Montgomery Co.    Katz v. Grasso    Friday
No. 2017-02140    Videotape Deposition of Michael Grasso    May 14, 2021

---

Page 170

1    MR. RAND:  Michael, it's about 12:25.
2    THE WITNESS:  I'll give him another --
3  one more go around, but I'm done for the day, kid.
4  I can't even talk.
5    MR. DORMONT:  Well, you know what?
6  Now is as good a time to stop as any.
7    THE WITNESS:  Okay.  Good for me.
8    MR. DORMONT:  I mean, it's going to
9  take a while so I don't want to -- you know, if I
10  had five minutes, I'd ask you five minutes --
11    THE WITNESS:  It's good for me.
12    MR. DORMONT:  -- but we'll --
13    THE WITNESS:  I'm ready to go.
14    VIDEOGRAPHER:  We're all set to go off
15  the record?
16    MR. DORMONT:  Yeah.  We're going to
17  recess this and reschedule it and continue the
18  Court-ordered deposition.
19    VIDEOGRAPHER:  This concludes the
20  videotaped deposition of Michael Grasso.  We're
21  going off the video record at 12:23 p.m.
22    (Witness excused.)
23    (The videotaped deposition adjourned
24  at 12:23 p.m.)

---

Page 172

1
2    ERRATA SHEET
  CASE NAME:  Marshall Katz v. Joseph Grasso
  DATE OF DEPOSITION:  May 14, 2021
3  WITNESS'S NAME:  Michael Grasso
4  PAGE/LINE(s)/    CHANGE       REASON
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20        MICHAEL GRASSO
21
22
23
24

---

Page 171

1    WITNESS CERTIFICATION
2
3    I hereby certify that I have read
4  the foregoing transcript of my deposition
5  testimony, and that my answers to the questions
6  propounded, with the attached corrections or
7  changes, if any, are true and correct.
8
9
10
11    DATE    MICHAEL GRASSO
12
13
14
15    PRINTED NAME
16
17
18
19
20
21
22
23
24

---

Page 173

1    CERTIFICATION
2
3    I, JOANNE ROSE, a Registered
4  Professional Reporter and Notary Public in and for
5  the Commonwealth of Pennsylvania, hereby certify
6  that the foregoing is a true and accurate
7  transcript of the deposition of said witness who
8  was first duly sworn by me on the date and place
9  herein before set forth.
10    I, FURTHER CERTIFY, that I am neither
11  attorney nor counsel for, not related to nor
12  employed by any of the parties to the action in
13  which this deposition was taken; and, further, that
14  I am not a relative or employee of any attorney or
15  counsel employed in this action, nor am I
16  financially interested in this case.
17
18
19
20    /s/ JOANNE ROSE
  Registered Professional Reporter
21  Registered Merit Reporter
  Notary Public
22
23
24

---

44 (Pages 170 to 173)

Page 174

1          IN THE COURT OF COMMON PLEAS
                 MONTGOMERY COUNTY
2

3                   - - -

4

5   MARSHALL KATZ,

6        Plaintiff,

7        V.                  Case No. 2017-02140

8   JOSEPH GRASSO,

9        Defendant.

10

                    VOLUME II
11

12

13        Continued videotaped deposition of

    MICHAEL GRASSO, taken at the offices of U.S.
14
    Realty, Inc., 120 East Lancaster Avenue, Ardmore,
15
    Pennsylvania, on Wednesday, August 11, 2021,
16
    commencing at approximately 8:56 a.m., before
17
    Joanne Rose, a Registered Merit Reporter, Certified
18
    Realtime Reporter and Notary Public, pursuant to
19
    notice.
20

21                  - - - - - -
                  TATE & TATE
22           Certified Court Reporters
             520 Stokes Road - Suite C-1
23            Medford, New Jersey 08055
          (856) 983-8484 - (800) 636-8283
24               www.tate-tate.com

EXHIBIT

2

Appx0170

Common Pleas - Montgomery Co.  Katz v. Grasso  Wednesday
No. 2017-02140  Videotape Deposition of Michael Grasso  August 11, 2021

## Page 175

```
1    APPEARANCES:
2       MONTGOMERY McCRACKEN
        WALKER & RHOADS LLP
3       BY:  DAVID DORMONT, ESQUIRE
        ddormont@mmwr.com
4       OR  RACHEL GOODMAN, ESQUIRE
        rgoodman@mmwr.com
5       1735 Market Street
        Philadelphia, PA 19103-7505
6       215-772-7280
        Attorneys for Plaintiff/
7       Judgment Creditor Marshall Katz
8
9    KLEHR, HARRISON, HARVEY,
     BRANZBURG LLP
10      BY:  WILLIAM A. HARVEY, ESQUIRE
        wharvey@klehr.com
11      1835 Market Street
        Suite 1400
12      Philadelphia, PA 19103
        215-569-3024
13      Attorney for Witness,
        Michael Grasso
14
15
16   ALSO PRESENT:
17      Michael Wright, Videographer
18      Ms. Hannah Travaglini
        Montgomery McCracken
        Walker & Rhoads LLP
19
20
21
22
23
24
```

## Page 176

```
1        EXAMINATION INDEX
2
     DEPONENT                    PAGE
3
     MICHAEL GRASSO
4
        BY MR. DORMONT . . . . . . . . . . . . . 180
5
6           - - -
7        EXHIBIT INDEX
8
     EXHIBIT                    MARKED
9
     Katz-11   Vol. 1 of transcript of Michael  181
10       Grasso taken 5/14/21
11   Katz-12   Letter dated 5/25/21 to David    183
         Dormont, Esq. from Jordan M.
12       Rand
13   Katz-13   Email dated 7/21/21 from David   232
         Dormont to Jordan M. Rand, et
14       al.
15   Katz-28   W-2s for Joseph Grasso issued     209
         by USRA Construction Management
16
     Katz-43   GF 2014 LP's 2016 tax return     188
17
     Katz-44   GF 2014 LP's 2017 U.S. Return    200
18       of partnership Income
19   Katz-48A  Photocopy of front and back of   312
         check from GF 2014 L.P. payable
20       to Joseph & Donna Grasso
21   Katz-52   Multi-page document containing   256
         photocopies of checks payable
22       to Donna Grasso
23   Katz-53   Check Register, US Realty        217
         Insurance Exchange, 01/14
24       through 12/16
```

## Page 177

```
1    EXHIBITS (Continued...)
2        EXHIBIT INDEX
3
     EXHIBIT                    MARKED
4
     Katz-67   Document entitled Lease Agreement  272
5        dated 10/23/13 between 579 E.
         Lafayette, L.P. and Coffee
6        Services International, LLC
7    Katz-104  Document entitled Stock Purchase  262
         Option
8
     Katz-104a Document entitled Stock Purchase  268
9        Option
10   Katz-123  Document entitled Escrow And     292
         Assignment Agreement dated 11/5/12
11       between Bay Investments, L.L.C.
         and Alan Weissman
12
     Katz-127  Motion of ABW-PA, Inc. For An    224
13       Order Granting Relief From The
         Automatic Stay Pursuant To 11 U.S.C.
14       Section 362(d)
15   Katz-163  Document containing photocopies  307
         of fronts and backs of four checks
16       from Iron Hill Company
17   Katz-168  Email dated 12/19/17 from Michael 245
         Grasso to Joseph Grasso and Jean
18       Grasso
19   Katz-238  Document containing photocopies  284
         of checks from Iron Hill Co.
20
     Katz-256  Emails dated 10/14/16 from       247
21       Michael Grasso to Joe Grasso,
         Michael Grasso and from Joe Grasso
22       to Michael Grasso
23   Katz-257  Document containing series of    242
         emails with top email dated 5/4/18
24       from Michael Grasso to Joe Grasso
```

## Page 178

```
1    EXHIBITS (Continued...)
2        EXHIBIT INDEX
3
     EXHIBIT                    MARKED
4
     Katz-258  Emails dated 8/14/18 from Michael  239
5        Grasso to Joseph Grasso and
         Joseph Grasso to Michael Grasso
6
     Katz-259  Email dated 2/1/19 from Michael   233
7        Grasso to Joseph Grasso and
         Michael Grasso forwarding email
8        dated 1/31/19
9
10   EXHIBITS PREVIOUSLY MARKED          PAGE
11   Katz-24                    211
12   Katz-33                    252
13   Katz-36                    251
14   Katz-46                    230
15   Katz-68                    278
16   Katz-122                   293
17   Katz-266                   309
18
19
20
21
22
23
24
```

2 (Pages 175 to 178)

Common Pleas - Montgomery Co.         Katz v. Grasso         Wednesday
No. 2017-02140      Videotape Deposition of Michael Grasso      August 11, 2021

---

Page 179

1       VIDEOGRAPHER:  We are now on the video
2 record.  Today is Wednesday, August 11, 2021.  This
3 is the continuation of the video-recorded
4 deposition of Michael Grasso taken in the matter of
5 Marshall Katz vs. Joseph Grasso, in the Court of
6 Common Pleas for Montgomery County under Case
7 Number 2017-02140.
8       My name is Michael Wright, the
9 videographer.  Our court reporter today is Joanne
10 Rose and we represent Tate & Tate Certified Court
11 Reporting.
12       Counsel will now state your appearance
13 for the record beginning with the noticing
14 attorney.
15       MR. DORMONT:  David Dormont on behalf
16 of the plaintiff, Marshall Katz, and his successor.
17       MR. HARVEY:  William Harvey of Klehr
18 Harrison Harvey Branzburg on behalf of the
19 deponent, Michael Grasso.
20       VIDEOGRAPHER:  The time is 8:56.  Our
21 court reporter will swear in the witness and we can
22 proceed.
23       MR. HARVEY:  He's already sworn.
24       MR. DORMONT:  I'd like him to be

---

Page 180

1 re-sworn.
2       MR. HARVEY:  Okay.
3       MICHAEL GRASSO, having been duly
4 sworn, was examined and testified as follows:
5       EXAMINATION (Continued...)
6 BY MR. DORMONT:
7 Q.   Good morning, Mr. Grasso.
8 A.   Good morning.
9 Q.   This is a continuation of your deposition
10 which we recessed on March 14, 2021.
11       Do you need me to repeat the
12 instructions I gave you at the beginning of the
13 first day of the deposition?
14 A.   No, I don't.
15 Q.   Now, you just took an oath to tell the truth
16 today.
17       Do you understand that?
18 A.   No, I don't.  Certainly, I do.  Why do you
19 ask that stupid question for, counselor?  What are
20 you wasting your time for?  I got two hours and I'm
21 going to walk away over here so...
22       MR. HARVEY:  All right, Michael.
23 Let's start.
24       THE WITNESS:  Don't waste my time.

---

Page 181

1       MR. HARVEY:  Let's be calm.
2       THE WITNESS:  Don't ask stupid
3 questions.
4       MR. HARVEY:  Let's be calm.
5       THE WITNESS:  I'm calm.  He's stupid.
6 Go ahead.  Answer the question -- ask -- go ahead.
7       Come on, counselor.  Ask another
8 question.
9 BY MR. DORMONT:
10 Q.   Do you know any reason why you could not
11 testify truthfully here today?
12 A.   No.
13 Q.   Now, what did you do to prepare for your
14 deposition today?
15 A.   I brushed my teeth and went to the men's
16 room but, other than that, nothing.
17 Q.   Did you review any documents?
18 A.   No.
19 Q.   Did you discuss your deposition with anyone
20 other than counsel?
21 A.   No.
22       (Exhibit Katz-11 was marked for
23 identification.)
24 BY MR. DORMONT:

---

Page 182

1 Q.   Let me show you what we've marked as Exhibit
2 Katz-11.  This is a copy of the transcript of your
3 deposition on May 14, 2021.
4       Did you receive a copy of this
5 transcript?
6 A.   No.
7 Q.   Now, do you recall -- excuse me.
8       Did you make any mistakes when you
9 testified previously?
10       MR. HARVEY:  Object to the form.  You
11 can answer it if you understand the question.
12       THE WITNESS:  What was the question?
13 BY MR. DORMONT:
14 Q.   You were deposed.  After leaving the
15 deposition or thinking about it over the past
16 several months, do you recall anything you said
17 that you believe was in error?
18 A.   There was a couple of things that we
19 answered right after the deposition that were --
20 that were not an error.  I just didn't have a
21 recollection of them.  And after we looked at it,
22 we clarified them.
23 Q.   Other than those --
24 A.   There was a couple or two things, one or two

---

3 (Pages 179 to 182)

Common Pleas - Montgomery Co.                    Katz v. Grasso                                    Wednesday
No. 2017-02140                    Videotape Deposition of Michael Grasso                    August 11, 2021

| Page 299 | Page 301 |
|---|---|

**Page 299**

1  difference.
2  Q.   Can we agree the papers falsely disclose
3  that Mr. Weissman was ABW's president?
4          MR. HARVEY:  No, we cannot agree to
5  that.  Object to the form of the question.
6          If you're offering a stipulation, we
7  reject your offer.
8          MR. DORMONT:  Let's take a look.
9  BY MR. DORMONT:
10  Q.   Do you have the papers in front of you, sir?
11  127, I think it's in this pile here.
12  A.   It says here that the name of the president
13  of ABW is Michael Grasso.  In this partnership it
14  says I'm the president.
15  Q.   This is Exhibit 127 that was filed with the
16  Court, sir.  We looked at this before.
17  A.   Yep.
18  Q.   If we look at what would be -- the easiest
19  way to find it, if you look, there's 5 -- there's a
20  document that's labeled 580-6 on top.  It's about
21  the 43rd document -- page.
22  A.   The bankruptcy court relief, is that what
23  you're talking about?
24  Q.   Yeah.  There are a number of documents.  The

**Page 300**

1  way they're numbered by the Court, there's a number
2  up on the top.  And if you go towards the back,
3  you're going to look for a number 580-6 on top.
4          Do you have that?
5  A.   No.
6  Q.   A few more pages up.  It's several pages.
7  If you want, I can try to find it for you more
8  quickly.
9  A.   This is the mortgage.
10  Q.   Correct.  It's past the mortgage.  Keep on
11  going.  Keep on going.  Okay, stop.
12          So there's something called a Blanket
13  Assignment and Loan Agreement.
14          MR. HARVEY:  Blanket Assignment Of
15  Loan And Loan Documents.
16          MR. DORMONT:  Yes.  Thank you for
17  that.
18          MR. HARVEY:  You're welcome.
19  BY MR. DORMONT:
20  Q.   And this agrees -- this says ABW-PA, Inc. is
21  the assign of Alan Weissman.  Correct?
22  A.   Mr. Weissman didn't sign this.
23  Q.   I understand.
24  A.   Because he was already out of the deal at

**Page 301**

1  that point.
2          MR. HARVEY:  No.  Counsel's
3  question -- your question is wrong.  It does not
4  say that.
5          It says that ABW-PA, Inc. is the
6  assignee of Bay Investments, not Mr. Weissman.
7  BY MR. DORMONT:
8  Q.   No.  If you look under Background, the last
9  sentence says, "ABW-PA, Inc. is the Assign of Alan
10  Weissman."  Correct?
11  A.   No, I'm not sure.  I'm not sure what it
12  means.
13  Q.   I'm not asking what it means.  I'm just
14  asking what it says.
15          MR. HARVEY:  We'll stipulate that the
16  last sentence of the Background says that.
17  BY MR. DORMONT:
18  Q.   And it doesn't -- and then if you turn to
19  three pages later or two pages later where there's
20  a signature, it lists Alan B. Weissman as
21  president.
22          But he wasn't president.  Correct?
23  A.   He was not president.  I was president.
24  Q.   Okay.

**Page 302**

1  A.   Lawyers do make mistakes, don't they?
2  Q.   And if you look at the first page of this
3  document, so if you turn all the way to the
4  beginning and look at paragraph 2 of the entire,
5  the entire document, which is the motion, this
6  identifies ABW's place of business as in Port
7  Chester.  Correct?
8  A.   But that's a mistake also.  By this time
9  A.B. Weissman was out of the deal completely and of
10  course maybe, maybe Klehr Harris's office was not
11  aware of the facts.
12          MR. HARVEY:  It's very possible.
13          THE WITNESS:  Or that may be the
14  difference to the whole ball of wax.  What's the
15  difference?
16  BY MR. DORMONT:
17  Q.   Now, who owns the Dodds Lane property today?
18  A.   GF 2014.
19  Q.   Is the property for sale?
20  A.   Yes.
21  Q.   Has it been sold?
22  A.   It's under agreement.
23  Q.   With who?
24  A.   I don't remember the guy's -- some buyer

33 (Pages 299 to 302)

Common Pleas - Montgomery Co.
No. 2017-02140

Katz v. Grasso
Videotape Deposition of Michael Grasso

Wednesday
August 11, 2021

---

**Page 303**

1  some broker brought in to us.
2  Q.  And what is the price?
3  A.  2 million bucks.
4  Q.  Were there disclosures signed in connection
5  with --
6  A.  Excuse me?
7  Q.  Were there disclosures signed in connection
8  with the attempt to sell the property?
9  A.  What disclosures?  Disclosures of what?
10  Q.  Seller's disclosures.
11  A.  I presume.
12  Q.  Who signed those?
13  A.  If it was necessary, I signed it, as
14  general partner.
15  Q.  Was anyone else authorized to sign them?
16  A.  Nope.
17  Q.  Have you looked for the utility bills for
18  the Dodds Lane property?
19  A.  There is no utility bills that we know of.
20  I can't find any utility bills.  All we have at
21  Dodds Lane is the sewer bill and the real estate
22  tax bill.
23  Q.  And who has paid those?
24  A.  Water and -- water is provided by a private

---

**Page 304**

1  company, so I don't get those bills.  Maybe when
2  Joe was living there, he got them.
3  I don't know if water is still open
4  there or not at this point.
5  Q.  Who pays the sewer bills?
6  A.  GF 2014.
7  Q.  Now, was there ever a Lease Agreement
8  between GF 2014 and Joseph and Donna?
9  A.  No.
10  Q.  Did you charge him rent for living at the
11  Dodds Lane property?
12  A.  No.
13  Q.  Has Donna or Joseph ever paid rent to GF
14  2014 for --
15  A.  No.
16  Q.  -- the Dodds Lane property?
17  A.  No.
18  Q.  Now, were you aware that prior to the
19  explosion the house was being renovated?
20  A.  Yes.
21  Q.  And who was doing the renovations?
22  A.  Joe.
23  Q.  And who paid for the renovations?
24  A.  Probably Joe.  I don't remember paying any.

---

**Page 305**

1  Q.  Do you know how much was spent on those
2  renovations?
3  A.  I have no idea.
4  Q.  And do you know who would have maintained
5  records of those expenditures?
6  A.  Excuse me?
7  Q.  Who would have maintained records of those
8  expenditures?
9  A.  If I didn't do them, I have no -- I didn't
10  do them so I don't have any record of them.  If Joe
11  did them, he must have some records.
12  Q.  Can we agree that the expenditures increased
13  the value of the property?
14  MR. HARVEY:  You mean before the fire
15  or after the fire?
16  MR. DORMONT:  Before the explosion.
17  MR. HARVEY:  I mean the explosion.
18  THE WITNESS:  I disagreed with it.  He
19  tore that house apart.  It was a complete wreck.
20  And it was better before he started.
21  BY MR. DORMONT:
22  Q.  But once he started --
23  A.  He wrecked it.  He made it go down in value.
24  Q.  Did he put new windows in?

---

**Page 306**

1  A.  Yeah.  He had to or he'd have rain up to
2  here on his head.
3  Q.  In fact, when he, quote, wrecked the
4  property, he still owned the property.  Correct?
5  A.  Excuse me?
6  Q.  When he, quote, wrecked the property, he
7  still owned it?
8  A.  He was doing work on it while we were trying
9  to foreclose.  The foreclosure took a couple years
10  before we were able to foreclose.  So some of that
11  work was done when he owned it, him and his wife
12  owned it.
13  Q.  Well, he knew you were foreclosing.
14  Correct?
15  A.  Yes, he did.
16  Q.  And, in fact, you discussed that with him?
17  A.  Certainly I did, probably.  He knew I was
18  foreclosing.
19  Q.  And did you tell him why you were
20  foreclosing?
21  A.  Because he owed them money.  What's the
22  question?
23  Q.  And did you tell him what was going to
24  happen once you bought the property?

---

Page 319

1                IN THE COURT OF COMMON PLEAS
                      MONTGOMERY COUNTY
2

3                          - - -

4      MARSHALL KATZ,

5                Plaintiff
              v                    Case No. 2017-02140
6
       JOSEPH GRASSO,
7
                 Defendant
8

9                      VOLUME III

10

11             Continued videotaped deposition of

12     MICHAEL GRASSO, taken at the offices of U.S.

13     Realty, Inc., 120 East Lancaster Avenue, Ardmore,

14     Pennsylvania, on Wednesday, September 15, 2021,

15     commencing at approximately 9:08 a.m., before

16     Barbara McKeon Quinn, a Registered Merit Reporter

17     and Notary Public, pursuant to notice.

18

19

20

21

22

23

24

25

**EXHIBIT**

**3**

Appx0175

Common Pleas - Montgomery Co.                Katz v. Grasso                        Wednesday
No. 2017-02140                    Videotape Deposition of Michael Grasso      September 14, 2021

---

## Page 320

```
 1
 2   APPEARANCES:
     MONTGOMERY McCRACKEN WALKER & RHOADS, LLP
 3   BY: DAVID DORMONT, ESQUIRE
     ddormont@mmwr.com
 4   1735 Market Street
     21st Floor
 5   Philadelphia, Pennsylvania 19103
     215-772-1500
 6   Counsel for Plaintiff
     Judgment Creditor Marshall Katz
 7   KLEHR, HARRISON, HARVEY, BRANZBURG LLP
     JORDAN M. RAND, ESQUIRE
 8   jrand@klehr.com
     1835 Market Street
 9   Suite 1400
     Philadelphia, Pennsylvania 19103
10   215-569-2700
     Counsel for Witness, Michael Grasso
11
     ALSO PRESENT:
12
     Neal Webb, Videographer
13   Ms. Jordan LaPorta
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 321

```
 1
 2              EXAMINATION INDEX
 3
     MICHAEL GRASSO - VOLUME III
 4
 5       BY MR. DORMONT . . . . . . . . . . . . 326
 6          EXHIBIT INDEX
 7   KATZ                          PAGE
 8    6   Motion to Quash Subpoena to Attend,   371
          Testify and Produce Documents and Things
 9
     7   Non-Party GF 2014 LP's Answers and     451
10       Objections to Plaintiff Marshall Katz's
         Interrogatories in Attachment
11
     14  Volume II of Michael Grasso deposition 328
12       taken 8/11/21
13   15  E-mail to Rand and Harvey from Dormont 330
         dated 8/17/21
14
     15A E-mail to Rand and Harvey from Dormont 330
15       dated 8/31/21
16   59  Series of checks from GF 2014 LP made  362
         payable to Iron Hill Company, 2/3/20 for
17       $100,000, 4/24/20 for $50,000, 5/18/20
         for $91,030.61 and 10620 for $26,500
18
     60  Letter authorization of Grasso dated   388
19       5/8/19 to Philadelphia Sheriff's Office
20   66  E-mail dated 3/23/21 from            455
         Joe Grasso, Jr. to Michael Grasso
21
     73  Letter dated 2/11/20 To Whom It May    393
22       Concern from Koory
23   74  Standard Agreement for the Sale of     397
         Real Estate at 817 Muirfield Road
24       between GF 2014 LP and Joseph and
         Cheryl Soffer
25
```

## Page 322

```
 1
 2   EXHIBITS: (Continued)
     KATZ                          PAGE
 3   76  Check for $200,000 to the Order of    399
         Keller Williams Philadelphia Escrow
 4       for 817 Muirfield Road
 5   82  E-mail dated 3/10/20 to Grasso        400
         from Koory
 6
     84  E-mail dated 3/31/20 to Keller        402
 7       Williams Realty from Pomerantz
 8   86  E-mail dated 3/9/21 from Greenberg    409
         to Kaplan with attached invoices
 9
     87  Invoice from Pomerantz to U.S. Realty 404
10       Associates, Inc. dated 4/14/20
11   88  Koory Invoices for Legal Services     406
         Performed February 2020 to GF 2014 LP
12       dated 3/1/20
13   90  E-mail dated 3/5/21 from Jean Grasso  413
         to Joseph Grasso, with attachments
14
     142 Sworn Statement in Proof of Loss      340
15
     143 Sworn Statement in Proof of Loss      340
16
     147 American Home Assurance Company check 343
17       made payable to U.S. Realty Associates,
         Inc. and Clarke & Cohen for $3,000,000
18
     148 American Home Assurance Company check 343
19       made payable to U.S. Realty Associates,
         Inc. and Clarke & Cohen for $120,375.92
20       and deposit slip
21   149 American Home Assurance Company check 343
         made payable to U.S. Realty Associates,
22       Inc. and Clarke & Cohen for $476,027/77
         and deposit slip
23
     152 E-mail dated 6/1/20 to Grasso from    353
24       Kaplan
25
```

## Page 323

```
 1
 2   EXHIBITS: (Continued)
     KATZ                          PAGE
 3   153 E-mail dated 9/1/20 to Grasso from    355
         Kaplan
 4
     156 E-mail dated 2/16/21 to Grasso from   357
 5       Kaplan
 6   160 Seller's Property Disclosure Statement 367
         for 649 Dodds Lane dated 11/9/17
 7
     171 Forwarded e-mail dated 4/16/19 from   436
 8       Joseph Grasso to Michael Grasso
 9   175 E-mail dated 7/30/19 from Koory to    438
         Lutz, with attached Lease Agreement
10       between Spring Del Associates
         and 520 Management
11
     177 E-mail dated 9/5/19 from Koory to Ed, 444
12       with attached Agreement of Sale of
         Liquor License
13
     178 E-mail dated 9/10/19 from Koory to    445
14       Dratch, with attached Lease Agreement
15   181 Affidavit of Jean Grasso             450
16   185 Forwarded e-mail with pro forma dated 447
         2/4/20 from Joseph Grasso to Michael
17       Grasso
18   191 E-mail dated 5/11/20 to Greenberg from 419
         Kaplan
19
     193 E-mail dated 6/29/20 from Greenberg to 424
20       Grasso with Schedule of Rent and CAM
21   194 E-mail string dated 6/29/20 from      425
         Greenberg to Grasso with Schedule
22       of Rent and CAM
23   195 E-mail dated 7/1/20 from Greenberg to 428
         Grasso
24
25
```

2 (Pages 320 to 323)

Common Pleas - Montgomery Co.          Katz v. Grasso                         Wednesday
No. 2017-02140            Videotape Deposition of Michael Grasso         September 14, 2021

---

## Page 324

1  EXHIBITS: (Continued)
2  KATZ                                    PAGE
3  196  E-mail dated 1/29/21 from Greenberg to  431
        Meakim
4
5  239  Iron Hill Company, Inc. check made   423
        payable to MG Palace LP for $17,000,
6       with attachments
7  253  E-mail dated 3/31/21 from Joe Grasso  456
        to Kaplan and Joe Grasso, Jr.,
8       with attachments
9
        EXHIBITS PREVIOUSLY MARKED        PAGE
10
        Katz-11                367
11      Katz-12                334
        Katz-49                69
12      Katz-68                332
13
14
15
16
17
18
19
20
21
22
23
24
25

---

## Page 325

1           VIDEOGRAPHER:  We're here today,
2  Wednesday, September 15, 2021, for the continuation
3  of video recorded deposition of Michael Grasso,
4  taken by the plaintiff, in the matter of Marshall
5  Katz versus Joseph Grasso, filed in the Court of
6  Common Pleas for Montgomery County, Docket No.
7  2017-02140.
8           I am Neal Webb the videographer; the
9  court reporter is Barb Quinn and we represent Tate
10 & Tate Certified Court Reporting.
11          Counsel, please introduce yourselves
12 for the record.
13          MR. DORMONT:  David Dormont on behalf
14 of the plaintiff.
15          MR. RAND:  Jordan Rand for the
16 deponent, Michael Grasso.
17          VIDEOGRAPHER:  The time is 9:08 a.m.
18 and the court reporter can swear in the witness.
19          MICHAEL GRASSO, having been duly
20 sworn, was examined and testified as follows:
21               EXAMINATION
22 BY MR. DORMONT:
23 Q.    Good morning, Mr. Grasso.
24 A.    Good morning.
25 Q.    This is a continuation of your deposition.

---

## Page 326

1  Do you need me to repeat the instructions that I
2  gave you on the first day?
3  A.    If you like to waste time, you can do it,
4  but I don't think you ought to do it again.
5  Q.    Okay.
6  A.    It's your time.
7  Q.    You've taken an oath to tell the truth here
8  today.  Do you understand that?
9  A.    Yes, sir.
10 Q.    And do you know of any reason you could not
11 testify truthfully here today?
12 A.    The only time I didn't testify truthfully is
13 if I didn't remember something correctly.  If I
14 remembered something correctly, I would say it the
15 way -- correctly, if I could -- you know, my memory
16 is not as good as it used to be when I was 20 years
17 old.  So sometimes I forget things that I say
18 something and it's not correct because I forgot,
19 but not that I'm trying to hide anything from you.
20 Q.    In your previous depositions did you make
21 such errors?
22 A.    Sure.
23 Q.    And what --
24 A.    I don't remember.
25 Q.    Well, one of the instructions is, please let

---

## Page 327

1  me get my question out --
2  A.    Okay.  Go ahead.
3  Q.    -- before you answer.  I know you might know
4  the answer but it will close the window.
5           Do you remember what mistakes you
6  made in your prior deposition?
7  A.    I think we corrected a couple of them in
8  writing, Jordan; is that correct?
9           And there might have been more that I
10 might have been mistaken but, you know, you asked
11 me -- showed me documents that I don't remember, so
12 I don't remember.
13 Q.    You sent corrections after your first day of
14 depositions.  Do you recall that?
15 A.    Yes.
16 Q.    Okay.  You didn't send any corrections after
17 the second day of your deposition.
18 A.    No.
19 Q.    No, you did not?
20 A.    No, I did not.
21 Q.    Is that because you don't recall making any
22 mistakes in your second deposition?
23 A.    No, it's not.
24 Q.    Did you make any mistakes in your second
25 deposition?

---

3 (Pages 324 to 327)

---

Page 340

1    Q.    About whether an itemized proof of loss was
2    prepared.
3    A.    I don't know.  I might have signed one, but
4    I don't remember.
5            (Exhibit Katz-142 and Katz-143 were
6    marked for identification.)
7    BY MR. DORMONT:
8    Q.    I'll show you what I've marked as Exhibit
9    Katz-142, and I'm also going to show you what I've
10   marked as -- it's Exhibit Katz-142 and this is 143.
11   Do you have those two pieces of paper?  Do you have
12   them?
13   A.    I see them.
14   Q.    And they're both sworn statements in proof
15   of loss; is that correct?
16   A.    Yes.
17   Q.    And you signed both of these?
18   A.    Yes.
19   Q.    You say, "The full cost of repair or
20   replacement of property was greater than $3
21   million."
22           Do you see that?
23   A.    That's what it says.
24   Q.    How did you determine that value?
25   A.    I did not.

---

Page 341

1    Q.    Who determined that value?
2    A.    The adjuster apparently.
3    Q.    The adjuster would be Clarke & Cohen?
4    A.    You know better than me.  I told you, I
5    don't know.  All I could tell you, it probably was
6    handed to me by my attorney and said this is the
7    proof of loss, sign it, so we signed it.
8    Q.    Did you ask any questions?
9    A.    No, not that I remember.  Probably, but not
10   that I remember.
11          MR. RAND:  I'm going to object to the
12   extent that he's asking you to state what you spoke
13   about with your attorney.  That's privileged.
14          THE WITNESS:  Okay.  My answer is, I
15   don't know.  I don't remember.
16          MR. DORMONT:  He didn't say he spoke
17   to his attorney.
18          MR. RAND:  If he spoke to someone
19   other than his attorney, fine.  But to the extent
20   you're asking about conversations with his lawyer
21   --
22   BY MR. DORMONT:
23   Q.    Had you spoken to Mr. Cohen?
24          MR. RAND:  Please let me get my
25   objection on the record.

---

Page 342

1            To the extent you spoke with, say,
2    Richard Koory, that's okay.
3    BY MR. DORMONT:
4    Q.    Had you spoken with Mr. Cohen?
5    A.    I don't have any recollection of ever
6    speaking to Mr. Cohen.
7    Q.    And Mr. Koory was handling a business
8    problem for you, correct, about getting an
9    insurance claim?
10          MR. RAND:  Objection, to the extent it
11   calls for a legal conclusion.
12          You can answer it.
13          THE WITNESS:  Can I answer it?
14          MR. RAND:  Yeah.
15          THE WITNESS:  It was a legal -- as far
16   as I was concerned, it was a legal problem.
17   BY MR. DORMONT:
18   Q.    Well, the damages are factual.  You claimed
19   that the building was worth a value.  What facts
20   did you use to come up with that value?
21   A.    I didn't do any facts.  These were facts
22   that the adjuster came up with.  I didn't have
23   anything to do with it.
24   Q.    So you relied upon the adjuster's
25   determination of the value of the building; is that

---

Page 343

1    correct?
2    A.    Correct.
3            (Exhibits Katz-147, Katz-148 and Katz-
4    149 were marked for identification.)
5    BY MR. DORMONT:
6    Q.    Now, I want to show you a series of checks
7    and deposit slips.  The first is Katz Exhibit 147,
8    the second is Katz Exhibit 148, and the last is
9    Katz Exhibit 149.  149 is more than one page.
10          Do you have those exhibits in front of
11   you?
12   A.    Yes.
13   Q.    And can we agree that these all show checks
14   to U.S. Realty Associates from American Home
15   Assurance Company?
16   A.    Yes.
17   Q.    And these checks total in excess of $3
18   million; correct?
19   A.    I haven't added them up, but if that's what
20   you say, probably close.
21   Q.    Well, look at exhibit -- the check that's on
22   Katz Exhibit 147.
23          Do you see that check?
24   A.    It's 476,000, 120,000, and 3,000,000.  So
25   it's in excess of 3,000,000.

---

7 (Pages 340 to 343)

## Page 344

1  Q.   And these checks were received for the
2  explosion at Dodds Lane; correct?
3  A.   Yes.
4  Q.   And the checks were all made payable to U.S.
5  Realty Associates, Inc.?
6  A.   That's because the policy is in their name,
7  yes.
8  Q.   And were all these checks really checks
9  intended for GF 2014?
10 A.   Yes.  That's where they went.
11 Q.   And the checks were deposited in the Metro
12 Development Company account; correct?
13 A.   Correct.  And if you notice on the deposit
14 slip it says GF 2014.
15 Q.   And do you know whose handwriting that is?
16 A.   It looks like Rob Greenberg's handwriting to
17 me.
18 Q.   Now, has the sale of the Dodds Lane property
19 been completed?
20 A.   No.
21 Q.   Do you know who the property is being sold
22 to?
23 A.   I don't remember the people's name.
24 Q.   When is the anticipated closing?
25 A.   There's a couple of violations that we have

## Page 345

1  to settle.  We've spent like about 100,000 cleaning
2  up violations.  So once them violations are
3  complete, the township gives a clean violation
4  slip, probably two weeks after that.  So I haven't
5  got a date.
6  Q.   What are the violations?
7  A.   I haven't -- I can't tell you exactly.  My
8  daughter's handling that.  I don't know.  Something
9  about a wall.  There was grading problems.
10 Neighbors next-door complained about water running
11 into their property.  So we had to clean it up.
12 And my daughter is handling it and having a
13 contractor work on it.  As we speak, it's been
14 worked on right now.
15 Q.   Which daughter is working on it?
16 A.   Krista.
17 Q.   And who is the contractor who is --
18 A.   I don't --
19 Q.   -- doing the work?
20 A.   B and S Company.  I don't know the name
21 exactly who the company is.
22 Q.   Can we agree that you anticipate getting
23 approximately $2 million from the sale of the
24 property?
25 A.   Less the mortgage, yes.

## Page 346

1  Q.   Less the mortgage?
2  A.   Less the mortgage.
3  Q.   What mortgage?
4  A.   The mortgage that GF 2014 owes to Metro
5  Mortgage Partners, which is me and my wife.
6  There's a mortgage recorded on the property.
7  Q.   Is there a reason that mortgage hasn't been
8  produced?
9  A.   You haven't asked for it.  If you want to,
10 I'll give it to you.
11 Q.   I have -- I actually think I have asked it.
12 A.   Huh?
13 Q.   I have asked it.
14 A.   I'll give you a copy of it if you want it.
15 Q.   Okay.
16 A.   You want it?  I'll get a copy for you.
17 Q.   Yes.  Please.
18          If you look at Exhibit Katz-15A,
19 which was my e-mail of August 31st.  You got that?
20 A.   No.  What page?
21 Q.   It's one of the documents I gave you earlier
22 today.
23 A.   Oh, I thought we were through with these
24 documents.
25          I see it.  I got it.

## Page 347

1  Q.   If you look at the sixth bullet point I had
2  asked for records related to the mortgage on the
3  property located at 649 Dodds Lane.
4  A.   Counselor, this e-mail was not sent to me.
5  It was sent to Bill Harvey.  I never saw this
6  before.  So I don't know if you're asking -- if
7  you're asking for it, I'll be happy to give it to
8  you.
9  Q.   What was the mortgage for?
10 A.   What was the mortgage for?  It was for money
11 we spent to buy mortgages.  We bought two mortgages
12 from other lenders that we took and foreclosed on.
13 Then we put a new mortgage on for the dollar amount
14 we spent to buy those two mortgages.
15 Q.   Well, how much -- so how much is the
16 mortgage on Dodds Lane?
17 A.   Is a million dollars.
18 Q.   But you didn't spend a million dollars to
19 buy the mortgage?
20 A.   Yes, we did.  We spent more.
21 Q.   So that you --
22 A.   I spent 200 -- this is memory now; I don't
23 have exact numbers.  We spent 200 for the one
24 mortgage, 400 for another mortgage, 400 for back
25 real estate taxes that we had to catch up with

Common Pleas - Montgomery Co.            Katz v. Grasso            Wednesday
No. 2017-02140        Videotape Deposition of Michael Grasso      September 14, 2021

---

### Page 368

1  Q.   I want to show you what I've marked as
2  Exhibit Katz-160.  This is a Seller's Property
3  Disclosure Statement for 649 Dodds Lane.
4       Do you see that?
5  **A.   Yes.**
6  Q.   Have you seen this Disclosure before?
7  **A.   Nope.**
8  Q.   Now, you've sold properties before; correct?
9  **A.   Many properties.**
10 Q.   And you know that a seller's disclosure is
11 required for any residential property?
12 **A.   I didn't know that, but if that's the case,**
13 **maybe it's true.  But this is not a residential**
14 **property; it's a vacant lot.  It's a vacant lot.**
15 **It's not a residential property as far as I'm**
16 **concerned, but...**
17 Q.   Well --
18 **A.   I didn't sign this anyway.  I never saw this**
19 **before (indicating).**
20 Q.   Well, your son Joseph signed this; correct?
21 **A.   So ask him what he knows about it.  Don't**
22 **ask me.**
23 Q.   Well, the trouble is the seller is listed as
24 GF 2014.
25 **A.   Yes.**

### Page 369

1  Q.   Okay.  And is it correct that on the last
2  page of the document, Page 10, Joseph was the one
3  who signed this?
4  **A.   Apparently.**
5  Q.   Why did your son sign the Disclosure?
6  **A.   I haven't the slightest idea.**
7  Q.   Well, in November of 2017, was GF 2014
8  trying to sell the Dodds Lane property?
9  **A.   When you say was "trying to sell" it, we**
10 **haven't -- it was not listed with any broker.  It**
11 **was available for sale.  If anybody came with a**
12 **check we would listen to them, but we were not -- I**
13 **was not actively engaged in trying to sell the**
14 **property.**
15 Q.   Well, was your son Joseph?
16 **A.   He might have been.  I don't know.**
17 Q.   Was a real estate company engaged to sell
18 the property?
19 **A.   Not by me.**
20 Q.   Was it done by Joseph?
21 **A.   I don't know.**
22 Q.   Now, if we look at Section 4 on Page 2 it
23 discloses that a new roof was installed four years
24 ago.
25      Do you see that?

### Page 370

1  **A.   What's the difference?  I don't have -- so I**
2  **see it.  What's it mean?**
3  Q.   Well, four years ago would have been 2013;
4  correct?
5  **A.   No.**
6  Q.   Four years prior to November 9th, 2017 would
7  not have been 2013?
8  **A.   I have no clue.  I can't count that fast.**
9  **You've been studying this for a month.  I don't**
10 **know.**
11      **Let me ask you a question.  What are**
12 **you trying to drive at here?  What's that mean?**
13 **What are you -- what's this all about?**
14      MR. RAND:  Michael, let him ask his
15 questions.  Do you want to take a break?
16      THE WITNESS:  He's wasting my fucking
17 time.  That's what it means.
18      I'm going to take a five-minute
19 recess.
20      **MR. DORMONT:**  That's fine.
21      VIDEOGRAPHER:  Off the video.  The
22 time is 9:59 a.m.
23      RECESS
24      VIDEOGRAPHER:  Back on the video.  The
25 time is 10:02 a.m.

### Page 371

1  BY MR. DORMONT:
2  Q.   Mr. Grasso, when we broke we were looking at
3  Exhibit 160, which is the Seller's Property
4  Disclosure for the Dodds Lane property from 2017.
5       If you turn to Page 3 and look at
6  Section 8, it references a new addition.  Could you
7  tell me what the new addition was?
8  **A.   No.**
9  Q.   Do you know who paid for the new addition?
10 **A.   No.**
11 Q.   And the new roof, do you know who paid for
12 the new roof?
13 **A.   No.**
14 Q.   I'm done with that exhibit.  We're going to
15 now move on to what I've marked as Exhibit Katz-6.
16      (Exhibit Katz-6 was marked for
17 identification.)
18 BY MR. DORMONT:
19 Q.   Exhibit Katz-6 is a Motion to Quash the
20 subpoena that is issued to you.  Do you recall
21 that after you were served a subpoena in this case
22 a motion to quash the subpoena was filed on your
23 behalf?
24 **A.   I never hired Mr. Mitts, so I didn't file**
25 **this motion to quash.**

---

14 (Pages 368 to 371)

COMMONWEALTH OF PENNSYLVANIA

IN THE COURT OF COMMON PLEAS OF MONTGOMERY COUNTY

MARSHALL KATZ            :
                         :
         v.              : **File No.**  2017-02140
                         :
JOSEPH GRASSO            :
                         :
                         :

<u>**SUBPOENA TO ATTEND AND TESTIFY**</u>

TO: Clarke & Cohen

    310 Belmont Avenue

    Bala Cynwyd, PA 19004

1.   You are ordered by the Court to come to   Montgomery McCracken Walker & Rhoads LLP
1735 Market Street, 21st Floor, Philadelphia,
                         (Specify courtroom or other place)

at _____, Philadelphia County, Pennsylvania, on  July 12, 2021

at    9:30    o'clock _A_ M., to testify on behalf of   Plaintiff/Judgment Creditor
     Marshall Katz

in the above case, and to remain until excused. See Exhibit A

2.   And bring with you the following:   See Exhibit B

        **If you fail to attend or to produce the documents or things required by this subpoena, you may be subject to the sanctions authorized by Rule 234.5 of the Pennsylvania Rules of Civil Procedure, including but not limited to costs, attorney fees and imprisonment.**

**ISSUED BY A PARTY/ATTORNEY IN COMPLIANCE WITH Pa.R.C.P.No.234.2 (a)**

**NAME:**  David Dormont

**ADDRESS:**  Montgomery McCracken Walker & Rhoads LLP

1735 Market St., Philadelphia, PA 19103

**TELEPHONE:**  215-772-7280

**SUPREME COURT ID #:**  66252

                                         BY THE COURT:          ┌─────────────┐
                                         Noah Marlier, Prothonotary  │  **EXHIBIT** │
                                                                │      **4**     │
                                                                └─────────────┘
**DATE:**   June 18, 2021
        **Seal of the Court**        **BY:** _[signature]_
                                              **Agent/Deputy**

**OFFICIAL NOTE: This form of subpoena shall be used whenever a subpoena is issuable including hearings in connection with depositions and before arbitrators, masters, commissioners, etc. in compliance with Pa.R.C.P.No.234.1. If a subpoena for production of documents, records or things is desired, complete paragraph 2.**

## Notice of Language Rights

**RETURN OF SERVICE:**

On the ____ 18th ____ day of

____ June ____, 20 2 1,

I, David Dormont

served Clarke & Cohen
(NAME OF PLACE SERVED)

with the for-going subpoena by:
(Describe method of service)

hand delivery on
Rhina Navarro
at 3:22 p.m.

I verify that the statements in this return of service are true and correct. I understand that false statements herein are made subject to the penalties of 18 Pa.C.S.A. § 4904 relating to unsworn falsification to authorities.

DATE: June 21, 2021

_____
(SIGNATURE)

**FREE INTERPRETER**
PO Box 311 Norristown, PA 19404
languageaccesscoordinator@montcopa.org
610-278-3231
www.pacourts.us/language-rights

**Spanish/Español:** Usted tiene derecho a un intérprete libre de costo. Para solicitar un intérprete favor de informárselo al personal judicial utilizando la información provista en la parte superior de este aviso.

**Russian/Русский:** У вас есть право на бесплатные услуги переводчика. Заявка на переводчика подается в суд по адресу, телефону или эл. почте, указанным выше в заголовке этого уведомления.

**Mandarin/Cantonese Simplified Chinese/普通话/粤语简体中文：**您有权获得得免费的口译员服务。若需要口译员，请使用本通知上方提供的联系信息通知法院工作人员。

**Korean/한국어:** 귀하는 비용에 대한 부담 없이 통역 서비스를 받을 권리가 있습니다. 통역 서비스를 요청하려면 본 통지서의 상단에 제공된 정보를 사용하여 법원 직원에게 알려주십시오.

**Arabic/العربية:** لديك الحق في الحصول على مترجم دون تحمل أي تكلفة. لطلب مترجم، يُرجى إبلاغ موظفي المحكمة باستخدام معلومات الاتصال المتوفرة في الجزء العلوي من هذا الإشعار.

Appx0182

## E  HIBIT A

Pursuant to Pa. R. Civ. P. 4007.1(e), the deponent is directed to designate one or more officers, directors, managing agents or other persons who consent to testify on its behalf concerning the following topics:

a. The preparation and support for the Sworn Statement in Proof of Loss under the American Home Assurance Company, Company Claim No. 9549224463US, Policy No. 026032320 (a copy of which Proof of Loss is attached hereto as Exhibit 1);

b. The preparation and support for the Sworn Statement in Proof of Loss under the American Home Assurance Company, Company Claim No. 8346143042US, Policy No. 026032320 (a copy of which Proof of Loss is attached hereto as Exhibit 2);

c. The preparation and support for any other Sworn Statement in Proof of Loss filed regarding the November 4, 2018 explosion at 649 Dodds Lane, Gladwyne, PA 19035;

d. Any communication between Clarke & Cohen and Joseph Grasso related to the property located at 649 Dodds Lane, Gladwyne, PA 19035; and

e. The value of any improvements made to the buildings located at 649 Dodds Lane, Gladwyne, PA 19035 prior to the November 4, 2018 explosion.

## E HIBIT B

The deponent is hereby directed to bring to the deposition all documents[1] related to or concerning:

    a.    The Sworn Statement in Proof of Loss under the American Home Assurance Company, Company Claim No. 9549224463US, Policy No. 026032320 (a copy of which Proof of Loss is attached hereto as Exhibit 1), including, but not limited, to all documents supporting, considered and/or relied upon in calculating the amount of the Full Cost of Repaid or Replacement of ">3,000,000";

    b.    The Sworn Statement in Proof of Loss under the American Home Assurance Company, Company Claim No. 8346143042US, Policy No. 026032320 (a copy of which Proof of Loss is attached hereto as Exhibit 2), including, but not limited, to all documents supporting, considered and/or relied upon in calculating the amount of the Full Cost of Repaid or Replacement of $3,339,818.59;

    c.    Any other Sworn Statement in Proof of Loss filed related to the November 4, 2018 explosion at 649 Dodds Lance, Gladwyne, PA 19035; and.

    d.    The property located at 649 Dodds Lane, Gladwyne, PA 19035, including, but not limited to, any documents related to the improvements made to the buildings located at 649 Dodds Lane, Gladwyne, PA 19035 prior to the November 4, 2018 explosion.

---

[1] The terms "document" and "documents" shall have the broadest meaning permitted under the applicable court rules and shall include any and all written, typed, printed, recorded or graphic material, however produced, reproduced or stored, whether an original or a copy, and whether prepared, published or released by any person or entity, including but not limited to, memoranda, letters, reports, agreements, contracts, correspondence, electronic mail, text messages, instant messages, voicemail, audio files, spreadsheets, databases, social media postings, telegrams, minutes or records of meetings, reports, summaries, lists, drafts, revisions, invoices, receipts, original and preliminary notes, sketches, records, ledgers, contracts, bills, inventories, financial data, accounting and financial records, diaries, journals, calendars, statements, work papers, videotapes, cassette tapes, photographs, pamphlets, brochures, advertisements, trade letters, press releases, tables, articles, conversation summaries, and printouts. It also includes information stored electronically, whether in a computer database, the cloud, the Internet, or otherwise, and includes information stored in electronic form on magnetic, optical, or other forms of media such as disks, CD-ROM, optical disks, ROM, and tape, regardless of whether such documents are presently also in non-electronic form.

**SWORN STATEMENT IN PROOF OF LOSS**

| | | |
|---|---|---|
| 026032320 | | 9549224463US |
| POLICY NUMBER | | COMPANY CLAIM NO |
| $ 125,407,884 | | 026032320 |
| AMOUNT OF POLICY AT | | POLICY NO. |
| TIME OF LOSS | | |
| 8-17-2017 | | The Graham Company |
| DATE ISSUED | | AGENCY AT |
| 8-17-2019 | | Lisa Talley |
| DATE EXPIRES | | AGENT |

To the   American Home Assurance Company

of   175 Water Street, New York, New York 10038

At time of loss, by the above indicated policy of insurance you insured    U.S. Realty Associates, Inc.

against loss by    All Risks of Physical Loss or Damage    to the property described according to
the terms and conditions of the said policy and all forms, endorsements, transfers and assignments attached thereto.

1.   Time and Origin: An   explosion    loss occurred about the hour of   8    o'clock   P    M.,

On the   4th   day of   November    20  18   . The cause and origin of the said loss were;
An explosion resulting from a gas leak. The cause of the gas leak is undetermined following the ATF's investigation.

2.   Occupancy: The building described, or containing the property described, was occupied at the time of the loss as follows, and
for no other purpose whatever:   Residence - Mansion occupied by entrusted party

3.   Title and Interest: At the time of the loss the interest of your insured in the property described therein was
U.S. Realty Associates, Inc.    No other person or persons had any interest therein
or encumbrance thereon, except:   None known

4.   Changes: Since the said policy was issued there has been no assignment thereof, or change of interest, use, occupancy,
possession, location or exposure of the property described, except:   None Known

5.   Total Insurance: The total amount of insurance upon the property described by this policy was, at the time of the loss,
$  125,407,884   .

6.   Full Cost of said property at time of loss . . . . . . . . . . . . . . . . . . . . . . . . . $   Undetermined

7.   Full Cost of Repair or Replacement . . . . . . . . . . . . . . . . . . . . . . . . . . . . $   >3,000,000

8.   Applicable Depreciation, Betterment and/or Reduction . . . . . . . . . . . . . . . . . $   N/A

9.   Undisputed amount agreed for first partial payment . . . . . . . . . . . . . . . . . . . $   3,000,000

The said loss did not originate by any act, design or procurement on the part of your insured, or this affiant; nothing has been done by or
with the privity or consent of your insured or this affiant, to violate the conditions of the policy, or render it void; no articles are mentioned
herein or in annexed schedules but such as were destroyed or damaged at the time of said loss; no property saved has in any manner
been concealed, and no attempt to deceive the said company, as to the extent of said loss, has in any manner been made. Any other
information that may be required will be furnished and considered a part of this proof.

The furnishing of this blank or the preparation of proofs by a representative of the above insurance company is not a waiver of any of
its rights.

State of   Pennsylvania

County of   Montgomery                                   US Realty Associates, Inc.
                                                        By X    Michael Grosso, President   Insured

Subscribed and sworn to before me this   30th   day of   January   20  20

Notary Public

Commonwealth of Pennsylvania - Notary Seal
Robert A. Greenberg, Notary Public
Montgomery County
My commission expires December 1, 2021
Commission number 1062272
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

**EXHIBIT 1**

M

**SWORN STATEMENT IN PROOF OF LOSS**

| | |
|---|---|
| 025032320 | 8346143042US |
| POLICY NUMBER | COMPANY CLAIM NO |
| $    125,407,884 | 025032320 |
| AMOUNT OF POLICY AT | POLICY NO, |
| TIME OF LOSS | |
| 8-17-2017 | The Graham Company |
| DATE ISSUED | AGENCY AT |
| 8-17-2019 | Lisa Talley |
| DATE EXPIRES | AGENT |

To the    American Home Assurance Company
of    175 Water Street, New York, New York 10038
At time of loss, by the above indicated policy of insurance you insured    U.S. Realty Associates, Inc.

against loss by    All Risks of Physical Loss or Damage    to the property described according to
the terms and conditions of the said policy and all forms, endorsements, transfers and assignments attached thereto.

1.   Time and Origin: An    explosion    loss occurred about the hour of    8    o'clock    P    M.,

On the    4th    day of    November    20  18   . The cause and origin of the said loss were:
An explosion resulting from a gas leak. The cause of the gas leak is undetermined following the ATF's investigation.

2.   Occupancy: The building described, or containing the property described, was occupied at the time of the loss as follows, and
for no other purpose whatever:   Residence - Mansion occupied by entrusted party

3.   Title and Interest: At the time of the loss the interest of your insured in the property described therein was
U.S. Realty Associates, Inc.    No other person or persons had any interest therein
or encumbrance thereon, except:    None known

4.   Changes: Since the said policy was issued there has been no assignment thereof, or change of interest, use, occupancy,
possession, location or exposure of the property described, except:   None Known

5.   Total Insurance: The total amount of insurance upon the property described by this policy was, at the time of the loss,
$   125,407,884    .

| | | | |
|---|---|---|---|
| 6. | Full Cost of said property at time of loss. . . . . . . . . . . . . . . . . | $ | Undetermined |
| 7. | Undisputed Amount of Repair or Replacement . . . . . . . . . . . . . | $ | 3,339,818.59 |
| 8. | Applicable Depreciation, Betterment and/or Reduction . . . . . . . . . . | $ | (209,442.67) |
| 9. | Minus Previous Payment . . . . . . . . . . . . . . . | $ | (3,000,000) |
| 10. | Minus Deductible . . . . . . . . . . . . . . . . . . | $ | (10,000) |
| 11. | Undisputed amount of second partial payment . . . . . . . . . . . . | $ | 120,375.92 |

The said loss did not originate by any act, design or procurement on the part of your insured, or this affiant; nothing has been done by or
with the privity or consent of your insured or this affiant, to violate the conditions of the policy, or render it void; no articles are mentioned
herein or in annexed schedules but such as were destroyed or damaged at the time of said loss; no property saved has in any manner
been concealed, and no attempt to deceive the said company, as to the extent of said loss, has in any manner been made. Any other
information that may be required will be furnished and considered a part of this proof.

The furnishing of this blank or the preparation of proofs by a representative of the above insurance company is not a waiver of any of
its rights,                                                                U/S Realty Associates, Inc.

State of   Pennsylvania                               By

County of   Montgomery                                        Michael Grasso  President        Insured

Subscribed and sworn to before me this   28th   day of   February   20  20

                                   Notary Public   Commonwealth of Pennsylvania - Notary Seal
                                                   Robert A. Greenberg, Notary Public
                                                   Montgomery County
                                                   My commission expires December 1, 2021
                                                   Commission number 1062272
                                                   MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

**EXHIBIT 2**

M



COMMONWEALTH OF PENNSYLVANIA

COUNTY OF PHILADELPHIA

In the matter of:

KATZ VS GRASSO

Court of Common Pleas

_____ January _____ Term, Yr. _21_____

No. ___00616_____

# Subpoena

To: __BHH Affiliates, LLC t/a Fox & Roach Rec. Custodian_____

(*Name of Witness*)                    (*Nombre del Testigo*)

1.    YOU ARE ORDERED BY THE COURT TO COME TO (*El tribunal le ordena que venga a*)

__1735 Market St., 21st Floor Philadelphia, PA 19103___, AT PHILADELPHIA, PENNSYLVANIA ON (*En Filadelfia*

*Pensilvania el*) _____October 08, 2021_____, AT (*a las*) _10:00_ O'CLOCK _A_.M.,    TO

TESTIFY ON BEHALF OF (*para atestiguar a favor de*) ___KATZ MARSHALL_____ IN THE

ABOVE CASE, AND TO REMAIN UNTIL EXCUSED (*en el caso arriba mencionado y permanecer hasta que le autoricen irse*).

2.    AND BRING WITH YOU THE FOLLOWING (*Y traer con usted lo siguiente*):

See Exhibit A

<table>
<tr><td>

**Notice**

If you fail to attend or to produce the documents or things required by the subpoena, you may be subject to the sanctions authorized by Rule 234.5 of the Pennsylvania Rules of Civil Procedure, including but not limited to costs, attorney fees and imprisonment.

</td><td>

**Aviso**

Si usted falla en comparecer o producir los documentos o cosas requeridas por esta cita, usted estara sujeto a las sanciones autorizadas por la regla 234.5 de las reglas de procedimiento civil de Pensilvania incluyendo pero no limitado a los costos, remuneracion de abogados y encarcelamiento.

</td></tr>
</table>

INQUIRIES CONCERNING THIS SUBPOENA SHOULD BE ADDRESSED TO (*Las preguntas que tenga acerca de esta Citacion deben ser dirigidas a*):

ISSUED BY:          David Dormont

(*Attorney*)                    (*Abodago/Abogada*)

Address (*Direccion*):

1735 Market Street, 21st Floor
Philadelphia, PA 19103

Telephone No. (*No. de Telefono*):          215 772-7280

Attorney ID # (*Abogado ID#*):

BY THE COURT (*Por El Tribunal*):

**Eric Feder**
Deputy Court Administrator  (*Administrador del Tribunal Adjunto*)
Director, Office of Judicial Records  (*Director de la Oficina de Registros Judiciales*)

Subp.#17141324?-1

PRO

(*Clerk*)                    (*Escribano*)

You may contact the Office of Judicial Records to verify that this subpoena was issued by the Philadelphia County Court of Common Pleas.
Phone:  (215) 686-6652  or Email: OJRCivil@courts.phila.gov

EXHIBIT
5

COMMONWEALTH OF PENNSYLVANIA
COUNTY OF PHILADELPHIA

In the matter of:

KATZ VS GRASSO

Court of Common Pleas

_____ January___ Term, Yr. _21_____

No.___00616_____

# Return of Service

On the _____ day of _____ , Yr. _____ ,
I, _____ , served with the foregoing subpoena by (described method of service):

_____

_____

_____

I verify that the statements in this return of service are true and correct. I understand that false statements herein are made subject to the penalties of 18 Pa. C.S.A. **§** 4904 relating to unsworn falsification to authorities.

_____
*Date*

_____
*Signature*

_____
*Name of Witness*

_____
*Name of person Served*

Appx0188

## E  HIBIT A

The deponent (the Custodian of Records of   HH Affiliates, LLC t/a Fox & Roach) is hereby directed to bring to the deposition all documents[1] related to or concerning Joseph Grasso, Donna Grasso and/or GF 2014, including but not limited to:

1. All documents related to or concerning any agreement between Joseph Grasso, Donna Grasso, and/or GF 2014 L.P., as the buyers and Joseph Soffer and/or Cheryl Soffer, as the sellers, for the real estate located at 817 Muirfield Rd.,   ryn Mawr, Lower Merion Township, PA 19010 from October 1, 2019 to date;

2. All documents related to and/or concerning the Iron Hill Company check numbered 6448 and dated January 2, 2020 made payable to Fox Roach, LP in the amount of $100,000;

3. Any brokerage agreement between Joseph Grasso, Donna Grasso, and/or GF 2014 L.P., on one hand, and   erkshire Hathaway Home Services Fox and Roach, and/or Lynn and/or Harris   erger, on the other, from January 1, 2016 to date;

4. All documents related to or concerning the sale or offer to sell the property located at 649 Dodds Lane, Gladwyne, Pennsylvania 19035, including, not limited to, Seller s Property

---

[1]    The terms "document" and "documents" shall have the broadest meaning permitted under the applicable court rules and shall include any and all written, typed, printed, recorded or graphic material, however produced, reproduced or stored, whether an original or a copy, and whether prepared, published or released by any person or entity, including but not limited to, memoranda, letters, reports, agreements, contracts, correspondence, electronic mail, text messages, instant messages, voicemail, audio files, spreadsheets, databases, social media postings, telegrams, minutes or records of meetings, reports, summaries, lists, drafts, revisions, invoices, receipts, original and preliminary notes, sketches, records, ledgers, contracts, bills, inventories, financial data, accounting and financial records, diaries, journals, calendars, statements, work papers, videotapes, cassette tapes, photographs, pamphlets, brochures, advertisements, trade letters, press releases, tables, articles, conversation summaries, and printouts. It also includes information stored electronically, whether in a computer database, the cloud, the Internet, or otherwise, and includes information stored in electronic form on magnetic, optical, or other forms of media such as disks, CD-ROM, optical disks, ROM, and tape, regardless of whether such documents are presently also in non-electronic form.

Disclosure Statements and Agreement for the sale of the property, from January 1, 2017 to date;

5. All documents related to or concerning the renting or leasing of the property located at 373 Righters Mill Road, Gladwyne, Pennsylvania 19035 from July 1, 2018 to date;

6. All communications between Joseph Grasso, Donna Grasso, and/or GF 2014 L.P., on one hand, and   erkshire Hathaway Home Services Fox and Roach, and/or Lynn and/or Harris erger, on the other, from January 1, 2016 to date.

## Agent Full

**649 Dodds Ln, Gladwyne, PA 19035**          **Pending**          **Land**          **$2,000,000**





| | | | |
|---|---|---|---|
| MLS #: | PAMC696214 | Lot Acres / SQFT: | 2.4a / 104544sf / Assessor |
| Tax ID #: | 40-00-15616-004 | Price/Acre: | $833,333.33 |
| Ownership Interest: | Fee Simple | | |
| Type: | Land | | |
| Waterfront: | No | | |
| Views: | Panoramic, Scenic Vista | | |

### Location

| | | | |
|---|---|---|---|
| County: | Montgomery, PA | School District: | Lower Merion |
| MLS Area: | Lower Merion Twp - Montgomery County (10640) | High School: | Harriton Senior |
| | | Middle/Junior School: | Welsh Valley |
| Subdiv / Neigh: | GLADWYNE | Elementary School: | Gladwyne |
| | | Cross Street: | Old Gulph |

### Association / Community Info

| | |
|---|---|
| Association Recreation Fee: | No |

### Taxes and Assessment

| | | | |
|---|---|---|---|
| Tax Annual Amt / Year: | $22,396 / 2021 | Tax Assessed Value: | $574,420 / 2021 |
| School Tax: | $17,903 | Historic: | No |
| County Tax: | $2,086 / Annually | Land Use Code: | 1108 |
| City/Town Tax: | $2,407 / Annually | Block/Lot: | 034 |
| Clean Green Assess: | No | | |
| Municipal Trash: | Yes | | |
| Zoning: | RESIDENTIAL | | |

### Land Information

| | | | |
|---|---|---|---|
| Lot Acres / SQFT: | 2.4a / 104,544sf / Assessor | Lot Size Dimensions: | 40.00 x 0.00 |
| Current Use: | Residential | | |
| Views: | Panoramic, Scenic Vista | | |
| Development Status: | One Building Lot, Utilities at Site | | |
| Additional Parcels: | No | | |

### Ground Rent

| | |
|---|---|
| Ground Rent Exists: | No |

### Exterior Features

| | |
|---|---|
| Exterior Features: | Other Structures: Carriage House |

### Utilities

| | |
|---|---|
| Utilities: | Natural Gas Available; Water Source: Public; Sewer: Public Sewer |

### Remarks

Public: Prime 2.40 acres on one of Gladwyne's most sought after cul de sacs :649 Dodds Lane. Bring your own builder or you can build with the owner/builder. Majestic setting, public sewer and public water. The sky's the limit on the home that can be built on this perfect piece of land. Presently there is a carriage home on the land, but the main house has been demolished. The photographs included in this listing are renderings of what the owner builder could build on this lot.

### Listing Office

| | | |
|---|---|---|
| Listing Agent: | Lynn Berger (3168188) (Lic# AB065588) | (610) 420-3904 |
| Listing Agent Email: | lynn.berger@foxroach.com | |

<div style="border:1px solid black">

**EXHIBIT**

**6**

</div>

Appx0191

| | |
|---|---|
| Broker of Record: | Joan Docktor (3155445) Click for License |
| Listing Office: | BHHS Fox & Roach-Haverford (61019) (Lic# RB061717C) |
| | 338 Lancaster Ave, Haverford, PA 19041-1309 |
| Office Manager: | Kathie Ramer (3117420) |

| | | | |
|---|---|---|---|
| Office Phone: | (610) 649-4500 | Office Fax: | (610) 649-5020 |
| Co-Listing Agent: | HARRIS BERGER (Lic# RS135820A) | | (610) 420-9444 |
| Co-Listing Agent Email: | location@comcast.net | | |

## Showing

| | |
|---|---|
| Appointment Phone: | (800) 746-9464 |
| Showing Contact: | Agent |
| Contact Name: | Showing time |
| Showing Requirements: | Call First - Showing Service, Lister Must Accompany |
| Showing Method: | In-Person Only |
| Directions: | Old Gulph Rd. to Dodds Lane |

## Compensation

| | | | |
|---|---|---|---|
| Buyer Agency Comp: | 2.5% Of Gross | Sub Agency Comp: | 0% Of Gross |
| Transaction Broker: | 2.5% Of Gross | Dual/Var Comm: | No |

## Listing Details

| | | | |
|---|---|---|---|
| Original Price: | $2,000,000 | Owner Name: | GF 2014 LP |
| Listing Agrmnt Type: | Exclusive Right | DOM / CDOM: | 6 / 6 |
| Prospects Excluded: | No | Listing Terms: | Builder - Choice/Use Own |
| Listing Service Type: | Full Service | Original MLS Name: | BRIGHT |
| Dual Agency: | Yes | Off Market Date: | 07/14/21 |
| Sale Type: | Standard | | |
| Listing Term Begins: | 06/04/2021 | | |
| Listing Entry Date: | 06/04/2021 | | |
| Possession: | 31-60 Days CD | | |
| Acceptable Financing: | Cash, Conventional | | |
| Federal Flood Zone: | No | | |

## Sale/Lease Contract

| | | | |
|---|---|---|---|
| Selling Agent: | Matthew Romano (3278406) (Lic# RS345684) | | (305) 799-7773 |
| Selling Agent Email: | matthew@delphipg.com | | |
| Selling Office: | Delphi Property Group, LLC (55661) (Lic# Unknown) | | |
| Responsible Broker: | Jamie Weiner (3163463) (Lic# RM422933-PA) | | |
| | 2000 N 2nd St Ste 100, Philadelphia, PA 19122 | | |
| Office Phone: | (215) 627-7300 | Office Fax: | (215) 627-7304 |
| Selling Office Email: | info@delphipg.com | | |
| Agreement of Sale Dt: | 06/09/21 | Close Date: | 01/30/22 |
| Contingency Type: | Other | Last Contingency Expires: | 07/03/2021 |
| Kick Out Clause YN: | No | | |
| | | Last List Price: | $2,000,000.00 |

© BRIGHT MLS - All information, regardless of source, should be verified by personal inspection by and/or with the appropriate professional(s). The information is not guaranteed. Measurements are solely for the purpose of marketing, may not be exact, and should not be relied upon for loan, valuation, or other purposes. Copyright 2022. Created: 01/18/2022 11:17 AM



DocuSign Envelope ID: 9E859A61-8907-4828-8D7F-23C55123F4D1



# BERKSHIRE HATHAWAY | Fox & Roach, REALTORS'
## HomeServices
### EXCLUSIVE LISTING CONTRACT

1. **Property**
   Address _____ 649 Dodds Lane
   Municipality (City, Borough, Township) _____ Gladwyne, PA 19035
   County _____ Montgomery _____ School District _____ Lower Merion
   Zoning and Present Use _____ Residential
   Identification Number _____ 40-0015616-004
   (tax ID number, parcel number, deed book page, recording date, if known to Seller)

2. **Seller** (List *all* individuals and entities with any ownership interest)
   Name _____ Joe Grasso (GF2014 LP)
   Name _____
   Name _____
   Mailing Address _____ 649 Dodds Lane, Gladwyne, PA 19035
   Phone Number _____ (215) 680-6800 _____ Alternate Number _____
   Email Address _____ jgrasso@walnutstcapital.com

3. **Broker's Licensee/License #:** _____ BHHS Fox Roach Haverford
   Additional Licensee/License #: _____
   Office Address _____ 338 W. Lancaster Ave, Haverford, PA 19041
   Office Phone Number _____ Alternate Number _____
   Email Address _____ jgrasso@walnutstcapital.com

4. **Purpose of Contract.** Seller is hiring Broker/Licensee (collectively, "Broker") to market the Property and find a Buyer (or if directed, a Lessee). During the term of this Contract, Seller will not hire any other broker to perform these or any other services related to the sale or lease of the Property. Seller agrees that Broker may list other properties for sale or rent and that Broker may show other properties to prospective Buyers or tenants.

5. **Listed Price** $2,300,000.00
   **Seller has final authority over the setting of this price and any subsequent adjustment thereto.**

6. **Start and End Dates of Listing Contract ("Term").** This Contract starts on the date it has been signed by all Seller(s) and Broker, and ends at 5:00 p.m. 365 days following the starting date, unless a sale/rental is being negotiated. In that event, Broker will continue to represent the Seller until either negotiations are terminated without an agreement to sell/rent or settlement occurs. Either Seller or Broker can terminate this representation on or after 180 days from the starting date by providing written notice to the other party 30 days in advance of the desired termination.

7. **Broker's Fee.** The Broker's Fee is (check one) ☐ six percent (6%), ☐ seven percent (7%), ☐ eight percent (8%) of the sale price, and is to be paid by the Seller to Broker at time of final settlement. Seller and Broker agree that Broker will pay from Broker's Fee:
   (a) A fee to another broker (Buyer Agent), who represents the Buyer. ☒ Yes ☐ No _____ 2.5 _____ % or $
   (b) A fee to another broker (Transaction Licensee), who does not represent either the Seller or a buyer. ☐ Yes ☒ No _____ % or $
   BHHS Fox & Roach will not pay a fee to another broker acting as a sub-agent.

8. **Obligation to Pay Broker's Fee.** Seller must pay Broker's Fee to Broker if a ready, willing and able buyer (one who will pay the Listed Price, or a price mutually agreed to by Buyer and Seller, for the Property) is found by Broker or by anyone, including Seller. In addition, the Broker's Fee is owed by Seller if:

_____ Seller initials p. 1 of 5

BHHS - Fox & Roach REALTORS - Haverford Home Marketing Center, 338 West Lancaster Ave Haverford, PA 19041
Phone:(610)649-45005464   Fax: (610)649-5020   Lynn Berger

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026 www.zipLogix.com

GF2014 LP

EXHIBIT 7

Appx0193

DocuSign Envelope ID: 9E859A61-8907-4828-8D7F-23C55123F4D1

(a) During the term of this Contract, Seller enters into an agreement to sell, exchange, lease or otherwise transfer any aspect of ownership of the Property, whether such agreement is brought by Broker, Broker's licensees, Seller or any other person or broker, at the above Listed Price or any other price acceptable to Seller. Provided the transaction closes, then Broker's Fee is to be paid at settlement.  **OR**

(b) Within one year of the ending date of this Contract, Seller enters into an agreement to sell, exchange, lease or otherwise transfer any aspect of ownership of the Property with a Buyer who was shown or negotiated to buy the Property during the term of this Contract.  Provided the transaction closes, then Broker's Fee is to be paid at settlement.

In the event that Seller is, by agreement or adjudication, entitled to retain some or all of a Buyer's deposit in connection with a terminated agreement to sell, exchange, lease or otherwise transfer any aspect of ownership of the Property, then Seller will pay to Broker either one half (50%) of the retained deposit money or Broker's Fee, whichever is less.  In the event that Broker is holding said deposit in escrow, then Seller hereby authorizes Broker to retain and apply said deposit on account of this obligation prior to any disbursement to Seller.

In the event that Seller enters into an agreement to lease the Property during the term of this Contract (or within one year of the ending date hereof to a lessee who was introduced to, shown or negotiated to buy or lease the Property during the term of this Contract), then Seller must pay a Leasing Broker's Fee to Broker in the amount of 1/12th of the annualized rent upon commencement of the lease.

In the event that subsequent to the termination of Broker's representation of Seller, Seller enters into an agreement to sell, exchange or otherwise transfer ownership of the Property while Seller is party to a *bona fide* exclusive listing contract with another broker, then Seller will not owe Broker the Broker's Fee.

9.  **Agency Relationships.** An agency relationship between Broker and Seller cannot be presumed.  Seller has the right to be represented by a broker (agency relationship) and may do so by agreeing to the terms of Seller Agency.

> **(a) Dual Agency.** Seller agrees that Broker/Licensee(s) may also represent the Buyer(s) of the Property. Broker/Licensee is a DUAL AGENT when representing both Seller and the buyer in the sale of a property. Seller acknowledges that as a DUAL AGENT, Broker/Licensee will take no action that is adverse or detrimental to either party's interest in a transaction.  Confidential information obtained within the fiduciary relationship of Designated Agency with Seller will not be disclosed without prior written consent.
> **(b) Designated Agency.** Broker will designate licensee(s) to represent the interests of the Seller. Licensee(s) is/are the Designated Agent, who will act exclusively for the Seller.  If Licensee(s) is/are also representing the Buyer(s), then Licensee(s) is/are a DUAL AGENT.
> **(c) Multiple Buyers.**
> 1.  More than one buyer may seek to purchase property through the Broker; it is agreed that Broker may represent those buyers whether such representation arises prior to, during, or after the end of this Contract.  In the event that Broker represents multiple buyers seeking to purchase the same property, **it is agreed that Licensee will disclose to each buyer the existence of the other offer(s).**
>
> 2.  the event a Licensee represents multiple buyers who have competing interests in the same property, **it is agreed that Licensee will disclose to each buyer the existence of the Licensee's other offer.**
>
> *Only at the direction of and with Seller's written instruction during the negotiation of licensees other offer will Broker/Licensee disclose any material terms of any other offer to any buyer.*

Seller agrees to Designated Agency with Disclosed Dual Agency ___*kz*___/_____ (Seller initials)

10.  **Possession.** Seller will give possession of the Property to Buyer at the time of settlement. If the Property is currently rented, a copy of the lease is to be attached to this Contract. Seller will not enter into or renew any lease during the term of this Contract or allow anyone else to occupy the Property.

11.  **Taxes and Association Fees.** Prior to settlement, Seller will provide the title company with the following required information: Real Estate Property Tax Assessment, yearly taxes, trash and sewer fees, wage/income tax rate, per capita tax, and association fees, as applicable.

12.  **Title.** At settlement Seller will give full rights of ownership, free and clear of debt, to Buyer. Seller represents that Seller has or will have sufficient funds to complete settlement and pay all settlement costs. Seller does not need approval from a court, lender or any other person or entity to sell, exchange or otherwise transfer the Property.

___*kz*___ _____ Seller Initials p. 2 of 5

DocuSign Envelope ID: 9E859A61-8907-4828-8D7F-23C55123F4D1

**13. Inclusions.**
Items included in the price of the Property _____

_____

Items rented by Seller _____

_____

**14. Exclusions.**
Items not included in the price of the Property _____

_____

Items rented by Seller _____

_____

**15. Inspection.** Seller will make the Property available for inspection by brokers, licensees, and any potential buyers they may bring, insurance representatives, mortgage lenders, appraisers, municipal officials, surveyors and inspectors provided that an appointment has been made reasonably in advance of inspection.

**16. Limitation of Liability. a.** Seller represents and warrants that reasonable and customary homeowner's property and liability insurance coverage are in full force and effect for the Property and will so remain during the term of this Agreement. In the event that such coverage is cancelled, Seller will immediately notify Broker thereof in writing.

Seller agrees that Broker/Licensee(s) are not responsible for any damage to the Property or any loss or theft of personal goods from the Property unless such damage, loss or theft is solely and directly caused by Broker/Licensee(s).

Seller agrees that Broker's/Licensee's total maximum liability to Seller for any claim arising out of Broker's/Licensee's representation of Seller is limited to a refund of commission which Seller has paid or would otherwise owe under this Contract. Seller shall defend, indemnify and hold harmless Broker/Licensee from any claims, lawsuits or actions arising out of Broker's/Licensee's representation of Seller including, but not limited to, those arising out of the condition of and/or assessments, fines or taxes on the Property and/or failure to provide disclosure thereof, but not including any claims, lawsuits or actions arising out of Broker's/Licensee's negligence or misconduct.

Seller, Broker and Licensee knowingly, voluntarily, and intentionally waive their present or future rights to: (a) a jury trial in any action to resolve any dispute to which Seller, on the one hand, and Broker and/or Licensee, on the other hand, are adverse to each other arising under or relating to this Contract; and/or (b) consolidate or transfer any such action with or to another action where any of them might otherwise be entitled to a jury trial.

**b. Dispute Resolution Procedures.** Seller and Broker/Licensee will submit to mediation all claims, disputes or controversies between Seller and Broker/Licensee that in any way arise from or relate to this Contract and/or and the services, advertising, disclosures, practices and procedures related to the foregoing ("Claim"). Mediation will be conducted in accordance with the mediation system offered or endorsed by the local Association of REALTORS®. Mediation fees charged by the Association or mediator will be paid by Broker/Licensee. The mediation process must be concluded without resolution before either Seller or Broker may initiate legal proceedings. The statute of limitations related to the Claim will be tolled until fourteen calendar days following the conclusion of the mediation process. In the event that mediation is unsuccessful in resolving the claim, dispute or controversy, then the parties hereto agree to be bound by and follow the policies, procedures and limitations set forth in *Arbitration of Certain Disputes and Waiver of Class Actions*, which is fully incorporated herein by reference and which has been received by Seller. _____ (Seller Initials)

**17. Signs and keys – Seller allows:**

Sale sign ☐ Yes ☒ No      Lock box:      Electronic ☐ Yes ☒ No
Sold sign ☐ Yes ☒ No                     Key ☐ Yes ☐ No
                                         Combination ☐ Yes ☐ No
                      Key in office:      ☐ Yes ☐ No

Other _____

**18. Multiple Listing Service (MLS)/Internet Advertising.** Seller authorizes Broker/Licensee to put a description of the Property in the MLS/Internet. Broker/Licensee is not responsible for mistakes in the MLS/Internet. The final sale price for the Property will be reported to MLS at time of settlement.

_____ Seller Initials p. 3 of 5

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026   www.zipLogix.com                    GF2014 LP

DocuSign Envelope ID: 9E859A61-8907-4828-8D7F-23C55123F4D1

**19. Publication of Sale Price.** The final sale price for the Property is a matter of public record beyond the control of Broker/Licensee, and may be published by various media after settlement.

**20. Use of Photographs/Buyer Information.** Seller agrees to allow Broker/Licensee to take interior and exterior photographs of the Property to help market the Property, which photographs remain the property of the Broker/Licensee. Broker/Licensee may make copies of the photographs and include copies of the photographs in the MLS and/or Internet. Seller will not hold Broker/Licensee responsible in any way for using the photographs to help market the Property. Broker/Licensee is not liable for any loss of or damage to the photographs, or any unauthorized use of the photographs by any third party. Any information regarding potential Buyers (sign-in sheets, sales lead tracking, etc.) which comes into Broker's possession as a result of this Listing is and will remain the property of Broker.

**21. Disclosure.** Most sellers of residential property are required by state law to complete a Seller's Property Disclosure Form. Unless exempted by law, Seller will complete this form before Broker/Licensee will list the Property for sale. Seller ALONE is responsible for the accuracy of the information contained in any Seller Property Disclosure Statement.

**22. Deposit Money.** Pursuant to state law, Broker will place all deposit monies it receives into an escrow account, although Seller agrees that Broker may wait to deposit any check received as deposit money until the Seller signs the Agreement of Sale. Broker will only release the deposit monies in connection with final settlement, unless prior to final settlement and while the agreement of sale is still in effect Broker receives a written disbursement directive signed by all Buyers and Sellers.

In the event that final settlement does not occur, state law does not allow a Broker holding deposit monies to determine who is entitled to the deposit monies, regardless of the apparent entitlement thereto. If the agreement of sale is terminated for any reason, Broker can only release the monies:

1. If there is no dispute between Buyers and Sellers over entitlement to the monies.
2. According to the terms of a written agreement signed by Buyers and Sellers directing Broker how to distribute some or all of the monies.
3. According to the terms of a final order of Court.
4. According to the terms of a prior written agreement between Buyer and Seller that directs the Broker how to distribute the deposit monies in the event of an unresolved dispute.
5. By paying the monies into Court and requesting that the Court decide entitlement thereto.

Broker shall have no liability if the monies are released on any of the grounds set forth above. In the event that Seller joins the Broker/Licensee in a lawsuit for the return of the monies, Seller will pay all of Broker's reasonable attorney fees and costs incurred in connection with such litigation.

**23. Services to Buyer.** Broker may provide services to Buyer for which Broker may accept a fee. These services may include financing, title insurance and document preparation. The companies providing the service may be under common control with Broker and the services may be paid for by the Buyer. Broker will disclose to Seller if any such fees are to be paid by Buyer.

**24. Conflict of Interest.** A conflict of interest is when the Broker has a financial or personal interest where Broker cannot put Seller's interest before any other. If Broker or any of Broker's licensees has a conflict of interest, Broker will notify Seller in a timely manner. Disclosed dual agency is not, *per se*, a conflict of interest.

**25. Home Warranties.** A home warranty can help protect you from the cost of a failure in your home's major systems and appliances while your Property is for sale. At settlement, the warranty can be assigned to the Buyer in order to continue the protection subject to the terms of the warranty. Broker's Licensee will provide you with more detailed information about home warranties.

**26. Offer.** All offers to purchase the Property will be made through the Broker/Licensee. All offers received by the Broker/Licensee will be presented to the Seller unless the Seller has already fully executed an Agreement of Sale.

**27. Broker's Fee and Term of Contract.** The terms and length of the business relationship, the fees and the range of services that Broker will provide are determined as a result of negotiations between Broker and Seller and have not been recommended by any association of REALTORS®.

Seller initials p. 4 of 5

**Appx0196**

DocuSign Envelope ID: 9E859A61-8907-4828-8D7F-23C55123F4D1

28. **Transfer of This Contract.** Seller agrees that Broker may transfer this Contract to another real estate broker if: Broker stops doing business; Broker forms a new real estate business; or Broker joins its business with another for any other reason. If transfer occurs, Seller will follow all requirements of this Contract with new Broker. Should Seller give or transfer the Property or an ownership interest in it, to anyone during the term of this Contract, all owners must follow the requirements of this Contract.

29. **Recovery Fund.** Pennsylvania has a Real Estate Recovery Fund to repay any person who has received a final court ruling against a Pennsylvania real estate licensee because of fraud, misrepresentation, or deceit in a real estate transaction. The Fund repays persons who have not been able to collect the judgment after trying all lawful ways to do so. For complete details about the Fund, call (717) 783-3658.

30. **Notice to Persons Offering to Solicit or Rent Housing in Pennsylvania.** Federal and State law makes it illegal for a seller, a broker, or anyone to use RACE, COLOR, RELIGION OR RELIGIOUS CREED, SEX, NATIONAL ORIGIN, HANDICAP OR DISABILITY physical or mental), FAMILIAL STATUS (children under 18 years of age), AGE (40 or older), USE, HANDLING, or TRAINING OF SUPPORT OR GUIDE ANIMALS, or the FACT OF RELATIONSHIP OR ASSOCIATION WITH AN INDIVIDUAL KNOWN TO HAVE A DISABILITY as reasons for refusing to sell, show, or rent properties, loan money, or set deposit amounts, or as reasons for any decision relating to the sale or rental of property.

31. **Entire Contract.** This Listing Contract constitutes the entire agreement between the parties and any prior contracts, whether written or oral, have been merged and integrated into this Contract. All modifications to and/or terminations of this Contract are binding only when in writing and signed by all Sellers and Broker/Licensee.

32. **Confidential Information.** After the termination of this Contract, Broker/Licensee is obligated to keep confidential any confidential information provided by Seller during the term of this Contract, subject to the laws of the Commonwealth of Pennsylvania.

33. **Consumer Notice.** Seller acknowledges that Seller has received and understands the business relationships described in the **Consumer Notice adopted by the Pennsylvania Real Estate Commission at 49 Pa. Code §35.336. The duties and definitions of business relationships stated therein, are incorporated here as part of this Listing Contract as though written here in their entirety.**

34. **Additional Terms and Conditions.** Commission is five percent (5%)

_____

_____

_____

### IF YOU DO NOT UNDERSTAND ALL OF THE TERMS OF THIS DOCUMENT, THEN YOU SHOULD SEEK LEGAL ADVICE BEFORE SIGNING IT

All Sellers must sign this Contract.

SELLER _Joe Grasso (GF2014 LP)_____ DATE 7/13/2017 | 10:00 AM EDT

   Joe Grasso (GF2014 LP)

SELLER _____ DATE _____

SELLER _____ DATE _____

ACCEPTED ON BEHALF OF BROKER, FOX & ROACH LP d/b/a BERKSHIRE HATHAWAY HOME SERVICES FOX & ROACH, REALTORS® BY;

_____ DATE _____
Designated Licensee & License Number
BHHS Fox Roach Haverford

_____ DATE _____
Additional Designated Licensee & License Number

© Fox & Roach, LP, An independently operated subsidiary of HomeServices of America, Inc., a Berkshire Hathaway affiliate, and a franchisee of BHH Affiliates, LLC. Berkshire Hathaway HomeServices and the Berkshire Hathaway HomeServices symbol are registered service marks of HomeServices of America, Inc.® Equal Housing Opportunity.        BHHS 03/2017

Appx0197



2017-02140-0038  11/4/2021 11:17 AM  # 13309448
Rcpt#S4160539  Fee:$0.00  Order - Other
Main (Public)
MontCo Prothonotary

Case# 2017-02140-29 Docketed at Montgomery County Prothonotary on 09/29/2021 12:53 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

MARSHALL J. KATZ,
**Plaintiff,**

v.

JOSEPH GRASSO,
**Defendant.**

COURT OF COMMON PLEAS
MONTGOMERY COUNTY,
PENNSYLVANIA

Case No. 2017-02140

## ORDER

AND NOW, this ____ day of ___NOV.___, 2021, after consideration of Plaintiff Marshall J. Katz's Motion to Compel Clarke & Cohen's Deposition and any response thereto, it is hereby **ORDERED** that the Motion to Compel is **GRANTED**, and it is **FURTHER ORDERED** that Clarke & Cohen shall produce all relevant and responsive documents to Plaintiff's Subpoena within ten (10) days of the date of this Order and shall appear for its deposition at a date, time, and location acceptable to Plaintiff within fifteen (15) days of the date of this Order.

~~It is FURTHER ORDERED that Clarke & Cohen shall pay Plaintiff $500.00 for attorney's fees and costs incurred in preparing this Motion.~~

BY THE COURT:

_Bernard A. Moore_
, J.

RULE 236 NOTICE PROVIDED ON 11/04/2021

**EXHIBIT 8**

Appx0198

**MITTS LAW, LLC**
Maurice R. Mitts, Esquire
Attorney I.D. No. 50297
1822 Spruce Street                                    *Attorney for Defendant*
Philadelphia, PA 19103                                *Joseph Grasso*
(215) 866-0112 (telephone)
(215) 866-0113 (facsimile)

_____

|                          |   |                                  |
|--------------------------|---|----------------------------------|
| MARSHALL KATZ,           | : | COURT OF COMMON PLEAS OF         |
|                          | : | MONTGOMERY COUNTY                |
| Plaintiff,               | : |                                  |
|                          | : | Case No. 2017-02140              |
| v.                       | : |                                  |
|                          | : |                                  |
| JOSEPH GRASSO,           | : |                                  |
|                          | : |                                  |
| Defendant.               | : |                                  |

_____

**AMENDED OBJECTIONS AND ANSWERS OF DEFENDANT JOSEPH GRASSO
TO PLAINTIFF MARSHALL KATZ'S FIRST POSTJUDGMENT
INTERROGATORIES ADDRESSED TO DEFENDANT JOSEPH GRASSO**

Pursuant to the Pennsylvania Rules of Civil Procedure, Defendant Joseph Grasso ("Mr.

Grasso"), by and through his undersigned counsel, Mitts Law, LLC, hereby provides the following

amended objections and answers (the "Answers") to the First Postjudgment Interrogatories (each,

an "Interrogatory") of Plaintiff Marshall Katz ("Plaintiff").

## GENERAL OBJECTIONS

1.      Each of Mr. Grasso's Answers set forth below, in addition to any specifically stated

objections, is subject to and incorporates the following General Objections. The assertion of the

same, similar or additional objections, or a partial response to any individual Interrogatory does

not waive any of Mr. Grasso's General Objections.

2.      The following Answers reflect the current state of Mr. Grasso's knowledge and

understanding respecting matters about which reasonable inquiry has been made. Mr. Grasso

**EXHIBIT
9**

expressly reserves his right to supplement or modify these Answers with such pertinent information as he may hereafter discover and will do so to the extent required by the Pennsylvania Rules of Civil Procedure, the Local Rules of this Court and any other applicable rule or law.

3. Mr. Grasso objects to any Interrogatory to the extent that it seeks information concerning communications between Mr. Grasso and his counsel that are protected by the attorney-client privilege.

4. Mr. Grasso objects to any Interrogatory to the extent that it seeks information prepared in anticipation of, or as a result of, litigation or which is otherwise protected by the work-product doctrine, or any other available privilege, protection or immunity.

5. The inadvertent disclosure by Mr. Grasso of communications or information protected from discovery by the attorney-client privilege, work-product doctrine, or any other applicable privilege, protection or immunity, shall not constitute a waiver of such privileges, protections or immunities with respect to those communications or information. In the event that inadvertent disclosure occurs, Plaintiff shall make no use of the contents thereof, nor premise any further discovery on information learned therefrom.

6. Mr. Grasso objects to the Interrogatories, including the Definitions and Instructions, to the extent that that they seek to impose upon Mr. Grasso any obligation beyond those imposed by the Pennsylvania Rules of Civil Procedure, the Local Rules of this Court or any other applicable rule or law.

7. Mr. Grasso objects to the Interrogatories to the extent that the Interrogatories are overbroad, unduly burdensome, duplicative, vague, ambiguous, confusing, require speculation to determine their meaning or use imprecise specifications of the information sought.

8. Mr. Grasso objects to the Interrogatories to the extent they are not reasonably

Appx0200

limited in time and, for each and every such Interrogatory, Mr. Grasso's Answer and, to the extent, if any, Mr. Grasso makes a responsive production, such production, shall date back to the entry of the foreign judgment in Cook County, Illinois on November 15, 2016, beyond which Plaintiff has no basis for requesting, or right to obtain, documents, things or information.

9.      Mr. Grasso objects to the extent certain Interrogatory seek documents, things or information related to transactions of unreasonably low values, such as $100 or $250, over periods of many years.  For each and every such Interrogatory, Mr. Grasso's Answer shall relate to transactions of $2,500 and above.

10.     Mr. Grasso objects to the Interrogatories to the extent that the Interrogatories seek documents, things or information related to assets held as tenants by the entireties with Mr. Grasso's wife, and are exempt from execution as a matter of law.

11.     Mr. Grasso objects to the Interrogatories to the extent that the Interrogatories seek documents, things or information related to third parties, including but not limited to Mr. Grasso's wife and father, brother, and are not reasonably calculated to lead to the discovery of information concerning Mr. Grasso's assets.

12.     Mr. Grasso objects to the Interrogatories to the extent they relate to communications and information protected by the attorney-client privilege, the work product doctrine, the joint defense privilege or any other applicable privilege, protection or immunity.

13.     Mr. Grasso objects to the Interrogatories to the extent they relate to communications and information protected by spousal privilege, confidential spousal communications or any other applicable privilege, protection or immunity.

14.     Production of an unprivileged communication that was transmitted between individuals otherwise entitled to privileged communications does not constitute a waiver of the

Appx0201

privilege.

15.     Mr. Grasso objects to the Interrogatories to the extent that the Interrogatories seek information that is already in Plaintiff's possession and/or is as readily available to Plaintiff as it is to Mr. Grasso.

16.     None of the objections or answers contained herein is an admission concerning the existence of any information, the relevance or admissibility of any information contained herein, or the truth or accuracy of any statement or characterization contained in the Interrogatories.  Mr. Grasso's Answers are made without waiving but, on the contrary, expressly reserving: (a) the right to object, on the grounds of competency, privilege, relevancy, materiality or any other proper grounds, to the use of the information contained in the Answers, in whole or in part, in any subsequent proceeding in this action or any other action; (b) the right to object on any and all grounds, at any time, to other interrogatories or other discovery procedures involving or relating to the subject matter of these Interrogatories; and (c) the right at any time to revise, correct, add or clarify any of the answers or objections provided herein.

17.     Mr. Grasso's objections and answers are made without prejudice to Mr. Grasso's right to introduce in the future any and all evidence of any kind in this matter.  Further, Mr. Grasso reserves the right to introduce, in the future, evidence from any witness in this matter even if that evidence was not provided in response to these Interrogatories due to mistake, oversight, inadvertence, misinterpretation or otherwise.  Moreover, a response to any of these Interrogatories does not constitute an admission by Mr. Grasso that he agrees with any of Plaintiff's characterizations or definitions contained therein, or that the information sought is likely to lead to the discovery of admissible evidence.  Except for facts explicitly admitted herein, no admission of any nature whatsoever is to be implied by or inferred from any statement anywhere in these

Appx0202

objections and answers.

18.     Mr. Grasso's failure to raise a specific objection to any Interrogatory does not constitute a waiver of that objection or privilege claim.

19.     Mr. Grasso expressly reserves the right to enter supplemental objections and responses.

20.     Unless otherwise indicated, Mr. Grasso will not provide any documents, things or information in response to any Interrogatory to the extent that such information is subject to his General Objections or his specific objections set forth below.

21.     Mr. Grasso incorporates each and every General Objection into each and every of his specific Answers below as if each and every General Objection were set forth at length therein.

## ANSWERS AND SPECIFIC OBJECTIONS TO INTERROGATORIES

1.     State Your Social Security number.

**ANSWER**:  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.


2.     State Your date and place of birth.

**ANSWER**: Mr. Grasso objects to this Interrogatory on the basis that it is not reasonably calculated to lead to the discovery of Mr. Grasso's assets.


3.     State Your Pennsylvania and any other state motor vehicle operator's license number(s).

**ANSWER**: Mr. Grasso will produce documents responsive to this Interrogatory.


4.     Identify each of Your telephone numbers (including home, work and mobile).

Appx0203

**ANSWER**:  215-680-6800 (Mobile) 215-701-1000 (Office).


5.      Identify each email address that You have access to for sending or receiving emails.

**ANSWER**: jgrasso@walnutstcapital.com; jgrasso@ironhillcompany.com.


6.      Identify the username, phone number and/or email address for any social media account, including but not limited to, Facebook, YouTube, Twitter, Instagram, Reddit, VK, Tumblr, Pinterest, Google+, LinkedIn, Snapchat, and TikTok, You have used in the past five years.

**ANSWER**: None.


7.      Identify each of Your children setting forth their birthdates, their current addresses, telephone numbers and email addresses.

**ANSWER**: Mr. Grasso objects to this Interrogatory on the basis that it is not reasonably calculated to lead to the discovery of Mr. Grasso's assets.  Mr. Grasso further objects to this Interrogatory on the basis that it seeks to impose unfair and unreasonable annoyance, embarrassment, oppression, burden or expense and is overly broad, unduly burdensome and is sought in bad faith.


8.      Do You now hold or have you ever held any professional licenses? If yes, identify each such license, including the profession, the state that issued the license, the date the license was first issued, and whether the license is current.

**ANSWER**: Mr. Grasso held a real estate salesperson license which expired many years ago.


9.      Identify each accountant or other financial professional that you have used to

Appx0204

prepare your personal income tax returns or otherwise employed in the past six years.

**ANSWER**: None.


10.    Identify each attorney that you have engaged and/or paid for legal services in the

past six years.

**ANSWER**: Mr. Grasso objects to this Interrogatory on the basis that it is not reasonably calculated

to lead to the discovery of Mr. Grasso's assets.  Mr. Grasso further objects to this Interrogatory on

the basis that it seeks to impose unfair and unreasonable annoyance, embarrassment, oppression,

burden or expense and is overly broad, unduly burdensome and is sought in bad faith.  Subject to,

and without waiver of, the foregoing general and specific objections, Mr. Grasso has engaged Mitts

Law, LLC, John Gagliardi, Giel Stein, William Zieske, Paul Winterhalter and Daniel Hogan.


11.    State the address at which You currently live and identify how long you have lived

there.

**ANSWER**: 373 Righters Mill Rd., Gladwyne, PA 19035 for approximately three years.


12.    Identify all other addresses where You have lived in the past five years, the dates

You lived at each address, and whether You owned those properties. If You did not own the

property, identify (a) the name of the property owner, and (b) the amount of rent you paid, if any,

per month for each property.

**ANSWER**: 373 Righters Mill Rd., Gladwyne, PA 19035, approximately three years, prior to that,

300 Conshohocken State Rd., Gladwyne, PA 19035 for approximately one year, prior to that, 649

Dodds Ln., Gladwyne, PA 19035 for over ten years.

Appx0205

13.     Do You have any ownership interest or other interest in any real estate anywhere in the World? If yes, describe the same.

**ANSWER**: Yes, 631 E. Elm St., Conshohocken, PA 19428 and 735 E. Hector St., Conshohocken, PA 19428.By way of further response, Mr. Grasso previously executed documents intended to transfer ownership of the properties to Mr. Grasso and his wife as tenants by the entireties.

14.     In the six years preceding the date of these interrogatories, have You transferred any interest in real property either by sale, gift, exchange, or otherwise? If yes, please identify,

    a.    The real property transferred;

    b.    the method or manner of transfer;

    c.    the name of the person, firm, or other entity to whom the real property was transferred;

    d.    The consideration or amount You received for the transfer;

    e.    The time and place of the transfer; and,

    f.    A verbatim detail the content of each document pertaining to said transaction, e.g., deed, mortgage, lease, title report, agreement of sale, judgment, writ of execution, release, or statement. (You may attach copies in lieu of response.)

**ANSWER**: Mr. Grasso and his wife, as tenants by the entireties, owned 649 Dodds Ln., Gladwyne, PA 19035, which ownership was transferred by sheriff's deed to GF 2014, L.P., on December 7, 2016.

15.     Is any of Your real or personal property rented to, leased to, or otherwise in

Appx0206

possession of a third person? If yes, please identify:

    a. The property;

    b. The person who has possession of the property;

    c. The circumstances and reason why the property is in the possession of the third person;

    d. The consideration or payment You receive(d);

    e. The name and address of the person or entity who receives rents or other consideration on behalf of You relative to the foregoing; and,

    f. A verbatim description of all receipts, statements, correspondence, and e-mails You sent and received relative to all of the foregoing. (You may attach copies in lieu of response.)

**ANSWER**: Real property at 631 E. Elm St., Conshohocken, PA 19428 is in the possession of Miguel A. Sigala and Gloria Solorzano-Eustacio and their children. There is no written or formal lease and rent is not paid. Ms. Solorzano-Eustacio occasionally performs cleaning services for the Grassos. Real property at 735 E. Hector St., Conshohocken, PA 19428 was previously in the possession of Gregory Horshaw, but is presently vacant and has been vacant for an extended period of time and is unlivable. Both properties are collateral to secured debt obligations of Mr. Grasso.

16.    State whether in the past six years You have been involved in any agreements involving real estate, regardless of whether such an agreement ever closed. If so, identify,

    a. Every party to such an agreement;

    b. The real property that was the subject of the agreement;

    c. The date of the agreement;

Appx0207

d. The terms of the agreement;

e. The state and county of recordation, with volume and page numbers, if the agreement was recorded; and

f. All receipts, statements, correspondence, and e-mails You sent and received related to or concerning all of the foregoing. (You may attach copies in lieu of response.).

**ANSWER**: Mr. Grasso and his wife, in their capacity as tenants by the entireties limited partners in GF 2014 L.P., were involved in a potential transaction with respect to 817 Muirfield Road, Bryn Mawr, PA 19010, in or around early 2020, which potential transaction was terminated shortly thereafter. Mr. Grasso previously held a partnership interest in a limited partnership, Spring-Pac Associate, L.P., which owned real property, a vacant lot, at 1019 Buttonwood Street, Philadelphia, Pennsylvania 19123, which property was sold at sheriff's sale for unpaid real estate taxes in 2018 and resulted in net proceeds of approximately $98,000, of which Mr. Grasso received a portion.

17. State whether or not You are the owner, policy holder, or beneficiary of any casualty, professional or other liability, health, life, disability, or other insurance. If so, for each policy identify:

a. The persons or entities who are so insured;

b. The serial or policy number or numbers of said contracts;

c. The face amount of the policy or contract;

d. The exact name and address of the insurance companies who issued the policy;

e. The named beneficiary or beneficiaries, and their present address(es);

f. The name of anyone who jointly owns the insurance policy;

g. Any cash value of the policy;

Appx0208

h.  The amount, if any, of any existing loans against such policies;

i.  All claims now pending, or that may be made against the policy and the estimated value of the same

j.  The contents of each said policy;

k.  The receipts, statements, correspondence, and e-mails You sent and received relative to all of the foregoing in the past four years. (You may attach copies in lieu of response.)

**ANSWER**: Mr. Grasso is covered by a vehicle insurance policy for the vehicles he drives owned by Iron Hill Co.


18.     State whether or not You own individually, or jointly, any corporate or government bonds or other securities. If so, for each security identify,

a.   The face amount;

b.  The serial numbers;

c.  The maturity date(s);

d.  The present location of the security;

e.  Any broker, brokerage, or other facility that maintains an account for the security;

f.  Any person who jointly owns the security;

g.  All receipts, statements, correspondence, and e-mails you sent and received relative to all of the foregoing in the past four years. (You may attach copies in lieu of response.)

**ANSWER**: No.

Appx0209

19.    Do You have any ownership or other interest, whether individually or jointly, in any stocks, shares, bonds, or interest in any corporation, unincorporated association, limited or general partnership, or limited liability company, or other entity. If yes, for each, identify:

a. The name, registered address, and state of incorporation or registration for the entity;

b. Your ownership interest (including number of shares and percentage of interest) in the entity;

c. The date you acquired Your interest.

d. The names and address of the other owners and their respectful interest in the entity;

e. The entity's officers, managers and/or other control persons;

f. The entity's principal place of business;

g. A description of the entity's business;

h. The name, address and telephone number of the person in charge of the entity's books and records;

i. The name of any joint owner of Your interest; and,

j. The consideration paid by the joint owner for their ownership interest.

**ANSWER**: Mr. Grasso and his wife, as tenants by the entireties, are limited partners in GF 2014, L.P., a Pennsylvania limited partnership with a principal place of business located at 120 East Lancaster Avenue, Ardmore, PA 19003, in which Michael Grasso is the general partner.   Mr. Grasso and his wife, as tenants by the entireties, are shareholders with a 70% ownership interest in Positive Dining Experience, Inc., d/b/a The Palace Bowling & Entertainment, located at 977 East Lancaster Avenue, Downingtown, PA 19335.

12

20.     State whether or not You maintain any checking, savings, or other depository accounts. If so, for each account identify,

    a.   The depository institution;

    b.   The branch or branches thereof that You customarily use in connection with the account;

    c.   The identification numbers of the account;

    d.   The amount in the account as of December 31, 2020;

    e.   The amount in the account at the time of answering these interrogatories;

    f.   Any joint owner of the account; and,

    g.   All receipts, statements, correspondence, and e-mails you sent and received relative to all of the foregoing in the past four years. (You may attach copies in lieu of response.)

**ANSWER**: No.


21.     Identify all persons whom You believe owe You money or other obligations, describing in detail the nature of the obligation, the terms of any payment, or values due to You thereunder, and whether or not You have written evidence of the obligation, and if so, the location thereof. Set forth the contents of each said agreement in verbatim detail, whether oral or written. (You may attach copies in lieu of response, to the extent that they are written.) Also state if the matter is in litigation, and if so, give full details. If You hold mortgages or judgments as security for any of these debts, state where and when such was recorded or entered, and the county, book, page number, and term where recorded. If You hold this judgment or mortgage jointly with any other person or persons, identify them. Describe in verbatim detail, receipts, statements,

Appx0211

correspondence, and e-mails You sent and received relative to all of the foregoing in the past four years. (You may attach copies in lieu of response.)

**ANSWER**: None.

22.     Identify every account (not previously noted before), titled in Your name in which You have an interest in whole or part, whether or not styled as a payroll account, individual retirement account, tax account, lottery account, partnership account, joint or tenants by the entirety account, insurance account, trust or escrow account, attorney's account or otherwise.

**ANSWER**: None.

23.     Are You the signatory for any account (not fully identified in Your answer to any of the proceeding interrogatories), regardless of whether You have an interest in such an account, whether or not styled as a checking, savings, or other depository accounts, payroll account, individual retirement account, tax account, lottery account, partnership account, joint or tenants by the entirety account, insurance account, trust or escrow account, attorney's account or otherwise. If yes, for each such account identify,

   a.  The name of the account holder(s);

   b.  The depository institution;

   c.  The branch or branches thereof that the You customarily use;

   d.  The identification numbers of the account;

   e.  The amount or amounts in each account at the time of answering these interrogatories; and

   f.  All receipts, statements, correspondence, and e-mails you sent and received relative

Appx0212

to all of the foregoing in the past four years. (You may attach copies in lieu of response.)

**ANSWER**: None.


24.    Do You own or have interest in any tangible personal property (including, but not limited to, machinery, equipment, inventory, furniture, fixtures, furnishings, and jewelry)? If yes, for each piece of tangible personal property identify,

    a.    The property, setting forth the full value of each and their present location;

    b.    Whether there are any encumbrances or liens on that property and, if so, the name and address of the encumbrance or lien holder, the present balance owing on that encumbrance, and the transaction that gave rise to the existence of the encumbrance and how the same was perfected and where and when the encumbrance or lien was recorded;

    c.    Any joint owner of the property;

    d.    All receipts, statements, correspondence, and e-mails You sent and received relative to all of the foregoing. (You may attach copies in lieu of response.)

**ANSWER**: Mr. Grasso owns used furniture, clothing and a watch.


25.    Do You own or have any rights or usage privileges relative to any motor vehicles, boats, or airplanes? If yes, for each such motor vehicle, boat, or airplane, identify:

    a.    The motor vehicle, boat or airplane, including color, model, title number, serial number, and registration plate or other number;

    b.    The person or entities to which each motor vehicle, boat, or airplane is registered;

Appx0213

    c.   The purchase price and purchase date of the motor vehicle, boat or airplane;

    d.   The present value of the motor vehicle, boat, or airplane;

    e.   The present location and place of regular storage, garaging, parking, or docking of the motor vehicle, boat or airplane;

    f.   Whether there are any encumbrances on the motor vehicle, boat, or airplane and, if so, the name and address of the encumbrance holder, the date of the encumbrance, the original amount of that encumbrance, the present balance of the encumbrance, and the transaction that gave rise to the existence of the encumbrance, and also provide a motor vehicle, boat, or airplane description of how the same was perfected;

    g.   If You do not own the motor vehicle boat, or airplane, state the extent of Your rights or privileges in and to such vehicles or boats

    h.   All receipts, statements, correspondence, and e-mails You sent and received relative to all of the foregoing. (You may attach copies in lieu of response.)

**ANSWER**: Mr. Grasso objects to this Interrogatory on the basis that, to the extent it requests an answer related to "any rights or usage privileges," it is not reasonably calculated to lead to the discovery of Mr. Grasso's assets. Mr. Grasso further objects to this Interrogatory to the extent it requests an answer related to "any rights or usage privileges," it is vague, ambiguous, and/or unanswerable. Subject to and without waiver of, the foregoing general and specific objections, Mr. Grasso is permitted to use the vehicles of Iron Hill Company.

    26.    State whether or not You maintain any safety deposit box or boxes. If so, then for each box identify,

    a. The institution and branch where the box is located;

    b. The identification number or other designation of the box;

    c. The contents of the box, including the amount of cash and the descriptions and values of any jewelry among those contents;

    d. Any person with joint access to the box;

    e. All receipts, statements, correspondence, and e-mails You sent and received relative to all of the foregoing. (You may attach copies in lieu of response.)

**ANSWER**: No.


27. Describe the nature and substance of every legal claim, chosen action, and other intangible personal property in which You have an interest to the extent not addressed in response to the above interrogatories. Describe in verbatim detail, receipts, statements, correspondence, and e-mails you sent and received relative to all of the foregoing. (You may attach copies in lieu of response.)

**ANSWER**: None.


28. In the preceding six years, have You transferred any assets (real property, tangible or intangible personal property) to any person or entity, which transfer was not disclosed in Your answers to any of preceding interrogatories? If yes, for each asset You transferred assets valued at more than $250.00 (including cash money), identify:

    a. The specific asset that was transferred;

    b. The type of transaction;

    c. Each transferee or recipient of the asset;

   d.  All receipts, statements, correspondence, and e-mails You sent and received

   relative to all of the foregoing. (You may attach copies in lieu of response.)

**ANSWER**: Mr. Grasso's compensation has been used to pay certain expenses of his wife, Donna

Grasso.  Mr. Grasso has paid for certain expenses for the real property located at 649 Dodds Ln.,

Gladwyne, PA 19035, owned by GF 2014, LP.

   29.   If You have any assets, claims, or accounts receivables that are not disclosed in the

preceding interrogatories, please set forth all details concerning the same. Describe in verbatim

detail, receipts, statements, correspondence, and e-mails You sent and received relative to all of

the foregoing. (You may attach copies in lieu of response.)

**ANSWER**: None.

   30.   State whether You are an officer, manager or employee of any entity? If yes,

identify the entity, its address, its telephone number, its website, the name(s) of its owners and

Your Position or Title.

**ANSWER**: Mr. Grasso objects to this Interrogatory on the basis that it is not reasonably calculated

to lead to the discovery of Mr. Grasso's assets.  Mr. Grasso further objects to this Interrogatory on

the basis that it seeks to impose unfair and unreasonable annoyance, embarrassment, oppression,

burden or expense and is overly broad, unduly burdensome and is sought in bad faith.  Subject to

and without waiver of, the foregoing general and specific objections, Mr. Grasso is the President

of Iron Hill Company, an entity 100% owned by Melissa Grasso.

   31.   Identify each person You have worked for in the past six years, regardless of

Appx0216

whether they paid You any compensation.

**ANSWER**: Mr. Grasso has worked for Iron Hill Company without a salary, receiving reimbursement for living and travel expenses.

32.    Identify each person who has provided You with $100 or more in compensation within the past six years, including (a) the amount of compensation paid, (b) when the compensation was paid, (c) the address of the person making the payment and (d) the reason for the compensation.

**ANSWER**: Mr. Grasso has received reimbursement for living and travel expenses from Iron Hill Company.

33.    State whether You have any employment agreements, whether oral or written or partly oral or partly written. If so, identify

     a.    The parties to any such agreement;

     b.    The persons who make and/or signed the agreement;

     c.    The terms of the agreement;

     d.    The date of the agreement; and,

     e.    All receipts, statements, correspondence, and e-mails You sent and received relative to all of the foregoing. (You may attach copies in lieu of response.).

**ANSWER**: No.

34.    Identify any other source of income You have received within the past six years, including the amount of income received, when You received the income, the basis for the income

Appx0217

and the name and address of person providing the income.

**ANSWER**: Mr. Grasso and his wife, as tenants by the entireties, receive $4,000 per month from GF 2014, L.P.

35.    Identify each credit card that You have used in the past six years, including the name on the credit card, the credit card number, issuer of the credit card, the billing address for the credit card, the person legally responsible for paying the credit card, the credit limit on the credit card and the balance owed on the credit card.

**ANSWER**: Mr. Grasso has credit cards with Credit One Bank and Open Sky, statements for which are being produced by Mr. Grasso.

36.    Do You owe money to anyone? If yes, identify the person You owe money to, whether Your debt has been reduced to writing, whether the debt is secured, the date the debt arose, the reason for the debt, the original amount of the debt, the terms, if any, of the debt and the date and amount of every payment You have made on such a debt.

**ANSWER**: To the extent the debt is undisputed and not satisfied by the distributions of the bankruptcy trustee, Mr. Grasso's creditors are listed on Mr. Grasso's schedules filed with the United States Bankruptcy Court of the Eastern District of Pennsylvania, case no. 12-11063-mdc.

37.    For Have You personally been sued for any reasons in the past six years? If yes, identify the person who sued You, the name of the court where the lawsuit was filed, the identity of each parties to the lawsuit, and the case/docket number of the case.

**ANSWER**: In addition to the present litigation, Mr. Grasso has been sued by Toby Katz in the

Appx0218

United States District Court for the Eastern District of Pennsylvania, civil action no. 2:20-cv-06320-CMR.

**MITTS LAW, LLC**

*/s/ Maurice R. Mitts*

Maurice R. Mitts, Esquire
Attorney I.D. No.: 50297
1822 Spruce Street
Philadelphia, PA 19103
(215) 866-0110 (telephone)
(215) 866-0111 (facsimile)
*Attorney for Defendant*
*Joseph Grasso*

21

## **VERIFICATION**

I, Joseph Grasso, and hereby verify that the Answers set forth in the foregoing Objections

and Answers of Defendant Joseph Grasso to Plaintiff Marshall Katz's First Postjudgment

Interrogatories are true and correct to the best of my knowledge, information and belief.  This

Verification is given subject to the penalties of 18 Pa. C.S. § 4904, relating to unsworn

falsification to authorities.


Date: April 23 , 2021                                    Joseph Grasso

**CERTIFICATE OF SERVICE**

I, Maurice R. Mitts, Esquire, hereby certify that the foregoing Amended Objections and Answers of Defendant Joseph Grasso to Plaintiff Marshall Katz's First Postjudgment Interrogatories was served on the following via electronic mail, in accordance with the applicable Pennsylvania and Local Rules of Civil Procedure, on the date indicated below:

David Dormont, Esq.
Montgomery McCracken Walker & Rhoads LLP
1735 Market Street, 21st Floor
Philadelphia, PA 19103
ddormont@mmwr.com
*Attorneys for Plaintiff*

/s/ Maurice R. Mitts
Maurice R. Mitts

Dated:  April 23, 2021

Appx0221

dotloop signature verification: dtlp.us/enFs-c0lB-SYRL
DocuSign Envelope ID: 29A092B2-D586-497A-BCC2-9CA5E93BD918

Case 2:21-cv-05472-CMR   Document 10-13   Filed 01/25/22   Page 1 of 14

## STANDARD AGREEMENT FOR THE SALE OF REAL ESTATE          ASR

This form recommended and approved for, but not restricted to use by, the members of the Pennsylvania Association of Realtors® (PAR)

### PARTIES

| | |
|---|---|
| **BUYER(S): GF2014LP** | **SELLER(S):  Joseph Soffer**<br>**Cheryl Soffer** |
| **BUYER'S MAILING ADDRESS:**<br>**120 E. Lancaster Avenue Suite 101**<br>**Ardmore, PA 19003** | **SELLER'S MAILING ADDRESS:**<br>**817 Muirfield Rd.**<br>**Bryn Mawr** |

### PROPERTY

ADDRESS (including postal city) **817 Muirfield Rd.**

ZIP **19010-1940** ,

in the municipality of **Bryn Mawr** , County of **MONTGOMERY** ,

in the School District of **LOWER MERION** , in the Commonwealth of Pennsylvania.

Tax ID #(s): **40-00-42144-008** and/or

Identification (e.g., Parcel #; Lot, Block; Deed Book, Page, Recording Date):

### BUYER'S RELATIONSHIP WITH PA LICENSED BROKER

☐ **No Business Relationship (Buyer is not represented by a broker)**

Broker (Company) **Berkshire Hathaway Home Services Fox and Roach**

Company License # **RB061717C**

Company Address **338 Lancaster Ave, Haverford, PA 19041-1309**

Company Phone

Company Fax **(610)649-4500**

Broker is (check only one):
- [X] Buyer Agent (Broker represents Buyer only)
- [ ] Dual Agent (See Dual and/or Designated Agent box below)

Licensee(s) (Name) **Lynn and Harris Berger**

State License # **AB065588**

Direct Phone(s) **(610)658-5464**

Cell Phone(s) **(610)420-3904**

Email **LYNN.BERGER@FOXROACH.COM**

Licensee(s) is (check only one):
- [ ] Buyer Agent (all company licensees represent Buyer)
- [X] Buyer Agent with Designated Agency (only Licensee(s) named above represent Buyer)
- [ ] Dual Agent (See Dual and/or Designated Agent box below)

☐ Transaction Licensee (Broker and Licensee(s) provide real estate services but do not represent Buyer)

### SELLER'S RELATIONSHIP WITH PA LICENSED BROKER

☐ **No Business Relationship (Seller is not represented by a broker)**

Broker (Company)  **Keller Williams Philadelphia**

Company License # **RB068858**

Company Address **1619 Walnut St. Fl. 5, Phila, PA  19103**

Company Phone **(215)627-3500**

Company Fax

Broker is (check only one):
- [X] Seller Agent (Broker represents Seller only)
- [ ] Dual Agent (See Dual and/or Designated Agent box below)

Licensee(s) (Name) **Andrea Desy**
**Paul Colletti**

State License # **RS279858**

Direct Phone(s)

Cell Phone(s) **(215)627-3500**

Email andrea@blacklabelkw.com/paul@blacklabelkw.com

Licensee(s) is (check only one):
- [ ] Seller Agent (all company licensees represent Seller)
- [X] Seller Agent with Designated Agency (only Licensee(s) named above represent Seller)
- [ ] Dual Agent (See Dual and/or Designated Agent box below)

☐ Transaction Licensee (Broker and Licensee(s) provide real estate services but do not represent Seller)

### DUAL AND/OR DESIGNATED AGENCY

A Broker is a Dual Agent when a Broker represents both Buyer and Seller in the same transaction. A Licensee is a Dual Agent when a Licensee represents Buyer and Seller in the same transaction. All of Broker's licensees are also Dual Agents UNLESS there are separate Designated Agents for Buyer and Seller. If the same Licensee is designated for Buyer and Seller, the Licensee is a Dual Agent.

**By signing this Agreement, Buyer and Seller each acknowledge having been previously informed of, and consented to, dual agency, if applicable.**

Buyer Initials: _____   ASR Page 1 of 14   Seller Initials: [CS] [JS]

02/20/20   02/20/20
7:11 PM EST   7:06 PM EST
dotloop verified   dotloop verified

Pennsylvania Association of Realtors®

COPYRIGHT PENNSYLVANIA ASSOCIATION OF REALTORS® 2020
rev. 11/19; rel. 1/20

BBHS - Fox & Roach REALTORS - Haverford Home Marketing Center, 338 West Lancaster Ave   Haverford PA 19041      Phone: (610)649-4500      Fax: (610)649-5020      817 Muirfield Rd
Lynn Berger
Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026   www.zipLogix.com

EXHIBIT
KATZ 74

EXHIBIT
10

GRASSO002870

Appx0222

dotloop signature verification: dtlp.us/enFs-c0lB-SYKL
DocuSign Envelope ID: 28A092B3-D566-497A-9CC2-3CA5F038D043

1  **1.** **By this Agreement**, dated February 17, 2020
2  Seller hereby agrees to sell and convey to Buyer, who agrees to purchase, the identified Property.
3  **2.** **PURCHASE PRICE AND DEPOSITS (4-14)**
4  (A) Purchase Price $ **2,460,000.00**
5  (**Two Million, Four Hundred Sixty Thousand**
6  U.S. Dollars), to be paid by Buyer as follows:
7  1.  Initial Deposit, within **1** days (5 if not specified) of Execution Date,
8  if not included with this Agreement:                                    $                           **200,000.00**
9  2.  Additional Deposit within _____ days of the Execution Date:          $
10 3.  _____                      $
11 Remaining balance will be paid at settlement.
12 (B) **All funds paid by Buyer, including deposits, will be paid by check, cashier's check or wired funds. All funds paid by Buyer**
13 **within 30 days of settlement, including funds paid at settlement, will be by cashier's check or wired funds, but not by per-**
14 **sonal check.**
15 (C) Deposits, regardless of the form of payment, will be paid in U.S. Dollars to Broker for Seller (unless otherwise stated here: _____
16 ) ,
17 who will retain deposits in an escrow account in conformity with all applicable laws and _____ regulations
18 until consummation or termination of this Agreement. Only real estate brokers are required to hold deposits in accordance with
19 the rules and regulations of the State Real Estate Commission. Checks tendered as deposit monies may be held uncashed pending
20 the execution of this Agreement.
21 **3.** **SELLER ASSIST (If Applicable) (1-10)**
22 Seller will pay $ _____ or _____ % of Purchase Price (0 if not specified) toward
23 Buyer's costs, as permitted by the mortgage lender, if any. Seller is only obligated to pay up to the amount or percentage which is
24 approved by mortgage lender.
25 **4.** **SETTLEMENT AND POSSESSION (4-14)**
26 (A) Settlement Date is _____ March 31, 2020 _____, or before if Buyer and Seller agree.
27 (B) Settlement will occur in the county where the Property is located or in an adjacent county, during normal business hours, unless
28 Buyer and Seller agree otherwise.
29 (C) At time of settlement, the following will be pro-rated on a daily basis between Buyer and Seller, reimbursing where applicable:
30 current taxes; rents; interest on mortgage assumptions; condominium fees and homeowner association fees; water and/or sewer
31 fees, together with any other lienable municipal service fees. All charges will be prorated for the period(s) covered. Seller will
32 pay up to and including the date of settlement and Buyer will pay for all days following settlement, unless otherwise stated here:
33 _____
34 (D) For purposes of prorating real estate taxes, the "periods covered" are as follows:
35 1.  Municipal tax bills for all counties and municipalities in Pennsylvania are for the period from January 1 to December 31.
36 2.  School tax bills for the Philadelphia, Pittsburgh and Scranton School Districts are for the period from January 1 to December
37 31. School tax bills for all other school districts are for the period from July 1 to June 30.
38 (E) Conveyance from Seller will be by fee simple deed of special warranty unless otherwise stated here: _____
39 _____
40 (F) Payment of transfer taxes will be divided equally between Buyer and Seller unless otherwise stated here: _____
41 _____
42 (G) Possession is to be delivered by deed, existing keys and physical possession to a vacant Property free of debris, with all structures
43 broom-clean, at day and time of settlement, unless Seller, before signing this Agreement, has identified in writing that the Property
44 is subject to a lease.
45 (H) If Seller has identified in writing that the Property is subject to a lease, possession is to be delivered by deed, existing keys and
46 assignment of existing leases for the Property, together with security deposits and interest, if any, at day and time of settlement.
47 Seller will not enter into any new leases, nor extend existing leases, for the Property without the written consent of Buyer. Buyer
48 will acknowledge existing lease(s) by initialing the lease(s) at the execution of this Agreement, unless otherwise stated in this
49 Agreement.
50 ☐ **Tenant-Occupied Property Addendum (PAR Form TOP) is attached and made part of this Agreement.**
51 **5.** **DATES/TIME IS OF THE ESSENCE (1-10)**
52 (A) Written acceptance of all parties will be on or before: February 20, 2020
53 (B) The Settlement Date and all other dates and times identified for the performance of any obligations of this Agreement are of the
54 essence and are binding.
55 (C) The Execution Date of this Agreement is the date when Buyer and Seller have indicated full acceptance of this Agreement by
56 signing and/or initialing it. For purposes of this Agreement, the number of days will be counted from the Execution Date, exclud-
57 ing the day this Agreement was executed and including the last day of the time period. **All changes to this Agreement should be**
58 **initialed and dated.**
59 (D) The Settlement Date is not extended by any other provision of this Agreement and may only be extended by mutual written agree-
60 ment of the parties.
61 (E) Certain terms and time periods are pre-printed in this Agreement as a convenience to the Buyer and Seller. All pre-printed terms
62 and time periods are negotiable and may be changed by striking out the pre-printed text and inserting different terms acceptable
63 to all parties, except where restricted by law.

64 Buyer Initials: _____           ASR Page 2 of 14           Seller Initials: _____  _____
                          Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026   www.zipLogix.com        817 Mairfield Rd

GRASSO002871
**Appx0223**

Case: 22-2896   Document: 14   Page: 207   Date Filed: 01/03/2023

DocuSign signature verification: dtlo.us/enFS-c0l8-sYKL
DocuSign Envelope ID: 28A09EB2-D766-4972-BCC2-2CA5F93BD616
Case 2:21-cv-05472-CMR   Document 10-13   Filed 01/25/22   Page 3 of 14

**6.  ZONING (4-14)**

65
66  Failure of this Agreement to contain the zoning classification (except in cases where the property {and each parcel thereof, if subdi-
67  vidable} is zoned solely or primarily to permit single-family dwellings) will render this Agreement voidable at Buyer's option, and, if
68  voided, any deposits tendered by the Buyer will be returned to Buyer without any requirement for court action.

69  **Zoning Classification, as set forth in the local zoning ordinance: Residential**

**7.  FIXTURES AND PERSONAL PROPERTY (1-20)**

70
71  (A)  It is possible for certain items of personal property to be so integrated into the Property that they become fixtures and will be
72  regarded as part of the Property and therefore included in a sale. Buyer and Seller are encouraged to be specific when negotiating
73  what items will be included or excluded in this sale.

74  (B)  INCLUDED in this sale, unless otherwise stated, are all existing items permanently installed in or on the Property, free of liens,
75  and other items including plumbing; heating; gas fireplace logs; radiator covers; hardwired security systems; thermostats; lighting
76  fixtures (including chandeliers and ceiling fans); pools, spas and hot tubs (including covers and cleaning equipment); electric
77  animal fencing systems (excluding collars); garage door openers and transmitters; mounting brackets and hardware for television
78  and sound equipment; unpotted shrubbery, plantings and trees; smoke detectors and carbon monoxide detectors; sump pumps;
79  storage sheds; fences; mailboxes; wall to wall carpeting; existing window screens, storm windows and screen/storm doors; win-
80  dow covering hardware (including rods and brackets), shades and blinds; awnings; central vacuum system (with attachments);
81  built-in air conditioners; built-in appliances; the range/oven; dishwashers; trash compactors; any remaining heating and cooking
82  fuels stored on the Property at the time of settlement; and, if owned, solar panels, windmills, water treatment systems, propane
83  tanks and satellite dishes. Unless stated otherwise, the following items are included in the sale, at no additional cost: **Washer, Dryer,**
84  **Regrigerator, all as is condition, rug in Living room, and den, all at no monetary value**
85  **Second floor bedroom furniture excluding Master Bedroom**

86  (C)  The following items are not owned by Seller and may be subject to a lease or other financing agreement. Contact the provider/
87  vendor for more information (e.g., solar panels, windmills, water treatment systems, propane tanks and satellite dishes): _____

88  _____

89  (D)  EXCLUDED fixtures and items: _____

90  _____

**8.  MORTGAGE CONTINGENCY (10-18)**

91
92  [X]  WAIVED. This sale is NOT contingent on mortgage financing, although Buyer may obtain mortgage financing and/or the parties
93  may include an appraisal contingency.

94  [ ]  ELECTED.
95  (A)  This sale is contingent upon Buyer obtaining mortgage financing according to the following terms:

| First Mortgage on the Property | Second Mortgage on the Property |
|---|---|
| Loan Amount $ _____ | Loan Amount $ _____ |
| Minimum Term _____ years | Minimum Term _____ years |
| Type of mortgage _____ | Type of mortgage _____ |
| For conventional loans, the Loan-To-Value (LTV) ratio is not to exceed _____ % | For conventional loans, the Loan-To-Value (LTV) ratio is not to exceed _____ % |
| Mortgage lender _____ | Mortgage lender _____ |
| Interest rate _____ %; however, **Buyer agrees to accept the interest rate as may be committed by the mortgage lender,** not to exceed a maximum interest rate of _____ %. | Interest rate _____ %; however, **Buyer agrees to accept the interest rate as may be committed by the mortgage lender,** not to exceed a maximum interest rate of _____ %. |
| Discount points, loan origination, loan placement and other fees charged by the lender as a percentage of the mortgage loan (exclud-ing any mortgage insurance premiums or VA funding fee) not to exceed _____ % (0% if not specified) of the mortgage loan. | Discount points, loan origination, loan placement and other fees charged by the lender as a percentage of the mortgage loan (exclud-ing any mortgage insurance premiums or VA funding fee) not to exceed _____ % (0% if not specified) of the mortgage loan. |

96-110

111  (B)  Upon receiving documentation demonstrating lender's approval, whether conditional or outright, of Buyer's mortgage applica-
112  tion(s) according to the terms set forth above, Buyer will promptly deliver a copy of the documentation to Seller, but in any case
113  no later than _____ .
114  1.  If Seller does not receive a copy of the documentation demonstrating lender's conditional or outright approval of Buyer's mort-
115  gage application(s) by the date indicated above, Seller may terminate this Agreement by written notice to Buyer. Seller's right
116  to terminate continues until Buyer delivers documentation demonstrating lender's conditional or outright approval of Buyer's
117  mortgage application(s) to Seller. Until Seller terminates this Agreement pursuant to this Paragraph, Buyer must continue to
118  make a good faith effort to obtain mortgage financing.
119  2.  Seller may terminate this Agreement by written notice to Buyer after the date indicated above if the documentation demon-
120  strating lender's conditional or outright approval of Buyer's mortgage application(s):
121  a.  Does not satisfy the terms of Paragraph 8(A), OR
122  b.  Contains any condition not specified in this Agreement (e.g., Buyer must settle on another property, an appraisal must be
123  received by the lender, or the approval is not valid through the Settlement Date) that is not satisfied and/or removed in
124  writing by the mortgage lender(s) within ___7___ DAYS after the date indicated in Paragraph 8(B), or any extension there-
125  of; other than those conditions that are customarily satisfied at or near settlement (e.g., obtaining insurance, confirming
126  employment).
127  3.  If this Agreement is terminated pursuant to Paragraphs 8(B)(1) or (2), or the mortgage loan(s) is not obtained for settlement,

128  Buyer Initials: _____   ASR Page 3 of 14   Seller Initials: _____

dotloop signature verification: dtlo.us/enFS-c0IB-sYKL
DocuSign Envelope ID: 29A092B3-D566-4972-9CC2-2CA6F933D619

| | |
|---|---|
| 129 | all deposit monies will be returned to Buyer according to the terms of Paragraph 26 and this Agreement will be VOID. Buyer |
| 130 | will be responsible for any costs incurred by Buyer for any inspections or certifications obtained according to the terms of this |
| 131 | Agreement, and any costs incurred by Buyer for: (1) Title search, title insurance and/or mechanics' lien insurance, or any fee |
| 132 | for cancellation; (2) Flood insurance, fire insurance, hazard insurance, mine subsidence insurance, or any fee for cancellation; |
| 133 | (3) Appraisal fees and charges paid in advance to mortgage lender(s). |

(C)  The Loan-To-Value ratio (LTV) is used by lenders as one tool to help assess their potential risk of a mortgage loan. A particular
LTV may be necessary to qualify for certain loans, or buyers might be required to pay additional fees if the LTV exceeds a spe-
cific level. The appraised value of the Property may be used by lenders to determine the maximum amount of a mortgage loan.
The appraised value is determined by an independent appraiser, subject to the mortgage lender's underwriter review, and may be
higher or lower than the Purchase Price and/or market price of the property.

(D)  The interest rate(s) and fee(s) provisions in Paragraph 8(A) are satisfied if the mortgage lender(s) gives Buyer the right to guarantee
the interest rate(s) and fee(s) at or below the maximum levels stated. If lender(s) gives Buyer the right to lock in the interest rate(s),
Buyer will do so at least _____15_____ days before Settlement Date. Buyer gives Seller the right, at Seller's sole option and as permitted
by law and the mortgage lender(s), to contribute financially, without promise of reimbursement, to Buyer and/or the mortgage
lender(s) to make the above mortgage term(s) available to Buyer.

(E)  Within _____ days (7 if not specified) from the Execution Date of this Agreement, Buyer will make a completed mortgage appli-
cation (including payment for and ordering of credit reports without delay) for the mortgage terms and to the mortgage lender(s)
identified in Paragraph 8(A), if any, otherwise to a responsible mortgage lender(s) of Buyer's choice. Broker for Buyer, if any,
otherwise Broker for Seller, is authorized to communicate with the mortgage lender(s) to assist in the mortgage loan process.
Broker for Seller, if any, is permitted to contact the mortgage lender(s) at any time to determine the status of the mortgage loan
application.

(F)  **Buyer will be in default of this Agreement if Buyer furnishes false information** to anyone concerning Buyer's financial and/
or employment status, fails to cooperate in good faith with processing the mortgage loan application (including payment for and
ordering of appraisal without delay), fails to lock in interest rate(s) as stated in Paragraph 8(D), or otherwise causes the lender to
reject, or refuse to approve or issue, a mortgage loan commitment.

(G)  If the mortgage lender(s), or a property and casualty insurer providing insurance required by the mortgage lender(s), requires
repairs to the Property, Buyer will, upon receiving the requirements, deliver a copy of the requirements to Seller. Within _____5_____
DAYS of receiving the copy of the requirements, Seller will notify Buyer whether Seller will make the required repairs at Seller's
expense.

1.  If Seller makes the required repairs to the satisfaction of the mortgage lender and/or insurer, Buyer accepts the Property and
agrees to the RELEASE in Paragraph 28 of this Agreement.

2.  If Seller will not make the required repairs, **or if Seller fails to respond within the stated time,** Buyer will, within _____5_____
DAYS, notify Seller of Buyer's choice to:

a.  Make the repairs/improvements at Buyer's expense, with permission and access to the Property given by Seller, which
will not be unreasonably withheld (Seller may require that Buyer sign a pre-settlement possession agreement such as the
Pre-Settlement Possession Addendum [PAR Form PRE], which shall not, in and of itself, be considered unreasonable), OR

b.  Terminate this Agreement by written notice to Seller, with all deposit monies returned to Buyer according to the terms of
Paragraph 26 of this Agreement.

**If Buyer fails to respond** within the time stated in Paragraph 8(G)(2) or fails to terminate this Agreement by written notice
to Seller within that time, **Buyer will accept the Property,** make the required repairs/improvements at Buyer's expense and
agree to the RELEASE in Paragraph 28 of this Agreement.

---

**FHA/VA, IF APPLICABLE**

(H)  It is expressly agreed that notwithstanding any other provisions of this contract, Buyer will not be obligated to complete the pur-
chase of the Property described herein or to incur any penalty by forfeiture of earnest money deposits or otherwise unless Buyer
has been given, in accordance with HUD/FHA or VA requirements, a written statement by the Federal Housing Commissioner,
Veterans Administration, or a Direct Endorsement Lender setting forth the appraised value of the Property of not less than
$_____ (the Purchase Price as stated in this Agreement). Buyer will have the privilege and option of
proceeding with consummation of the contract without regard to the amount of the appraised valuation. The appraised valuation
is arrived at to determine the maximum mortgage the Department of Housing and Urban Development will insure. HUD does
not warrant the value nor the condition of the Property. Buyer should satisfy himself/herself that the price and condition of the
Property are acceptable.

**Warning:** Section 1010 of Title 18, U.S.C., Department of Housing and Urban Development and Federal Housing
Administration Transactions, provides, "Whoever for the purpose of influencing in any way the action of such Department,
makes, passes, utters or publishes any statement, knowing the same to be false shall be fined under this title or imprisoned not
more than two years, or both."

(I)  **U.S. Department of Housing and Urban Development (HUD) NOTICE TO PURCHASERS: Buyer's Acknowledgement**
☐   Buyer has received the HUD Notice "For Your Protection: Get a Home Inspection." Buyer understands the importance of
getting an independent home inspection and has thought about this before signing this Agreement. Buyer understands that
FHA will not perform a home inspection nor guarantee the price or condition of the Property.

(J)  **Certification** We the undersigned, Seller(s) and Buyer(s) party to this transaction each certify that the terms of this contract
for purchase are true to the best of our knowledge and belief, and that any other agreement entered into by any of these parties
in connection with this transaction is attached to this Agreement.

---

191   Buyer Initials: _____   **ASR Page 4 of 14**   Seller Initials: _____

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026   www.zipLogix.com
817 Mairfield Rd

7:*1 PM EST   7:06 PM EST
dotloop verified dotloop verified

dotloop signature verification: dtlp.us/enFS-c0IB-sYKL
DocuSign Envelope ID: 28A092B2-D51C-4C72-CMR9-5CA15938DE18

Case 2:21-cv-05472-CMR   Document 10-13   Filed 01/25/22   Page 5 of 14

192 **9.** **CHANGE IN BUYER'S FINANCIAL STATUS (9-18)**
193 If a change in Buyer's financial status affects Buyer's ability to purchase, Buyer will promptly notify Seller and lender(s) to whom the
194 Buyer submitted a mortgage application, if any, in writing. A change in financial status includes, but is not limited to, loss or a change
195 in employment; failure or loss of sale of Buyer's home; Buyer's having incurred a new financial obligation; entry of a judgment against
196 Buyer. **Buyer understands that applying for and/or incurring an additional financial obligation may affect Buyer's ability to**
197 **purchase.**
198 **10.** **SELLER REPRESENTATIONS (1-20)**
199 (A) **Status of Water**
200 Seller represents that the Property is served by:
201 ☒ Public Water   ☐ Community Water   ☐ On-site Water   ☐ None   _____
202 (B) **Status of Sewer**
203 1. Seller represents that the Property is served by:
204 ☐ Public Sewer   ☐ Community Sewage Disposal System   ☐ Ten-Acre Permit Exemption (see Sewage Notice 2)
205 ☒ Individual On-lot Sewage Disposal System (see Sewage Notice 1)   ☐ Holding Tank (see Sewage Notice 3)
206 ☐ Individual On-lot Sewage Disposal System in Proximity to Well (see Sewage Notice 1; see Sewage Notice 4, if applicable)
207 ☐ None (see Sewage Notice 1)   ☐ None Available/Permit Limitations in Effect (see Sewage Notice 5)
208 ☐
209 2. **Notices Pursuant to the Pennsylvania Sewage Facilities Act**
210 **Notice 1: There is no currently existing community sewage system available for the subject property.** Section 7 of the
211 Pennsylvania Sewage Facilities Act provides that no person shall install, construct, request bid proposals for construction, alter,
212 repair or occupy any building or structure for which an individual sewage system is to be installed, without first obtaining a
213 permit. Buyer is advised by this notice that, before signing this Agreement, Buyer should contact the local agency charged with
214 administering the Act to determine the procedure and requirements for obtaining a permit for an individual sewage system. The
215 local agency charged with administering the Act will be the municipality where the Property is located or that municipality
216 working cooperatively with others.
217 **Notice 2: This Property is serviced by an individual sewage system installed under the ten-acre permit exemption**
218 **provisions of Section 7 of the Pennsylvania Sewage Facilities Act.** (Section 7 provides that a permit may not be required
219 before installing, constructing, awarding a contract for construction, altering, repairing or connecting to an individual sewage
220 system where a ten-acre parcel or lot is subdivided from a parent tract after January 10, 1987). Buyer is advised that soils and
221 site testing were not conducted and that, should the system malfunction, the owner of the Property or properties serviced by
222 the system at the time of a malfunction may be held liable for any contamination, pollution, public health hazard or nuisance
223 which occurs as a result.
224 **Notice 3: This Property is serviced by a holding tank (permanent or temporary) to which sewage is conveyed by a**
225 **water carrying system and which is designed and constructed to facilitate ultimate disposal of the sewage at another**
226 **site.** Pursuant to the Pennsylvania Sewage Facilities Act, Seller must provide a history of the annual cost of maintaining the
227 tank from the date of its installation or December 14, 1995, whichever is later.
228 **Notice 4: An individual sewage system has been installed at an isolation distance from a well that is less than the dis-**
229 **tance specified by regulation.** The regulations at 25 Pa. Code §73.13 pertaining to minimum horizontal isolation distances
230 provide guidance. Subsection (b) of §73.13 states that the minimum horizontal isolation distance between an individual water
231 supply or water supply system suction line and treatment tanks shall be 50 feet. Subsection (c) of §73.13 states that the hor-
232 izontal isolation distance between the individual water supply or water supply system suction line and the perimeter of the
233 absorption area shall be 100 feet.
234 **Notice 5: This lot is within an area in which permit limitations are in effect and is subject to those limitations.** Sewage
235 facilities are not available for this lot and construction of a structure to be served by sewage facilities may not begin until
236 the municipality completes a major planning requirement pursuant to the Pennsylvania Sewage Facilities Act and regulations
237 promulgated thereunder.
238 (C) **Historic Preservation**
239 Seller is not aware of historic preservation restrictions regarding the Property unless otherwise stated here: _____
240
241 (D) **Land Use Restrictions**
242 1. ☐ Property, or a portion of it, is subject to land use restrictions and may be preferentially assessed for tax purposes under the
243 following Act(s) (see Notices Regarding Land Use Restrictions below):
244 ☐ Agricultural Area Security Law (Right-to-Farm Act; Act 43 of 1981; 3 P.S. §901 et seq.)
245 ☐ Farmland and Forest Land Assessment Act (Clean and Green Program; Act 319 of 1974; 72 P.S. § 5490.1 et seq.)
246 ☐ Open Space Act (Act 442 of 1967; 32 P.S. § 5001 et seq.)
247 ☐ Conservation Reserve Program (16 U.S.C. § 3831 et seq.)
248 ☐ Other _____
249 2. **Notices Regarding Land Use Restrictions**
250 a. **Pennsylvania Right-To-Farm Act:** The property you are buying may be located in an area where agricultural operations
251 take place. Pennsylvania protects agricultural resources for the production of food and agricultural products. The law limits
252 circumstances where normal agricultural operations may be subject to nuisance lawsuits or restrictive ordinances.
253 b. Clean and Green Program: Properties enrolled in the Clean and Green Program receive preferential property tax assess-
254 ment. Buyer and Seller have been advised of the need to contact the County Tax Assessment Office before the execution
255 of this Agreement to determine the property tax implications that will or may result from the sale of the Property, or that
256 may result in the future as a result of any change in use of the Property or the land from which it is being separated.

257 Buyer Initials: _____   **ASR Page 5 of 14**   Seller Initials: [initials] [initials]

GRASSO002874

**Appx0226**

258      c. **Open Space Act:** This Act enables counties to enter into covenants with owners of land designated as farm, forest, water
259      supply, or open space land on an adopted municipal, county or regional plan for the purpose of preserving the land as open
260      space. A covenant between the owner and county is binding upon any Buyer of the Property during the period of time that
261      the covenant is in effect (5 or 10 years). Covenants automatically renew at the end of the covenant period unless specific
262      termination notice procedures are followed. Buyer has been advised of the need to determine the restrictions that will apply
263      from the sale of the Property to Buyer and the property tax implications that will or may result from a change in use of the
264      Property, or any portion of it. Buyer is further advised to determine the term of any covenant now in effect.
265      d. **Conservation Reserve (Enhancement) Program:** Properties enrolled in the Conservation Reserve Program or CREP are
266      environmentally-sensitive areas, the owners of which receive compensation in exchange for an agreement to maintain the
267      land in its natural state. Contracts last from 10 to 15 years and carry penalties to Seller if terminated early by Buyer. Buyer
268      has been advised of the need to determine the restrictions on development of the Property and the term of any contract now
269      in effect. Seller is advised to determine the financial implications that will or may result from the sale of the Property.
270    (E) **Real Estate Seller Disclosure Law**
271      Generally, the Real Estate Seller Disclosure Law requires that before an agreement of sale is signed, the seller in a residential real
272      estate transfer must make certain disclosures regarding the property to potential buyers in a form defined by the law. A residential
273      real estate transfer is defined as a sale, exchange, installment sales contract, lease with an option to buy, grant or other transfer of
274      an interest in real property where **NOT LESS THAN ONE AND NOT MORE THAN FOUR RESIDENTIAL DWELLING
275      UNITS** are involved. Disclosures for condominiums and cooperatives are limited to the seller's particular unit(s). Disclosures
276      regarding common areas or facilities are not required, as those elements are already addressed in the laws that govern the resale
277      of condominium and cooperative interests.
278    (F) **Public and/or Private Assessments**
279      1. Seller represents that, as of the date Seller signed this Agreement, no public improvement, condominium or homeowner asso-
280      ciation assessments have been made against the Property which remain unpaid, and that no notice by any government or public
281      authority (excluding assessed value) has been served upon Seller or anyone on Seller's behalf, including notices relating to
282      violations of zoning, housing, building, safety or fire ordinances that remain uncorrected, and that Seller knows of no condition
283      that would constitute a violation of any such ordinances that remain uncorrected, unless otherwise specified here: _____
284      _____
285      2. Seller knows of no other potential notices (including violations) and/or assessments except as follows: _____
286      _____
287    (G) **Highway Occupancy Permit**
288      Access to a public road may require issuance of a highway occupancy permit from the Department of Transportation.
289    (H) **Internet of Things (IoT) Devices**
290      1. The presence of smart and green home devices that are capable of connecting to the Internet, directly or indirectly, and the data
291      stored on those various devices make up a digital ecosystem in the Property sometimes referred to as the "Internet of Things
292      (IoT)." Buyer and Seller acknowledge that IoT devices may transmit data to third parties outside of the control of their owner.
293      2. On or before settlement, Seller will make a reasonable effort to clear all data stored on all IoT devices located on the Property
294      and included in the sale. Seller further acknowledges that all personal devices owned by Seller (including but not limited to
295      cellular telephones, personal computers and tablets) having connectivity to any IoT device(s) located on the Property will be
296      disconnected and cleared of relevant data prior to settlement. Further, no attempts will be made after settlement by Seller or
297      anyone on Seller's behalf to access any IoT devices remaining on the Property.
298      3. Following settlement, Buyer will make a reasonable effort to clear all stored data from any IoT device(s) remaining on the
299      Property and to restrict access to said devices by Seller, Seller's agents or any third party to whom Seller may have previously
300      provided access. This includes, but is not limited to, restoring IoT devices to original settings, changing passwords or codes,
301      updating network settings and submitting change of ownership and contact information to device manufacturers and service
302      providers.
303      4. This paragraph will survive settlement.
304 **11. WAIVER OF CONTINGENCIES (9-05)**
305      If this Agreement is contingent on Buyer's right to inspect and/or repair the Property, or to verify insurability, environmental condi-
306      tions, boundaries, certifications, zoning classification or use, or any other information regarding the Property, **Buyer's failure to exer-
307      cise any of Buyer's options within the times set forth in this Agreement is a WAIVER of that contingency and Buyer accepts
308      the Property and agrees to the RELEASE in Paragraph 28 of this Agreement.**
309 **12. BUYER'S DUE DILIGENCE/INSPECTIONS (10-18)**
310    (A) **Rights and Responsibilities**
311      1. Seller will provide access to insurers' representatives and, as may be required by this Agreement or by mortgage lender(s), to
312      surveyors, municipal officials, appraisers and inspectors; in addition, unless otherwise agreed, only Parties and their real estate
313      licensee(s) may attend any inspections.
314      2. Buyer may make two pre-settlement walk-through inspections of the Property for the limited purpose of determining that the
315      condition of the Property is as required by this Agreement and any addenda. Buyer's right to these inspections is not waived
316      by any other provision of this Agreement.
317      3. **Seller will have heating and all utilities (including fuel(s)) on for all inspections/appraisals.**
318      4. All inspectors, including home inspectors, are authorized by Buyer to provide a copy of any inspection Report to Broker for
319      Buyer.
320      5. Seller has the right, upon request, to receive a free copy of any inspection Report from the party for whom it was prepared.
321      Unless otherwise stated, Seller does not have the right to receive a copy of any lender's appraisal report.

322 Buyer Initials: _____      ASR Page 6 of 14      Seller Initials: 

GRASSO002875

**Appx0227**

| 323 | (B) | Buyer waives or elects at Buyer's expense to have the following inspections, certifications, and investigations (referred to as "Inspection" or "Inspections") performed by professional contractors, home inspectors, engineers, architects and other properly licensed or otherwise qualified professionals. All inspections shall be non-invasive, unless otherwise agreed in writing. If the same inspector is inspecting more than one system, the inspector must comply with the Home Inspection Law. (See Paragraph 12(D) for Notices Regarding Property and Environmental Inspections) |
|---|---|---|

328    (C)    For elected Inspection(s), Buyer will, within the Contingency Period stated in Paragraph 13(A), complete Inspections, obtain any Inspection Reports or results (referred to as "Report" or "Reports"), and accept the Property, terminate this Agreement, or submit a written corrective proposal to Seller, according to the terms of Paragraph 13(B).

**Home/Property Inspections and Environmental Hazards (mold, etc.)**



**Elected** Buyer may conduct an inspection of the Property's structural components; roof; exterior windows and exterior doors; exterior building material; fascia, gutters and downspouts; swimming pools, hot tubs and spas; appliances; electrical systems; interior and exterior plumbing; public sewer systems; heating and cooling systems; water penetration; electromagnetic fields; wetlands and flood plain delineation; structure square footage; mold and other environmental hazards (e.g., lead, radon, indoor air quality, asbestos, underground storage tanks, etc.); and any other items Buyer may select. If Buyer elects to have a home inspection of the Property, as defined in the Home Inspection Law, the home inspection must be performed by a full member in good standing of a national home inspection association, or a person supervised by a full member of a national home inspection association, in accordance with the ethical standards and code of conduct or practice of that association, or by a properly licensed or registered engineer or architect. (See Notices Regarding Property & Environmental Inspections)

**Wood Infestation**



**Elected** Buyer may obtain a written "Wood-Destroying Insect Infestation Inspection Report" from an inspector certified as a wood-destroying pests pesticide applicator and will deliver it and all supporting documents and drawings provided by the inspector to Seller. The Report is to be made satisfactory and in compliance with applicable laws, mortgage lender requirements, and/or Federal Insuring and Guaranteeing Agency requirements. The Inspection is to be limited to all readily-visible and accessible areas of all structures on the Property, except fences. If the Inspection reveals active infestation(s), Buyer, at Buyer's expense, may obtain a Proposal from a wood-destroying pests pesticide applicator to treat the Property. If the Inspection reveals damage from active or previous infestation(s), Buyer may obtain a written Report from a professional contractor, home inspector or structural engineer that is limited to structural damage to the Property caused by wood-destroying organisms and a Proposal to repair the Property.

**Deeds, Restrictions and Zoning**



**Elected** Buyer may investigate easements, deed and use restrictions (including any historic preservation restrictions or ordinances) that apply to the Property and review local zoning ordinances. Buyer may verify that the present use of the Property (such as in-law quarters, apartments, home office, day care, commercial or recreational vehicle parking) is permitted and may elect to make the Agreement contingent upon an anticipated use. Present use: _____

**Water Service**



**Elected** Buyer may obtain an Inspection of the quality and quantity of the water system from a properly licensed or otherwise qualified water/well testing company. If and as required by the inspection company, Seller, at Seller's expense, will locate and provide access to the on-site (or individual) water system. Seller will restore the Property to its previous condition, at Seller's expense, prior to settlement.

**Radon**



**Elected** Buyer may obtain a radon test of the Property from a certified inspector. The U.S. Environmental Protection Agency (EPA) advises corrective action if the average annual exposure to radon is equal to or higher than 0.02 working levels or 4 picoCuries/liter (4pCi/L). Radon is a natural, radioactive gas that is produced in the ground by the normal decay of uranium and radium. Studies indicate that extended exposure to high levels of radon gas can increase the risk of lung cancer. Radon can find its way into any air-space and can permeate a structure. If a house has a radon problem, it usually can be cured by increased ventilation and/or by preventing radon entry. Any person who tests, mitigates or safeguards a building for radon in Pennsylvania must be certified by the Department of Environmental Protection. Information about radon and about certified testing or mitigation firms is available through Department of Environmental Protection, Bureau of Radiation Protection, 13th Floor, Rachel Carson State Office Building, P.O. Box 8469, Harrisburg, PA 17105-8469, (800) 23RADON or (717) 783-3594. www.epa.gov



**Elected** **On-lot Sewage (If Applicable)**    Waived

Buyer may obtain an Inspection of the individual on-lot sewage disposal system, which may include a hydraulic load test, from a qualified, professional inspector. If and as required by the inspection company, Seller, at Seller's expense, will locate, provide access to, empty the individual on-lot sewage disposal system and provide all water needed, unless otherwise agreed. Seller will restore the Property to its previous condition, at Seller's expense, prior to settlement. See Paragraph 13(C) for more information regarding the Individual On-lot Sewage Inspection Contingency.

**Property and Flood Insurance**



**Elected** Buyer may determine the insurability of the Property by making application for property and casualty insurance for the Property to a responsible insurer. Broker for Buyer, if any, otherwise Broker for Seller, may communicate with the insurer to assist in the insurance process. If the Property is located in a specially-designated flood zone, Buyer may be required to carry flood insurance at Buyer's expense, which may need to be ordered 14 days or more prior to Settlement Date. Revised flood maps and changes to Federal law may substantially increase future flood

387    Buyer Initials: _____    ASR Page 7 of 14    Seller Initials: _____
817 Mairfield Rd

GRASSO002876
Appx0228

dotloop signature verification: dtlp.us/enFS-cDlB-5YKL
DocuSign Envelope ID: 28A092B3-D586-4971-ACC2-2CA5F938D01B

| | | |
|---|---|---|
| 388 | | insurance premiums or require insurance for formerly exempt properties. Buyer should consult with one or more |
| 389 | | flood insurance agents regarding the need for flood insurance and possible premium increases. |
| 390 | | **Property Boundaries** |
| 391 | Elected | Buyer may engage the services of a surveyor, title abstractor, or other qualified professional to assess the legal |
| 392 | | description, certainty and location of boundaries and/or quantum of land. Most sellers have not had the Property |
| 393 | | surveyed as it is not a requirement of property transfer in Pennsylvania. Any fences, hedges, walls and other natural |
| 394 | | or constructed barriers may or may not represent the true boundary lines of the Property. Any numerical represen- |
| 395 | | tations of size of property are approximations only and may be inaccurate. |
| 396 | | **Lead-Based Paint Hazards (For Properties built prior to 1978 only)** |
| 397 | Elected | Before Buyer is obligated to purchase a residential dwelling built prior to 1978, Buyer has the option to conduct |
| 398 | | a risk assessment and/or inspection of the Property for the presence of lead-based paint and/or lead-based paint |
| 399 | | hazards. **Regardless of whether this inspection is elected or waived, the Residential Lead-Based Paint Hazard** |
| 400 | | **Reduction Act requires a seller of property built prior to 1978 to provide the Buyer with an EPA-approved** |
| 401 | | **lead hazards information pamphlet titled "Protect Your Family from Lead in Your Home," along with a** |
| 402 | | **separate form, attached to this Agreement, disclosing Seller's knowledge of lead-based paint hazards and** |
| 403 | | **any lead-based paint records regarding the Property.** |
| 404 | | **Other** |
| 405 | Elected | stucco |
| 406 | | |

The Inspections elected above do not apply to the following existing ASR conditions and/or items: _____

407

408

409

(D) **Notices Regarding Property & Environmental Inspections**

410

411      1.  Exterior Building Materials: Poor or improper installation of exterior building materials may result in moisture penetrating
412      the surface of a structure where it may cause mold and damage to the building's frame.
413      2.  Asbestos: Asbestos is linked with several adverse health effects, including various forms of cancer.
414      3.  Environmental Hazards: The U.S. Environmental Protection Agency has a list of hazardous substances, the use and disposal
415      of which are restricted by law. Generally, if hazardous substances are found on a property, it is the property owner's respon-
416      sibility to dispose of them properly.
417      4.  Wetlands: Wetlands are protected by the federal and state governments. Buyer may wish to hire an environmental engineer
418      to investigate whether the Property is located in a wetlands area to determine if permits for plans to build, improve or develop
419      the property would be affected or denied because of its location in a wetlands area.
420      5.  Mold, Fungi and Indoor Air Quality: Indoor mold contamination and the inhalation of bioaerosols (bacteria, mold spores,
421      pollen and viruses) have been associated with allergic responses.
422      6.  Additional Information: Inquiries or requests for more information about asbestos and other hazardous substances can be
423      directed to the U.S. Environmental Protection Agency, Ariel Rios Building, 1200 Pennsylvania Ave., N.W., Washington, D.C.
424      20460, (202) 272-0167, and/or the Department of Health, Commonwealth of Pennsylvania, Division of Environmental Health,
425      Harrisburg, PA 17120. Information about indoor air quality issues is available through the Pennsylvania Department of Health
426      and may be obtained by contacting Health & Welfare Building, 8th Floor West, 625 Forster St., Harrisburg, PA 17120, or by
427      calling 1-877-724-3258.

428  **13. INSPECTION CONTINGENCY (10-18)**

429    (A)  The Contingency Period is 7 _____ days (14 if not specified) from the Execution Date of this Agreement for each Inspection elected
430      in Paragraph 12(C).

431    (B)  **Within the stated Contingency Period** and as the result of any Inspection elected in Paragraph 12(C), except as stated in
432      Paragraph 12(C):

433      1.  If the results of the inspections elected in Paragraph 12(C) are satisfactory to Buyer, Buyer WILL **present all Report(s) in**
434      **their entirety to Seller, accept the Property with the information stated in the Report(s) and agree to the RELEASE in**
435      **Paragraph 28 of this Agreement,** OR

436      2.  If the results of any inspection elected in Paragraph 12(C) are unsatisfactory to Buyer, Buyer WILL **present all Report(s) in**
437      **their entirety to Seller and terminate this Agreement** by written notice to Seller, with all deposit monies returned to Buyer
438      according to the terms of Paragraph 26 of this Agreement, OR

439      3.  If the results of any inspection elected in Paragraph 12(C) are unsatisfactory to Buyer, Buyer WILL **present all Report(s) in**
440      **their entirety to Seller with a Written Corrective Proposal ("Proposal") listing corrections and/or credits desired by**
441      **Buyer.**

442      The Proposal may, but is not required to, include the name(s) of a properly licensed or qualified professional(s) to perform
443      the corrections requested in the Proposal, provisions for payment, including retests, and a projected date for completion of
444      the corrections. Buyer agrees that Seller will not be held liable for corrections that do not comply with mortgage lender or
445      governmental requirements if performed in a workmanlike manner according to the terms of Buyer's Proposal.

446      a.  Following the end of the Contingency Period, Buyer and Seller will have _____ days (5 if not specified) for a Negotiation
447      Period. During the Negotiation Period:

448      (1)  Seller will acknowledge in writing Seller's agreement to satisfy all the terms of Buyer's Proposal OR

449      (2)  Buyer and Seller will negotiate another mutually acceptable written agreement, providing for any repairs or improve-
450      ments to the Property and/or any credit to Buyer at settlement, as acceptable to the mortgage lender, if any.

451      If Seller agrees to satisfy all the terms of Buyer's Proposal, or Buyer and Seller enter into another mutually acceptable

452  Buyer Initials: _____    **ASR Page 8 of 14**    Seller Initials: _____

817 Mairfield Rd

GRASSO002877
Appx0229

dotloop signature verification: dtlp.us/enFS-c0lB-sYKL
DocuSign Envelope ID: 28A092B2-DE96-497A-BCC2-2CA5F933D816

453 written agreement, Buyer accepts the Property and agrees to the RELEASE in Paragraph 28 of this Agreement and the
454 Negotiation Period ends.

455 b. If no mutually acceptable written agreement is reached, or if Seller fails to respond, during the Negotiation Period, within
456 _____ days (2 if not specified) **following the end of the Negotiation Period,** Buyer will:

457 (1) Accept the Property with the information stated in the Report(s) and agree to the RELEASE in Paragraph 28 of this
458 Agreement, OR

459 (2) Terminate this Agreement by written notice to Seller, with all deposit monies returned to Buyer according to the terms
460 of Paragraph 26 of this Agreement.

461 **If Buyer and Seller do not reach a mutually acceptable written agreement, and Buyer does not terminate this Agreement**
462 **by written notice to Seller within the time allotted in Paragraph 13(B)(3)(b), Buyer will accept the Property and agree**
463 **to the RELEASE in Paragraph 28 of this Agreement. Ongoing negotiations do not automatically extend the Negotiation**
464 **Period.**

465 (C) If a Report reveals the need to expand or replace the existing individual on-lot sewage disposal system, Seller may, within _____
466 days (25 if not specified) of receiving the Report, submit a Proposal to Buyer. The Proposal will include, but not be limited to,
467 the name of the company to perform the expansion or replacement; provisions for payment, including retests; and a projected
468 completion date for corrective measures. Within _____5_____ DAYS of receiving Seller's Proposal, or **if no Proposal is provided within**
469 **the stated time,** Buyer will notify Seller in writing of Buyer's choice to:

470 1. Agree to the terms of the Proposal, accept the Property and agree to the RELEASE in Paragraph 28 of this Agreement, OR
471 2. Terminate this Agreement by written notice to Seller, with all deposit monies returned to Buyer according to the terms of
472 Paragraph 26 of this Agreement, OR

473 3. Accept the Property and the existing system and agree to the RELEASE in Paragraph 28 of this Agreement. If required by
474 any mortgage lender and/or any governmental authority, Buyer will correct the defects before settlement or within the time
475 required by the mortgage lender and/or governmental authority, at Buyer's sole expense, with permission and access to the
476 Property given by Seller, which may not be unreasonably withheld. If Seller denies Buyer permission and/or access to correct
477 the defects, Buyer may, within _____5_____ DAYS of Seller's denial, terminate this Agreement by written notice to Seller, with all
478 deposit monies returned to Buyer according to the terms of Paragraph 26 of this Agreement.

479 **If Buyer fails to respond** within the time stated in Paragraph 13(C) **or fails to terminate** this Agreement by written notice to
480 Seller within that time, **Buyer will accept the Property** and agree to the RELEASE in Paragraph 28 of this Agreement.

481 **14. TITLES, SURVEYS AND COSTS (9-18)**

482 (A) Within _____ days (7 if not specified) from the Execution Date of this Agreement, Buyer will order from a reputable title company
483 for delivery to Seller a comprehensive title report on the Property. Upon receipt, Buyer will deliver a free copy of the title report
484 to Seller.

485 (B) Buyer is encouraged to obtain an owner's title insurance policy to protect Buyer. An owner's title insurance policy is different
486 from a lender's title insurance policy, which will not protect Buyer from claims and attacks on the title. Owner's title insurance
487 policies come in standard and enhanced versions; **Buyer should consult with a title insurance agent about Buyer's options.**
488 Buyer agrees to release and discharge any and all claims and losses against Broker for Buyer should Buyer neglect to obtain an
489 owner's title insurance policy.

490 (C) Buyer will pay for the following: (1) Title search, title insurance and/or mechanics' lien insurance, or any fee for cancellation;
491 (2) Flood insurance, fire insurance, hazard insurance, mine subsidence insurance, or any fee for cancellation; (3) Appraisal fees
492 and charges paid in advance to mortgage lender; (4) Buyer's customary settlement costs and accruals.

493 (D) Any survey or surveys required by the title insurance company or the abstracting company for preparing an adequate legal descrip-
494 tion of the Property (or the correction thereof) will be obtained and paid for by Seller. Any survey or surveys desired by Buyer or
495 required by the mortgage lender will be obtained and paid for by Buyer.

496 (E) The Property will be conveyed with good and marketable title that is insurable by a reputable title insurance company at the reg-
497 ular rates, free and clear of all liens, encumbrances, and easements, **excepting however** the following: existing deed restrictions;
498 historic preservation restrictions or ordinances; building restrictions; ordinances; easements of roads; easements visible upon the
499 ground; easements of record; and privileges or rights of public service companies, if any.

500 (F) In the event of a change in Seller's financial status affecting Seller's ability to convey title to the Property on or before the
501 Settlement Date, or any extension thereof, Seller shall promptly notify Buyer in writing. A change in financial status includes,
502 but is not limited to, Seller filing bankruptcy; filing of a foreclosure lawsuit against the Property; entry of a monetary judgment
503 against Seller; notice of public tax sale affecting the Property; and Seller learning that the sale price of the Property is no longer
504 sufficient to satisfy all liens and encumbrances against the Property.

505 (G) If Seller is unable to give good and marketable title that is insurable by a reputable title insurance company at the regular rates,
506 as specified in Paragraph 14(E), Buyer may terminate this Agreement by written notice to Seller, with all deposit monies returned
507 to Buyer according to the terms of Paragraph 26 of this Agreement. Upon termination, Seller will reimburse Buyer for any costs
508 incurred by Buyer for any inspections or certifications obtained according to the terms of this Agreement, and for those items
509 specified in Paragraph 14(C) items (1), (2), (3) and in Paragraph 14(D).

510 (H) Oil, gas, mineral, or other rights of this Property may have been previously conveyed or leased, and Sellers make no representation
511 about the status of those rights unless indicated elsewhere in this Agreement.

512 ☐ **Oil, Gas and Mineral Rights Addendum (PAR Form OGM) is attached to and made part of this Agreement.**

513  Buyer Initials: _____    **ASR Page 9 of 14**    Seller Initials: _____

GRASSO002878
**Appx0230**

dotloop signature verification: dtlp.us/enFS-cQlB-sYKL
DocuSign Envelope ID: 62A092BB-B836-491A-A692-20A6E838D519

514   (I)   **COAL NOTICE (Where Applicable)**
515         THIS DOCUMENT MAY NOT SELL, CONVEY, TRANSFER, INCLUDE OR INSURE THE TITLE TO THE COAL AND RIGHTS OF SUPPORT UNDER-
516         NEATH THE SURFACE LAND DESCRIBED OR REFERRED TO HEREIN, AND THE OWNER OR OWNERS OF SUCH COAL MAY HAVE THE COM-
517         PLETE LEGAL RIGHT TO REMOVE ALL SUCH COAL AND IN THAT CONNECTION, DAMAGE MAY RESULT TO THE SURFACE OF THE LAND AND
518         ANY HOUSE, BUILDING OR OTHER STRUCTURE ON OR IN SUCH LAND. (This notice is set forth in the manner provided in Section 1 of
519         the Act of July 17, 1957, P.L. 984.) "Buyer acknowledges that he may not be obtaining the right of protection against subsidence
520         resulting from coal mining operations, and that the property described herein may be protected from damage due to mine subsid-
521         ence by a private contract with the owners of the economic interests in the coal. This acknowledgement is made for the purpose
522         of complying with the provisions of Section 14 of the Bituminous Mine Subsidence and the Land Conservation Act of April 27,
523         1966." Buyer agrees to sign the deed from Seller which deed will contain the aforesaid provision.
524   (J)   The Property is not a "recreational cabin" as defined in the Pennsylvania Construction Code Act unless otherwise stated here:
525         _____
526   (K)   1.   This property is not subject to a Private Transfer Fee Obligation unless otherwise stated here: _____
527              ☐ **Private Transfer Fee Addendum (PAR Form PTF) is attached to and made part of this Agreement.**
528         2.   **Notices Regarding Private Transfer Fees:** In Pennsylvania, Private Transfer Fees are defined and regulated in the Private
529              Transfer Fee Obligation Act (Act 1 of 2011; 68 Pa.C.S. §§ 8101, et. seq.), which defines a Private Transfer Fee as "a fee that
530              is payable upon the transfer of an interest in real property, or payable for the right to make or accept the transfer, if the obli-
531              gation to pay the fee or charge runs with title to the property or otherwise binds subsequent owners of property, regardless of
532              whether the fee or charge is a fixed amount or is determined as a percentage of the value of the property, the purchase price or
533              other consideration given for the transfer." A Private Transfer Fee must be properly recorded to be binding, and sellers must
534              disclose the existence of the fees to prospective buyers. Where a Private Transfer Fee is not properly recorded or disclosed,
535              the Act gives certain rights and protections to buyers.
536   **15.   NOTICES, ASSESSMENTS AND MUNICIPAL REQUIREMENTS (9-18)**
537   (A)   In the event any notices of public and/or private assessments as described in Paragraph 10(F) (excluding assessed value) are
538         received after Seller has signed this Agreement and before settlement, Seller will within _____5_ DAYS of receiving the notices and/
539         or assessments provide a copy of the notices and/or assessments to Buyer and will notify Buyer in writing that Seller will:
540         1.   Fully comply with the notices and/or assessments, at Seller's expense, before settlement. If Seller fully complies with the
541              notices and/or assessments, Buyer accepts the Property and agrees to the RELEASE in Paragraph 28 of this Agreement, OR
542         2.   Not comply with the notices and/or assessments. If Seller chooses not to comply with the notices and/or assessments, or **fails**
543              **within the stated time to notify Buyer whether Seller will comply,** Buyer will notify Seller in writing within ____5__ DAYS
544              that Buyer will:
545              a.   Comply with the notices and/or assessments at Buyer's expense, accept the Property, and agree to the RELEASE in
546                   Paragraph 28 of this Agreement, OR
547              b.   Terminate this Agreement by written notice to Seller, with all deposit monies returned to Buyer according to the terms of
548                   Paragraph 26 of this Agreement.
549              **If Buyer fails to respond** within the time stated in Paragraph 15(A)(2) **or fails to terminate** this Agreement by written notice
550              to Seller within that time, **Buyer will accept the Property** and agree to the RELEASE in Paragraph 28 of this Agreement.
551   (B)   If required by law, within _____30__ DAYS from the Execution Date of this Agreement, but in no case later than _____15__ DAYS prior
552         Settlement Date, Seller will order at Seller's expense a certification from the appropriate municipal department(s) disclosing notice
553         of any uncorrected violations of zoning, housing, building, safety or fire ordinances and/or a certificate permitting occupancy of
554         the Property. If Buyer receives a notice of any required repairs/improvements, Buyer will promptly deliver a copy of the notice to
555         Seller.
556         1.   Within _____5__ DAYS of receiving notice from the municipality that repairs/improvements are required, Seller will deliver a
557              copy of the notice to Buyer and notify Buyer in writing that Seller will:
558              a.   Make the required repairs/improvements to the satisfaction of the municipality. If Seller makes the required repairs/
559                   improvements, Buyer accepts the Property and agrees to the RELEASE in Paragraph 28 of this Agreement, OR
560              b.   Not make the required repairs/improvements. If Seller chooses not to make the required repairs/improvements, Buyer will
561                   notify Seller in writing within _____5__ DAYS that Buyer will:
562                   (1)   Accept a temporary access certificate or temporary use and occupancy certificate, agree to the RELEASE in Paragraph
563                         28 of this Agreement and make the repairs at Buyer's expense after settlement, OR
564                   (2)   Terminate this Agreement by written notice to Seller, with all deposit monies returned to Buyer according to the terms
565                         of Paragraph 26 of this Agreement.
566              **If Buyer fails to respond** within the time stated in Paragraph 15(B)(1)(b) **or fails to terminate** this Agreement by writ-
567              ten notice to Seller within that time, **Buyer will accept the Property** and agree to the RELEASE in Paragraph 28 of this
568              Agreement, and **Buyer accepts the responsibility to perform the repairs/improvements** according to the terms of the
569              notice provided by the municipality.
570         2.   If repairs/improvements are required and Seller fails to provide a copy of the notice to Buyer as required in this Paragraph,
571              Seller will perform all repairs/improvements as required by the notice at Seller's expense. **Paragraph 15(B)(2) will survive**
572              **settlement.**
573   **16.   CONDOMINIUM/PLANNED COMMUNITY (HOMEOWNER ASSOCIATIONS) NOTICE (9-16)**
574   (A)   Property is NOT a Condominium or part of a Planned Community unless checked below.
575         ☐   CONDOMINIUM. The Property is a unit of a condominium that is primarily run by a unit owners' association. Section 3407
576              of the Uniform Condominium Act of Pennsylvania requires Seller to furnish Buyer with a Certificate of Resale and copies of
577              the condominium declaration (other than plats and plans), the bylaws and the rules and regulations of the association.

578   Buyer Initials: _____                         ASR Page 10 of 14                         Seller Initials: _____

dotloop signature verification: dtlp.us/enFS-c0l8-sYKL
DocuSign Envelope ID: 82A092BE-B696-4921-AC69-22A65F938D519

579    ☐   PLANNED COMMUNITY (HOMEOWNER ASSOCIATION). The Property is part of a planned community as defined by
580      the Uniform Planned Community Act. Section 5407(a) of the Act requires Seller to furnish Buyer with a copy of the decla-
581      ration (other than plats and plans), the bylaws, the rules and regulations of the association, and a Certificate containing the
582      provisions set forth in Section 5407(a) of the Act.

583   (B)   **THE FOLLOWING APPLIES TO INITIAL SALES OF PROPERTIES THAT ARE PART OF A CONDOMINIUM**
584      **OR A PLANNED COMMUNITY:**
585      If this is the first sale of the property after creation of the condominium or planned community (therefore a sale by the Declarant),
586      Seller shall furnish Buyer with a Public Offering Statement no later than the date Buyer executes this Agreement. Buyer may void
587      this Agreement within 15 days (if a condominium) or within 7 days (if part of a planned community) after receipt of the Public
588      Offering Statement or any amendment to the Statement that materially and adversely affects Buyer. Upon Buyer declaring this
589      Agreement void, all deposit monies will be returned to Buyer according to the terms of Paragraph 26 of this Agreement.

590   (C)   **THE FOLLOWING APPLIES TO RESALES OF PROPERTIES THAT ARE PART OF A CONDOMINIUM OR A**
591      **PLANNED COMMUNITY:**
592     1.   Within  ___15___   DAYS from the Execution Date of this Agreement, Seller, at Seller's expense, will request from the association
593      a Certificate of Resale and any other documents necessary to enable Seller to comply with the relevant Act. The Act provides
594      that the association is required to provide these documents within 10 days of Seller's request.
595     2.   Seller will promptly deliver to Buyer all documents received from the association. Under the Act, Seller is not liable to Buyer
596      for the failure of the association to provide the Certificate in a timely manner or for any incorrect information provided by the
597      association in the Certificate.
598     3.   The Act provides that Buyer may declare this Agreement VOID at any time before Buyer receives the association documents
599      and for 5 days after receipt, OR until settlement, whichever occurs first. Buyer's notice to Seller must be in writing; upon Buyer
600      declaring this Agreement void, all deposit monies will be returned to Buyer according to the terms of Paragraph 26 of this
601      Agreement.
602     4.   If the association has the right to buy the Property (right of first refusal), and the association exercises that right, Seller will
603      reimburse Buyer for any costs incurred by Buyer for any inspections or certifications obtained according to the terms of the
604      Agreement, and any costs incurred by Buyer for: (1) Title search, title insurance and/or mechanics' lien insurance, or any fee for
605      cancellation; (2) Flood insurance, fire insurance, hazard insurance, mine subsidence insurance, or any fee for cancellation; (3)
606      Appraisal fees and charges paid in advance to mortgage lender.

607 **17. REAL ESTATE TAXES AND ASSESSED VALUE (4-14)**
608      In Pennsylvania, taxing authorities (school districts and municipalities) and property owners may appeal the assessed value of a prop-
609      erty at the time of sale, or at any time thereafter. A successful appeal by a taxing authority may result in a higher assessed value for
610      the property and an increase in property taxes. Also, periodic county-wide property reassessments may change the assessed value of
611      the property and result in a change in property tax.

612 **18. MAINTENANCE AND RISK OF LOSS (1-14)**
613   (A)   Seller will maintain the Property (including, but not limited to, structures, grounds, fixtures, appliances, and personal property)
614      specifically listed in this Agreement in its present condition, normal wear and tear excepted.
615   (B)   If any part of the Property included in the sale fails before settlement, Seller will:
616     1.   Repair or replace that part of the Property before settlement, OR
617     2.   Provide prompt written notice to Buyer of Seller's decision to:
618      a.   Credit Buyer at settlement for the fair market value of the failed part of the Property, as acceptable to the mortgage lender,
619      if any, OR
620      b.   Not repair or replace the failed part of the Property, and not credit Buyer at settlement for the fair market value of the failed
621      part of the Property.
622     3.   If Seller does not repair or replace the failed part of the Property or agree to credit Buyer for its fair market value, **or if Seller fails**
623      **to notify Buyer of Seller's choice,** Buyer will notify Seller in writing within  ___5___   DAYS or before Settlement Date, whichever
624      is earlier, that Buyer will:
625      a.   Accept the Property and agree to the RELEASE in Paragraph 28 of this Agreement, OR
626      b.   Terminate this Agreement by written notice to Seller, with all deposit monies returned to Buyer according to the terms of
627      Paragraph 26 of this Agreement.
628      **If Buyer fails to respond** within the time stated in Paragraph 18(B)(3) **or fails to terminate** this Agreement by written notice
629      to Seller within that time, **Buyer will accept the Property** and agree to the RELEASE in Paragraph 28 of this Agreement.
630   (C)   Seller bears the risk of loss from fire or other casualties until settlement. If any property included in this sale is destroyed and not
631      replaced prior to settlement, Buyer will:
632     1.   Accept the Property in its then current condition together with the proceeds of any insurance recovery obtainable by Seller, OR
633     2.   Terminate this Agreement by written notice to Seller, with all deposit monies returned to Buyer according to the terms of
634      Paragraph 26 of this Agreement.

635 **19. HOME WARRANTIES (1-10)**
636      At or before settlement, either party may purchase a home warranty for the Property from a third-party vendor. Buyer and Seller
637      understand that a home warranty for the Property does not alter any disclosure requirements of Seller, will not cover or warrant any
638      pre-existing defects of the Property, and will not alter, waive or extend any provisions of this Agreement regarding inspections or
639      certifications that Buyer has elected or waived as part of this Agreement. Buyer and Seller understand that a broker who recommends
640      a home warranty may have a business relationship with the home warranty company that provides a financial benefit to the broker.

641   Buyer Initials: _____        **ASR Page 11 of 14**        **Seller Initials** _____ _____

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026   www.zipLogix.com

817 Mairfield Rd

02/20/20   02/20/20
7:01 PM EST   7:06 PM EST
dotloop verified/dotloop verified

GRASSO002880
**Appx0232**

dotloop signature verification: dtlp.us/enFS-c0lB-sYKL
DocuSign Envelope ID: C2A092BB-B596-4291-AC92-2DA5E538D513

642 **20. RECORDING (9-05)**
643     This Agreement will not be recorded in the Office of the Recorder of Deeds or in any other office or place of public record. If Buyer
644     causes or permits this Agreement to be recorded, Seller may elect to treat such act as a default of this Agreement.

645 **21. ASSIGNMENT (1-10)**
646     This Agreement is binding upon the parties, their heirs, personal representatives, guardians and successors, and to the extent assign-
647     able, on the assigns of the parties hereto. Buyer will not transfer or assign this Agreement without the written consent of Seller unless
648     otherwise stated in this Agreement. Assignment of this Agreement may result in additional transfer taxes.

649 **22. GOVERNING LAW, VENUE AND PERSONAL JURISDICTION (9-05)**
650     (A) The validity and construction of this Agreement, and the rights and duties of the parties, will be governed in accordance with the
651         laws of the Commonwealth of Pennsylvania.
652     (B) The parties agree that any dispute, controversy or claim arising under or in connection with this Agreement or its performance
653         by either party submitted to a court shall be filed exclusively by and in the state or federal courts sitting in the Commonwealth of
654         Pennsylvania.

655 **23. FOREIGN INVESTMENT IN REAL PROPERTY TAX ACT OF 1980 (FIRPTA) (1-17)**
656     The disposition of a U.S. real property interest by a foreign person (the transferor) is subject to the Foreign Investment in Real Property
657     Tax Act of 1980 (FIRPTA) income tax withholding. FIRPTA authorized the United States to tax foreign persons on dispositions of U.S.
658     real property interests. This includes but is not limited to a sale or exchange, liquidation, redemption, gift, transfers, etc. Persons pur-
659     chasing U.S. real property interests (transferee) from foreign persons, certain purchasers' agents, and settlement officers are required
660     to withhold up to 15 percent of the amount realized (special rules for foreign corporations). Withholding is intended to ensure U.S.
661     taxation of gains realized on disposition of such interests. The transferee/Buyer is the withholding agent. If you are the transferee/
662     Buyer you must find out if the transferor is a foreign person as defined by the Act. If the transferor is a foreign person and you fail to
663     withhold, you may be held liable for the tax.

664 **24. NOTICE REGARDING CONVICTED SEX OFFENDERS (MEGAN'S LAW) (4-14)**
665     The Pennsylvania General Assembly has passed legislation (often referred to as "Megan's Law," 42 Pa.C.S. § 9791 et seq.) providing
666     for community notification of the presence of certain convicted sex offenders. **Buyers are encouraged to contact the municipal**
667     **police department or the Pennsylvania State Police** for information relating to the presence of sex offenders near a particular prop-
668     erty, or to check the information on the Pennsylvania State Police Web site at www.pamegansLaw.state.pa.us.

669 **25. REPRESENTATIONS (1-10)**
670     (A) All representations, claims, advertising, promotional activities, brochures or plans of any kind made by Seller, Brokers, their licens-
671         ees, employees, officers or partners are not a part of this Agreement unless expressly incorporated or stated in this Agreement.
672         This Agreement contains the whole agreement between Seller and Buyer, and there are no other terms, obligations, covenants,
673         representations, statements or conditions, oral or otherwise, of any kind whatsoever concerning this sale. This Agreement will not
674         be altered, amended, changed or modified except in writing executed by the parties.
675     (B) Unless otherwise stated in this Agreement, Buyer has inspected the Property (including fixtures and any personal property spe-
676         cifically listed herein) **before signing this Agreement or has waived the right to do so, and agrees to purchase the Property**
677         **IN ITS PRESENT CONDITION**, subject to inspection contingencies elected in this Agreement. Buyer acknowledges that
678         Brokers, their licensees, employees, officers or partners have not made an independent examination or determination of the
679         structural soundness of the Property, the age or condition of the components, environmental conditions, the permitted uses, nor of
680         conditions existing in the locale where the Property is situated; nor have they made a mechanical inspection of any of the systems
681         contained therein.
682     (C) Any repairs required by this Agreement will be completed in a workmanlike manner.
683     (D) Broker(s) have provided or may provide services to assist unrepresented parties in complying with this Agreement.

684 **26. DEFAULT, TERMINATION AND RETURN OF DEPOSITS (4-14)**
685     (A) If Buyer terminates this Agreement pursuant to any right granted by this Agreement, Buyer will be entitled to a return of all
686         deposit monies paid on account of Purchase Price pursuant to the terms of Paragraph 26(B), and this Agreement will be VOID.
687         Termination of this Agreement may occur for other reasons giving rise to claims by Buyer and/or Seller for the deposit monies.
688     (B) Regardless of the apparent entitlement to deposit monies, Pennsylvania law does not allow a Broker holding deposit monies to
689         determine who is entitled to the deposit monies when settlement does not occur. Broker can only release the deposit monies:
690         1. If this Agreement is terminated prior to settlement and there is no dispute over entitlement to the deposit monies. A written
691             agreement signed by both parties is evidence that there is no dispute regarding deposit monies.
692         2. If, after Broker has received deposit monies, Broker receives a written agreement that is signed by Buyer and Seller, directing
693             Broker how to distribute some or all of the deposit monies.
694         3. According to the terms of a final order of court.
695         4. According to the terms of a prior written agreement between Buyer and Seller that directs the Broker ho
696             deposit monies if there is a dispute between the parties that is not resolved. (See Paragraph 26(C))
697     (C) Buyer and Seller agree that if there is a dispute over the entitlement to deposit monies that is unresolved   5
698         specified) after the Settlement Date stated in Paragraph 4(A) (or any written extensions thereof) or following termination of the
699         Agreement, whichever is earlier, then the Broker holding the deposit monies will, within 30 days of receipt of Buyer's written
700         request, distribute the deposit monies to Buyer unless the Broker is in receipt of verifiable written notice that the dispute is the
701         subject of litigation or mediation. If Broker has received verifiable written notice of litigation prior to the receipt of Buyer's request
702         for distribution, Broker will continue to hold the deposit monies until receipt of a written distribution agreement between Buyer
703         and Seller or a final court order. Buyer and Seller are advised to initiate litigation for any portion of the deposit monies prior to
704         any distribution made by Broker pursuant to this paragraph. Buyer and Seller agree that the distribution of deposit monies based
705         upon the passage of time does not legally determine entitlement to deposit monies, and that the parties maintain their legal rights
706         to pursue litigation even after a distribution is made.

707   **Buyer Initials:** _JGLL_           **ASR Page 12 of 14**           **Seller Initials:** _CS_ _JS_

GRASSO002881

**Appx0233**

708 (D) Buyer and Seller agree that a Broker who holds or distributes deposit monies pursuant to the terms of Paragraph 26 or Pennsylvania
709 law will not be liable. Buyer and Seller agree that if any Broker or affiliated licensee is named in litigation regarding deposit
710 monies, the attorneys' fees and costs of the Broker(s) and licensee(s) will be paid by the party naming them in litigation.
711 (E) Seller has the option of retaining all sums paid by Buyer, including the deposit monies, should Buyer:
712     1.   Fail to make any additional payments as specified in Paragraph 2, OR
713     2.   Furnish false or incomplete information to Seller, Broker(s), or any other party identified in this Agreement concerning Buyer's
714         legal or financial status, OR
715     3.   Violate or fail to fulfill and perform any other terms or conditions of this Agreement.
716 (F) **Unless otherwise checked in Paragraph 26(G),** Seller may elect to retain those sums paid by Buyer, including deposit monies:
717     1.   On account of purchase price, OR
718     2.   As monies to be applied to Seller's damages, OR
719     3.   As liquidated damages for such default.
720 (G)  ☒  **SELLER IS LIMITED TO RETAINING SUMS PAID BY BUYER, INCLUDING DEPOSIT MONIES, AS LIQUI-**
721        **DATED DAMAGES.**
722 (H) If Seller retains all sums paid by Buyer, including deposit monies, as liquidated damages pursuant to Paragraph 26(F) or (G), Buyer
723 and Seller are released from further liability or obligation and this Agreement is VOID.
724 (I) Brokers and licensees are not responsible for unpaid deposits.
725 **27. MEDIATION (1-10)**
726 Buyer and Seller will submit all disputes or claims that arise from this Agreement, including disputes and claims over deposit monies,
727 to mediation. Mediation will be conducted in accordance with the Rules and Procedures of the Home Sellers/Home Buyers Dispute
728 Resolution System, unless it is not available, in which case Buyer and Seller will mediate according to the terms of the mediation
729 system offered or endorsed by the local Association of Realtors®. Mediation fees, contained in the mediator's fee schedule, will be
730 divided equally among the parties and will be paid before the mediation conference. This mediation process must be concluded before
731 any party to the dispute may initiate legal proceedings in any courtroom, with the exception of filing a summons if it is necessary to
732 stop any statute of limitations from expiring. Any agreement reached through mediation and signed by the parties will be binding. Any
733 agreement to mediate disputes or claims arising from this Agreement will survive settlement.
734 **28. RELEASE (9-05)**
735 **Buyer releases, quit claims and forever discharges SELLER, ALL BROKERS, their LICENSEES, EMPLOYEES and any**
736 **OFFICER or PARTNER of any one of them and any other PERSON, FIRM or CORPORATION who may be liable by or**
737 **through them, from any and all claims, losses or demands,** including, but not limited to, personal injury and property damage and
738 all of the consequences thereof, whether known or not, which may arise from the presence of termites or other wood-boring insects,
739 radon, lead-based paint hazards, mold, fungi or indoor air quality, environmental hazards, any defects in the individual on-lot sewage
740 disposal system or deficiencies in the on-site water service system, or any defects or conditions on the Property. Should Seller be in
741 default under the terms of this Agreement or in violation of any Seller disclosure law or regulation, this release does not deprive Buyer
742 of any right to pursue any remedies that may be available under law or equity. This release will survive settlement.
743 **29. REAL ESTATE RECOVERY FUND (4-18)**
744 A Real Estate Recovery Fund exists to reimburse any persons who have obtained a final civil judgment against a Pennsylvania real
745 estate licensee (or a licensee's affiliates) owing to fraud, misrepresentation, or deceit in a real estate transaction and who have been
746 unable to collect the judgment after exhausting all legal and equitable remedies. For complete details about the Fund, call (717) 783-
747 3658.
748 **30. COMMUNICATIONS WITH BUYER AND/OR SELLER (1-10)**
749 (A) If Buyer is obtaining mortgage financing, Buyer shall promptly deliver to Broker for Buyer, if any, a copy of all Loan Estimate(s)
750 and Closing Disclosure(s) upon receipt.
751 (B) Wherever this Agreement contains a provision that requires or allows communication/delivery to a Buyer, that provision shall be
752 satisfied by communication/delivery to the Broker for Buyer, if any, **except for documents required to be delivered pursuant**
753 **to Paragraph 16.** If there is no Broker for Buyer, those provisions may be satisfied only by communication/delivery being made
754 directly to the Buyer, unless otherwise agreed to by the parties. Wherever this Agreement contains a provision that requires or
755 allows communication/delivery to a Seller, that provision shall be satisfied by communication/delivery to the Broker for Seller, if
756 any. If there is no Broker for Seller, those provisions may be satisfied only by communication/delivery being made directly to the
757 Seller, unless otherwise agreed to by the parties.
758 **31. HEADINGS (4-14)**
759 The section and paragraph headings in this Agreement are for convenience only and are not intended to indicate all of the matter in the
760 sections which follow them. They shall have no effect whatsoever in determining the rights, obligations or intent of the parties.

761   Buyer Initials: _____           **ASR Page 13 of 14**           Seller Initials: _____

817 Mairfield Rd

GRASSO002882

**Appx0234**

dotloop signature verification: dtlp.us/enFs-cOlB-sYKL
DocuSign Envelope ID: 02A092BB-B396-4921-AE93-2DA6F538D519

Case 2:21-cv-05472-CMR    Document 10-13    Filed 01/25/22    Page 14 of 14

762  **32. SPECIAL CLAUSES (1-10)**
763  (A)  **The following are attached to and made part of this Agreement if checked:**
764  ☐ Sale & Settlement of Other Property Contingency Addendum (PAR Form SSP)
765  ☐ Sale & Settlement of Other Property Contingency with Right to Continue Marketing Addendum (PAR Form SSPCM)
766  ☐ Sale & Settlement of Other Property Contingency with Timed Kickout Addendum (PAR Form SSPTKO)
767  ☐ Settlement of Other Property Contingency Addendum (PAR Form SOP)
768  ☐ Appraisal Contingency Addendum (PAR Form ACA)
769  ☐ Short Sale Addendum (PAR Form SHS)
770  ☑ Addendum/ Endorsement to The Agreement of Sale
771
772  _____

773  (B)  Additional Terms: ~~It is agreed and understood by all parties that the $200,000 held in escrow by Keller Williams Philadelphia is~~
774  ~~non refundable; should the buyer default for any reason, as long as there is not a Seller default including but not limited to~~
775  ~~items specified in paragraph 18, then the monies will be immediately released to the Sellers Joseph and Cheryl Soffer. The~~
776  ~~sellers are responsible for ensuring the septic system is fully functioning and in proper working order. The inspection will be~~
777  ~~done at the expense of the Buyer by a licensed septic inspection company, who must verify it is in proper order.~~
778
779  Seller shall cause the Steves Stucco Remediation to be completed prior to settlement, and all warranties and guarantees shall be
780  transferable to the Buyer at time of final settlement.
781
782
783
784
785
786
787

788  Buyer and Seller acknowledge receipt of a copy of this Agreement at the time of signing.

789  **This Agreement may be executed in one or more counterparts,** each of which shall be deemed to be an original and which counterparts
790  together shall constitute one and the same Agreement of the Parties.

791  **NOTICE TO PARTIES: WHEN SIGNED, THIS AGREEMENT IS A BINDING CONTRACT.** Parties to this transaction are
792  advised to consult a Pennsylvania real estate attorney before signing if they desire legal advice.

793  Return of this Agreement, and any addenda and amendments, including **return by electronic transmission**, bearing the signatures of all
794  parties, constitutes acceptance by the parties.

795  Buyer has received the Consumer Notice as adopted by the State Real Estate Commission at 49 Pa. Code §35.336.

796  Buyer has received a statement of Buyer's estimated closing costs before signing this Agreement.

797  Buyer has received the Deposit Money Notice (for cooperative sales when Broker for Seller is holding deposit money)
798  before signing this Agreement.

799  Buyer has received the Lead-Based Paint Hazards Disclosure, which is attached to this Agreement of Sale. Buyer has
800  received the pamphlet Protect Your Family from Lead in Your Home (for properties built prior to 1978).

801  BUYER  _Joe Grasso (GF2014 LP)_  8/30/2020 | 7:04 PM PST  DATE 2/18/2020 | 7:30 PM PST
       GF2014 LP     3C597D49BD3D402...
802  BUYER  _____  DATE _____
803  BUYER  _____  DATE _____

804  Seller has received the Consumer Notice as adopted by the State Real Estate Commission at 49 Pa. Code §35.336.
805  Seller has received a statement of Seller's estimated closing costs before signing this Agreement.

806  SELLER  _Joseph Soffer_  dotloop verified 02/20/20 7:06 PM EST WNVR-VMLA-1R9Z-PHXI  DATE _____
        Joseph Soffer
807  SELLER  _Cheryl Soffer_  dotloop verified 02/20/20 7:11 PM EST CXE1-HTMI-N04W-XHZI  DATE _____
        Cheryl Soffer
808  SELLER  _____  DATE _____

Produced with zipForm® by zipLogix  18070 Fifteen Mile Road, Fraser, Michigan 48026  www.zipLogix.com     817 Mairfield Rd

GRASSO002883
**Appx0235**

Online Banking | Citizens Bank

# Check Image



This is an image of an item (check, substitute check, or debit memo) which has posted to your account. Items resulting in a non-sufficient funds situation may not have been paid. Unpaid items will show as a credit item in your account history on the business date following the date the item was presented.

| EXHIBIT | EXHIBIT |
|---------|---------|
| KATZ-119 | 11 |

GRASSO000242

Appx0236

EXHIBIT
KATZ-120

EXHIBIT
12

## SWORN STATEMENT IN PROOF OF LOSS

| | |
|---|---|
| 026032320 **POLICY NUMBER** | 9549224463US **COMPANY CLAIM NO** |
| $ 125,407,884 **AMOUNT OF POLICY AT TIME OF LOSS** | 026032320 **POLICY NO.** |
| 8-17-2017 **DATE ISSUED** | The Graham Company **AGENCY AT** |
| 8-17-2019 **DATE EXPIRES** | Lisa Talley **AGENT** |

To the   American Home Assurance Company
of   175 Water Street, New York, New York 10038
At time of loss, by the above indicated policy of insurance you insured   U.S. Realty Associates, Inc.

against loss by   All Risks of Physical Loss or Damage   to the property described according to the terms and conditions of the said policy and all forms, endorsements, transfers and assignments attached thereto.

1.  Time and Origin: An   explosion   loss occurred about the hour of   8   o'clock   P   M.,
On the   4th   day of   November   20 18 .   The cause and origin of the said loss were;
An explosion resulting from a gas leak. The cause of the gas leak is undetermined following the ATF's investigation.

2.  Occupancy: The building described, or containing the property described, was occupied at the time of the loss as follows, and for no other purpose whatever:   Residence - Mansion occupied by entrusted party

3.  Title and Interest: At the time of the loss the interest of your insured in the property described therein was
U.S. Realty Associates, Inc.   No other person or persons had any interest therein
or encumbrance thereon, except:   None known

4.  Changes: Since the said policy was issued there has been no assignment thereof, or change of interest, use, occupancy, possession, location or exposure of the property described, except:   None Known

5.  Total Insurance: The total amount of insurance upon the property described by this policy was, at the time of the loss,
$ 125,407,884 .

6.  Full Cost of said property at time of loss . . . . . . . . . . . . . $   Undetermined
7.  Full Cost of Repair or Replacement . . . . . . . . . . . . . $   >3,000,000
8.  Applicable Depreciation, Betterment and/or Reduction . . . . . . . . . . $   N/A
9.  Undisputed amount agreed for first partial payment . . . . . . . . . $   3,000,000

The said loss did not originate by any act, design or procurement on the part of your insured, or this affiant; nothing has been done by or with the privity or consent of your insured or this affiant, to violate the conditions of the policy, or render it void; no articles are mentioned herein or in annexed schedules but such as were destroyed or damaged at the time of said loss; no property saved has in any manner been concealed, and no attempt to deceive the said company, as to the extent of said loss, has in any manner been made. Any other information that may be required will be furnished and considered a part of this proof.

The furnishing of this blank or the preparation of proofs by a representative of the above insurance company is not a waiver of any of its rights.

State of   Pennsylvania
County of   Montgomery
Subscribed and sworn to before me this   30th   day of   JANUARY   20 20

Michael Grosso, President   Insured

Notary Public

Commonwealth of Pennsylvania - Notary Seal
Robert A. Greenberg, Notary Public
Montgomery County
My commission expires December 1, 2021
Commission number 1062272
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

**EXHIBIT 13**

**EXHIBIT KATZ 142**

Appx0238

## SWORN STATEMENT IN PROOF OF LOSS

| | |
|---|---|
| 025032320 | 8348143042US |
| **POLICY NUMBER** | **COMPANY CLAIM NO** |
| $   125,407,884 | 025032320 |
| **AMOUNT OF POLICY AT** | **POLICY NO,** |
| **TIME OF LOSS** | |
| 8-17-2017 | The Graham Company |
| **DATE ISSUED** | **AGENCY AT** |
| 8-17-2019 | Lisa Talley |
| **DATE EXPIRES** | **AGENT** |

To the   American Home Assurance Company

of   175 Water Street, New York, New York 10038

At time of loss, by the above indicated policy of insurance you insured   U.S. Realty Associates, Inc.

against loss by   All Risks of Physical Loss or Damage   to the property described according to
the terms and conditions of the said policy and all forms, endorsements, transfers and assignments attached thereto.

1.   Time and Origin: An   explosion   loss occurred about the hour of   8   o'clock   P   M.,

On the   4th   day of   November   20  18 .   The cause and origin of the said loss were:
An explosion resulting from a gas leak.  The cause of the gas leak is undetermined following the ATF's investigation.

2.   Occupancy: The building described, or containing the property described, was occupied at the time of the loss as follows, and
for no other purpose whatever:   Residence  - Mansion occupied by entrusted party

3.   Title and Interest: At the time of the loss the interest of your insured in the property described therein was
U.S. Realty Associates, Inc.   No other person or persons had any interest therein
or encumbrance thereon, except:   None known

4.   Changes: Since the said policy was issued there has been no assignment thereof, or change of interest, use, occupancy,
possession, location or exposure of the property described, except:   None Known

5.   Total Insurance: The total amount of insurance upon the property described by this policy was, at the time of the loss,
$   125,407,884   .

| | | |
|---|---|---|
| 6.   Full Cost of said property at time of loss. . . . . . . . . . . . . . . . . | $ | Undetermined |
| 7.   Undisputed Amount of Repair or Replacement . . . . . . . . . . . . . | $ | 3,339,818.59 · |
| 8.   Applicable Depreciation, Betterment and/or Reduction . . . . . . . . . . . . | $ | (209,442.67) |
| 9.   Minus Previous Payment . . . . . . . . . . . . . . . . . . | $ | (3,000,000) |
| 10.  Minus Deductible . . . . . . . . . . . . . . . . . . . . . | $ | (10,000) |
| 11.  Undisputed amount of second partial payment . . . . . . . . . . . . . | $ | 120,375.92 |

The said loss did not originate by any act, design or procurement on the part of your insured, or this affiant; nothing has been done by or
with the privity or consent of your insured or this affiant, to violate the conditions of the policy, or render it void; no articles are mentioned
herein or in annexed schedules but such as were destroyed or damaged at the time of said loss; no property saved has in any manner
been concealed, and no attempt to deceive the said company, as to the extent of said loss, has in any manner been made.  Any other
information that may be required will be furnished and considered a part of this proof.

The furnishing of this blank or the preparation of proofs by a representative of the above insurance company is not a waiver of any of
its rights.

By   US Realty Associates, Inc.

State of   Pennsylvania

County of   Montgomery   Michael Grasso  President   Insured

Subscribed and sworn to before me this   28th   day of   February   20  20

_____ Notary Public

Commonwealth of Pennsylvania - Notary Seal
Robert A. Greenberg, Notary Public
Montgomery County
My commission expires December 1, 2021
Commission number 1082272
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

**EXHIBIT
KATZ 143**

**EXHIBIT
14**

M

**DEPOSIT TICKET**

3-7380/2360

METRO DEVELOPMENT CO.
PARTNERSHIP DISBURSEMENT ACCOUNT
120-124 EAST LANCASTER AVENUE, SUITE 101
ARDMORE, PA 19003

**F1RSTRUST BANK**
800.220.BANK / firstrust.com

DATE 3-11-20
DEPOSITS MAY NOT BE AVAILABLE FOR IMMEDIATE WITHDRAWAL

| | DOLLARS | CENTS |
|---|---|---|
| CURRENCY | | |
| COIN | | |
| CHECKS LIST EACH SEPARATELY | | |
| 58-937 | 3,000.00 | — |

TOTAL FROM OTHER SIDE OR ATTACHED LIST

BE SURE EACH ITEM IS PROPERLY ENDORSED
TOTAL ITEMS  3,000,000  —

Checks and other items are received for deposit subject to the provisions of the Uniform Commercial Code or any applicable collection agreement.

GT 2014  $ 30000000.00  20

FOR SECURITY PURPOSES, THE FACE OF THIS DOCUMENT CONTAINS A BLUE BACKGROUND AND MICROPRINTING IN THE BORDER

AMERICAN HOME ASSURANCE COMPANY

Claim No. 83481450420
Reason for Payment  First Partial Payment.
US Policy No. 008025032520

*********Three Million Dollars***

PAY
TO THE
ORDER OF

U.S. REALTY ASSOCIATES, INC.
Clarke & Cohen

JPMORGAN CHASE BANK, N.A.
SYRACUSE, NY 13206

THE WATERMARK IS NOT PRESENT ON THE REVERSE SIDE OF THIS DOCUMENT - HOLD AT AN ANGLE TO VIEW

CHECK NO.  34336471
REF No.  001441180
DATE  02/08/2020

Void after 90 Days

AUTHORIZED SIGNATURE

*****$3,000,000.00

AMOUNT PAID

EXHIBIT
15

EXHIBIT
KATZ 147

GRASSO001841

Appx0240

DocuSign Envelope ID: FCase 2521-67305472-CMB 34ADocument 10-19   Filed 01/25/22   Page 1 of 10

## SELLER'S PROPERTY DISCLOSURE STATEMENT

SPD

This form recommended and approved for, but not restricted to use, the members of the Pennsylvania Association of Realtors® (PAR).

1 PROPERTY _649 Dodds Lane Gladwyne, PA 19035_
2 SELLER _GF2014LP_

3              **INFORMATION REGARDING THE REAL ESTATE SELLER DISCLOSURE LAW**

4      Generally speaking, the Real Estate Seller Disclosure Law (68 P.S. §7301 et seq.) requires that before an agreement of sale is signed, the
5 seller in a residential real estate transfer must make certain disclosures regarding the property to potential buyers in a form defined by the
6 law. A residential real estate transfer is defined as a sale, exchange, installment sales contract, lease with an option to buy, grant or other
7 transfer of an interest in real property where **NOT LESS THAN ONE AND NOT MORE THAN FOUR RESIDENTIAL DWELLING**
8 **UNITS** are involved. The Law defines a number of exceptions where the disclosures do not have to be made:

9    1.  Transfers that are the result of a court order.
10   2.  Transfers to a mortgage lender that result from a buyer's default and subsequent foreclosure sales that result from default.
11   3.  Transfers from a co-owner to one or more other co-owners.
12   4.  Transfers made to a spouse or direct descendant.
13   5.  Transfers between spouses that result from divorce, legal separation, or property settlement.
14   6.  Transfers by a corporation, partnership or other association to its shareholders, partners or other equity owners as part of a plan of
15        liquidation.
16   7.  Transfer of a property to be demolished or converted to non-residential use.
17   8.  Transfer of unimproved real property.
18   9.  Transfers by a fiduciary during the administration of a decedent estate, guardianship, conservatorship or trust.
19   10. Transfers of new construction that has never been occupied when:
20        a.  The buyer has received a one-year warranty covering the construction;
21        b.  The building has been inspected for compliance with the applicable building code or, if none, a nationally recognized model
22             building code; and
23        c.  A certificate of occupancy or a certificate of code compliance has been issued for the dwelling.

24     In addition to these exceptions, disclosures for condominiums and cooperatives are limited to the seller's particular unit(s). Disclosures
25 regarding common areas or facilities are not required, as those elements are already addressed in the laws that govern the resale of condo-
26 minium and cooperative interests.

27     While the Law requires certain disclosures, this statement includes disclosures beyond the basic requirements of the Law in an effort to
28 assist sellers in complying with seller disclosure requirements and to assist buyers in evaluating the property being considered. Sellers who
29 wish to see or use the basic disclosure form can find the form on the Web site of the Pennsylvania State Real Estate Commission.

30     This Statement discloses Seller's knowledge of the condition of the property as of the date signed by Seller and **is not a substitute for**
31 **any inspections or warranties** that Buyer may wish to obtain. This Statement is not a warranty of any kind by Seller or a warranty or rep-
32 resentation by any listing real estate broker, any selling real estate broker, or their licensees. Buyer is encouraged to address concerns about
33 the condition of the property that may not be included in this Statement. This Statement does not relieve Seller of the obligation to disclose
34 a **material defect** that may not be addressed in this form.

35     A **material defect** is a problem with a residential real property or any portion of it that would have a significant adverse impact on the
36 value of the property or that involves an unreasonable risk to people on the property. The fact that a structural element, system or subsystem
37 is at or beyond the end of the normal useful life of such a structural element, system or subsystem is not by itself a material defect.
38
39     **Check yes, no, unknown (unk) or not applicable (N/A) for each question.** Be sure to check N/A when a question does not apply to
40 the property. Check unknown when the question does apply to the property but you are not sure of the answer.

<table>
<tr><td>EXHIBIT<br>**16**</td><td>EXHIBIT<br>**KATZ-160**</td></tr>
</table>

41 Seller's Initials _JC_ / _____ Date _11/9/2017_ | 2:31 PM EST        Buyer's Initials _____ / _____   Date _____
                                                    **SPD Page 1 of 10**

Pennsylvania Association of REALTORS®

COPYRIGHT PENNSYLVANIA ASSOCIATION OF REALTORS® 2016
1/16

BHHS - Fox & Roach REALTORS - Haverford Home Marketing Center, 338 West Lancaster Ave   Haverford, PA 19041
Phone: (610)649-4500        Fax: (610)649-5020        Lynn Berger                                   NEW_Joe Grasso

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026   www.zipLogix.com

Appx0241

**1. SELLER'S EXPERTISE**

| | Yes | No | Unk | N/A |
|---|---|---|---|---|
| A | X | | | |
| B | | X | | |
| C | | X | | |

(A) Does Seller possess expertise in contracting, engineering, architecture, environmental assessment or other areas related to the construction and conditions of the property and its improvements?
(B) Is Seller the landlord for the property?
(C) Is Seller a real estate licensee?

Explain any "yes" answers in Section 1: _____

**2. OWNERSHIP/OCCUPANCY**

| | Yes | No | Unk | N/A |
|---|---|---|---|---|
| 1 | | | X | |
| 2 | X | | | |
| 3 | | | | |
| B 1 | X | | | |
| 2 | | | | |
| 3 | | | | |
| 4 | | | | |
| 5 | | | | |
| C | | | | |
| D | | | | |

(A) **Occupancy**
   1. When was the property most recently occupied? _____
   2. Was the Seller the most recent occupant? If "no," when did the Seller most recently occupy the property? _____
   3. How many persons most recently occupied the property?  4
(B) **Role of Individual Completing This Disclosure.** Is the individual completing this form:
   1. The owner
   2. The executor
   3. The administrator
   4. The trustee
   5. An individual holding power of attorney
(C) When was the property purchased? _____
(D) Are you aware of any pets having lived in the house or other structures during your ownership?

Explain section 2 (if needed): _____

**3. CONDOMINIUMS/PLANNED COMMUNITIES/OTHER HOMEOWNERS ASSOCIATIONS**

| | Yes | No | Unk | N/A |
|---|---|---|---|---|
| 1 | | X | | |
| 2 | | X | | |
| 3 | | X | | |
| 4 | | X | | |
| B | | | | |
| C | | X | | |
| | | | | |
| D 1 | | | | |
| 2 | | | | |
| 3 | | | | |
| 4 | | | | |
| E | | | | |

(A) **Type.** Is the Property part of a(n):
   1. Condominium
   2. Homeowners association or planned community
   3. Cooperative
   4. Other type of association or community _____
(B) If "yes," how much are the fees? $ _____ , paid ( ☐ Monthly)( ☐ Quarterly)( ☐ Yearly)
(C) If "yes," are there any community services or systems that the association or community is responsible for supporting or maintaining? Explain: _____

(D) If "yes," provide the following information about the association:
   1. Community Name _____
   2. Contact _____
   3. Mailing Address _____
   4. Telephone Number _____
(E) How much is the capital contribution/initiation fee? $ _____
*Notice to Buyer: A buyer of a resale unit in a condominium, cooperative, or planned community must receive a copy of the declaration (other than the plats and plans), the by-laws, the rules or regulations, and a certificate of resale issued by the association in the condominium, cooperative, or planned community. Buyers may be responsible for capital contributions, initiation fees or similar one-time fees in addition to regular monthly maintenance fees. The buyer will have the option of canceling the agreement with the return of all deposit monies until the certificate has been provided to the buyer and for five days thereafter or until conveyance, whichever occurs first.*

**4. ROOF AND ATTIC**

| | Yes | No | Unk | N/A |
|---|---|---|---|---|
| 1 | | | | |
| 2 | | | | |
| B 1 | X | | | |
| 2 | | | | |
| C 1 | X | | | |
| 2 | | X | | |

(A) **Installation**
   1. When was the roof installed?  4 years ago
   2. Do you have documentation (invoice, work order, warranty, etc.)?
(B) **Repair**
   1. Has the roof or any portion of it been replaced or repaired during your ownership?
   2. If it has been replaced or repaired, was the existing roofing material removed?
(C) **Issues**
   1. Has the roof ever leaked during your ownership?
   2. Are you aware of any current/past problems with the roof, gutters, flashing or downspouts?
**Explain any "yes" answers in section 4, including the location and extent of any problem(s) and any repair or remediation efforts:** _____

Seller's Initials _____ / _____    Date  11/9/2017 | 2:31 PM EST    SPD Page 2 of 10    Buyer's Initials _____ / _____    Date _____

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026    www.zipLogix.com    NEW_Joe Grasso

Appx0242

**5. BASEMENTS AND CRAWL SPACES**

| | | Yes | No | Unk | N/A | |
|---|---|---|---|---|---|---|
| | | | | | | **(A) Sump Pump** |
| 101 | 1 | | X | | | 1. Does the property have a sump pit? If yes, how many? _____ |
| 102 | 2 | | X | | | 2. Does the property have a sump pump? If yes, how many? _____ |
| 103 | 3 | | X | | | 3. If it has a sump pump, has it ever run? |
| 104 | 4 | | X | | | 4 If it has a sump pump, is the sump pump in working order? |
| 105 | | | | | | **(B) Water Infiltration** |
| 107 | 1 | | X | | | 1. Are you aware of any water leakage, accumulation, or dampness within the basement or crawl space? |
| 109 | 2 | | X | | | 2. Do you know of any repairs or other attempts to control any water or dampness problem in the basement or crawl space? |
| 111 | 3 | | X | | | 3. Are the downspouts or gutters connected to a public system? _____ |

**Explain any "yes" answers in this section, including the location and extent of any problem(s) and any repair or remediation efforts:** _____

**6. TERMITES/WOOD-DESTROYING INSECTS, DRYROT, PESTS**

| | | Yes | No | Unk | N/A | |
|---|---|---|---|---|---|---|
| | | | | | | **(A) Status** |
| 116 | 1 | | X | | | 1. Are you aware of any termites/wood-destroying insects, dryrot, or pests affecting the property? |
| 117 | 2 | | X | | | 2. Are you aware of any damage caused by termites/wood-destroying insects, dryrot, or pests? |
| 118 | | | | | | **(B) Treatment** |
| 119 | 1 | | X | | | 1. Is your property currently under contract by a licensed pest control company? |
| 120 | 2 | | X | | | 2. Are you aware of any termite/pest control reports or treatments for the property? |

**Explain any "yes" answers in section 6, including the name of any service/treatment provider, if applicable:** _____

**7. STRUCTURAL ITEMS**

| | | Yes | No | Unk | N/A | |
|---|---|---|---|---|---|---|
| 124 | A | | X | | | (A) Are you aware of any past or present movement, shifting, deterioration, or other problems with walls, foundations, or other structural components? |
| 126 | B | | X | | | (B) Are you aware of any past or present problems with driveways, walkways, patios, or retaining walls on the property? |
| 128 | C | | X | | | (C) Are you aware of any past or present water infiltration in the house or other structures, other than the roof, basement or crawl spaces? |
| 130 | | | | | | **(D) Stucco and Exterior Synthetic Finishing Systems** |
| 131 | 1 | | X | | | 1. Is your property constructed with stucco? |
| 132 | 2 | | X | | | 2. Is your property constructed with an Exterior Insulating Finishing System (EIFS), such as Dryvit or synthetic stucco, synthetic brick or synthetic stone? |
| 134 | 3 | | | | | 3. If "yes," when was it installed? _____ |
| 135 | E | | X | | | (E) Are you aware of any fire, storm, water or ice damage to the property? |
| 136 | F | | X | | | (F) Are you aware of any defects (including stains) in flooring or floor coverings? |

**Explain any "yes" answers in section 7, including the location and extent of any problem(s) and any repair or remediation efforts:** _____

**8. ADDITIONS/ALTERATIONS**

| | | Yes | No | Unk | N/A | |
|---|---|---|---|---|---|---|
| 140 | A | X | | | | (A) Have any additions, structural changes, or other alterations been made to the property during your ownership? Itemize and date all additions/alterations below. |
| 142 | B | | X | | | (B) Are you aware of any private or public architectural review control of the property other than zoning codes? |

| Addition, structural change, or alteration | Approximate date of work | Were permits obtained? (Yes/No/Unknown) | Final inspections/ approvals obtained? (Yes/No/Unknown) |
|---|---|---|---|
| new addition | 8 | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

☐ A sheet describing other additions and alterations is attached.

Seller's Initials _____ / _____   Date 11/9/2017 | 2:31 PM EST   Buyer's Initials _____ / _____   Date _____

SPD Page 3 of 10

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026   www.zipLogix.com

NEW_Joe Grasso

**Appx0243**

155 *Note to Buyer: The PA Construction Code Act, 35 P.S. §7210 et seq. (effective 2004), and local codes es-*
156 *tablish standards for building and altering properties. Buyers should check with the municipality to de-*
157 *termine if permits and/or approvals were necessary for disclosed work and if so, whether they were*
158 *obtained. Where required permits were not obtained, the municipality might require the current owner to*
159 *upgrade or remove changed made by the prior owners. Buyers can have the property inspected by an ex-*
160 *pert in codes compliance to determine if issues exist. Expanded title insurance policies may be available*
161 *for Buyers to cover the risk of work done to the property by previous owners without a permit or approval.*
162 *Note to Buyer: According to the PA Stormwater Management Act, each municipality must enact a Storm*
163 *Water Management Plan for drainage control and flood reduction. The municipality where the property*
164 *is located may impose restrictions on impervious or semi-pervious surfaces added to the property. Buyers*
165 *should contact the local office charged with overseeing the Stormwater Management Plan to determine*
166 *if the prior addition of impervious or semi-pervious areas, such as walkways, decks, and swimming pools,*
167 *might affect your ability to make future changes.*

**9.   WATER SUPPLY**

(A) **Source.** Is the source of your drinking water (check all that apply)?

| | Yes | No | Unk | N/A | |
|---|---|---|---|---|---|
| 1 | X | | | | 1. Public |
| 2 | | X | | | 2. A well on the property |
| 3 | | X | | | 3. Community water |
| 4 | | X | | | 4. A holding tank |
| 5 | | X | | | 5. A cistern |
| 6 | | X | | | 6. A spring |
| 7 | | X | | | 7. Other |
| 8 | | X | | | 8. No water service (explain): |

(B) **Bypass Valve** (for properties with multiple sources of water)

| | Yes | No | Unk | N/A | |
|---|---|---|---|---|---|
| 1 | | X | | | 1. Does your water source have a bypass valve? |
| 2 | | X | | | 2. If "yes," is the bypass valve working? |

(C) **Well**

| | Yes | No | Unk | N/A | |
|---|---|---|---|---|---|
| 1 | | X | | | 1. Has your well ever run dry? |
| 2 | | | | | 2. Depth of Well |
| 3 | | | | | 3. Gallons per minute _____ , measured on (date) _____ |
| 4 | | X | | | 4. Is there a well used for something other than the primary source of drinking water? |
| 5 | | X | | | 5. If there is an unused well, is it capped? |

(D) **Pumping and Treatment**

| | Yes | No | Unk | N/A | |
|---|---|---|---|---|---|
| 1 | | X | | | 1. If your drinking water source is not public, is the pumping system in working order? If "no," explain: |
| 2 | | X | | | 2. Do you have a softener, filter, or other treatment system? |
| 3 | | X | | | 3. Is the softener, filter, or other treatment system leased? From whom? |

(E) **General**

| | Yes | No | Unk | N/A | |
|---|---|---|---|---|---|
| 1 | | | | | 1. When was your water last tested? _____ Test results: _____ |
| 2 | | | | | 2. Is the water system shared? With whom? _____ |

(F) **Issues**

| | Yes | No | Unk | N/A | |
|---|---|---|---|---|---|
| 1 | | X | | | 1. Are you aware of any leaks or other problems, past or present, relating to the water supply, pumping system, and related items? |
| 2 | | X | | | 2. Have you ever had a problem with your water supply? |

**Explain any "yes" answers in section 9, including the location and extent of any problem(s) and any repair or remediation efforts:** _____

**10. SEWAGE SYSTEM**

(A) **General**

| | Yes | No | Unk | N/A | |
|---|---|---|---|---|---|
| 1 | X | | | | 1. Is your property served by a sewage system (public, private or community)? |
| 2 | | | | | 2. If no, is it due to availability or permit limitations? |
| 3 | | | X | | 3. When was the sewage system installed (or date of connection, if public)? _____ |

(B) **Type** Is your property served by:

| | Yes | No | Unk | N/A | |
|---|---|---|---|---|---|
| 1 | X | | | | 1. Public (if "yes," continue to D through G below) |
| 2 | | | | | 2. Community (non-public) |
| 3 | | | | | 3. An individual on-lot sewage disposal system |
| 4 | | | | | 4. Other, explain: |

212  Seller's Initials ___ / ___   Date 11/9/2017 | 2:31 PM EST   **SPD Page 4 of 10**   Buyer's Initials ___ / ___   Date ___

**Appx0244**

| | Yes | No | Unk | N/A |
|---|---|---|---|---|
| | | | | |

**(C) Individual On-lot Sewage Disposal System.** Is your sewage system (check all that apply):

| 213 | | Yes | No | Unk | N/A |
|---|---|---|---|---|---|
| 214 | 1 | X | | | | 1. Within 100 feet of a well |
| 215 | 2 | | X | | | 2. Subject to a ten-acre permit exemption |
| 216 | 3 | | X | | | 3. A holding tank |
| 217 | 4 | | X | | | 4. A drainfield |
| 218 | 5 | | X | | | 5. Supported by a backup or alternate drainfield, sandmound, etc. |
| 219 | 6 | X | | | | 6. A cesspool |
| 220 | 7 | | X | | | 7. Shared |
| 221 | 8 | | | | | 8. Other, explain: _____ |

**(D) Tanks and Service**

| 222 | | | | | |
|---|---|---|---|---|---|
| 223 | 1 | | | | | 1. Are there any metal/steel septic tanks on the Property? |
| 224 | 2 | | | | | 2. Are there any cement/concrete septic tanks on the Property? |
| 225 | 3 | | | | | 3. Are there any fiberglass septic tanks on the Property? _____ |
| 226 | 4 | | | | | 4. Are there any other types of septic tanks on the Property? _____ |
| 227 | 5 | | | | | 5. Where are the septic tanks located? _____ |
| 228 | 6 | | | | | 6. How often is the on-lot sewage disposal system serviced? _____ |
| 229 | 7 | | | | | 7. When was the on-lot sewage disposal system last serviced? _____ |

**(E) Abandoned Individual On-lot Sewage Disposal Systems and Septic**

| 230 | | | | | |
|---|---|---|---|---|---|
| 231 | 1 | | X | | | 1. Are you aware of any abandoned septic systems or cesspools on your property? |
| 232 | 2 | | X | | | 2. Have these systems or cesspools been closed in accordance with the municipality's ordinance? |

**(F) Sewage Pumps**

| 233 | | | | | |
|---|---|---|---|---|---|
| 234 | 1 | | X | | | 1. Are there any sewage pumps located on the property? |
| 235 | 2 | | | | | 2. What type(s) of pump(s)? _____ |
| 236 | 3 | | | | | 3. Are pump(s) in working order? _____ |
| 237 | 4 | | | | | 4. Who is responsible for maintenance of sewage pumps? _____ |

**(G) Issues**

| 238 | | | | | |
|---|---|---|---|---|---|
| 239 | 1 | | | | | 1. Is any waste water piping not connected to the septic/sewer system? |
| 240 | 2 | | | | | 2. Are you aware of any past or present leaks, backups, or other problems relating to the sewage |
| 241 | | | | | | system and related items? |

| 242 | **Explain any "yes" answers in section 10, including the location and extent of any problem(s) and any** |
| 243 | **repair or remediation efforts:** _____ |
| 244 | _____ |

**11. PLUMBING SYSTEM**

**(A) Material(s).** Are the plumbing materials (check all that apply):

| 245 | | Yes | No | Unk | N/A |
|---|---|---|---|---|---|
| 246 | 1 | X | | | | 1. Copper |
| 247 | 2 | | X | | | 2. Galvanized |
| 248 | 3 | | X | | | 3. Lead |
| 249 | 4 | | X | | | 4. PVC |
| 250 | 5 | | X | | | 5. Polybutylene pipe (PB) |
| 251 | 6 | X | | | | 6. Cross-linked polyethyline (PEX) |
| 252 | 7 | | X | | | 7. Other _____ |
| 253 | B | | X | | | (B) Are you aware of any problems with any of your plumbing fixtures (e.g., including but not limited |
| 254 | | | | | | to: kitchen, laundry, or bathroom fixtures; wet bars; exterior faucets; etc.)? |
| 255 | | | | | | If "yes," explain: _____ |
| 256 | | | | | | _____ |
| 257 | | | | | | |

**12. DOMESTIC WATER HEATING**

**(A) Type(s).** Is your water heating (check all that apply):

| 258 | | Yes | No | Unk | N/A |
|---|---|---|---|---|---|
| 259 | 1 | | X | | | 1. Electric |
| 260 | 2 | X | | | | 2. Natural gas |
| 261 | 3 | | X | | | 3. Fuel oil |
| 262 | 4 | | X | | | 4. Propane |
| 263 | 5 | | X | | | 5. Solar |
| 264 | 6 | | X | | | 6. Geothermal |
| 265 | 7 | | X | | | 7. Other: _____ |
| 266 | 8 | | X | | | 8. Is your water heating a summer-winter hook-up (integral system, hot water from the boiler, etc.)? |
| 267 | B | | | | | (B) How many water heaters are there? _____ When were they installed? _____ |
| 268 | C | | X | | | (C) Are you aware of any problems with any water heater or related equipment? |
| 269 | | | | | | If "yes," explain: _____ |
| 270 | | | | | | _____ |

| 271 | Seller's Initials _____ / _____ Date _11/9/2017 | 2:31 PM EST_ SPD Page 5 of 10    Buyer's Initials _____ / _____ Date _____ |

## 13. HEATING SYSTEM

| | Yes | No | Unk | N/A | |
|---|---|---|---|---|---|
| | | | | | **(A) Fuel Type(s).** Is your heating source (check all that apply): |
| 274 1 | | | | | 1. Electric |
| 275 2 | X | | | | 2. Natural gas |
| 276 3 | | | | | 3. Fuel oil |
| 277 4 | | | | | 4. Propane |
| 278 5 | | | | | 5. Geothermal |
| 279 6 | | | | | 6. Coal |
| 280 7 | | | | | 7. Wood |
| 281 8 | | | | | 8. Other _____ |
| 282 | | | | | **(B) System Type(s)** (check all that apply): |
| 283 1 | X | | | | 1. Forced hot air |
| 284 2 | | | | | 2. Hot water |
| 285 3 | | | | | 3. Heat pump |
| 286 4 | | | | | 4. Electric baseboard |
| 287 5 | | | | | 5. Steam |
| 288 6 | | | | | 6. Radiant |
| 289 7 | | | | | 7. Wood stove(s) How many? _____ |
| 290 8 | | | | | 8. Coal stove(s) How many? _____ |
| 291 9 | | | | | 9. Other: _____ |
| 292 | | | | | **(C) Status** |
| 293 1 | | | X | | 1. When was your heating system(s) installed? _new_ |
| 294 2 | | | X | | 2. When was the heating system(s) last serviced? _____ |
| 295 3 | | | | | 3. How many heating zones are in the property? _9_ |
| 296 4 | | X | | | 4. Is there an additional and/or backup heating system? Explain: _____ |
| 297 | | | | | **(D) Fireplaces** |
| 298 1 | X | | | | 1. Are there any fireplace(s)? How many? _2_ |
| 299 2 | | | | | 2. Are all fireplace(s) working? |
| 300 3 | | | | | 3. Fireplace types(s) (wood, gas, electric, etc.): _wood_ |
| 301 4 | | | | | 4. Were the fireplace(s) installed by a professional contractor or manufacturer's representative? |
| 302 5 | X | | | | 5. Are there any chimney(s) (from a fireplace, water heater or any other heating system)? |
| 303 6 | | | | | 6. How many chimney(s)? _3_   When were they last cleaned? _____ |
| 304 7 | | | | | 7. Are the chimney(s) working? If "no," explain: _____ |
| 305 E | | | | | **(E)** List any areas of the house that are not heated: _____ |
| 306 | | | | | **(F) Heating Fuel Tanks** |
| 307 1 | | X | | | 1. Are you aware of any heating fuel tank(s) on the property? |
| 308 2 | | | | | 2. Location(s), including underground tank(s): _____ |
| 309 3 | | | | | 3. If you do not own the tank(s), explain: _____ |
| 310 P | | | | | **Are you aware of any problems or repairs needed regarding any item in section 13? If "yes," explain:** |
| 311 | | | | | |

## 14. AIR CONDITIONING SYSTEM

| | Yes | No | Unk | N/A | |
|---|---|---|---|---|---|
| | | | | | **(A) Type(s).** Is the air conditioning (check all that apply): |
| 314 1 | X | | | | 1. Central air |
| 315 2 | | | | | 2. Wall units |
| 316 3 | | | | | 3. Window units |
| 317 4 | | | | | 4. Other _____ |
| 318 5 | | | | | 5. None |
| 319 | | | | | **(B) Status** |
| 320 1 | | | | | 1. When was the central air conditioning system installed? _____ |
| 321 2 | | | | | 2. When was the central air conditioning system last serviced? _____ |
| 322 3 | | | | | 3. How many air conditioning zones are in the property? _____ |
| 323 C | | | | | **(C)** List any areas of the house that are not air conditioned: _____ |
| 324 P | | | | | **Are you aware of any problems with any item in section 14? If "yes," explain:** _____ |
| 325 | | | | | |

## 15. ELECTRICAL SYSTEM

| | Yes | No | Unk | N/A | |
|---|---|---|---|---|---|
| 326 | | | | | **(A) Type(s)** |
| 328 1 | | X | | | 1. Does the electrical system have fuses? |
| 329 2 | X | | | | 2. Does the electrical system have circuit breakers? |

330  **Seller's Initials** ___ / ___  **Date** 11/9/2017 | 2:31 PM EST   **SPD Page 6 of 10**   **Buyer's Initials** ___ / ___  **Date** _____

|  | Yes | No | Unk | N/A |
|---|---|---|---|---|
| 331 B |  |  |  |  |
| 332 C |  |  |  |  |
| 333 P |  |  |  |  |

(B) What is the system amperage? _____
(C) Are you aware of any knob and tube wiring in the home?

334

**Are you aware of any problems or repairs needed in the electrical system? If "yes," explain:**

335  **16. OTHER EQUIPMENT AND APPLIANCES**

336  This section must be completed for each item that will, or may, be sold with the property. **The fact**
337  **that an item is listed does not mean it is included in the Agreement of Sale.** Terms of the Agreement
338  of Sale negotiated between Buyer and Seller will determine which items, if any, are included in the
339  purchase of the Property.

| Item | Yes | No |  | Item | Yes | No |
|---|---|---|---|---|---|---|
| Electric garage door opener |  | X |  | Trash compactor |  | X |
| Garage transmitters |  | X |  | Garbage disposal | X |  |
| Keyless entry |  | X |  | Stand-alone freezer |  | X |
| Smoke detectors |  | X |  | Washer | X |  |
| Carbon monoxide detectors |  | X |  | Dryer | X |  |
| Security alarm system |  | X |  | Intercom |  | X |
| Interior fire sprinklers |  | X |  | Ceiling fans |  | X |
| In-ground lawn sprinklers | X |  |  | A/C window units |  | X |
| Sprinkler automatic timer |  | X |  | Awnings |  | X |
| Swimming pool | X |  |  | Attic fan(s) |  | X |
| Hot tub/spa |  | X |  | Satellite dish |  | X |
| Deck(s) |  | X |  | Storage shed |  | X |
| Pool/spa heater |  | X |  | Electric animal fence |  | X |
| Pool/spa cover |  | X |  | Other: |  |  |
| Whirlpool/tub |  | X |  | 1. |  |  |
| Pool/spa accessories |  | X |  | 2. |  |  |
| Refrigerator(s) | X |  |  | 3. |  |  |
| Range/oven |  |  |  | 4. |  |  |
| Microwave oven | X |  |  | 5. |  |  |
| Dishwasher | X |  |  | 6. |  |  |

(rows 340–360)

361  **Are you aware of any problems or repairs needed regarding any item in section 16? If "yes," explain:**

362
363

| 364 | Yes | No | Unk | N/A |
|---|---|---|---|---|
| 366 1 |  | X |  |  |
| 367 2 |  | X |  |  |
| 369 3 |  | X |  |  |
| 372 4 |  | X |  |  |

**17. LAND/SOILS**
(A) **Property**
   1. Are you aware of any fill or expansive soil on the property?
   2. Are you aware of any sliding, settling, earth movement, upheaval, subsidence, sinkholes or
      earth stability problems that have occurred on or affect the property?
   3. Are you aware of any sewage sludge (other than commercially available fertilizer products) being
      spread on the property, or have you received written notice of sewage sludge being spread on
      an adjacent property?
   4. Are you aware of any existing, past or proposed mining, strip-mining, or any other excavations
      that might affect this property?
   *Note to Buyer: The property may be subject to mine subsidence damage. Maps of the*
   *counties and mines where mine subsidence damage may occur and mine subsidence in-*
   *surance are available through:* Department of Environmental Protection, Mine Subsi-
   dence Insurance Fund, 25 Technology Drive, California Technology Park, Coal Center,
   PA 15423 (800) 922-1678 (within Pennsylvania) or (724) 769-1100 (outside Pennsyl-
   vania).

380  Seller's Initials _____ / _____    Date 11/9/2017 | 2:31 PM EST    Buyer's Initials _____ / _____    Date _____

Produced with zipForm® by zipLogix  18070 Fifteen Mile Road, Fraser, Michigan 48026  www.zipLogix.com    NEW_Joe Grasso

Appx0247

DocuSign Envelope ID: F... Case 2:21-cv-05472-CMR Document 10-19 Filed 01/25/22 Page 8 of 10



**(B) Preferential Assessment and Development Rights**

Is the property, or a portion of it, preferentially assessed for tax purposes, or subject to limited development rights under the:

1. Farmland and Forest Land Assessment Act - 72 P.S.§5490.1 et seq. (Clean and Green Program)
2. Open Space Act - 16 P.S. §11941 et seq.
3. Agricultural Area Security Law - 3 P.S. §901 et seq. (Development Rights)
4. Any other law/program: _____

*Note to Buyer: Pennsylvania has enacted the Right to Farm Act (3 P.S. § 951-957) in an effort to limit the circumstances under which agricultural operations may be subject to nuisance suits or ordinances. Buyers are encouraged to investigate whether any agricultural operations covered by the Act operate in the vicinity of the property.*

**(C) Property Rights**

Are you aware of the transfer, sale and/or lease of any of the following property rights (by you or a previous owner of the property):

1. Timber
2. Coal
3. Oil
4. Natural gas
5. Other minerals or rights (such as farming rights, hunting rights, quarrying rights) Explain:

*Note to Buyer: Before entering into an agreement of sale, Buyer can investigate the status of these rights by, among other means, engaging legal counsel, obtaining a title examination of unlimited years and searching the official records in the county Office of the Recorder of Deeds, and elsewhere. Buyer is also advised to investigate the terms of any existing leases, as Buyer may be subject to terms of those leases.*

Explain any "yes" answers in section 17: _____

**18. FLOODING, DRAINAGE AND BOUNDARIES**

**(A) Flooding/Drainage**

1. Is any part of this property located in a wetlands area?
2. Is the property, or any part of it, designated a Special Flood Hazard Area (SFHA)?
3. Do you maintain flood insurance on this property?
4. Are you aware of any past or present drainage or flooding problems affecting the property?
5. Are you aware of any drainage or flooding mitigation on the property?
6. Are you aware of the presence on the property of any man-made feature that temporarily or permanently conveys or manages storm water, including any basin, pond, ditch, drain, swale, culvert, pipe or other feature?
7. If "yes", are you responsible for maintaining or repairing that feature which conveys or manages storm water for the property?

Explain any "yes" answers in section 18(A), including dates and extent of flooding and the condition of any man-made storm water management features: _____

**(B) Boundaries**

1. Are you aware of any encroachments, boundary line disputes, or easements affecting the property?

*Note to Buyer: Most properties have easements running across them for utility services and other reasons. In many cases, the easements do not restrict the ordinary use of the property, and Seller may not be readily aware of them. Buyers may wish to determine the existence of easements and restrictions by examining the property and ordering an Abstract of Title or searching the records in the Office of the Recorder of Deeds for the county before entering into an agreement of sale.*

2. Do you access the property from a private road or lane?
3. If "yes," do you have a recorded right of way or maintenance agreement?
4. Are you aware of any shared or common areas (driveways, bridges, docks, walls, etc.) or maintenance agreements?

Explain any "yes" answers in section 18(B): _____

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026    www.zipLogix.com    NEW Joe Grasso

**Appx0248**

## 19. HAZARDOUS SUBSTANCES AND ENVIRONMENTAL ISSUES

**(A) Mold and Indoor Air Quality (other than radon)**

| | Yes | No | Unk | N/A |
|---|---|---|---|---|
| 1 | | | | |
| 2 | | | | |

1. Are you aware of any tests for mold, fungi, or indoor air quality in the property?
2. Other than general household cleaning, have you taken any efforts to control or remediate mold or mold-like substances in the property?

*Note to Buyer: Individuals may be affected differently, or not at all, by mold contamination. If mold contamination or indoor air quality is a concern, buyers are encouraged to engage the services of a qualified professional to do testing. Information on this issue is available from the United States Environmental Protection Agency and may be obtained by contacting IAQ INFO, P.O. Box 37133, Washington, D.C. 20013-7133, 1-800-438-4318.*

**(B) Radon**

1. Are you aware of any tests for radon gas that have been performed in any buildings on the property? If "yes," list date, type, and results of all tests below:

| | First Test | Second Test |
|---|---|---|
| Date | _____ | _____ |
| Type of Test | _____ | _____ |
| Results (picocuries/liter) | _____ | _____ |
| Name of Testing Service | _____ | _____ |

2. Are you aware of any radon removal system on the property? If "yes," list date installed and type of system, and whether it is in working order below:

| Date Installed | Type of System | Provider | Working? |
|---|---|---|---|

**(C) Lead Paint**

| | Yes | No | Unk | N/A |
|---|---|---|---|---|
| 1 | | | | |
| 2 | | | | |

If property was constructed, or if construction began, before 1978, you must disclose any knowledge of, and records and reports about, lead-based paint on the property.

1. Are you aware of any lead-based paint or lead-based paint hazards on the property?
2. Are you aware of any reports or records regarding lead-based paint or lead-based paint hazards on the property?

**(D) Tanks**

| | Yes | No | Unk | N/A |
|---|---|---|---|---|
| 1 | | X | | |
| 2 | | X | | |
| E | | X | | |

1. Are you aware of any existing or removed underground tanks?  Size: _____
2. If "yes," have any tanks been removed during your ownership?

**(E) Dumping.** Are you aware of any dumping on the property?

**(F) Other**

| | Yes | No | Unk | N/A |
|---|---|---|---|---|
| 1 | | X | | |
| 2 | | X | | |
| 3 | | X | | |
| 4 | | X | | |

1. Are you aware of any existing hazardous substances on the property (structure or soil) such as, but not limited to, asbestos or polychlorinated biphenyls (PCBs)?
2. Have you received written notice regarding the presence of an environmental hazard or biohazard on your property or any adjacent property?
3. Are you aware of any testing on the property for any other hazardous substances or environmental concerns?
4. Are you aware of any other hazardous substances or environmental concerns that might impact upon the property?

Explain any "yes" answers in section 19: _____

_____

## 20. MISCELLANEOUS

**(A) Deeds, Restrictions and Title**

| | Yes | No | Unk | N/A |
|---|---|---|---|---|
| 1 | X | | | |
| 2 | | X | | |
| 3 | | X | | |

1. Are you aware of any deed restrictions that apply to the property?
2. Are you aware of any historic preservation restriction or ordinance or archeological designation associated with the property?
3. Are you aware of any reason, including a defect in title, that would prevent you from giving a warranty deed or conveying title to the property?

**(B) Financial**

| | Yes | No | Unk | N/A |
|---|---|---|---|---|
| 1 | | X | | |
| 2 | | X | | |
| 3 | | X | | |

1. Are you aware of any public improvement, condominium or homeowner association assessments against the property that remain unpaid or of any violations of zoning, housing, building, safety or fire ordinances or other use restriction ordinances that remain uncorrected?
2. Are you aware of any mortgage, judgment, encumbrance, lien, overdue payment on a support obligation, or other debt against this property or Seller that cannot be satisfied by the proceeds of this sale?
3. Are you aware of any insurance claims filed relating to the property?

Seller's Initials _JG_ / _____ Date 11/9/2017 | 2:31 PM EST    Buyer's Initials _____ / _____ Date _____

SPD Page 9 of 10

DocuSign Envelope ID: Case 2:21-cv-05472-CMR Document 10-19   Filed 01/25/22   Page 10 of 10

| | Yes | No | Unk | N/A | |
|---|---|---|---|---|---|
| 498 | | | | | **(C) Legal** |
| 499 | 1 | X | | | 1. Are you aware of any violations of federal, state, or local laws or regulations relating to the property? |
| 500 | | | | | |
| 501 | 2 | X | | | 2. Are you aware of any existing or threatened legal action affecting the property? |
| 502 | | | | | **(D) Additional Material Defects** |
| 503 | 1 | X | | | 1. Are you aware of any material defects to the property, dwelling, or fixtures which are not |
| 504 | | | | | disclosed elsewhere on this form? |

*Note to Buyer: A material defect is a problem with a residential real property or any portion of it that would have a significant adverse impact on the value of the property or that involves an unreasonable risk to people on the property. The fact that a structural element, system or subsystem is at or beyond the end of the normal useful life of such a structural element, system or subsystem is not by itself a material defect.*

2. After completing this form, **if Seller becomes aware of additional information about the property,** including through inspection reports from a buyer, the Seller must update the Seller's Property Disclosure Statement and/or attach the inspection(s). These inspection reports are for informational purposes only.

**Explain any "yes" answers in section 20:** _____

_____

_____

**21. ATTACHMENTS**

    (A) **The following are part of this Disclosure if checked:**

        ☐ Seller's Property Disclosure Statement Addendum (PAR Form SDA)

        ☐ _____

        ☐ _____

        ☐ _____

**The undersigned Seller represents that the information set forth in this disclosure statement is accurate and complete to the best of Seller's knowledge. Seller hereby authorizes the Listing Broker to provide this information to prospective buyers of the property and to other real estate licensees. SELLER ALONE IS RESPONSIBLE FOR THE ACCURACY OF THE INFORMATION CONTAINED IN THIS STATEMENT. Seller shall cause Buyer to be notified in writing of any information supplied on this form which is rendered inaccurate by a change in the condition of the property following completion of this form.**

**SELLER**    *joseph Grasso*             **DATE** 11/9/2017 | 2:

         3C697D49BD3D402...

**SELLER** _____ **DATE** _____

**SELLER** _____ **DATE** _____

---

**EXECUTOR, ADMINISTRATOR, TRUSTEE SIGNATURE BLOCK**

According to the provisions of the Real Estate Seller Disclosure Law, the undersigned executor, administrator or trustee is not required to fill out a Seller's Property Disclosure Statement. The executor, administrator or trustee, must, however, disclose any known material defect(s) of the property.

                                                 **DATE** _____

---

**RECEIPT AND ACKNOWLEDGEMENT BY BUYER**

**The undersigned Buyer acknowledges receipt of this Disclosure Statement. Buyer acknowledges that this Statement is not a warranty and that, unless stated otherwise in the sales contract, Buyer is purchasing this property in its present condition. It is Buyer's responsibility to satisfy himself or herself as to the condition of the property. Buyer may request that the property be inspected, at Buyer's expense and by qualified professionals, to determine the condition of the structure or its components.**

**BUYER** _____ **DATE** _____

**BUYER** _____ **DATE** _____

**BUYER** _____ **DATE** _____

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026   www.zipLogix.com

NEW_Joe Grasso

**Appx0250**

**Michael Grasso**

| | |
|---|---|
| **From:** | Richard Koory |
| **Sent:** | Friday, February 28, 2020 10:44 AM |
| **To:** | Heather Berman |
| **Cc:** | JGrasso@ironhillcompany.com; clandco-2018110007@claimwizard.com; Richard Cohen; Lisa Talley; Peter Prinsen; Michael Grasso |
| **Subject:** | RE: Policy#:025032320 // 649 Dodds Lane, Gladwyne, PA 19035 // GF 2014 |
| **Attachments:** | Proof of loss $120375.92_20200228104034.pdf |

Heather and Rich

Attached is the signed Sworn Statement for the $120,375.92 balance of the undisputed loss amount

Richard A. Koory
General Counsel
U.S. Realty Associates, Inc.
120 E. Lancaster Avenue
Suite 101
Ardmore, PA 19003
(215) 701- 3836
(215) 701-3839 Fax
rkoory@eusrealty.com

**From:** Heather Berman <heather@clarkeandcohen.com>
**Sent:** Thursday, February 27, 2020 4:31 PM
**To:** Richard Koory <rkoory@eusrealty.com>
**Cc:** JGrasso@ironhillcompany.com; clandco-2018110007@claimwizard.com; Richard Cohen <rcohen@clarkeandcohen.com>
**Subject:** RE: Policy#:025032320 // 649 Dodds Lane, Gladwyne, PA 19035 // GF 2014

Dear Mr. Koory,

Please see the attached document for 649 Dodds Lane, Gladwyne, PA 19035.

Thank you,

Heather Berman

Clarke & Cohen
Property Loss Consultants
510 Belmont Ave.
Bala Cynwyd, PA 19004
Phone: 610-206-3763
Fax: 610-668-0140
Email: Heather@clarkeandcohen.com

www.clarkeandcohen.com

1

**EXHIBIT**

**17**

Case# 2017-02140-18 Docketed at Montgomery County Prothonotary on 02/08/2021 9:54 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

## COURT OF COMMON PLEAS OF MONTGOMERY COUNTY, PENNSYLVANIA
## CIVIL DIVISION

| | | |
|---|---|---|
| MARSHALL J. KATZ, | : | |
| | : | |
| | : | |
| *Plaintiff,* | : | No. 2017-02140 |
| | : | |
| v. | : | |
| | : | |
| JOSEPH GRASSO, | : | |
| | : | |
| *Defendant.* | : | |

### ORDER

**AND NOW**, this 8th day of February, 2021, after consideration of Michael Grasso's Motion to Quash Subpoena to Attend, Testify and Produce Documents and Things, and Plaintiff/Judgment Creditor Marshall J. Katz's response thereto, it is hereby **ORDERED** that the Motion to Quash is **DENIED,** and it is **FURTHER ORDERED** that Movant Michael Grasso shall produce all relevant and responsive documents to Plaintiff's Subpoena within twenty one (21) days of the date of this Order and shall appear for his deposition on a date, time and location acceptable to Plaintiff within forty-five (45) days of the date of this Order.

BY THE COURT:

GARRETT D. PAGE,                    J.

This Order has been E-filed on 2-8-2021
Served via e-filing to the parties of record
Email to: Andrew Braunfeld, Esquire
Interoffice mail to:
Court Administration, Civil Division

Judicial Secretary

EXHIBIT

**18**

RULE 236 NOTICE PROVIDED ON 02/08/2021

Appx0252

Case# 2017-02140-28 Docketed at Montgomery County Prothonotary on 07/15/2021 11:17 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania. Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

## IN THE COURT OF COMMON PLEAS OF MONTGOMERY COUNTY, PA

MARSHALL J. KATZ                        :
                                        :
            v.                          :        No. 2017-02140
                                        :        Seq. 24 Motion for Protective Order
JOSEPH GRASSO                           :

### O R D E R

AND NOW, this __15th__ day of July, 2021, upon consideration of Michael Grasso's

Motion for Protective Order (seq. 24) and Plaintiff/Judgment Creditor Marshall J. Katz's

Response thereto (seq.27) it is hereby **ORDERED** that the Motion for a Protective Order

is **DENIED**, and it is **FURTHER ORDERED** that Movant Michael Grasso shall appear

for the continuation of his deposition on a date, time and location acceptable to plaintiff

within 21 days of the date of this Order.

The continued deposition of Michael Grasso is to last no longer than five (5)

hours. No further deposition of Michael Grasso is to take place without leave of this

Court, upon application.

BY THE COURT:

Copies sent via Prothonotary to:
Plaintiff/Plaintiff's Counsel
Defendant/Defendant's Counsel

Copies sent via Chambers to:
Court Administration - Civil

*Maureen McNiff*
Judicial Secretary

*Garrett D. Page*
Garrett D. Page,                                    J.

**EXHIBIT**
**19**

RULE 236 NOTICE PROVIDED ON 07/15/2021

**Dormont, David**

| | |
|---|---|
| **From:** | Dormont, David |
| **Sent:** | Wednesday, April 14, 2021 2:43 PM |
| **To:** | 'Michael Duffy'; Maurice Mitts |
| **Cc:** | Kergides, Kacie |
| **Subject:** | Katz v. Grasso - Melissa Grasso Subpoena |
| **Attachments:** | Melissa Russo Subpoena - Full.pdf |

Dear Michael:

Following up on our April 7, 2021 conversation during which you advised that you were authorized to accept subpoenas directed to Joseph Grasso's children, attached please find a subpoena directed to Melissa Russo.

David



**David Dormont** | Partner
**Montgomery McCracken Walker & Rhoads LLP**
1735 Market Street | Philadelphia, PA 19103-7505
Tel: 215-772-7280 | Fax: 215-731-3644 | ddormont@mmwr.com | Attorney Profile

Notice: This email message may contain legally privileged and/or confidential information. If you are not the intended recipient(s), or the employee or agent responsible for delivery of this message to the intended recipient(s), you are hereby notified that any dissemination, distribution and/or copying of this message is strictly prohibited. If you have received this message in error, please immediately notify the sender and please immediately delete this message from your computer as well as any storage device(s). Thank you.

EXHIBIT
**20**

Appx0254

COMMONWEALTH OF PENNSYLVANIA

IN THE COURT OF COMMON PLEAS OF MONTGOMERY COUNTY

Marshall J. Katz                           :
                                           :
            v.                             : **File No.**    2017-02140
                                           :
Joseph Grasso                              :

### SUBPOENA TO ATTEND AND TESTIFY

TO:  Melissa Russo

c/o Maurice R. Mitts, Mitts Law, LLC, 1822 Spruce Street, Philadelphia, PA 19103

1.  You are ordered by the Court to come to   Montgomery McCracken Walker & Rhoads LLP,
1735 Market Street, 21st Floor, Philadelphia, PA 19103

(Specify courtroom or other place)

at _____, Philadelphia   County, Pennsylvania, on   May 5, 2021

at    9:30    o'clock  A  M., to testify on behalf of   Plaintiff/Judgment Creditor Marshall Katz

in the above case, and to remain until excused.

2.  And bring with you the following:   the  documents identified in Exhibit A

**If you fail to attend or to produce the documents or things required by this subpoena, you may be subject to the sanctions authorized by Rule 234.5 of the Pennsylvania Rules of Civil Procedure, including but not limited to costs, attorney fees and imprisonment.**

**ISSUED BY A PARTY/ATTORNEY IN COMPLIANCE WITH Pa.R.C.P.No.234.2 (a)**

**NAME:**   David Dormont

**ADDRESS:**  1735 Market Street, 19th Floor
Philadelphia, PA 19103

**TELEPHONE:**  215-772-7280

**SUPREME COURT ID #:**    66252

BY THE COURT:
Noah Marlier, Prothonotary

**DATE:**   April 14, 2021                    **BY:** _____
**Seal of the Court**                              **Agent/Deputy**

OFFICIAL NOTE: This form of subpoena shall be used whenever a subpoena is issuable including hearings in connection with depositions and before arbitrators, masters, commissioners, etc. in compliance with Pa.R.C.P.No.234.1. If a subpoena for production of documents, records or things is desired, complete paragraph 2.

## Notice of Language Rights

**RETURN OF SERVICE:**

On the _____ day of _____, 20____

I, _____

served _____
(NAME OF PLACE SERVED)

with the foregoing subpoena by: _____
(Describe method of service)

_____

_____

I verify that the statements in this return of service are true and correct. I understand that false statements herein are made subject to the penalties of 18 Pa.C.S.A. § 4904 relating to unsworn falsification to authorities.

DATE: _____

_____
(SIGNATURE)

**FREE INTERPRETER**
PO Box 311 Norristown, PA 19404
languageaccesscoordinator@montcopa.org
610-278-3231
www.pacourts.us/language-rights

**Spanish/Español:** Usted tiene derecho a un intérprete libre de costo. Para solicitar un intérprete favor de informárselo al personal judicial utilizando la información provista en la parte superior de este aviso.

**Russian/Русский:** У вас есть право на бесплатные услуги переводчика. Заявка на переводчика подается в суд по адресу, телефону или эл. почте, указанным выше в заголовке этого уведомления.

**Mandarin/Cantonese Simplified Chinese/普通话/粤语简体中文：** 您有权获得免费的口译员服务。若需要口译员，请使用本通知上方提供的联系信息通知法院工作人员。

**Korean/한국어:** 귀하는 비용에 대한 부담 없이 통역 서비스를 받을 권리가 있습니다. 통역 서비스를 요청하려면 본 통지서의 상단에 제공된 정보를 이용하여 법원 직원에게 알려주십시오.

**العربية/Arabic:** يحق لك الحصول على مترجم دون أي تكلفة. لطلب مترجم، يرجى إبلاغ موظفي المحكمة باستخدام معلومات الاتصال الموجودة أعلى هذا الإشعار.

## EXHIBIT A

The deponent **Melissa Russo** is hereby directed to bring to the deposition the following documents:[1]

1.      Each of the Deponent's tax returns, including all schedules and exhibits, filed with, or prepared for, any federal, state, or local taxing authority for the years 2015 to date.

2.      All bank, credit union, or other financial institution statements from January 1, 2014 to date for all checking, savings and other accounts of every kind, which account (1) was/is titled in whole or in part in the Deponent's name and (2) Defendant Joseph Grasso used for any purpose and/or maintained a direct or indirect interest of any kind in.

3.      Any and all communications between Defendant Joseph Grasso and the Deponent, from January 1, 2017 to date.

4.      Any and all documents evidencing any payments and/or transfers that Defendant Joseph Grasso and/or Donna Ohara Grasso made to the Deponent from January 1, 2017 to date.

5.      Any and all agreements executed by both the Deponent and Defendant Joseph Grasso from January 1, 2014 to date.

6.      Any and all joint venture agreements, general partnership agreements, limited partnership agreements, shareholder agreements, certificates of limited partnership, other contracts and agreements, and other documentary evidence of any form of partnership agreement(s) for any entity in which the Deponent currently has an interest and/or has had any interest in from January 1, 2014 to date.

---

[1]     The terms "document" and "documents" shall have the broadest meaning permitted under the applicable court rules and shall include any and all written, typed, printed, recorded or graphic material, however produced, reproduced or stored, whether an original or a copy, and whether prepared, published or released by any person or entity, including but not limited to, memoranda, letters, reports, agreements, contracts, correspondence, electronic mail, text messages, instant messages, voicemail, audio files, spreadsheets, databases, social media postings, telegrams, minutes or records of meetings, reports, summaries, lists, drafts, revisions, invoices, receipts, original and preliminary notes, sketches, records, ledgers, contracts, bills, inventories, financial data, accounting and financial records, diaries, journals, calendars, statements, work papers, videotapes, cassette tapes, photographs, pamphlets, brochures, advertisements, trade letters, press releases, tables, articles, conversation summaries, and printouts. It also includes information stored electronically, whether in a computer database, the cloud, the Internet, or otherwise, and includes information stored in electronic form on magnetic, optical, or other forms of media such as disks, CD-ROM, optical disks, ROM, and tape, regardless of whether such documents are presently also in non-electronic form.

7.      All documents related to and/or concerning the ownership of the Iron Hill Company and/or The Louderback Group, LLC (collectively "Iron Hill").

8.      All documents related to the formation of Iron Hill, including, but not limited to, certificates of formation, shareholder and/or partnership agreements and documents related to the initial funding of Iron Hill.

9.      Any and all documents that Deponent executed or had executed on behalf of Iron Hill, including, but not limited to, contracts, leases, insurance applications, loan applications, bank records, government registration or license applications, from January 1, 2014 to date.

10.      All annual financial statements prepared (internally and/or externally) for Iron Hill from 2014 to date.

11.      Iron Hill's financial records (including, but not limited to, balance sheets, income statements, and check registers) from January 1, 2014 to date.

12.      Each of Iron Hill's tax returns, including all schedules and exhibits, filed with, or prepared for, any federal, state, or local taxing authority for the years 2014 to date.

13.      All Internal Revenue Service Form 1099s (regardless of letter designation) and form W-2s (regardless of letter designation) and K-1s and similar forms for other taxing authorities that the Deponent received from 2014 to date from Iron Hill and/or any other entity in which Defendant Joseph Grasso was/is involved.

14.      Any and all checks that the Deponent wrote and/or signed payable to Defendant Joseph Grasso and/or Donna Ohara Grasso from January 1, 2017 to date.

15.      Any and all documents evidencing any payments and/or transfers that the Deponent made on behalf of Defendant Joseph Grasso and/or Donna Ohara Grasso from January 1, 2017 to date.

16.      Any and all copies of any business cards the Deponent has used from January 1, 2014 to date.

Common Pleas - Montgomery Co.       Katz v. Grasso       Thursday
No. 2017-02140      Videotape Deposition of Melissa Russo      June 17, 2021

Page 1

```
                 IN THE COURT OF COMMON PLEAS
                      MONTGOMERY COUNTY


                           - - -


    MARSHALL KATZ,

         Plaintiff,

         V.                          Case No. 2017-02140

    JOSEPH GRASSO,

         Defendant.


                      VOLUME I



              Remote Videotaped Deposition of

    MELISSA RUSSO, taken via Zoom video conference,

    with the witness located in Gladwyne, Pennsylvania,

    on Thursday, June 17, 2021, commencing at

    approximately 9:01 a.m., before Joanne Rose, a

    Registered Merit Reporter, Certified Realtime

    Reporter and Notary Public, pursuant to notice.




                      TATE & TATE
                 Certified Court Reporters
                 520 Stokes Road - Suite C-1
                 Medford, New Jersey 08055
                 (856) 983-8484 - (800) 636-8283
                      www.tate-tate.com
```

**EXHIBIT**
**21**

Appx0259

Common Pleas - Montgomery Co.            Katz v. Grasso                    Thursday
No. 2017-02140                  Videotape Deposition of Melissa Russo      June 17, 2021

| | Page 2 |
|---|---|
| 1 | |
| 2 | APPEARANCES VIA ZOOM: |
| 3 | MONTGOMERY McCRACKEN |
| 4 | WALKER & RHOADS LLP |
| 5 | BY: DAVID DORMONT, ESQUIRE |
| 6 | ddormont@mmwr.com |
| 7 | BY: RACHEL GOODMAN, ESQUIRE |
| 8 | 1735 Market Street |
| 9 | Philadelphia, PA 19103-7505 |
| 10 | 215-772-7280 |
| 11 | Attorneys for Plaintiff/ |
| 12 | Judgment Creditor Marshall Katz |
| 13 | |
| 14 | MITTS LAW, LLC |
| 15 | BY: MAURICE R. MITTS, ESQUIRE |
| 16 | mmitts@mittslaw.com |
| 17 | 1822 Spruce Street |
| | Philadelphia, PA  19103 |
| 18 | 215-866-0112 |
| | Attorney for Defendant |
| 19 | Joseph Grasso and the |
| | witness |
| 20 | |
| | ALSO PRESENT: |
| 21 | |
| | Eric Bencivengo, Videographer |
| 22 | |
| 23 | |
| 24 | |

| | Page 4 |
|---|---|
| 1 | EXHIBIT INDEX |
| 2 | EXHIBIT                      MARKED |
| 3 | |
| 4 | Katz 107  2017 U.S. Corporate Income Tax    101 |
| 5 | Return for Iron Hill Company |
| 6 | Katz 111  2018 Schedule K-1 for shareholder  105 |
| 7 | Melissa Russo |
| 8 | |
| 9 | Katz 112  2019 Schedule K-1 for shareholder  110 |
| 10 | Melissa Russo |
| 11 | Katz 119  Check Image of Check 109 dated    77 |
| 12 | 11/7/19 |
| 13 | |
| 14 | Katz 178  Email series with top email dated   153 |
| 15 | 9/10/19 from Richard Koory to Dave |
| 16 | Dratch, et al., with attached Lease |
| 17 | Agreement |
| 18 | |
| 19 | Katz 179  Email series with top email dated   159 |
| 20 | 9/12/19 from Dave Dratch to Richard |
| 21 | Koory, et al., with attached Lease |
| 22 | Agreement |
| 23 | |
| 24 | EXHIBITS (Continued...) |

| | Page 3 |
|---|---|
| 1 | EXAMINATION INDEX |
| 2 | |
| 3 | MELISSA RUSSO |
| 4 | |
| 5 | BY MR. DORMONT . . . . . . . . . . . . . 6 |
| 6 | |
| 7 | - - - |
| 8 | |
| 9 | EXHIBIT INDEX |
| 10 | |
| 11 | EXHIBIT                      MARKED |
| 12 | Katz 9    Subpoena To Attend And Testify    20 |
| 13 | Katz 10   Response To Subpoena          24 |
| 14 | Katz 92   Document entitled Certificate of   84 |
| 15 | Corporate Resolution of Iron Hill |
| 16 | Company |
| 17 | Katz 102  Document entitled Shareholders'   79 |
| 18 | Agreement Iron Hill Company |
| 19 | |
| 20 | Katz 104  Document entitled Stock Purchase   91 |
| 21 | Option |
| 22 | Katz 106  2016 U.S. Corporate Income Tax    99 |
| 23 | Return for Iron Hill Company |
| 24 | EXHIBITS (Continued...) |

| | Page 5 |
|---|---|
| 1 | EXHIBIT INDEX |
| 2 | |
| 3 | EXHIBIT                      MARKED |
| 4 | Katz 180  Email series with top email dated   162 |
| 5 | 9/17/19 from Joseph Grasso to |
| 6 | Michele Grasso with attachment |
| 7 | Katz 185  Email series with top email dated   165 |
| 8 | 2/4/20 from Joseph Grasso to |
| 9 | Michele Grasso with attachment |
| 10 | Katz 200  Document entitled Certificate of    126 |
| 11 | Organization-Domestic Limited |
| 12 | Liability Company dated 11/9/20 |
| 13 | Katz 240  Multi-page document containing bank  55 |
| 14 | statements from Beneficial Bank |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |

2 (Pages 2 to 5)

Common Pleas - Montgomery Co.                 Katz v. Grasso                     Thursday
No. 2017-02140                    Videotape Deposition of Melissa Russo          June 17, 2021

| Page 14 | Page 16 |
|---|---|

**Page 14**

1       Do you understand that?
2  **A.  Yes.**
3  Q.  Do you know of any reason why you cannot
4  testify truthfully today?
5  **A.  No.**
6  Q.  Is anyone in the room with you?
7  **A.  No.**
8  Q.  Do you have any electronic devices that are
9  on?
10  **A.  Just my phone.**
11  Q.  Do you understand your answers today must be
12  your own and you cannot take any suggestions that
13  anyone might send you electronically?
14  **A.  Yes.**
15  Q.  Now, what did you do to prepare for today's
16  deposition?
17  **A.  Met with my counsel.**
18  Q.  And when did you meet with your counsel?
19  **A.  Um, I'm not sure of a specific date but last**
20  **week, I believe.**
21  Q.  Okay.  And did you review any documents to
22  prepare for your deposition?
23  **A.  I did not.**
24  Q.  Have you discussed your deposition with

**Page 16**

1  question.  I want to put you on notice,
2  Mr. Dormont, that you are already taking the
3  deposition of a child of somebody that your client
4  has a judgment against and now you are exploring
5  the relationship of grandchildren.
6       You will have a very short leash on
7  this.  So I expect -- and knowing you as a
8  professional I believe you will -- you to be very
9  judicious in stepping around these subjects at all.
10  And we will stop there.
11       If you have documents that you want to
12  go over, we certainly can and I think that would be
13  a more proper way to explore this, because you
14  could imagine somebody questioning your children
15  and your grandchildren would be inherently abusive.
16       So please be judicious in what you
17  say.
18  BY MR. DORMONT:
19  Q.  Ms. Russo, could you just tell me the names
20  of your children?
21  **A.  Giada Russo, Luca Russo, Italia Russo.**
22  Q.  Italia with an I?
23  **A.  Yes.**
24  Q.  And just because I want to make the record

| Page 15 | Page 17 |
|---|---|

**Page 15**

1  anyone other than your counsel?
2  **A.  I did not.**
3  Q.  Have you discussed your deposition with your
4  father?
5  **A.  I did not.**
6  Q.  Now, is it correct that you're married?
7  **A.  Correct.**
8  Q.  And how many children do you have?
9  **A.  Three.**
10  Q.  And what are their names?
11      **MR. MITTS:**  Excuse me.  Don't answer
12  that question.
13      **MR. DORMONT:**  Excuse me, Maurice.
14  It's relevant.  I need to take this because there
15  are other questions that I'm going to ask.
16      It's an appropriate -- I just need to
17  know their names because of the fraudulent
18  transfers involved in this case, because I see
19  checks to people and I want to see whether or not
20  they're names of her children.
21  BY MR. DORMONT:
22  Q.  Now, Ms. Russo, can you please answer the
23  question?
24      **MR. MITTS:**  You can answer the

**Page 17**

1  straight, you know, while you are Joseph Grasso's
2  child, is it correct that you were born in 1983?
3  **A.  Correct.**
4  Q.  And can you briefly give me your educational
5  background?
6  **A.  I went through -- I finished high school.  I**
7  **went to a two-year college, went to -- took classes**
8  **at Saint Joe's and that was it.  I have my real**
9  **estate license as well.**
10  Q.  And when did you get your real estate
11  license?
12  **A.  I'm not aware of the exact date.  I was, I**
13  **believe, 23 when I got it.**
14  Q.  And did you graduate from the junior
15  college?
16  **A.  I did not.**
17  Q.  And can you briefly give me your work
18  experience?
19  **A.  I worked for Axis Construction.  I worked**
20  **for Walnut Street Capital.  I also for a brief time**
21  **worked for... I'm not sure if it was Metro**
22  **Development at the time but another commercial real**
23  **estate.**
24  Q.  And what did you do for Axis Construction?

5 (Pages 14 to 17)

Common Pleas - Montgomery Co.                    Katz v. Grasso                              Thursday
No. 2017-02140                          Videotape Deposition of Melissa Russo          June 17, 2021

---

Page 30

1  BY MR. DORMONT:
2  Q.   Did either of your parents make any gifts or
3  pay any bills for any of your children?
4  A.   No.
5  Q.   Do you know who Danella Grasso is?
6  A.   Yes.
7  Q.   And who is that?
8  A.   My sister-in-law.
9  Q.   And who is she married to?
10 A.   Joseph Grasso.
11 Q.   Let's go down to number 6.
12       Number 6 asks for "All joint venture
13 agreements, general partnership agreements, limited
14 partnership agreements, shareholder agreements,
15 certificates of limited partnership, other
16 contracts and agreements and other documentary
17 evidence of any form of partnership agreements for
18 any entity in which..." you "...currently has an
19 interest and/or had any interest in from January 1,
20 2014..." and you said you would produce those
21 documents.
22       Have you produced all those documents?
23       THE WITNESS:  Maurice?
24       MR. MITTS:  Mr. Dormont, I do know

---

Page 31

1  from Mr. Duffy that there has been a production and
2  that there's a further production and that we had
3  offered to postpone this deposition a week.
4        So I don't know personally because I
5  don't know what the -- what's in the production and
6  not in the production.  Michael Duffy does.  So I
7  can't definitively say if you have them already or
8  there's more coming.
9        I do know that our production to you
10 will be completed imminently.  So that's the best I
11 can give you.
12       MR. DORMONT:  Let me say this.  There
13 was no offer to postpone the deposition a week.
14 That was never made.  So that's a false statement.
15 We never discussed it or had any communications,
16 Maurice, prior to this deposition.
17       And Mr. Duffy and I spoke often and he
18 never proposed postponing the deposition a week.
19       MR. MITTS:  Well, I will just tell you
20 that I spoke to Mr. Duffy and he suggested -- he
21 said to me that he had a conversation with you
22 about deferring this deposition until after the
23 production was complete and that you declined.
24       MR. DORMONT:  You know, this is

---

Page 32

1  hearsay.  So, please, Mr. Duffy is not here.  I had
2  no conversation and I don't want to waste more time
3  with this witness.
4  BY MR. DORMONT:
5  Q.   Could you tell me what joint venture
6  agreements, partnerships or other businesses you
7  have had an ownership in from 2014 to date?
8  A.   None other than Iron Hill.
9  Q.   Well, you just told me you also have an
10 ownership interest in Louderback?
11 A.   Iron Hill was the one in 2015 to date.
12 Q.   So is it -- I just want to make sure.
13       Your testimony is you have had no
14 other ownership interest in any other business from
15 2014 to date other than either Iron Hill Company or
16 Louderback?
17 A.   Correct.
18 Q.   Now, number 10 sought annual financial
19 statements prepared either internally or externally
20 for Iron Hill from 2014 to date.  And I've seen
21 some tax returns produced for 2015, 2016 and 2017.
22       I understand that there are tax
23 returns also for later years.  Is that correct?
24 A.   You mean 2018 and '19?

---

Page 33

1  Q.   Yes, and 2018, 2019 and I assume 2020 as
2  well.
3  A.   Correct.
4  Q.   Okay.  And do you have those?
5  A.   I provided --
6        THE WITNESS:  Maurice, we provided,
7  right, everything that...
8        MR. MITTS:  It's the same response to
9  my prior remark, David.  There's been a production
10 and there's a further production.  So I just don't
11 know what's in the two buckets.
12       And I wish I could be more helpful to
13 you on that, but I can't.
14       MR. DORMONT:  Like I said, I'll
15 represent to you that nothing after 2017 was
16 produced other than your K-1s for 2018 and 2019.
17       MR. MITTS:  Okay.
18 BY MR. DORMONT:
19 Q.   Question 13, that starts all Form 1099s and
20 W-2s and K-1s for any entity that -- of which your
21 father was associated with -- that was badly
22 written or stated.
23       Other than the K-1 from Iron Hill,
24 have you received any other K-1 for any entity in

---

9 (Pages 30 to 33)

Appx0262

Page 42

1    MR. MITTS:  Object to the form.  You
2  can answer.
3    THE WITNESS:  Yes.
4  BY MR. DORMONT:
5  Q.   And for how long had he worked for your
6  father or his companies?
7  **A.   I'm unaware of specific dates of how long.**
8  Q.   When you worked for Walnut Street Capital,
9  did Mr. Kaplan work for your father?
10  **A.   Yes.**
11  Q.   And was he CFO at Walnut Street Capital?
12  **A.   I believe so.**
13  Q.   And has Mr. Kaplan always been the CFO of
14  any of your father's companies?
15  **A.   Not always.**
16  Q.   When was he not?
17  **A.   I don't -- I don't know specific dates.**
18    **I know that he didn't always work for**
19  **my father.  So if that's what you're asking, no, he**
20  **did not always work for my dad.**
21  Q.   Since he started working for your dad, has
22  he continued to work for your father ever since?
23  **A.   Yes.**
24    **MR. MITTS:  Objection.  Melissa, you**

Page 43

1  have to give me one more second.
2    THE WITNESS:  Sorry.
3    (Court reporter asked for
4  clarification.)
5    **MR. MITTS:**  I said object to the form.
6  You can answer.
7  BY MR. DORMONT:
8  Q.   Do you know what type of phone your father
9  has?
10  **A.   Yes.**
11  Q.   What type?
12  **A.   An iPhone.**
13  Q.   And do you know what number?
14  **A.   No.  You're asking the wrong person.**
15  Q.   Who should I be asking?
16  **A.   I'm not technical I'm saying.  I don't take**
17  **notice to that.**
18  Q.   Now, what does your father do for a living?
19    **MR. MITTS:**  Excuse me.  Could you read
20  back his question?  Thank you.
21    **MR. DORMONT:**  I said -- I'll repeat
22  it.
23  BY MR. DORMONT:
24  Q.   What does your father do for a living?

Page 44

1  **A.   He runs Louderback or Iron Hill, now**
2  **Louderback.**
3  Q.   And where is his office?
4  **A.   Norristown.**
5  Q.   At 579 East Lafayette Street?
6  **A.   Correct.**
7  Q.   And what does he get paid for running
8  Louderback?
9  **A.   I do not know.**
10  Q.   What did he get paid for running Iron Hill?
11  **A.   I do not know.**
12  Q.   Other than Iron Hill or Louderback, does
13  your father have any other businesses?
14  **A.   Not that I'm...**
15    **MR. MITTS:**  Excuse me.  Object to the
16  form.  You can answer.
17    THE WITNESS:  Not that I'm aware of.
18  BY MR. DORMONT:
19  Q.   Has your father had any other businesses
20  within the last six years?  So that's from 2015 to
21  date.
22    **MR. MITTS:**  Object to the form.  You
23  can answer.
24    THE WITNESS:  Not that I'm aware of.

Page 45

1  BY MR. DORMONT:
2  Q.   Does your father -- has your father operated
3  or controlled any other businesses from 2015 to
4  date?
5  **A.   Not that I'm aware of.**
6  Q.   So does your father do business with your
7  grandfather, Michael Grasso?
8  **A.   Yes.**
9  Q.   And what businesses do they -- what business
10  do they do together?
11  **A.   None that I'm aware of, but I do know they**
12  **have done business together.**
13    **MR. MITTS:**  Just a clarifying
14  instruction.  Melissa, you have to listen to the
15  tense.  He asked a present tense question.
16    THE WITNESS:  Okay.  Sorry.
17    **MR. MITTS:**  You gave a historical
18  answer.  He said "do, "which means now --
19    THE WITNESS:  Okay, now.
20    **MR. MITTS:**  Or have they ever.
21  BY MR. DORMONT:
22  Q.   Have you ever done any banking for your
23  father?
24  **A.   No.**

12 (Pages 42 to 45)

Appx0263

Common Pleas - Montgomery Co.            Katz v. Grasso                          Thursday
No. 2017-02140                  Videotape Deposition of Melissa Russo            June 17, 2021

Page 46

1   Q.   Have you ever allowed your father to use
2   your bank accounts?
3   A.   No.
4   Q.   You said you haven't worked in the last 13
5   years.  Is that correct?
6   A.   Correct.
7   Q.   What is the source of your personal income?
8   A.   My husband.
9   Q.   Anything else other than your husband's
10  income?
11  A.   No.
12  Q.   Now, have you ever allowed your father to
13  use your bank accounts?
14  A.   No.
15          MR. MITTS:  Objection.
16  BY MR. DORMONT:
17  Q.   Do you hold or own any property for your
18  father?
19  A.   No.
20  Q.   Now, in the last six years have you had any
21  business relationships with your father?
22          MR. MITTS:  Object to the form.  You
23  can answer.
24          THE WITNESS:  Can you be more

Page 47

1   specific, please?  I don't...
2   BY MR. DORMONT:
3   Q.   Sure.  Well, would you consider -- your
4   father works for Iron Hill -- excuse me.
5          Your father worked for Iron Hill and
6   he now works for Louderback.  Correct?
7   A.   Correct.
8   Q.   Okay.  And that's a business relationship
9   because you have an ownership interest in a company
10  that he works for.
11  A.   Correct.
12  Q.   Do you have an ownership interest in any
13  company that your father has worked for other than
14  Iron Hill or Louderback?
15  A.   I do not.
16  Q.   Has your father been involved with any
17  company that you have been involved with as well
18  other than Louderback and Iron Hill?
19          MR. MITTS:  Object to the form.  You
20  can answer.
21          THE WITNESS:  Can you be more specific
22  as in did I work in any company?  Is that what
23  you're asking?
24  BY MR. DORMONT:

Page 48

1   Q.   Did you have any interest at all, any
2   ownership interest?
3   A.   No, no.
4   Q.   Did you work in any other business that your
5   father was involved with?
6   A.   Yes.
7   Q.   What business?
8   A.   Again, Walnut Street Capital, Axis.  I guess
9   there was a time that when Saxby's was there, I
10  worked for them.
11          I had been working with my father
12  right out of college, so I had a little time at
13  most of the companies to see how they were run.
14  Q.   Other than these business dealings, have you
15  had any other business dealings with your father?
16  A.   No.
17  Q.   Now, do you run any businesses?
18  A.   No.
19  Q.   Other than Iron Hill and Louderback, do you
20  own any businesses?
21  A.   No.
22  Q.   Now, what title or position did you have at
23  Iron Hill?
24          MR. MITTS:  Object to the form.  You

Page 49

1   can answer.
2          THE WITNESS:  I am the sole
3   shareholder.
4   BY MR. DORMONT:
5   Q.   And what positions or titles do you have
6   with Louderback?
7   A.   I am a 19.5 percent owner.
8   Q.   And are you the -- are each of your other
9   brothers and sisters also 19.5 percent owners?
10  A.   Correct.
11  Q.   And who is the owner of the remainder of the
12  interest?
13  A.   Bruce Kaplan.
14  Q.   And what's Mr. Kaplan's ownership interest?
15  A.   One percent I think.
16  Q.   And is this a limited partnership?
17          MR. MITTS:  Objection.  You're asking
18  for a legal conclusion, but you can answer.
19          THE WITNESS:  I believe so.
20  BY MR. DORMONT:
21  Q.   And what's Mr. Kaplan's position?
22  A.   I'm unaware.
23  Q.   Now, is this an LLC?
24  A.   I'm unaware.

13 (Pages 46 to 49)

Common Pleas - Montgomery Co.                    Katz v. Grasso                    Thursday
No. 2017-02140                    Videotape Deposition of Melissa Russo                    June 17, 2021

Page 50

1    Q.   Is there someone who is the general partner
2    or managing member of this entity, Louderback?
3         MR. MITTS:  Object to the form.  You
4    can answer.
5         THE WITNESS:  Again, I'm unaware.
6    BY MR. DORMONT:
7    Q.   Now, when you were sole owner of Iron Hill,
8    who determined what your father got paid?
9    A.   I'm unaware.
10   Q.   Why, as the sole owner of the company, did
11   you not set your father's salary?
12        MR. MITTS:  Object to the form.  You
13   can answer.
14        THE WITNESS:  Because I was just that,
15   the owner.  I did not have anything to do with
16   daily operations.
17   BY MR. DORMONT:
18   Q.   Did you care how much money the company
19   made?
20        MR. MITTS:  Object to the form.  You
21   can answer.
22        THE WITNESS:  Yes.
23   BY MR. DORMONT:
24   Q.   And if the company made money, did you

Page 51

1    profit?
2    A.   I did not.
3    Q.   And why did you not profit if the company
4    made money?  And the company is Iron Hill.
5    A.   I want the company to grow.  So any profit
6    that was made, which I believe was only the first
7    couple years we actually had a profit, was put back
8    into the business.
9    Q.   Well, if you're concerned about the profits
10   and losses of businesses, aren't you concerned
11   about how much your father got paid?
12   A.   No.
13        MR. MITTS:  Objection to form.
14   BY MR. DORMONT:
15   Q.   Why not?
16   A.   Because I trust that the right decisions
17   were being made.
18   Q.   Did you ever review the finances for Iron
19   Hill?
20   A.   I did not.
21   Q.   Were you provided with regular information
22   on how the company was doing financially?
23   A.   No.
24   Q.   Did your father need your approval to do

Page 52

1    anything?
2    A.   He did not.
3    Q.   Now, let me ask for Iron Hill.
4         Who sets your father's salary at Iron
5    Hill?
6         MR. MITTS:  You were asking about Iron
7    Hill.  Do you mean Louderback now?
8         MR. DORMONT:  Excuse me, Louderback.
9    I apologize.  Yes.  Thank you, Maurice.
10   BY MR. DORMONT:
11   Q.   Who sets your father's salary at Louderback?
12   A.   I am not aware.
13   Q.   Is your permission or the permission of any
14   of your brothers and sisters needed for Louderback
15   to do anything?
16   A.   I am not aware.
17   Q.   Do you know who was responsible for
18   Louderback -- excuse me.  Who was responsible for
19   Iron Hill's books and records?
20   A.   Bruce Kaplan.
21   Q.   And who is responsible for Louderback's
22   books and records?
23   A.   Bruce Kaplan.
24   Q.   Is Mr. Kaplan a full-time employee of

Page 53

1    Louderback?
2    A.   Yes.
3    Q.   And was Mr. Kaplan a full-time employee of
4    Iron Hill?
5    A.   Yes.
6    Q.   Did Iron Hill have any business other than
7    construction?
8    A.   No.
9    Q.   Now, is your mother, Donna Grasso, an
10   employee of Iron Hill?
11   A.   No.
12   Q.   Is she an employee of Louderback?
13   A.   No.
14   Q.   And does your mother work?
15   A.   She does not.
16   Q.   Now, were you aware that your father filed
17   for bankruptcy in 2012?
18   A.   Yes.
19   Q.   And did you understand that he was denied a
20   discharge from bankruptcy?
21   A.   Can you repeat that?  I'm sorry.
22   Q.   Did you know that your father was denied a
23   discharge in bankruptcy?
24   A.   I wasn't aware.

14 (Pages 50 to 53)

Common Pleas - Montgomery Co.
No. 2017-02140

Katz v. Grasso
Videotape Deposition of Melissa Russo

Thursday
June 17, 2021

---

Page 74

1  **A.  I'm unaware of what's going to happen with**
2  **it.**
3  Q.   Well, who will make that decision?
4  **A.   Again, I own it.  I don't do daily**
5  **operations.  I am not at all involved in any of**
6  **that.**
7  **So I would have to go and speak to the**
8  **people who are there in daily operations to see**
9  **what is going to continue.**
10  Q.   And who would you speak to?
11  **A.   I would start off by speaking to Bruce**
12  **Kaplan.**
13  Q.   Anyone else?
14  **A.   And my father.**
15  Q.   Now, as the sole director of Iron Hill, what
16  did you understand your duties and responsibilities
17  were?
18  **A.   I did not want any duties and**
19  **responsibilities.  I just owned the company.**
20  **I wanted to have something that I**
21  **owned that eventually I would be able to contribute**
22  **myself to once I personally was in the right spot**
23  **in life.**
24  Q.   And are you at that right spot yet?

---

Page 75

1  **A.   Not yet.  I still have a 5 year-old.**
2  Q.   With a 5 year-old I can certainly understand
3  you might not be in the right spot.
4  Now, is it correct that Iron Hill
5  named your father president, treasurer and
6  secretary?
7  **A.   Correct.**
8  Q.   And did you have any conversations with your
9  father about what his duties would be as president,
10  treasurer and secretary of the company?
11  **A.   No.**
12  Q.   Did Iron Hill ever have any other officers
13  other than your father?
14  **A.   No.**
15  Q.   Did your father ever cease to be the
16  president, treasurer and secretary of Iron Hill?
17  **A.   No.**
18  Q.   Now, I think you've previously testified you
19  don't know what compensation your father has
20  received from Iron Hill.  Is that correct?
21  **A.   Correct.**
22  Q.   Does your father set his own compensation?
23  **A.   I am unaware of what happens on a daily**
24  **basis there.  I don't know.**

---

Page 76

1  Q.   I'm not asking on a daily basis.  I'm
2  talking about, you know, annual compensation.
3  **A.   I am unaware.**
4  Q.   Are there any limits on what your father can
5  and cannot pay from Iron Hill?
6  **A.   I am unaware.**
7  **MR. MITTS:**  Objection.  You can
8  answer.
9  BY MR. DORMONT:
10  Q.   Who would know?
11  **A.   Internally Bruce Kaplan.**
12  Q.   As the sole director of Iron Hill, do you
13  believe that it is appropriate to let your father
14  decide what to pay and what not to pay without any
15  input from you?
16  **MR. MITTS:**  Object to the extent to
17  which you're calling for a legal conclusion.  You
18  can answer.
19  THE WITNESS:  Yes.
20  BY MR. DORMONT:
21  Q.   Are you aware that your father uses Iron
22  Hill to pay his rent?
23  **MR. MITTS:**  Object to the form.  You
24  can answer.

---

Page 77

1  THE WITNESS:  I am unaware.  Again, I
2  don't have anything to do with the way that he gets
3  paid.
4  (Exhibit Katz 119 was marked for
5  identification.)
6  **MR. DORMONT:**  Can you put up what
7  we've marked as Exhibit Katz 119?
8  BY MR. DORMONT:
9  Q.   Do you see this Iron Hill check?  And if we
10  have to scroll down a little, you can see it has a
11  Bates number, which is Grasso 00242 on the bottom.
12  **MR. MITTS:**  Can you make that larger?
13  **MR. DORMONT:**  Sure.
14  **MR. MITTS:**  Thank you.  And then roll
15  up.
16  BY MR. DORMONT:
17  Q.   Now, do you see this is an Iron Hill check
18  dated November 7, 2019?
19  **A.   Correct.**
20  Q.   And it's for $21,000?
21  **A.   Yes.**
22  Q.   And the address there is -- I believe it's
23  373 Righters Mill.  Do you see that?
24  **A.   Correct.**

---

20 (Pages 74 to 77)

Common Pleas - Montgomery Co.        Katz v. Grasso                    Friday
No. 2017-02140              Videotape Deposition of Donna Grasso       July 30, 2021

Page 1

IN THE COURT OF COMMON PLEAS
OF MONTGOMERY COUNTY, PENNSYLVANIA


MARSHALL KATZ,

                    Plaintiff,

        vs.                        Case No. 2017-02140

JOSEPH GRASSO,

                    Defendant.


                ------------
        FRIDAY, JULY 30, 2021
                ------------


        Oral sworn videotaped deposition of
DONNA GRASSO, taken remotely via Zoom, before Nancy
L. Delaney, Certified Court Reporter, on the above
date, commencing at 9:05 a.m., there being present:


            MONTGOMERY McCRACKEN
            WALKER & RHOADS LLP
            1735 Market Street, 21st Floor
            Philadelphia, Pennsylvania 19103
            BY:  DAVID DORMONT, ESQ.
                 RACHEL L. GOODMAN, ESQ.
            Attorneys for Plaintiff

                - - - - - -


            TATE & TATE, INC.
        Certified Court Reporters
        520 Stokes Road - Suite C-1
        Medford, New Jersey 08055
        (856) 983-8484 - (800) 636-8283
            www.tate-tate.com

EXHIBIT
22

(856) 983-8484              Tate & Tate, Inc.              (800) 636-8283
                520 Stokes Road, Suite C-1 Medford, NJ 08055

Appx0267

Page 2

1   APPEARANCES CONTINUED:

2        MITTS LAW, LLC
         1822 Spruce Street
3        Philadelphia, Pennsylvania 19103
         BY:  MAURICE R. MITTS, ESQ.
4             MICHAEL J. DUFFY, ESQ.
         Attorneys for Defendant

5

6        ALSO PRESENT:  ROBERT TATE, Videographer

7
                         I N D E X
8
    WITNESS                                      PAGE
9
    DONNA GRASSO
10
         Examination by Mr. Dormont                6
11

12               ---------------

13

                   E X H I B I T S
14
    NUMBER          DESCRIPTION          MARKED FOR ID
15
    Katz-33   Assignment of partnership interest    126
16            dated January 2, 2017

17  Katz-48   Copy of check dated November 9, 2018  149

18  Katz-49   Check register for GF 2014 LP         231

19  Katz-52   Photocopies of checks                 147

20  Katz-68   First amendment to lease agreement    196
              dated October 1, 2017
21
    Katz-69   Email to Ken Rafferty from Fels       199
22            Supply dated April 5, 2021 with
              attached email string
23
    Katz-117  Residential lease dated October 8,    168
24            2019

Appx0268

Common Pleas - Montgomery Co.      Katz v. Grasso      Tuesday
No. 2017-02140      Videotape Deposition of Donna Grasso      October 12, 2021

Page 240

```
1              IN THE COURT OF COMMON PLEAS
            OF MONTGOMERY COUNTY, PENNSYLVANIA
2
   MARSHALL KATZ,
3              Plaintiff,
            vs.
4  JOSEPH GRASSO,
            Defendant.
5
                ------------
6          TUESDAY, OCTOBER 12, 2021
                ------------
7
        Videotaped sworn deposition of DONNA
8  GRASSO, Volume II, taken remotely via Zoom, before
   Carolyn J. McCalla, Certified Court Reporter, on the
9  above date, commencing at 10:00 a.m. there being
   present:
10
            MONTGOMERY, McCRACKEN,
11          WALKER & RHOADS, LLP
            1735 Market Street
12          Philadelphia, Pennsylvania 19103
            BY:  DAVID DORMONT, ESQUIRE
13               KACIE KERGIDES, ESQUIRE
            Attorneys for Plaintiff
14
15                - - - - - -

16

17

18

19          TATE & TATE

20       Certified Court Reporters

21       520 Stokes Road - Suite C-1

22       Medford, New Jersey 08055

23       (856) 983-8484 - (800) 636-8283

24          www.tate-tate.com
```

EXHIBIT
23

Appx0269

Common Pleas - Montgomery Co.        Katz v. Grasso        Tuesday
No. 2017-02140        Videotape Deposition of Donna Grasso        October 12, 2021

---

### Page 241

```
 1    APPEARANCES CONTINUED:
 2
 3      MITTS LAW, LLC
 4      1822 Spruce Street
 5      Philadelphia, Pennsylvania 19103
 6      BY: MICHAEL J. DUFFY, ESQUIRE
 7      Attorneys for Defendant
 8
 9    ALSO PRESENT:
10
11      William Chan, Videographer
12
13
14
15
16
17
18
19
20
21
22
23
24
```

---

### Page 243

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Katz-210 | Louderback account operating statements from November 10, 2020 through June 30, 2021 | 355 |
| Katz-235 | Series of Iron Hill Company operating account statements produced by Citizens Bank | 348 |
| Katz-245 | Series of deposit slips from WSFS, Bates WSFS 002384 to 2434 | 286 |
| Katz-246 | Set of deposit slips for WSFS, Bates WSFS 002488 to 2491 | 296 |
| Katz-267 | Citizens Bank account statement | 272 |
| Katz-280 | Am Ex statement | 330 |
| Katz-281 | Am Ex statement from March 19, 2019 | 334 |
| Katz-266A | Series of checks from WSFS account, WSFS Bates 000763 to 789 | 301 |

---

### Page 242

```
                I N D E X

WITNESS      EXAMINING ATTORNEY        PAGE

DONNA GRASSO

    Examination By Mr. Dormont          245

    ----------------------------
```

```
              E X H I B I T S
NUMBER      DESCRIPTION        MARKED
                               FOR ID
```

| NUMBER | DESCRIPTION | MARKED FOR ID |
|---|---|---|
| Katz-16 | July 30, 2021 deposition transcript | 247 |
| Katz-71 | Letter of intent dated December 10, 2020 | 382 |
| Katz-83 | Nationwide private client quote | 387 |
| Katz-169 | PECO account activity statement | 392 |
| Katz-198 | 2017 K-1 for Positive Dining Experience, Inc. the Palace Bowling and Entertainment | 400 |
| Katz-199 | 2019 tax return for Positive Dining Experience, Inc. | 402 |

---

### Page 244

EXHIBITS PREVIOUSLY MARKED AND REFERRED TO:    PAGE

| | |
|---|---|
| Katz-48 | 305 |
| Katz-48A | 306 |
| Katz-73 | 384 |
| Katz-74 | 386 |
| Katz-152 | 372 |
| Katz-156 | 375 |
| Katz-160 | 366 |
| Katz-180 | 396 |
| Katz-266 | 290 |
| Katz-302 | 297 |

---

2 (Pages 241 to 244)

(856) 983-8484        Tate & Tate, Inc.        (800) 636-8283
520 Stokes Road, Suite C-1, Medford, NJ 08055

Common Pleas - Montgomery Co.      Katz v. Grasso      Tuesday
No. 2017-02140      Videotape Deposition of Donna Grasso      October 12, 2021

---

Page 269

1  A.    Well, they took all the money out of my
2  account. So no, they closed the account. So I did
3  not have one.
4  Q.    So, you used your daughter Melissa's
5  account for a period of time to put your money into,
6  correct?
7  A.    What little I had.
8  Q.    In fact, you put thousands of dollars in
9  there, correct?
10  A.    I don't know how much I put in there.
11  Q.    Now, could you take money out of that
12  account?
13  A.    No. I don't think so. Take money out, no,
14  I don't think I could.
15  Q.    Why would you put, if you need -- you
16  needed money after your husband's bankruptcy,
17  correct?
18  A.    Well, yeah.
19  Q.    And the only bank account you could use was
20  your daughter Melissa's, correct?
21  A.    I don't know if that's the only one I could
22  have used, but that is the one I used.
23  Q.    Other than your daughter Melissa's
24  accounts, did you use anyone else's accounts to

---

Page 270

1  deposit money into?
2  A.    No, no.
3  Q.    So, when you put money into the account in
4  Melissa's name, were you able to take money out of
5  that account?
6  A.    What do you mean, go to the bank and take
7  money out?
8  Q.    However you did it.
9  A.    I'm sure I had -- I'm sure she gave me
10  checks.
11  Q.    What did you do with those checks?
12  A.    Probably paid my electric bill, my water
13  bill.
14  Q.    So, you took Melissa's -- I'm sorry, go
15  ahead. I didn't mean to cut you off.
16  A.    I paid my utility bills. I had to I mean
17  unless you want me to, I could be homeless.
18  Q.    But you took -- is it correct that Melissa
19  gave you checks and you wrote those checks out to
20  pay various bills?
21  A.    I'm sure that's what I did. I don't know
22  specifically.
23  Q.    Did Melissa allow your husband to do the
24  same thing?

---

Page 271

1  A.    Not that I know of.
2      (Discussion off the record due to fire
3  alarm.)
4      (The following took place off the
5  video record.)
6      THE VIDEOGRAPHER: We are going off
7  the video record. The time is 10:37 a.m.
8      MR. DORMONT: Maybe that's it,
9  stopped. That may have been just -- I apologize
10  again. So it's not continuing to sound so I think
11  we're fine. If it's a problem we will have to exit
12  the building or at least go to the staircase.
13      (The following took place on the video
14  record.)
15      THE VIDEOGRAPHER: Please stand by.
16  Back on the video record. The time is 10:37 a.m.
17  Q.    Ms. Grasso, sorry again for that
18  interruption caused by the building.
19      Who decided that checks made payable to you
20  should be deposited into Melissa's account?
21  A.    Me. I don't know. I can't remember. You
22  are talking years and years ago. I don't remember
23  who decided. I'm sure I asked her to do it.
24  Q.    Did she agree?

---

Page 272

1  A.    Obviously.
2  Q.    Now, can we agree that you allowed your
3  husband to take checks payable to him and put them
4  into your bank account?
5  A.    Yeah, yes.
6  Q.    Let me show you what I have marked as
7  Exhibit 267.
8      (Exhibit Katz-267, Citizens Bank
9  account statement, was marked for identification.)
10  Q.    Can you see Exhibit 267?
11  A.    Yes.
12  Q.    Exhibit 267 is a Citizens Bank account
13  statement for you. Do you recognize these?
14  A.    You are moving it too fast.
15  Q.    Okay, we will go slower. Go up to the top
16  a little bit.
17  A.    Okay, you are saying that's my bank
18  account?
19  Q.    Do you see how your name is right now --
20  A.    Yes.
21  Q.    Donna Grasso your checking with interest?
22  A.    Right.
23  Q.    And you had an account at Citizens Bank.
24  A.    Awhile ago.

---

9 (Pages 269 to 272)

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on January 25, 2022, I caused a true and correct copy of the foregoing *Defendant Toby Katz's Motion to Dismiss Plaintiff's Amended Complaint or, in the Alternative, for Summary Judgment* to be filed and served to all counsel of record electronically via the Court's Electronic Filing System ("ECF") and is available for viewing and downloading from the Court's ECF.

I further certify that on the same date I caused a true and correct copy of the foregoing to be served on the following counsel by email:

Jordan Rand (jrand@klehr.com)
KLEHR HARRISON HARVEY
BRANZBURG LLP
1835 Market Street, Suite 1400
Philadelphia, PA 19103
*Counsel for Plaintiff Michael Grasso, individually and t/a General Partner of GF 21014, L.P.*

By:   /s/ David Dormont
       David Dormont

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

MICHAEL GRASSO, individually and as
General Partner of GF 2014, LP,                NO. 2:21-cv-05472-CMR

               *Plaintiff*,

               vs.

TOBY KATZ,

               *Defendant*.

## <u>PROPOSED ORDER</u>

**AND NOW**, this _____ day of _____, 2022, upon consideration of the

Motion to Dismiss or, In the Alternative, For Summary Judgment filed by defendant Toby Katz,

together with the Memorandum in Opposition filed by plaintiffs Michael Grasso and Michael

Grasso t/a General Partner of GF 2014, L.P., it is hereby **ORDERED** that defendant's Motion is

**DENIED**, and all parties are to proceed with discovery.

 

 

                             **BY THE COURT**

                             _____

                             **RUFE, J.**

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| MICHAEL GRASSO, individually and as General Partner of GF 2014, LP, | NO. 2:21-cv-05472-CMR |
| *Plaintiff,* | |
| vs. | |
| TOBY KATZ, | |
| *Defendant.* | |

**DECLARATION OF JORDAN M. RAND PURSUANT TO FED. R. CIV. P. 56(d), IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO THE MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT, FILED BY DEFENDANT TOBY KATZ**

Respectfully submitted,

*/s/ Jordan M. Rand*
William A. Harvey (25344)
Jordan M. Rand (208671)
Amanda J. Dougherty (310663)
**KLEHR HARRISON HARVEY BRANZBURG LLP**
1835 Market Street, 14th Floor
Philadelphia, PA 19103
Telephone: (215) 569-2700
Fax: (215) 568-6603
jrand@klehr.com

*Attorneys for Defendants Michael Grasso and Michael Grasso t/a General Partner of GF 2014, L.P.*

Dated: February 8, 2022

9868784.v1

**Appx0275**

I, Jordan M. Rand, Esquire, being duly sworn according to law, hereby depose and say as follows:

1.       I am a partner at the law firm of Klehr Harrison Harvey Branzburg LLP and represent plaintiffs GF 2014, L.P. ("**GF 2014**"), and Michael Grasso, individually and as General Partner of GF 2014, L.P. ("**Michael**," and together with GF 2014, "**Plaintiffs**"), in the above-captioned action.

2.       I submit this Declaration pursuant to Federal Rule of Civil Procedure 56(d) and 28 USC § 1746, as counsel for Plaintiffs and in support of their opposition to the alternative request by defendant Toby Katz ("**Katz**") to convert her motion to dismiss (the "**Motion**") into a motion for summary judgment.

3.       The parties have not yet had a Rule 26(d) or Rule 16 conference, and, accordingly, discovery has not commenced in this matter.

4.       The Motion's alternative request implicates, *inter alia*, the following issues of material fact:

    (a) Whether, in issuing her subpoena to BHH Affiliates, LLC t/a Fox & Roach ("Fox & Roach") on September 28, 2021 (the "**Fox & Roach Subpoena**"), Katz intended to obtain discovery to support a federal fraudulent transfer action she filed on December 16, 2020 (Docket No. 2:20-CV-06320, the "**Katz Litigation**");

    (b) Whether Katz knew that discovery could not yet commence in the Katz Litigation and issued the Fox & Roach Subpoena outside of that litigation in an improper effort to avoid the Federal Rules of Civil Procedure and/or to avoid notifying Plaintiffs that it had been issued so as to give them an appropriate opportunity to challenge it;

    (c) Whether Katz issued the Fox & Roach Subpoena to with the intent of harming Michael and/or GF 2014 by, for example:

- Causing Fox & Roach to believe that Plaintiffs are/were engaged in fraudulent conduct, in general and specifically with respect to the property at 649 Dodds Lane, Gladwyne, PA (the "**Dodds Lane Property**");

- Delaying or preventing the sale of the Dodds Lane Property; and

- Causing Fox & Roach to cease their longstanding business relationship with Plaintiffs and thus prevent Plaintiffs' longstanding source of real estate deals and assistance in profitable real estate transactions.

(d) Whether, in issuing her subpoena to Clarke & Cohen on November 4, 2021 (the "**Clarke & Cohen Subpoena**"), Katz intended to obtain discovery to support the Katz Litigation;

(e) Whether Katz issued the Clarke & Cohen Subpoena in an improper effort to avoid application of the Federal Rules of Civil Procedure and/or to avoid notifying Plaintiffs that it had been issued so as to give them an appropriate opportunity to challenge it;

(f) Whether Katz issuance of the Clarke & Cohen Subpoena to harm Michael and/or GF 2014 by, for example:

- Causing Clarke & Cohen to believe that Plaintiffs are/were engaged in fraudulent conduct, in general and specifically with respect to the Dodds Lane Property; and

- Spreading the general belief to anyone and everyone who has or might in the future do business with Plaintiffs that they may be subjecting themselves to involvement in litigation involving accusations of fraud.

(g) To what extent Plaintiffs' business dealings have been damaged by the above-described misconduct;

(h) Whether and to what extent Michael's reputation has been harmed in the real estate community, thereby depriving him of financial opportunities in the form of real estate transactions, sales, purchases, referrals and/or other opportunities;

(i) To what extent Michael has suffered emotional distress from Katz's improper actions; and

(j) To what extent Michael's relationships with his family members have been harmed by Katz's actions.

5.    Rule 56(d) provides: "If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order."

6.    To properly investigate and develop its causes of action against Katz, Plaintiffs require, at least, the following discovery:

(a) A production of documents from Katz that includes documents establishing her motives, including whether she misused process in state court to either avoid application of the Federal Rules that would not have allowed her to commence discovery, to intentionally harm the business of Plaintiffs and/or to utilize abusive litigation tactics and publicly disseminated fraud accusations in the course of the state court litigation with the intent of causing Michael, GF 2014 and/or any of Michael's family members to pay a debt of Joseph Grasso despite having no obligation to do so;

(b) A deposition of Katz to determine her motives, including whether she misused process in state court to either avoid application of the Federal Rules that would not have allowed her to commence discovery, to intentionally harm the business of Plaintiffs and/or to utilize abusive litigation tactics and publicly disseminated fraud accusations in the course of the state court litigation with the intent of causing Michael, GF 2014 and/or any of Michael's family members to pay a debt of Joseph Grasso despite having no obligation to do so;

(c) Document discovery of Fox & Roach, Clarke & Cohen and other persons having knowledge regarding the extent to which Katz's actions have affected the sale of the Dodds Lane Property, Plaintiffs' deal flow from buyers, sellers and referral sources in the real estate community and Plaintiffs' general business reputations; and

(d) Depositions of the two realtors at Fox & Roach with whom Michael has had longstanding business relationships to determine the extent those relationships have been damaged and whether Katz's actions have caused either of them to decide not to refer future business opportunities to Plaintiffs.

7.     Determination of a motion for summary judgment typically contemplates that there has been adequate time for discovery. *See* Fed. R. Civ. P. 56(c)(1)(A) (noting that the moving party must cite to discovery materials of record such as depositions, documents, interrogatory answers, etc., to support a motion for summary judgment).  Moreover, the "motive or absence of motive of a party to engage in conduct alleged by another party is relevant to determining whether a genuine issue of fact exists." *Farkas v. Rich Coast Corp.*, No. 1:14-CV-272, 2017 WL 10299186, at *5 (M.D. Pa. May 19, 2017), *report and recommendation adopted*, No. 1:14-CV-272, 2017 WL 10311284 (M.D. Pa. Aug. 21, 2017).

8.     Plaintiffs respectfully submit that the material facts at issue in this case, i.e., Katz's intent and the extent of resulting damages to Plaintiffs, and Plaintiffs' proposed discovery to

explore those and other material facts, establish good cause to conclude that Plaintiffs should not at this time be required to respond to a motion for summary judgment and should instead be permitted to develop a record through adequate discovery.

9.      The information contained in this Declaration is true and correct to the best of my knowledge, information, and belief.  I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: February 8, 2022                               KLEHR HARRISON HARVEY
                                                      BRANZBURG LLP


                                        By:    /s/ Jordan M. Rand
                                               Jordan M. Rand, Esquire

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

MICHAEL GRASSO, individually and as
General Partner of GF 2014, LP,

      *Plaintiff*,

      vs.

TOBY KATZ,

      *Defendant*.

NO. 2:21-cv-05472-CMR

## CERTIFICATE OF SERVICE

Undersigned counsel hereby certifies that on February 8, 2022, a true and correct copy of the foregoing Plaintiffs' Memorandum in Opposition to the Motion to Dismiss, or, In the Alternative, Motion for Summary Judgment Filed By Defendant Toby Katz was served on all counsel of record via this Court's ECF service and electronic mail.

Respectfully submitted,

/s/ Jordan M. Rand
William A. Harvey (25344)
Jordan M. Rand (208671)
**KLEHR HARRISON HARVEY**
**BRANZBURG LLP**
1835 Market Street, 14th Floor
Philadelphia, PA 19103
Telephone: (215) 569-2700
Fax: (215) 568-6603
jrand@klehr.com

*Attorneys for Defendants Michael*
*Grasso and Michael Grasso t/a*
*General Partner of GF 2014, L.P.*

Dated: February 8, 2021

9868985.v1

**Appx0280**

Page 1

1              IN THE COURT OF COMMON PLEAS
         OF MONTGOMERY COUNTY, PENNSYLVANIA
2

3   MARSHALL KATZ,

4
                    Plaintiff,
5
         vs.                         Case No. 2017-02140
6

7   JOSEPH GRASSO,

8
                    Defendant.
9

10
                   ------------
11          FRIDAY, JANUARY 28, 2022
                   ------------
12

13              Oral sworn videotaped deposition of
    JOSEPH GRASSO, taken remotely via Zoom, before Nancy
14  L. Delaney, Certified Court Reporter, on the above
    date, commencing at 9:58 a.m., there being present:
15

16              MONTGOMERY McCRACKEN
                ALKER & RHOADS LLP
                1735 Market Street, 21st Floor
17              Philadelphia, Pennsylvania 19103
                Y:  DAVID DORMONT, ES .
18                  RACHEL L. GOODMAN, ES .
                    KACIE KERGIDES, ES .
19              Attorneys for plaintiff

20              - - - - - -

21
                TATE & TATE, INC.
22          Certified Court Reporters
            520 Stokes Road - Suite C-1
23          Medford, New Jersey 08055
            (856) 983-8484 - (800) 636-8283
24              www.tate-tate.com

**EXHIBIT 24**

Common Pleas - Montgomery Co.     Katz v. Grasso     Friday
No. 2017-02140     Videotape Deposition of Joseph Grasso     January 28, 2022

## Page 2

APPEARANCES CONTINUED:
MITTS LAW, LLC
1822 Spruce Street
Philadelphia, Pennsylvania 19103
BY: MAURICE R. MITTS, ESQ.
MICHAEL J. DUFFY, ESQ.
Attorneys for Defendant

ALSO PRESENT: NEAL WEBB, Videographer

I N D E X

WITNESS     PAGE

JOSEPH GRASSO

Examination by Mr. Dormont    6

-------------

E X H I B I T S
NUMBER    DESCRIPTION    MARKED FOR ID
Katz-8  Answers to interrogatories dated   203
   March 18, 2021

Katz-8A  Amended answers to interrogatories   208
   dated April 23, 2021
Katz-28  W-2s from USRA for Joseph Grasso   281
   dated 2015 through 2017

Katz-67  Lease agreement dated October 23,   180
   2013 (MG250-272)
Katz-120  Copies of check numbers 127, 128 and   95
   129

Katz-201  Louderback Group trademark   123
   registration dated August 13, 2020

## Page 3

E X H I B I T S (Continued)
NUMBER    DESCRIPTION    MARKED FOR ID
Katz-202  Operating agreement of the Louderback   160
   Group, LLC dated November 10, 2020
   (RUSSO000105-119)
Katz-204  Information from Louderback website   277
Katz-205  Copy of check to Mitts Law dated   37
   November 17, 2020 with attached
   documents (GRASSO00390, 381 and 382)
Katz-207  Copy of photograph   130
Katz-210  Citizens Banks statements dated   78
   November 2020 through June 2021
   (CB00014-101.11)
Katz-230  Copies of checks   155
Katz-234  Iron Hill Company operating account   171
   statements dated January through
   December 2020 (CB00254-265.11)
Katz-235  Bank statements from Iron Hill   64
   operating account dated January to
   June 2021 (CB00035-40.08)
Katz-255  Copies of checks (WSFS 00021)   100
Katz-301  Transcript of testimony of Mr. Grasso   12
   dated October 31, 2016

Katz-319  Group of checks and deposit slips   188
   regarding Global Blends, LLC
   (Attached)
(Previously marked)
Katz-68  First amendment to lease agreement   177
   dated October 1, 2017

Katz-68A  First amendment to lease agreement   177
   dated October 1, 2017 (MG000504-507)

## Page 4

E X H I B I T S (Continued)
NUMBER    DESCRIPTION    MARKED FOR ID
(Previously marked)
Katz-69  Email to Ken Rafferty from Fels   195
   Supply dated April 5, 2021 with
   attached email string
Katz-70  Email to Ken Rafferty from   198
   sales@felssupply.com dated April 4,
   2021 with attached email string and
   attached letter

Katz-119  Copy of check dated November 7, 2019   93

Katz-191  Email to Rob Greenberg from Bruce   332
   Kaplan dated May 11, 2020
   (GRASSO001937)

Katz-203  Louderback meet the team information   164

Katz-215  Iron Hill Company, Inc. A/P payment   144
   register cash disbursement journal
   2020 (GRASSO005310-5423)

Katz-220  Iron Hill Company, Inc. G/L history   152
   detail report dated 01/01/2020 to
   12/31/2020 (GRASSO004922-5220)

Katz-245  Deposits made to account of Melissa   231
   Russo (WSFS 002384-2434)
Katz-265  Copies of documents regarding   310
   Beneficial/WSFS account

Katz-266  Beneficial Bank statement dated   259
   October 12, 2017
Katz-289  U.S. individual income tax return   245
   for Joseph and Donna Grasso dated
   2020 (GRASSO005567-5647)
Katz-293  Schedule B personal property   298
   schedules for Joseph Grasso

## Page 5

E X H I B I T S (Continued)
NUMBER    DESCRIPTION    MARKED FOR ID
(Previously marked)
Katz-297  Complaint dated February 5, 2014 for   26
   Case No. 14-00057

Katz-299  Settlement agreement and release   28
   dated July 12, 2017
Katz-304  Vanguard statement for Joseph Grasso   307
   dated March 31, 2018

Katz-318  Checks made payable to Joseph Grasso   237
   and deposited to account of Iron
   Hill (WSFS 000858 and WSFS 000869)

I N D E X (Continued)

REQUEST TO PRODUCE:
   No requests

REFUSAL TO ANSWER QUESTION:

PAGE   LINE   PAGE   LINE   PAGE   LINE

11   10   23   20   23   23

49   4   52   4   52   21

108   23   110   8   217   8

218   22   300   3   300   7

2 (Pages 2 to 5)

Common Pleas - Montgomery Co.    Katz v. Grasso    Friday
No. 2017-02140    Videotape Deposition of Joseph Grasso    January 28, 2022

Page 6

1        THE VIDEOGRAPHER:  We're here
2    today, January 28, 2022 for the video
3    recorded deposition of Joseph Grasso taken
4    by the plaintiff in the matter of Katz v.
5    Grasso filed in the Court of Common Pleas
6    for Montgomery County, docket number
7    2017-02140.  I am Neal Webb, the
8    videographer.  The court reporter is Nancy
9    Delaney and represent Tate & Tate Certified
10   Court Reporters.
11        Counsel will be noted on the
12   stenographic record and time is now
13   9:58 a.m. and will the court reporter
14   please swear in the witness.
15
16        JOSEPH GRASSO, having been first duly
17   sworn, was examined and testified as follows:
18   EXAMINATION BY MR. DORMONT:
19   Q.   Good morning, Mr. Grasso.  Could you
20   please state your full name?
21   **A.   Joseph Grasso, G-r-a-s-s-o.**
22   Q.   And where do you currently live?
23   **A.   421 North Rose Lane in Haverford.**
24   Q.   And how long have you lived there?

Page 7

1   **A.   Three months, approximately.**
2   Q.   You moved in in October?
3   **A.   October or November, sometime in that time**
4   **frame.**
5   Q.   And was this house on North Rose Lane
6   purchased in September of 2021?
7   **A.   Somewhere around there.  I'm not sure of**
8   **the exact date.**
9   Q.   And can we agree that this house cost more
10  than $2 million?
11  **A.   Yes.**
12  Q.   And do you own the home?
13  **A.   No.**
14  Q.   Who owns the home?
15  **A.   GF 214 owns the home.**
16  Q.   Do you pay any rent for the house?
17  **A.   Nope.**
18  Q.   Do you pay the taxes for the house?
19  **A.   Yep.**
20  Q.   How do you pay the taxes for the house?
21  **A.   Not in two months, I haven't.**
22  Q.   Do you pay for any expenses for the house?
23  **A.   All the operating expenses, electric and**
24  **gas.**

Page 8

1   Q.   Whose name is the electric is in?
2   **A.   I'm not sure.**
3   Q.   Whose name is the gas in?
4   **A.   I don't know.  I'm not sure.  It could be**
5   **me or my wife.  I'm not sure.**
6   Q.   How do you pay the electric bill?
7   **A.   My wife pays it.**
8   Q.   And how do you pay the gas bill?
9   **A.   My wife pays it.**
10  Q.   Does she pay it by check?
11  **A.   Courier pigeon.**
12  Q.   Mr. Grasso --
13  **A.   Seriously, how do I pay -- how do you pay**
14  **a bill?  I don't know.  My wife pays it.  Do you**
15  **want me to answer for my wife?**
16        MR. MITTS:  No, he just want to
17   know if you know.
18  **A.   I don't know.**
19        MR. MITTS:  That's the answer
20   then, you don't know.  That's all.
21  Q.   Have you made any repairs or improvements
22  to the house?
23  **A.   No.**
24  Q.   Do you have an email address?

Page 9

1   **A.   Yes.**
2   Q.   What is your email address?
3   **A.   Jgrasso   ironhillcompany.com.**
4   Q.   Do you have any other email addresses?
5   **A.   Yes, jgrasso   walnutstreetcapital.com.**
6   Q.   Any others?
7   **A.   I think all the other ones are closed.  I**
8   **don't believe -- I don't use anything else.**
9   Q.   Do you have a Louderback email address?
10  **A.   If I do, I haven't used it, so possibly I**
11  **could have it, yeah.**
12  Q.   Who would know whether you have a
13  Louderback email address?
14  **A.   My IT guy or my son or my -- Bruce might**
15  **know.**
16  Q.   And by Bruce, you mean Bruce Kaplan?
17  **A.   Yes.**
18  Q.   Are you currently employed?
19  **A.   Yes.**
20  Q.   By whom are you employed?
21  **A.   The Louderback Group.**
22  Q.   And what is your position with the
23  Louderback Group?
24  **A.   I am senior advisor and construction**

3 (Pages 6 to 9)

Common Pleas - Montgomery Co.          Katz v. Grasso                    Friday
No. 2017-02140              Videotape Deposition of Joseph Grasso        January 28, 2022

---

Page 266

1    Stairworks, Inc.  Correct?
2    A.    Correct.
3    Q.    That was for the house on Dodds Lane?
4    A.    I believe so.
5    Q.    And if we go down, there's another check
6    to J Fab Design for $6000, also for the house?
7    A.    That was for some wiring, prewiring in the
8    house.  Yes.
9    Q.    And Distinctive Elements, $4000.  Correct?
10   A.    I don't know what that's for.
11   Q.    That would be for Dodds Lane, though.
12   Right?
13   A.    No.  She did work for other jobs for us as
14   well.
15   Q.    So was your wife paying for jobs done by
16   Iron Hill at that point?
17   A.    It's not -- it was not under Iron Hill.
18   There was stuff that she did for me and my wife.
19   Q.    What did she work on?
20   A.    On other properties we looked to get
21   involved in.  She did some preliminary work for
22   us in them.  It never panned out.
23   Q.    So what was it that you and your wife were
24   looking to do?

---

Page 267

1    A.    Develop a property.
2    Q.    And how were you guys going to develop a
3    property?
4    A.    What does that mean?
5    Q.    Well, you said you were looking to develop
6    a property.  How were you in your financial
7    condition going to be able to buy a house?
8    A.    I'm a pretty creative guy.
9    Q.    How would you be able to finance something
10   like that?
11   A.    I'm a pretty creative guy.
12   Q.    You said someone $4000 for services in
13   connection with a property, what property?
14   A.    I'm not saying that's definitely -- I
15   didn't tell you that I knew exactly what it was
16   for.  It's 2018, for God's sake.  I don't know.
17   Q.    Would it be for Dodds Lane?
18   A.    It's Dodds, D-o-d-d-s, Dodds Lane.
19   Q.    Is that a yes?
20   A.    I don't know the question.
21   Q.    Could this have been a payment for Dodds
22   Lane?
23   A.    It could have been for Santa Clause, too.
24   I don't know.

---

Page 268

1    Q.    Now, if we go six pages ahead to 1030,
2    there's another payment to Greg Radon?
3    A.    Mm-hm.
4    Q.    Also for Dodds Lane?
5    A.    Those checks from my wife had to be for
6    Dodds Lane, yeah.
7    Q.    To save some time, are all the checks to
8    Greg Radon for Dodds Lane?
9    A.    I would -- I don't want to speculate, but
10   it makes sense.
11   Q.    Sir, as a result of the explosion at the
12   house, did you put together a list of all the
13   improvements that you made?
14   A.    I didn't do it.
15   Q.    Who did it?
16   A.    A public adjustor did it.
17   Q.    Would that be Clark and Company?
18   A.    Yes.
19   Q.    And --
20   A.    I know that they discussed with me what
21   was the improvements over the years, but that's
22   how it was done, I'm pretty sure.
23   Q.    And did you give them paperwork to support
24   those improvements?

---

Page 269

1    A.    Not much.  I didn't have much paperwork.
2    Q.    Did Iron Hill pay for some of those
3    improvements?
4    A.    If Iron Hill paid for it, I believe that
5    they got paid back by GF 214.  I don't think that
6    Iron Hill ever laid out money and didn't get it
7    back.
8    Q.    Now, question -- I'm going back to Exhibit
9    8A and page 18, question 30.  This asks whether
10   you are an officer, manager or employee of any
11   entity.  And then if yes, please identify it, and
12   the only entity you identified was Iron Hill
13   Company.  Correct?
14   A.    Let me read this.
15         (Witness examines document.)
16   A.    So far everything that's said there is
17   completely true.
18   Q.    Then the question is -- 31, have you
19   worked in the past six years regardless of
20   whether they paid you any compensation -- excuse
21   me.  Each person you've worked for in the past
22   six years regardless of whether they paid you
23   compensation and the only thing you identified
24   was Iron Hill.  Correct?

---

Page 286

1  without asking your father?
2  **A.    Yeah, yeah.**
3  Q.    Can you make a decision for $100,000
4  without asking your father?
5  **A.    No, no, no.**
6  Q.    So the number is somewhere between $10,000
7  and $100,000?
8              MR. MITTS:  Objection.  That was
9      not his testimony.
10              MR. DORMONT:  I'm trying to find
11      out where the number is.
12  **A.    There's no -- I'm not going to give you a**
13  **specific number, because I don't know a specific**
14  **number.  If you're trying to get that out of me,**
15  **I don't know it or I would have to speculate.**
16  Q.    I want to do based upon your experience.
17  You've made numerous --
18  **A.    That means you want me to speculate,**
19  **because based upon my experience, I'm going to**
20  **tell you what I think could happen or do you want**
21  **to know what can happen?  I don't know exactly.**
22  Q.    I want to know what decisions in the past
23  as far as a dollar number have you then gone to
24  your father for.

Page 287

1  **A.    I don't remember.**
2  Q.    But you say you made construction
3  decisions for your father?
4  **A.    Yeah, yes.**
5  Q.    What is a construction decision?
6  **A.    After he took over, took over the**
7  **property, we decided during the -- during the**
8  **reconstruction, before the explosion, from the**
9  **insurance proceeds, he wanted to know where the**
10 **money was going.**
11 Q.    So after the explosion, he wanted to know
12 what was going to be done with the construction
13 proceeds; is that correct?
14 **A.    Yes.**
15 Q.    Before the explosion, was he involved in
16 decisions relating to Dodds Lane and the
17 construction?
18 **A.    The only time is when he was the owner, he**
19 **was in control.  When he wasn't the owner in**
20 **control, I didn't have to tell him anything.**
21 Q.    When did he become the owner and in
22 control?
23 **A.    I don't know the exact date.**
24 Q.    How did he become the owner and in

Page 288

1  control?
2  **A.    He bought the note from the bankruptcy**
3  **court through the bank, bought the bank and**
4  **foreclosed on it somehow.  I wasn't involved.**
5  Q.    After he bought the note, did you make
6  decisions on, for example, what windows to buy?
7  **A.    I don't remember.  I don't remember the**
8  **timing on that.  I don't remember.**
9  Q.    Who made the decisions on what windows to
10 buy?
11 **A.    Who made the decision on who -- I was the**
12 **one that picked the windows out, so yeah, it was**
13 **me.**
14 Q.    And you paid for the windows.  Correct?
15 **A.    In what time period was that?**
16 Q.    Prior to the explosion.
17 **A.    Was it prior to my father owning the**
18 **property?  Because I -- I only put the money**
19 **in -- when he owned the property, I don't think I**
20 **put a dime into the property out of my own money.**
21 **It was an asset of the court before that until**
22 **they abandoned it or sold it off.**
23 Q.    Sir, we saw a whole bunch of checks to
24 Greg Radon and his construction company.

Page 289

1  Correct?
2  **A.    Yes, yes.**
3  Q.    Those weren't checks from your father?
4  **A.    No.**
5  Q.    Correct?
6  **A.    No.**
7  Q.    They were checks that your wife wrote --
8  or excuse me, those were checks that were written
9  out of your wife's account.  Correct?
10 **A.    Yes, but what time period was that?**
11 Q.    That was 2017 and 2018.
12 **A.    And when was the foreclosure?  When did he**
13 **own the property at that point?**
14 Q.    Sir, I believe the foreclosure took place
15 sometime in -- actually, I don't --
16 **A.    I think it was after that.**
17 Q.    It was 2016, I believe.
18 **A.    Was it 2016?**
19 Q.    So the checks we saw were after the
20 alleged foreclosure, but before the explosion.
21 **A.    And it might have been that I was putting**
22 **money out and waiting to get reimbursed, could**
23 **have been.**
24 Q.    And after the explosion occurred, did you

73 (Pages 286 to 289)

Common Pleas - Montgomery Co.      Katz v. Grasso      Friday
No. 2017-02140      Videotape Deposition of Joseph Grasso      January 28, 2022

---

Page 290

1  get reimbursed?
2  A.   I'm not sure.
3  Q.   Well, it would have been to the tune of
4  somewhere at least in six figures?
5  A.   Yeah, it would have been.
6  Q.   You don't know whether you got reimbursed?
7  A.   I don't know how I -- I don't know.
8  Q.   But do you think you were owed the money?
9  A.   I don't know.
10  Q.   Well, you said you thought -- you were
11  waiting for reimbursement.  Correct?
12       MR. MITTS:  Objection.  I think
13       you're asking for a lot of speculation,
14       but . . .
15  Q.   Sir, you said you put out money and you
16  expected to get reimbursed by GF 2014 because --
17  A.   I don't know exactly.  I said I don't know
18  where the money came from.  I haven't got that
19  much information.  I don't even know where the
20  money came from.  He might have gave me the
21  money.  I don't know.
22  Q.   Sir, you don't know where the money in
23  your wife's account came from?
24  A.   No, I don't.  If you have a check or some

---

Page 291

1  way to refresh my memory, I'll be happy to look
2  at that, but I don't remember how the hell I got
3  that money.  It was insignificant in my whole
4  problem of my -- that was going on in my life.
5  Q.   Well, tens of thousands of dollars was
6  insignificant to you?
7  A.   Tens of thousands of dollars?  What are
8  you talking about, tens of thousands of dollars?
9  You can't even buy a car for $10,000 these days.
10  What are you talking about, so?
11  Q.   I was talking tens, multiples of $10,000?
12  A.   I work in the construction industry.  Tens
13  and 20s and 50s are common, because things cost a
14  lot of money, so I don't know.
15  Q.   But your wife didn't have an income.
16  Correct?
17  A.   I'm not suggesting it ever came from
18  something that she made, okay?  That's fact,
19  unless somebody left her money.
20  Q.   Did someone leave your wife money?
21  A.   No.
22  Q.   The money came from you.  Correct?
23       MR. MITTS:  Objection, that's not
24       his testimony.

---

Page 292

1  A.   That's none of -- that's just plain --
2  correct, no, it's not correct.  I don't know
3  where the money from.  It could have been a joint
4  asset.
5  Q.   What was the joint asset?
6  A.   I said it could have been.
7  Q.   I understand that.
8  A.   I don't know.  Unless you have something
9  to refresh my memory, I don't know.  It could
10  have been a joint asset.
11       MR. MITTS:  Well, the difficulty
12       is if you don't speculate, then you don't
13       have this chasing tails.  So if you say
14       what you know, that's helpful.  When you
15       speculate, then we get on this side show.
16  A.   I have to shut up.  I'm sorry.
17       MR. MITTS:  Just answer the
18       questions he asks you.
19  A.   I got you.  I'm sorry.
20  Q.   Sir, did you and your wife have some type
21  of joint asset that you both owned in 2016, 2017
22  or 2018?
23  A.   I don't recall.
24  Q.   Do you have any joint assets now?

---

Page 293

1       MR. MITTS:  Objection to the
2       extent to which you're calling for a legal
3       conclusion.  You mean other than what he's
4       testified to already?
5       MR. DORMONT:  I want to know what
6       joint assets he thinks he has currently.
7  A.   We don't have any assets except our
8  clothing on our backs.  We don't have any assets.
9  I don't own my car.  She doesn't own her car.  We
10  don't have any assets.
11  Q.   Who owns the furniture in your house?
12  A.   It's shit.  It's all just garbage.  You
13  can have it if you want.  It's junk.  It's all
14  from -- we moved the furniture that was in the
15  townhouse.  Before that, it was in the little
16  house.  We haven't bought a bit of furniture and
17  that would be joint, you're right.  That would be
18  joint assets.  I'm not proud of these joint
19  assets, but that's part of the joint assets.
20  Q.   Sir, question 34 on Exhibit 8A, question
21  34, the bottom of page 19, asked you to identify
22  any other sources of income within the past six
23  years, including the amount of income received,
24  when you received the income and the basis for

---

74 (Pages 290 to 293)